IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ECB USA, INC., et al., )
)
Plaintiffs, ) C.A. No. 19-731-RGA-CJB
)
v. )
)
SAVENCIA, S.A., et al.,)
)
Defendants. )

Wednesday, March 3, 2021
11:14 a.m.

844 King Street
Wilmington, Delaware

BEFORE: THE HONORABLE CHRISTOPHER J. BURKE
United States District Court Judge

APPEARANCES:

MACAULEY, LLC
BY: THOMAS MACAULEY, ESQ.

-and-

MARKO & MAGOLNICK, P.A.
BY: JOHN KIRKPATRICK, ESQ.
BY: DAVID MARKO, ESQ.
BY: DAVIDE PROIETTI, ESQ.

Counsel for the Plaintiff

APPEARANCES CONTINUED:

MORGAN, LEWIS & BOCKIUS, LLP
BY: DAVID MARSTON, ESQ.
BY: TROY BROWN, ESQ.
BY: MARGOT BLOOM, ESQ.
BY: SU JIN KIM, ESQ.

Counsel for the Defendant

THE COURT: Let's go on the record and as we do, I'll just say for the record that we're here today in the matter of ECB USA, Inc., vs. Savencia SA in civil action number identify themselves for the record. We'll start first with counsel for plaintiffs and we'll begin there with Delaware counsel.

MR. MACAUELY: Thomas Macauley on behalf of the plaintiffs. And I'm here with my co-counsel in Florida, John Kirkpatrick is on the video, as well as David Marko, I believe is here. And John, I'm not sure if anyone --

MR. KIRKPATRICK: Also with me listening in today are Davide Proietti and Lethia Munyow.

THE COURT: All right. Thank you. And we'll do the same for counsel on defendants side and again we'll begin with Delaware counsel.

MR. MARSTON: Good morning, Your Honor. It's David Marston for the defendants. With me is Troy Brown on video and also on audio only is Margot Bloom and Su Jin Kim.

THE COURT: All right, counsel.

Thank you. I allocated 30 minutes per side for argument, which obviously is meant to be spent focused, can't touch on everything, but focused on the portions of the briefs that the parties felt that they needed to give further clarity to the Court on or make a clarifying argument.

So I'll turn first to the movant's side, that's defendants side and I'll let each side know when they have five minutes left unless they ask me otherwise and let's turn first to defendant's side. Who is going to speak on behalf of defendants?

MR. BROWN: I'll speak on behalf of defendants. Troy Brown, Your Honor. Good morning. It's nice to see you and present to you again. One quick logistical question. We had inquired whether the slides we had submitted to guide our argument would be able to be published. It might be easier, though, I can do it from hard copy in front of me as well to make sure we're efficient.

THE COURT: I'm not sure how you publish them on teams, but you certainly can do that. If you know how to do it, I don't know if

there's anything we need to do to allow you to do it. If there is, I'm not sure. I do have your slides, so I can just follow along with them too.

MR. BROWN: Okay. I concede, I don't think either Mr. Marston or I know how to do that on Teams, so we'll just go with the hard copies. I know everyone has them, including the Court and we'll follow them along so that we can be efficient to Your Honor's time scale.

Your Honor is very familiar with this case, obviously. We spent a good deal of time arguing a motion to dismiss on the first amended complaint. And now we're here on the second amended complaint and the parties have extensively briefed the matter. The briefing has been closed for three months. And starting on slide 2, which is the opening slide, as Your Honor knows, this is now the fourth iteration, really the third substantive iteration of this complaint along with the corrected amended complaint that corrected some issues between the first and second. And we believe Your Honor has very comprehensively addressed, in his report

and recommendation on the motions to dismiss the first amended complaint, some of the real challenges, in particular the Rule 8 and Rule 9(B) challenges to the pleading for claims. We appreciate and understand the basis for the Court's dismissal of eight of the nine non-contract claims in the first amended complaint as well as portions of the contract claim, which I'll call the 9th claim, even though it's the first one pleaded. The Court was very clear in its report and recommendation, Your Honor, that this was the last chance to amend and Your Honor made commentary in the report and recommendation that is was certainly possible that plaintiffs could plead and overcome some of the deficiencies and I think that's the word that Your Honor used. We believe, as we've set forth comprehensively under the briefing, that the claims still fail under Rule 8, Rule 9(B) and Rule 12(b)(6) and that this complaint should now be dismissed in its entirety with prejudice two and a half years after the initial case was filed in the state court in Florida.

On the breach of contract claim, Your Honor, Your Honor focused in his report and recommendation on the failure to plead the how and nothing has changed in our view, as we've laid forth in comprehensive detail in our briefing, mostly on pages 5 through 12 of our opening briefing as well as the reply brief.

The reps and warranties that are alleged to be breached by Zausner, the signing party to this agreement, still do not set forth anything in our view about the how. They are the replication of what is written in the SPA followed by allegations that Zausner, either independently or working in collaboration, breached the language set forth in the reps and warranties. And we'll go through some specifics. And the deficiencies applied to the entire claim, not just -- not just particular rep and warranties asserted.

On slide 3, Your Honor, we'll talk about briefly the fraud based claims. Your Honor was also very clear and focused less on some of the legal substantive issues, but more in his report and recommendation on Rule 9(B)

and the failure to plead the who, what, where and when of the alleged fraud. Some of that was independent and some of that was complicated by a rampant repleading that we pointed out to the Court in the first amended complaint and that we think remains as we have briefed and as we'll talk about briefly in the second amended complaint.

And finally, these fraud claims still suffer from the same two legal infirmities in addition to the pleading infirmities it suffered from in the first amended claimant. The independent tort doctrine bars and the merger and non-reliance provisions are as well, if the Court even ever needed to get there after dealing with the 9(B) issues.

Finally we'll address the carryover tort claims, the aiding and abetting breach of fiduciary duty claims, conspiracy claims. We've laid out in the briefing and we'll talk about today the fact that there are no pre closing fiduciary duties owed to plaintiffs by these two defendants since they were counter parties in an arm's length

transaction. And the same 9(B) infirmities apply to the pleading for the post closing allegations of anything that would satisfy pleading burdens on fiduciary duty and defending civil conspiracy.

Finally, Your Honor, slide 4, we will spend very brief time on the statute of limitations time bar issues. We are sensitive and respectful of and understand the Court's analysis in the opening report and recommendation with respect to statute of limitations and time bar. We'll go over a few points and urge this court on a new fresh reading of a now comprehensively repleaded second amended complaint to, if it believes it needs to or is appropriate to, revisit the statute of limitations issues at that point.

So I'll turn to the breach of contract claim, Your Honor, slide 6. The Court, in its order of dismissal, said very clearly that plaintiffs did not really explain how the first amended complaint does plausibly suggest that they have been breached. And nothing has changed, Your Honor. The same rationale that

has been briefed in detail applies to the breach of contract claim in the second amended complaint. What the second amended complaint does with respect to particularized alleged breaches, what was breached, what reps and warranties or what covenants were breached. The essence and pure pleading in the second amended complaint says here's a rep and warranty, here's what it says and we claim that Zausner breached it by doing the inverse. And it does that serially and we'll take a few examples that we've addressed each of them in the briefing that's before Your Honor at pages 5 through 12 of the briefing.

The example, Your Honor, that I'd like to focus on is on page 7 of the slides. It's the lead allegation in the second amended complaint. It's the first rep and warranty focused on and it's article 3.7, which is the fairly standard in stock purchase and asset agreement financial statements rep and warranty. And it reps -- Zausner reps to the plaintiff that the financial statement represents or prepared in accordance with cap, fairly present

the financial condition of the company and were maintained accurately. And what plaintiffs claim and what plaintiffs plead in their second amended complaint, which is what they did in their first amended complaint, is the inverse. They say it provides that they were prepared in accordance with gap and plaintiffs claim they were not prepared in accordance with gap. They don't say how, they plead that they were. Inconsistent with what Your Honor suggested in his report and recommendation about the how. And it goes on. It barely presents the financial condition of Strata, but not how. Replete with errors, omissions and intentional misstatements, but not how. Were not maintained accurately, but not how. Were not properly recorded, but not how. And then the transitional final point, which is, quote, designed to conseal the frauds being perpetrated by the group-pleaded Savencia conspiracy, but again, not how.

And an aside, as we briefed to Your Honor in the briefing before you, one of the key aspects of the financial statement

allegations for breach of contract and how they sync up with the fraud allegations, which we'll talk about in the fraud slide -- and this is attached to the second amended complaint as exhibit C, plaintiffs attached the guarantee agreement at exhibit C, which is a January 5th, 2015 agreement between them and Alain Voss. Not Zausner. Not Savencia. And in that exhibit, what Mr. Voss does, independent of Zausner, the party in the contract claim here, is he makes certain representations and warranties to plaintiffs that plaintiffs were unable to secure at arm's length in the stock purchase agreement from Zausner. And that includes representations and warranties with respect to the accuracy of the 2014 audited financial statements. Something that they were -- they, the plaintiffs, were unable to extract at the bargaining table from Zausner.

So we continue, Your Honor, as we turn to slide 8, to find the second amended complaint the rest of the how. And when we look at other deficiencies, as we've briefed comprehensively, even with respect to the

specific language in the stock purchase agreement attached to the second amended complaint before the Court for consideration, plaintiff inaccurately paraphrased certain of the contractual representations even without providing the how in an effort to try to cobble together some sort of a claim that can survive rule 8 and rule 12(b)(6) on the contract. For example, as Your Honor has seen both in the theme, the introduction, the background and then both the contract and the non-contract claims, the real crux of plaintiff's allegations in this case, irrespective of the claim asserted, is that somehow prior to closing, Zausner and/or Savencia, though the how of Savencia is really lacking, as we'll discuss briefly, the crux is that Alain Voss's title and job responsibilities were somehow different than or misrepresented to plaintiffs in connection with what they relied on in connection with entering into this agreement.

Now, as we know from the briefing and from the SPA itself, there is a no reliance, there is an entire agreement provision, there is

language that says you can't rely on extra-contractual representations or otherwise, you must rely on the reps and warranties that you extracted at the table. And what's important, Your Honor, as we briefed both on the first amended complaint motions and on the second amended complaint motions, is that there is no representation or warranty in the entirety of the stock purchase agreement that speaks to Mr. Voss's job title and responsibility.

Now, empirically, Your Honor has seen the documents both attached to, submitted by plaintiff and integral to the complaint, that clearly identify that Mr. Voss was the president and CEO of the company and that clearly identify that Mr. Wild, for a time period until the end of 2014, was also being appointed as the executive vice president with interim CEO duties. And Your Honor has seen, as we'll show in the slide, that that was clearly delineated and pointed out to plaintiff. And, in fact, plaintiffs made commentary, including in their guarantee agreement attached as exhibit C, that they recognized that Mr. Voss was running this

business as the president and CEO for, I believe the language they use in the guarantee agreement, to which they're not a party, 20 years. So you have paraphrasing about what the reps and warranty said, but you have no rep and warranty about Mr. Voss's title or otherwise in the stock purchase agreement itself.

THE COURT: Mr. Brown, real quick there. In terms of what's alleged in count 1, is there an alleged breach that you think in essence suggests that there was a rep and warranty about Voss's title and job responsibility in and of itself?

MR. BROWN: We don't believe that there is, Your Honor. And we briefed that pretty comprehensively. What I think plaintiff is trying to argue to you in their opposition briefing and what I assume from both the four slides that were submitted yesterday and from Mr. Kirkpatrick's prior argument on the first amended complaint, I believe they will try to argue in some way that while it's not specifically repped and warrantied, that somehow if there was a corporate governance shift, which

we would argue there's not, and anything was disclosed, but if there was some sort of a corporate governance shift where Mr. Voss went from president and CEO to president and CEO along with another executive vice president and interim CEO, that somehow that fits into either the ordinary course representation, which they tried to brief. Interestingly, Your Honor, and as we briefed to you in our opening and our reply brief, that doesn't carry the day, because the ordinary course reps and other reps related to July 1st and following, they're time specific. And even on plaintiff's own pleading and plaintiff's own arguments, the alleged duping, the alleged challenged changeover in Voss's real or perceived duties and responsibilities happened on June 30th, 2014, or earlier. So even when they try to shoehorn a rep and warranty breach from the Voss change for something that does exist in the stock purchase agreement, they lose because of the time scale that they negotiated in connection with when that rep triggers and when that rep ends at closing. So Mr. Kirkpatrick --

THE COURT: Mr. Brown, I'm sorry to interrupt, but my question there is, if it could be inferred or fairly understood from the allegations that Mr. Voss's responsibilities changed beginning before the key date but then continued in that changed way after the key date up through the end of the year, couldn't it be asserted that that conduct, that continuing change amounts to a change from the ordinary course of business that existed before the key date?

MR. BROWN: We don't believe so, Your Honor. We don't think that's what the reps and warranties permit. The reps and warranties are specifically negotiated and there's specific language that applies by two sophisticated entities with sophisticated counsel. For example, in article 3.9, which is the absence of changes rep and warranty, it's the same issue. It only applies to events after 7-1-14. If the alleged change, again, the plaintiffs knew about it, the alleged change occurred before July 1st, 2014. It's not a change post July 1st, 2014, it's a condition that existed as of the date

before the rep and warranty triggers. To find that a non change could be a change post the trigger date, whether it's for section 3.9, the absence of change, or section 6.1 for interim operations or otherwise, you would have to read out of the agreement the triggering date, because the ordinary course of reps that buyers get in stock purchase agreements all the time are designed to insulate from my ability for rep and warranty breaches, activities that occurred before the date. The parties are free to negotiate whatever date they choose or they're free to negotiate an uninterrupted ordinary course change, interim change language. These parties negotiated July 1st, 2014 as the trigger dates. The Voss employment letters are specifically referenced in the SPA, as Your Honor has seen, expressly at at section 6.17 and section 13.1, so plaintiffs know about the letters of employment. They know about the changes to the structure from the consent documents that Mr. Kirkpatrick submitted as the first of his four slides yesterday and that we have been arguing both since the first amended

complaint motion and now this motion, bely the allegations. I hope that addresses Your Honor's question.

THE COURT: Sure. Let me let you continue.

MR. BROWN: Okay. Thank you, Your Honor. I think we can then turn to slide 9. Very briefly on slide 9, Your Honor, since the start of this case, defendants have been seeking a dismissal of the contract claim full stop, all of the contract claims. The reps and warrant advertise, period. In response to the dismissal of what I'll call 8.2 of the nine claims asserted in the first amended complaint, plaintiffs contend that they've now added certain breach of contract claims to prior breach of contract claims and on top of that they have added what they represent to be 117 new allegations in connection with their pleading, both for their tort claims, their story telling and their contract claims. Setting aside even the fact that rule 12(g)(2) makes clear that when a plaintiff's amended complaint contains new factual averments, it

doesn't apply to restrict defendants in any way from challenging with another 12(b)(6) motion. This motion on this second amended complaint with 117 new allegations, allegedly, and two new sub claims within the contract, provides defendants with a full opportunity to challenge the entirety, not just by illustration, but by serial addressment. We did that in pages 5 and 12 of the opening belief. We attached it again to our reply brief. These matters have been fully briefed for three months. And in fact, your Honor, as we look back at Your Honor's report and recommendation, one of the comments Your Honor made therein with respect to the contract claim was because the Court decided to deny the motion to dismiss as it related to the heavily briefed statute of limitations issues, it was only looking at the two rep and warranties addressed by illustration in the first amended complaint.

We think we've addressed the waiver issue fairly comprehensively in the briefing, to the extent Your Honor has any other questions.

We identified why the Freed case and the Lease case, that plaintiffs cite in their two waiver cases, clearly don't apply here. In particularly, the Lease case had a collateral estoppel argument in the first motion to dismiss, abandoned that and raised the statutory standing claim on a second motion to dismiss that it never even previewed in any record. And the Freed case was a single new count with not a single new factual allegation as opposed to the 117 that are alleged to have occurred here.

I'll move on now, Your Honor, to fraud claims. If Your Honor wants to move to slide 11 after the heading. We reminded the Court and we obviously remind the Court respectfully, because the Court understands and knows what its report and recommendation was, but the Court was fairly particular and specific with the issues that it found, the lack of the who, what, when, where of the alleged fraud and other tort claims, and it advised the plaintiffs what the Court felt were the infirmities. And if you turn to slide 12, the same deficiencies

continue to plague the second amended complaint, Your Honor, as we briefed comprehensively.

The plaintiffs still do not identify the speaker of the alleged fraudulent misrepresentations in almost all respects. And Mr. Kirkpatrick, in his opposition and I'm sure in his argument, will identify early storytelling statements where he says no, look we said Mr. X was generally speaking this in connection with pre SPA discussions. Setting aside the entire agreement and merger clause, what the real crux of the fraud claim is, and it's on a group pleading that I'll address in a moment and a who issue. This complaint, now the fourth iteration, does not serialize which representative agents of Zausner and certainly not of the non-signatory bar and parent Savencia made specific representations, oral, written or otherwise, about specific factual issues that are the predicates of fraud claims that as the Southern District of Florida observed in transferring to this court, each of which is the obverse of a written representation and warranty in the stock purchase agreement. That was the

case of the claim in Florida. That was the case on the first amended complaint and that remains the case in the second amended complaint for the very detailed reasons that we briefed in our briefing to the court.

And as I mentioned, Your Honor, the nature of the balance for the parent company, Savencia, as the non party, are even more egregious in this second amended complaint than as to Zausner where they are clearly deficient. They're doubly deficient and I recognize that's not a legal standard, but a semantic point.

The allegations, even such as you can try to parse them through for when individuals are alleged to have taken some sort of allegedly actionable conduct, are just called agents of Savencia. And as the complaint reveals clearly and as our briefing points out very cogently, I believe, nobody was acting on behalf of the foreign parent Savencia. Nobody is alleged to even have been an officer/director acting on behalf of Savencia in connection with this transaction. They entered into this

document, this stock purchase agreement, they had negotiations that are now fully integrated and an entire agreement provision on behalf of Zausner and on behalf of SSI, the sold business. In fact, the only reference to somebody associated with Savencia, the parent company, is to Mr. Baumgrand. And when Mr. Baumgrand is referenced, he's referenced as signing documents. And how is it revealed that he signed the documents? He signed them on behalf of Schratter, Essify or Korman, not on behalf of Savencia. So the untethering, not only of the who, what and where, but of the connectivity between alleged defrauders acting somehow to find the French foreign parent Savencia non party is even more deficient than the already deficient lack of pleading particularity under 9(B) for the Zausner entities.

THE COURT: Mr. Brown, real quick. Is it clear enough to you on the law that if a person that has a title at Savencia or Zausner signs a document on, you know, facially on behalf of another related company, that the act still can't be attributed additionally to the

Savencias of the world or the Zausners of the world? Is that clear enough in the law?

MR. BROWN: We believe, as we briefed, Your Honor, that it's not only clear, but where you have a non party to a fully integrated, sophisticated corporate document like the stock purchase agreement and you have contract claims and fraud claims predicated on the obverse of the reps and warranties in that corporate document, to allege that an actor who has a position at the sold company or the seller to have been acting clearly on behalf of those entities, but also has a role at any other company, including a parent company, 17 other affiliates or some unaffiliated entity, the notion that that individual could somehow vicariously bind the non signatory parent company on whose behalf he didn't sign simply because he holds title or relationship to other parties not a party to the SPA, we have not seen any case law suggesting that that could be the case in the third circuit or under Florida law depending on who is trying to find this particular issue at the time.

THE COURT: Let me let you continue. You've got about five minutes. I can probably go up until 12:30, so I can give you a little extra time. So why don't you make a few additional arguments on the remaining claims and I'll try to give each side a few additional minutes beyond the 30, but please continue.

MR. BROWN: Thank you, Your Honor. Quickly on page 13, Your Honor found group pleading to be a real significant deficiency and wrote a lot about it in the report and recommendation. Nothing has changed. In fact, what I would suggest happened is, on the examples and there are many examples, when Your Honor found group pleading as to the Savencia defendants, what plaintiffs did was take that reference and expand it and just simply write Savencia, Zausner and five individuals along with other non party members of the conspiracy. So rather than plead what did Mr. Voss specifically do, what did Mr. Gitlin specifically do and Mr. Raglan specifically do, they simply took Your Honor's suggestions about group pleading and appear to have copy and

pasted to correct Zausner defendants to just individual names. That's not substance, that's just simply semantics.

The where on slide 14, Your Honor, still remains deficient. Your Honor identified that they did not sufficiently identify the where and when things were pre closing, whether they are oral, whether they were written, presumably so Your Honor could then parse through, since you dismissed mostly based on 9(B) and if you have to confront the independent tort doctrine after 9(B), we need to understand are they alleging pre closing oral representations by particular actors acting on behalf of Zausner for Savencia that are different to or the same as the written representations and warranties. Without that Your Honor couldn't even do an independent tort doctrine assessment. You didn't reach that issue because you dismissed on 9(B) and that has not been corrected in the second amended complaint. The where, including oral, written, who and when prior to closing, remains wildly deficient.

Slide 15 and 16, Your Honor, are just highlights again of the documents that have been incorporated into the complaint, integral to the complaint or are important to plaintiff's effort to overcome their deficiencies in the motion to dismiss. So at least with respect to the special action by the board in slide 16, Mr. Kirkpatrick submitted it as his first slide in connection with his argument today as well as what is on slide 15, the breakdown of the directors and officers of the business and the express representation to the buyer prior to closing that Mr. Voss was the president and CEO and Mr. Wild was the executive vice president of the company for an interim period as well as on 16, the special action and delineated the exact responsibilities between the two. You can't conceal something that you provide to the other side that the other side knows and hears and understands and uses in connection with its opposition to the motion to dismiss.

THE COURT: Mr. Brown, real quick on that. Is it clear enough on the record that the special action was in the data room?

MR. BROWN: Yes. Your Honor, it was produced back to us by plaintiff in discovery and we addressed that in the first amended complaint briefing and we've addressed it again in the briefing on the second amended complaint. The only question that there has been about documents that were or weren't provided or were or weren't available has seemed to be the Voss employment letter and the Korman employment letter, which are expressly referenced in the stock purchase agreement and it has been unclear -- so it's actually disclosed in the definition and in a rep and warranty section. The only question that I had understood plaintiffs to raise in that regard previously was whether or not they actually went and looked at what was in the data room or not. Because as Your Honor has seen in their opposition briefing both in response to the first amended complaint and now, part of their argument has been well, maybe we didn't look much at the due diligence data room because we were reliant on Mr. Voss and Mr. Voss was supposed to be making certain representations

about what's in there and we didn't know that our clients are foreign actors, so maybe we didn't see it. That's basically the gist of the argument in both opposition papers.

THE COURT: All right. Mr. Brown, we're right at about 30 minutes. Let me stop you there. I know you have the remaining claims, the aiding and abetting and conspiracy, you may want to say a few things about it. I'll certainly give you a few minutes on rebuttal, if you want to address those there or if you want to address things that Mr. Kirkpatrick said. But let me turn to him and make sure plaintiffs get their time and then I'll come back to you, Okay.

MR. BROWN: Thank you, your honor.

MR. KIRKPATRICK: Your Honor, may I take a two-minute break for the facilities?

THE COURT: Okay. Sure, Mr. Kirkpatrick. We'll come back in two minutes.

MR. KIRKPATRICK: Thank you.

(Short recess.)

THE COURT: All right. Looks like Mr. Kirkpatrick is back and we'll go back on the

record and Mr. Kirkpatrick, I'll turn it to you.

MR. KIRKPATRICK: Thank you, Your Honor. I'd like to start by addressing a couple of the global issues raised by Mr. Brown. First, the pleading. As the third circuit has stated, the pleading requirement is who is being sued for what relief and on what theory with enough detail to guide discovery. And I would direct this Court to Baker v. Assad 785 Fed Ap 904. In making their arguments, Zausner asserts that this complaint is somehow, quote, mere copy paste of the same conclusory non-specific allegations against both defendants. That statement sounds good, but the trouble is, it simply isn't true. This complaint contains 169 allegations, factual allegations, 117 of which are new and were not in the first amended complaint. So when the Court is taking a look at this issue, it needs to be looking at the factual allegations in the second complaint. Defendants also like to keep quoting Judge McGarrell from the southern district regarding the first complaint filed in state court. That complaint is entirely different than what is

before this court. And she wasn't talking about whether there was a fraud claim, she was talking about transfer to Delaware, the only subject before her.

Defendants both argue group pleading and this Court in its R&R, in three different places, addressed group pleading, page 42, 44 and 45. But primarily what the Court indicated is, quote, they never indicate what either of the two defendants are said to have done individually, nor do they make reference to any person employed by or who was an agent of each of those defendants and who is said to have aided and abetted. And the Court suggested providing that information. So what did we do? We provided it. The complaint identifies six individual actors, by name and by position. Four of those actors are, Mr. Brown said, we don't say that there's officers and directors of Savencia. Four of the actors are alleged to be officers and directors of Savencia, namely, Alex Baumgrand, chairman, Wild, Ronye, who is general secretary of Savencia and Thomas Forteil who sits on Savencia's board. One of the actors,

Mr. Goodwin, was Z&HC Zausner's general counsel and was activity involved on behalf of Z&HH and Zausner in this and it was stated that he was acting on behalf of Z&HC and Zausner. And two of the actors, Mr. Voss and Mr. Preust, were acting on behalf of both of them.

So in the complaint on group pleadings, one of the arguments made by Savencia is that we only make two allegations regarding Mr. Baumgrand, that he signed employment letters and that he stated that Mr. Voss was trustworthy. This is simply untrue. There are 70 specific allegations as to Mr. Baumgrand ranging from he directed the acts of the others, that each of them reported to him with regard to these acts. Some of this is set forth in the documentation that is before the Court. Mr. Ronye, Mr. Baumgrand were and Mr. Voss were reporting directly to Mr. Baumgrand under those, quote unquote, employment agreements. The allegations also include an allegation that Mr. Baumgrand misrepresented that Alain Voss was the extant president, chief executive officer and managed the day to day affairs of Schratter,

that he was a trusted, knowledgeable and effective chief, that he was indispensable to the operation of Schratter. As to each of those individuals who participate on behalf of one or the other of the defendants, it is stated who they were representing and what they did.

So in this regard, I want to look at 9(B) for a second. I want to move to the fraud claim and look at rule 9(B). This issue is not developed in the initial briefs. And I would refer this Court to local rule 7.1.3(c)(2) on reply briefs. The party filing an opening brief shall not reserve materials for the reply brief which should have been included in the full and fair opening brief. In the District of Delaware and in the third circuit, when something is not included in an initial brief, it's waived. I would just demonstrate how it was waived here. At page 12 of its brief, Zausner says, we're going to join in Savencia's motion to dismiss on these issues. At page 5 of Savencia's brief, the only mention of specificity is citing a case about the requirement of specificity with no developed

argument whatsoever. In sum, the argument was waived. But even --

THE COURT: Mr. Kirkpatrick, just to jump in on that issue. In your opening briefs the other side clearly did address the group pleading issue suggesting in essence that for a lot of the key allegations both with regard to breach of contract, but also fraud, that, you know, you kind of like looked, admittedly put the names of the people that you were talking about who might work for one company or the other or whether agent, but kind of lumped them all together, in essence, that you kind of changed things, Savencia and Zausner, to fill in the blank of five people. I think what they were kind of suggesting is you know, when it comes to the fraud side of things, if you can't tell like which or who of those five people did X and when was that supposed to have happened, that that would be relevant to a 9(B) argument. Isn't that an argument that was preserved, at least?

MR. KIRKPATRICK: Well, to the extent they preserved it, it's based on

misrepresentation. And I want the Court to take a look at what the complaint actually does, okay. Paragraphs 71, 90, 91, 92 refer the Court to the letter of intent which was written and signed by Mr. Gitlin on behalf of Zausner and sent to Freeman on behalf of the plaintiffs. It contains many of these misrepresentations, including the misrepresentation that Voss was the actual acting CEO president and he managed the day to day affairs of Schratter. That's an example of a specific allegation by a specific person made to a specific person. Similarly, drafts of the stock purchase agreement, which contain many reps and warranties prior to the execution of the stock purchase agreement, were sent by Mr. Gitlin, Mr. Ronye and Mr. Voss to the plaintiffs on November 7, 10, 25, 26 and 27 and December 4 and 5 of 2014. That's in paragraph 112. The 2014 financial statement, which is part of the fraud that continues until the execution of the first amendment, okay, was sent by Gitlin to Freeman on February 23rd, 2015. Likewise, and this is very important to the way one has to look at this case, the data

room. Documents being put into the data room under the supervision and control of Zausner contained documents with many of these misrepresentations. They've been identified. Now, we don't know what day they were put into the data room, but that is something done by Zausner specifically, given to the plaintiffs and defined in time.

The Court said in the R&R that it needed to know what representations were made before or after the SPA was signed. So what did we do? We went through and provided a timeline and we set forth exactly when, sometimes it's a window. There are a lot of like with regard to the data room, the financial statements in the data room. We don't know the day, but it's a window, sometime in late October, through sometime at closing, those documents were put in, reviewed and relied on by our clients. So there is particularity in here. It's a myth, two myths, one is that we don't state that there were officers and employees of Savencia acting in this fraud. They denied it. Well, that's a factual issue inappropriate for a motion to

dismiss. They've cited no authority to support their position, so it's also inappropriate at this juncture and we certainly allege who is doing what on behalf of whom.

Now, leaving particularity aside, because they don't argue the particularity in their briefs, okay, they do argue something else. They argue or attempt to argue -- so negative factual inferences from documents that are extrinsic. Okay. First, they talk about the corporate resolution, okay? And in their initial brief they cite a piece of a corporate resolution that says that Mr. Wild is going to be interim executive -- the interim vice president with some of the authority of the CEO. But we sent to the Court three slides or four slides because we wanted to be clear as to what's going on here and what this -- what the resolution is about and what the argument is about. The bylaws. This is a Delaware corporation governed by Delaware law. The bylaws are the constitution of the organization and the bylaws set forth what you're allowed to do and not allowed to do. So what does the

bylaw say about Executive vice president? So I'd like the Court to turn to, I believe it's slide 3, there's executive vice president, president on the slides. Look for the executive vice president one. It defines that in the absence of the president, the executive vice president assumes the duties. Well, what do we know here? That resolution is dated June 27th. On June 30th, Mr. Voss signed his contracts. There is a gap. He was the interim executive vice president pursuant to the bylaws because there was no president. Likewise, the Voss resolution, which was not mentioned by the defendants in their brief, says we're going to offer Mr. Voss the job of president and CEO. So what do they do? They offer him the job, they tell us he accepts the job. They tell us that he's the president and CEO, but in that resolution it says until, at the discretion of Mr. Baumgrand, he's moved to Korman. Never happened. Mr. Voss was the president by label, the CEO by label, but what they did was in violation of the bylaw defining president, they stripped him of his duties. They moved him,

okay, from a fully vested president to a president that had no authority whatsoever. So for example, in attachment 1 to this employment letter, they're talking about duties. And this is the operative language stripping Mr. Voss of his duties. All other aspects of the operation of SFI shall be the responsibility of J Wild, who, although carrying the title of executive vice president, will be the de facto position of chief executive officer with responsibilities shall include, but not be limited to, finance, human resources, quality, information, systems, all other corporate functions. Mr. Voss was put out as bait, as bait to our clients. They represented to our clients that he was the extant president and CEO and in violation of their own bylaws they stripped him of those positions.

THE COURT: Mr. Kirkpatrick, just two questions about this kind of Voss being put out as the CEO, but Wild really having the de facto duties. If I'm right, I think this is what is alleged to have occurred. But in the later half of 2014, my understanding is post

closing when plaintiffs became in control of Essify, they installed Voss as president, but the other side, a few times, kind of says some version of look, we don't understand how it's alleged how even if we did misrepresent or, you know, lead the plaintiffs to believe that Voss was the president during this last half of 2014, and in fact, it was really Wild who had all the duties, like how is that alleged to have caused damage or harm. Is there anything you want to say about that?

MR. KIRKPATRICK: Absolutely straightforward, Your Honor. Our clients, as set forth in the complaint, are foreign nationals who do not have work visas in the United States. They are foreign nationals who do not have any experience in the cheese business. They were being sold a business that purported to have extant management in place and they bought a business with management in place. Okay. They would not have bought this business, they would not have paid one red cent for this business if it didn't have management in place because they did not have the capacity to do so.

It is absolutely material and its central to the damages that they suffered.

THE COURT: And the other question was at least in one instance I can think of the other side is suggesting that prior to closing there was at least one document in the data room that did, in fact, make clear that Mr. Wild was, you know, the de facto CEO and so I think also there's some suggestion that it's the existence of such documents was referenced in the SPA. Is there anything you want to say about the defendant's position on those issues?

MR. KIRKPATRICK: Leaving aside the fact that such documents are entirely extrinsic to the complaint, okay, that's what I just addressed, which is that resolution. It says Mr. Voss, we're going to invite him to be the president and CEPO. Okay? In the interim, Mr. Wild will be the interim vice president and assume those duties of the CEO. Okay. There's no contradiction there whatsoever, no notice. That is simply following the bylaws and the definition of the executive vice president. Nothing in that document or that resolution says

we have stripped Mr. Voss of his duties as president. Nothing in that resolution says we stripped him of his day to day managerial control over the company. What that document says is that per the bylaws, definition of executive vice president, which I referred to you a moment ago, Mr. Wild, in the absence of the president, will be the interim vice president. We know there was at least an absence between the 27th and the 30th when Mr. Voss accepted the position as president and CEO. And we know they contemplated an absence based upon the Voss resolution which says he might be moved over to Korman shipping supplies. So yes, but there is nothing -- that has nothing to do with the misrepresentation. What they misrepresented is that Voss was the president, that Voss was running the company, that Voss had day to day managerial control. They've made those misrepresentations both orally and in writing. In fact, the two charts which are attached to Mr. Brown's program, one of them says Voss is the chairman and the president. The other one says Voss is the chairman and the

president and Mr. Wild is the EVP, executive vice president. None of them indicate in any way that Mr. Voss is a fake president.

Now, the Court should also note, the misrepresentations of this go so far as to article 6.26 of the SPA, which says that Voss, and I'll quote it to the Court, 6.26 in the SPA states Alain Voss shall operate the business of the company. Okay. There's no question about what they are putting out to these plaintiffs. They were putting out a business with management in place and our clients did that hook and hired their representative, who was a turncoat, who shielded, you know, who worked on the due diligence, guided us so we would not find out these frauds, would not find out that even his status as president and CEO was a fraud until five years later in 2019.

I do want to make some comments about breach of contract, okay? A breach of contract, the complaint is straightforward and the law of this circuit is straightforward. As Judge Andrews has said, you're not required to put your whole case when you allege a breach of

contract. That's what Zausner is asking for. Zausner contends that we don't say how. Well, we say how very, very clearly. Zausner cites three cases. Each of those cases involves a situation where the Court said this claim is incomprehensible, there's no contract, there's no allegation of a contract. In one of them there were three different contracts and they never identified which contract was breached or which provision of which contract was breached. Judge Andrews said, a detailed factual allegation concerning the extent and effect of the breach is not required by the plausibility standard for a motion to dismiss analysis.

So what do we do here? We allege the contract. There's no dispute about that. The contract is the SPA in the first amendment. We allege the specific provisions that were breached, okay? And then we allege how they were breached. The defendants are asking for is not how, they're asking us to put forth our case in the complaint on this. We meet the plausibility requirement and, you know, they argue, for example, you asked a question about

it, the ordinary course and Voss's status, as president and CEO.

I want to refer the Court to the SPA on this issue. Under ordinary course there's a definition in the SPA and it's in our brief, but it's at the end of the definitional section. I'm going to read it to the Court. Ordinary course of business means an action by a person will be deemed to have been taken in the ordinary course of business only if that action, A, is consistent in nature and amount with the past practices of such person and is taken in the ordinary course of normal day to day operations of such person; and B, does not require authorization of the board of directors of such person and does not require any other separate or special authorization of any nature. Well, they want to make the assertion that their fraud is ordinary course. We would love to see them argue that to a jury. But it's clear under ordinary course that this contrived, illegal corporate governance scheme is anything but ordinary course. Likewise, they make these assertions in their brief, we don't state how

they were violating the law. Well, we alleged in paragraph 172 that they were violating the immigration laws at their warehouses in California through their employment practices. We stated that they were violating corporate governance laws of Delaware and we state, because it's a very, very broad provision, it says any federal, state or common law that their frauds violate federal, state and common laws. So we do not understand how they are attempting to apply specificity standards that would even go beyond rule 9 standards to a basic contract claim.

I'd like to end with one comment, which is that this Court admonished us not to attack the other side. And in their brief we're attacked and I have to respond to it, okay? Indeed this entire issue is troubling from the perspective of candor to the Court, they write at pages 8 and 9 of the Savencia brief. And they proceed to say, defendants urge the Court to review document number which clearly disclosed Mr. Wild as the de facto CEO and then measure it against plaintiff's allegation that

this document made no mention of the fact that Wild was de factor chief executive officer. And they cite to paragraph 88. They, in that sentence say that this document, ECB SA is what we're referring to in paragraph 88. What paragraph 88 says, the second document was a management chart that identified Voss as the president and chief executive officer and Wild as the executive vice president, making no mention of the fact that Wild was de factor chief executive officer. So what they've done, using an ellipses, is they've made a misrepresentation to the Court trying to impune our candor.

Unless the Court has any other questions, I think I'm complete. I mean, on the other issues we rely on our briefing and on the various rulings that the Court made in the R&R.

THE COURT: Okay. And obviously for both parties, there are many, many sub issues here. The briefing is larger than normal. The Court is going to very carefully go through each of the sections of the brief whether or not we retouched on them at argument

today as I said up front, you know, the argument today really meant to touch on key points that the sides wanted to emphasize from their comprehensive briefing and is a case, as Mr. Brown noted, I have quite a lot of familiarity from the first R&R.

Mr. Brown, let me give you a few minutes to respond before we adjourn today.

MR. BROWN: Thank you, Your Honor. I'll be brief. Mr. Kirkpatrick referenced the letter of intent in one of his arguments. Whether or not that was briefed by them, I'm not sure. As Your Honor has seen, we're not big on making waiver arguments. We're usually opposing waiver argument, but the letter was superceded by the signing of the SPA, so it's not relevant.

With respect to the data room that they focused on extensively, Your Honor, data room requirements are article 6.2 and what is article 6.2 titled? Access to information. And what does it mandate? It mandates reasonable access to the data room. Makes no other representation and warranty. It's a lengthy provision and the Court can read it and it's in

the briefing, but it does not obligate particular things in or not in the data room. I didn't exactly follow Mr. Kirkpatrick's argument with respect to that, but article 6.2 is a reasonable access to information on request rep and warranty. It doesn't rep and warranty specifics about a data room and that is pretty consistent with, I would suggest, most, if not all of the stock purchase agreements this Court considers in these type of disputes.

With respect to the special action by written consent on June 27th, I would really just urge the Court, again, to look at exactly what it says, because I think what it exactly says, what plaintiffs have now conceded they had before they signed, this stock purchase agreement, is different than what they are trying to plead in this case. It says expressly, expressly that Mr. Voss is the president and CEO and it says expressly that Mr. Wild will be the, quote, de facto chief executive officer while maintaining the title of executive vice president. There's never been a misrepresentation with respect to that. This

was disclosed. Plaintiffs concede that they have it. They embrace it, but it says what it says.

And to Your Honor's question about damages and impact, once again, as Your Honor is previewing, as soon as this -- as soon as this stock purchase agreement closed, the buyers installed Mr. Voss as the president and CEO, which is what he had served as for 20 years, according to them in the guarantee agreement and they put their faith in him to run the business freestanding for two years until they fired him in 2017. No misrepresentations of something that was clearly disclosed and the plaintiffs now concede they had access to.

Your Honor, unless Your Honor has questions, I will just say very briefly on the aiding and abetting claims, that for post closing, post closing aiding and abetting of a fiduciary duty, the complaint is bereft of the 9(B) who, what, when, where of specific acts. I say it in slide 19. There's no specificity about affirmative acts by either defendant. There's no specificity of their knowledge of

alleged breaches of fiduciary duties by Voss or Praust or anyone deployed by the buyer. No specificity of the existence of encouragement. No access alleged by the defendants to the post closing books and records and financial condition of a company and certainly no allegations at all of any actual communications that would feed either the conspiracy claim or the aiding and abetting of fiduciary duty claim between post closing any particular defendant, any particular agent of a defendant and either Voss, Praust or otherwise. The complaint is empty and it's two and a half years since it was first filed.

I won't comment further on Mr. Kirkpatrick's final point unless the Court has questions. I think the parties have been doing their utter best, both before and after Your Honor's argument to try to be as professional and civil to one another. As Your Honor knows, there is a civil reco action that was then abandoned and now sued on fraud and all sorts of tort claims en carta against these five individuals as well as affiliated Savencia

Cheese entity on the same core facts, the same core allegations alleging individuals have been defrauders, have acted as a criminal enterprise before that claim was abandoned. There have been seven or eight total complaints in two different jurisdictions under the same core facts. So if briefing at time gets heated, it's for good reason, I believe, and I think both sides have, Mr. Kirkpatrick and myself and our respective teams have done everything we can to try to zealously advocate this case, but without taking ad homonym attacks of individuals on the other side. That plan's to continue. I plan to continue it and otherwise I won't comment on his final statements.

THE COURT: Thank you, Mr. Brown. Thank you, counsel. We're going to take it under advisement and we'll be working on it. It's going to take some time to complete the report and recommendation, because there are, as we said, a lot of issues and the Court will have to carefully go through all of them. But my hope is that relatively soon we'll have an R&R to issue so the parties will at least have an

answer from me and being move forward. All right, with that said, I appreciate the arguments again today. I wish everybody health and safety going forward and unless there's anything else, we'll end our video conference today and go off the record. Thanks, everyone.

(End at 12:21 p.m.)

State of Delaware )
)
New Castle County )

CERTIFICATE OF REPORTER

I, Stacy M. Ingram, Certified Court Reporter and Notary Public, do hereby certify that the foregoing record, Pages 1 to 55 inclusive, is a true and accurate transcript of my stenographic notes taken on March 3, 2021, in the above-captioned matter.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 3rd day of March 2021, at Wilmington.

*/s/ Stacy M. Ingram*

Stacy M. Ingram, CCR