**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ECB USA, INC. and ATLANTIC VENTURES CORP., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-731-RGA-CJB |
| | ) | |
| SAVENCIA, S.A. and ZAUSNER FOODS CORP., on behalf of itself and as successor in interest to ZNHC, INC., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

In this case, Plaintiffs ECB USA, Inc. ("ECB") and Atlantic Ventures Corp. ("Atlantic Ventures" and collectively with ECB, "Plaintiffs") bring breach of contract and various state law tort claims against Savencia, S.A. ("Savencia") and Zausner Foods Corp. ("Zausner") (collectively, "Defendants"). Pending before the Court are: (1) Zausner's motion to dismiss ("Zausner's Motion"), in which Zausner seeks to dismiss all counts of the operative Second Amended Complaint ("SAC") against it, for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), (D.I. 155); and (2) Savencia's motion to dismiss ("Savencia's Motion," and collectively with Zausner's Motion, "the Motions"), in which Savencia also seeks to dismiss all counts of the SAC against it for failure to state a claim pursuant to Rule 12(b)(6), (D.I. 157). For the reasons set forth below, the Court recommends that both Motions be GRANTED-IN-PART and DENIED-IN-PART.

## I.     BACKGROUND

### A.      Factual Background

On July 10, 2020, the Court issued a lengthy Report and Recommendation ("July 10, 2020 R&R"), in which it addressed Savencia's and Zausner's motions seeking dismissal of the then-operative First Amended Complaint ("FAC").  (*See* D.I. 135)  The Court assumes familiarity with the July 10, 2020 R&R here, but below it will also summarize the relevant factual allegations in the SAC.[1]

### 1.      The Parties and Related Entities

Plaintiffs ECB and Atlantic Ventures are Florida corporations with their principal places of business located in that state.  (D.I. 147 at ¶¶ 3-4)

Defendants are all in the business of food, and in particular, cheeses.  (*Id.* at ¶¶ 13, 16-19)  Defendant Savencia is a French company with its principal place of business located in France.  (*Id.* at ¶ 5)  It is a "multinational conglomerate" which is alleged to be "the second largest producer of cheese in France" and to "sell[] cheese and other dairy products in over 120 countries."  (*Id.* at ¶¶ 5, 16)  Over 20 years ago, Savencia (then known as "Bongrain, S.A."), acquired non-party Schratter Foods, Inc. ("Schratter") to develop Schratter as Savencia's distribution arm in the United States.  (*Id.* at ¶ 18)  Over time, Schratter became a market leader in the United States for the distribution of specialty cheeses and other dairy products; Schratter grossed over $200 million in 2012, much of that from the distribution of Savencia's products.  (*Id.* at ¶ 19)  The other Defendant, Zausner, is a Delaware corporation that "do[es] business throughout the United States."  (*Id.* at ¶ 6)  Zausner is an affiliate of Savencia.  (*Id.* at ¶ 13)  The

---

[1]      The SAC is very lengthy (it spans 66 pages) and the way it is written makes it sometimes difficult to follow.  In this Section, the Court will not attempt to include every fact from the SAC that might possibly be relevant to all aspects of the Motions.  Instead, it will simply try to include enough of what is pleaded so as to help the reader understand the basic narrative behind what Plaintiffs are alleging.

SAC states that Zausner is the successor in interest to ZNHC, Inc. ("ZNHC"), and that any reference to Zausner includes ZNHC.  (*Id*. at ¶ 7)

### 2.      Relevant Non-Parties

The SAC refers to three people who are described throughout as "ECB Representatives[,]," meaning that they were representatives of Plaintiffs in the relevant time frame.  (*See, e.g.*, *id.* at 1-2)  They are Arno Leoni, Bruno Blandin and Claude Blandin ("C. Blandin").  (*Id.*)

Several of Defendants' directors or representatives are also named throughout the SAC as being integral players with regard to the SAC's allegations.  Alex Bongrain ("Bongrain") was the "chairman of Savencia" and acted "on behalf of Savencia."  (*Id.* at ¶ 8)  Pierre Ragnet ("Ragnet") was previously Zausner's President and "at all relevant times, [was] secretary general of Savencia" who acted "on behalf of Savencia[.]"  (*Id.* at ¶ 9)  J.M. Wild ("Wild") was the Chief Financial Officer ("CFO") for Savencia's North American affiliates.  (*Id.* at ¶ 10)  Wild is also alleged to have been the "*de facto* [CEO] of Schratter from June 30, 2014[] until December 31, 2014."  (*Id.*)  Thomas Swartele ("Swartele") was a director of Savencia who acted "on behalf of Savencia[.]"  (*Id.* at ¶ 11)  Lewis Gitlin ("Gitlin") was Zausner's chief legal officer and acted "on behalf of Zausner[.]"  (*Id.* at ¶ 12)  Alain Voss ("Voss") was Schratter's President and Chief Executive Officer ("CEO"), and also eventually became a director of Atlantic Ventures.  (*Id.* at 2; *id.* at ¶¶ 14, 20)  Bertrand Proust ("Proust") was Schratter's CFO.  (*Id.* at ¶ 15)

### 3.      Relevant Events Relating to Plaintiffs' Purchase of Schratter

The parties' overarching dispute centers on a transaction that occurred in December 2014, in which ECB and Atlantic Ventures purchased Schratter.[2]  The terms of the purchase were set out in a Stock Purchase Agreement, or "SPA."  (*Id.*, ex. 1 (hereinafter "SPA"))  The basic gist of the SAC is that, as part of the Schratter sale process and thereafter, Zausner, Savencia, the above-referenced representatives of Zausner and Savencia, Voss and Proust all engaged in what the SAC refers to as the "Savencia Conspiracy" in order to harm Plaintiffs and cause them damage.  (*See, e.g.*, *id.* at ¶ 38)

The relevant events regarding the Savencia Conspiracy began in 2014.  In mid-to-late 2014, the SAC alleges that the ECB Representatives "became enmeshed with Zausner, Savencia, [] Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss[] and Proust, who then began their efforts to fraudulently induce the ECB Representatives, and ultimately Plaintiffs, to enter into [the SPA] for the purchase of all of Schratter's stock."  (*Id.* at ¶ 23)[3]  More specifically, the SAC alleges that these entities and people all agreed to take various steps necessary to "strip Schratter of assets, to strip Voss of his corporate offices and authority, to make the necessary misrepresentations to sell Schratter at an inflated price, and to take such further action as was needed to harm Schratter, and any ultimate purchaser of Schratter, for the benefit of Savencia and its affiliates."  (*Id.* at ¶ 38)

---

[2]       Until June 2014, Zausner owned 75 percent of Schratter's shares, while Voss owned 25 percent of those shares through his company, Voss Enterprises, Inc. ("VEI").  (D.I. 147 at ¶¶ 20, 21)  Thereafter, until Schratter's sale to Plaintiffs in December 2014, Zausner owned 100% of Schratter's stock.  (*Id.* at ¶ 21)

[3]       As will be further discussed below, this is just one of many, many paragraphs in the SAC in which the SAC refers to up to nine persons or entities as all having said or done the exact same thing in the same time frame, without any further explanation.  In this Section, the Court will list some (but certainly not all) instances in which this occurs in the SAC.

The SAC asserts that a key factor in Defendants' ability to perpetrate this scheme was that Voss served as an "[i]nside [m]an." (*See, e.g., id.* at 6 & ¶ 26 (emphasis omitted))  Because the ECB Representatives "did not have any experience in the cheese distribution business" and "did not have permission to work in the United States[,]" then if Plaintiffs were going to purchase Schratter, Plaintiffs and the ECB Representatives would have to rely on Schratter's senior management to help run the company. (*Id.* at ¶ 26)  During the sale negotiations, "Zausner, Savencia, Bongrain, Ragnet, Wild, Gitlin[] and Voss [] held Voss out as Schratter's trusted, knowledgeable [] and effective [CEO], for the purpose of persuading the ECB Representatives to accept Voss as a fiduciary and partner and to partner with him to purchase Schratter." (*Id.* at ¶ 27)  In reliance on these representations, the ECB representatives and Plaintiffs:  "(a) took Voss [] as a fiduciary; (b) partnered with Voss to purchase Schratter; (c) relied on Voss for much of the due diligence regarding the acquisition of Schratter; (d) 'retained' Voss as [P]resident and [CEO] of Schratter [after the acquisition]; and (e) [later] appointed Voss as the [P]resident of Atlantic Ventures." (*Id.* at ¶ 28)

In order to incentivize Voss to participate in this conspiracy, "the other members of the [] [c]onspiracy negotiated and caused Schratter and Zausner to enter into a series of agreements with Voss to lock[ ]down his loyalty and participation" (referred to in the SAC as the "June 30 agreements"). (*Id.* at ¶ 40)  One of the June 30 agreements was a letter, signed by Bongrain, which set up a "secret corporate structure in violation of the documents defining Schratter's corporate governance." (*Id.* at ¶ 42)  That letter (referred to as the "Schratter Employment Letter") purported to maintain Voss as Schratter's President and CEO, while in fact divesting him of all such authority and secretly vesting that authority in Wild. (*Id.* at ¶ 44)  The SAC alleges that the Schratter Employment Letter states in part:

> [I]n view of [Voss's] history with [Schratter], the title
> President/[CEO] . . . is mainly to enhance the effectiveness of
> Employee's sales efforts.
>
> All other aspects of the operation of [Schratter] shall be the
> responsibility of J. Wild, who although carrying the title of
> Executive Vice President, will have the de facto position of [CEO].
> These responsibilities shall include, but not be limited to
>
> 1. Finance
> 2. Human Resources
> 3. Quality
> 4. Information Systems
> 5. All other corporate functions.

(*Id.* at ¶ 45 (emphasis omitted, certain alterations in original); *see* D.I. 158, ex. 2 at ex. A)  In an effort to "conceal th[is] corporate deceit, [] Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild[] and Gitlin[] required Voss to sign a confidentiality agreement regarding the[se] secret terms of his continued employment."  (D.I. 147 at ¶ 47)  And as further inducement for Voss to participate, "Zausner and Savencia, acting through Bongrain, Swartele, Ragnet, Wild[] and Gitlin" promised to pay Voss an additional $350,000 for the year 2015; they did so through a second employment letter (the "Corman Employment Letter") between Voss and a newly-created shell company, Corman Ship Supplies, LLC ("Corman").  (*Id.* at ¶¶ 48-50; *see also* D.I. 158, ex. 2 at ex. B)  Moreover, the SAC alleges that Defendants also provided other forms of compensation to Voss in order to obtain his participation, including:

- The purchase of Voss's 25 percent interest in Schratter for $3 million.

- Payment of a bonus to Voss of up to an additional $1 million determined primarily in the discretion of Bongrain.

- Payment to Voss of 25 percent of the net proceeds from the sale of Corman.

- The transfer of Chocolate Stars, a "valuable division of Schratter," to Voss for one dollar.

- The financing of Voss's "'purchase'" of Chocolate Stars' inventory with an unsecured loan in the amount of $676,852.97.

- The continuation of Voss's then-current salary as President and CEO of Schratter, "even though he had been stripped of his duties and authority."

(D.I. 147 at ¶ 54(a)-(f))

Plaintiffs also allege that "Zausner, Savencia, Bongrain, Ragnet, Wild, Gitlin[] and Voss" recruited Proust to participate in the Savencia Conspiracy. (*Id.* at ¶ 56)  Ragnet and Voss agreed to pay Proust a bonus of $50,000 after the completion of Schratter's sale, in exchange for his assistance. (*Id.*)  Proust was recruited to aid the Savencia Conspiracy because of his past status as senior manager at Constantin Associates, LLP ("Constantin"), the accounting firm that audited Schratter's financial statements; in his role at Constantin, Proust was in charge of Schratter's audits from 2007 to 2012, before he became employed by Schratter in 2013. (*Id.* at ¶ 58)

After recruiting Voss and Proust, in August 2014, Defendants began negotiations with the ECB Representatives regarding the sale of Schratter. (*Id.* at ¶ 101)  However, Defendants did not disclose to the ECB Representatives the "fact that Voss had been stripped of his duties and powers as Schratter's [P]resident and [CEO]" nor the terms of the Schratter Employment Letter or the Corman Employment Letter. (*Id.* at ¶¶ 64-65)  As negotiations continued, the SAC alleges that the "ECB Representatives reasonably believe[ed] that Voss represented their interests[,] and[] ultimately[] Plaintiffs' interests, while, in fact, he was representing his own interests and those of the Savencia Conspiracy." (*Id.* at ¶ 102; *see also id.* at ¶ 63)

During these negotiations, Voss falsely represented to the ECB Representatives that Schratter was valued at $40 million. (*Id.* at ¶ 103)  In support of this valuation, in September 2014 Voss told "the ECB Representatives that ZNHC purchased [a 25] percent interest in

Schratter for $10 million[,]" even though ZNHC had only purchased VEI's shares for $3 million. (*Id.* at ¶¶ 103-04)

Then, beginning in September 2014, Defendants and their representatives made misrepresentations in various documents sent to the ECB Representatives' attorney.  For example, "Voss, Bongrain, Ragnet, Wild[] and Gitlin prepared a letter of intent" outlining the sale of Schratter with a purchase price of $35 million.  (*Id.* at ¶¶ 105, 107)  Drafts of the letter of intent were being circulated in October 2014, and the final version of the letter of intent was ultimately signed by Gitlin and Voss; all versions of the letter, including the final version, misrepresented that Schratter was "managed on a day-to-day basis by [Voss] . . . in his role as Company President/CEO."  (*Id.* at ¶¶ 89-92 (emphasis omitted))  Additionally, in drafts of the SPA that were circulated on November 1, 2014 and December 6, 2014, "Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Voss, [] Proust" and Gitlin misrepresented Voss's title and Schratter's financials.  (*Id.* at ¶¶ 71, 112)

Additionally, prior to and during negotiations over Schratter's sale, Defendants secretly "stripped [Schratter] of valuable assets, including business relationships, further depleting Schratter's value."  (*Id.* at ¶ 115)  Defendants also "caused Schratter to pay vendors and debts related to Savencia, while failing to pay third-party debts, all in an effort to bleed the assets out of Schratter before closing the sale."  (*Id.* at ¶ 116)

Plaintiffs, meanwhile, conducted a due diligence investigation in late 2014, in order to determine whether to buy Schratter.  This investigation included use of a virtual data room (the "data room"), in which Defendants were to provide information about Schratter to the ECB Representatives for due diligence purposes.  (*Id.* at ¶¶ 78-79)  The SAC alleges that "Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss[] and Proust controlled what

documents were included in the data room [but] acted to exclude documents which would reveal the true terms of Voss's employment with Schratter[,]" (*id.* at ¶ 84), or that were otherwise material to the transaction.[4]   However, the SAC asserts that the data room did not include all material information.   For example, it did not include the June 2014 contract for purchase of VEI's shares in Schratter for $3 million.   (*Id.* at ¶ 109)   Additionally, although the data room contained various documents concerning Schratter's corporate governance, including Schratter's "bylaws and corporate book[,]" (*id.* at ¶¶ 93-94), certain documents in the data room allegedly misrepresented Voss's status.   That is in part because Gitlin and Ragnet caused two documents (a list of Schratter's directors and officers, and a Schratter management chart) to be included in the data room that identified Voss as President and CEO, without mention that Wild was the de facto CEO.   (*Id.* at ¶ 88)   And it was in part because neither the Schratter Employment Letter nor the Corman Employment Letter were included in the data room.   (*Id.* at ¶ 87)   Throughout the due diligence period, Plaintiffs allege that Defendants "misrepresented that Schratter was being operated in the ordinary course of business when, in fact, it was being run by a group of Savencia senior managers who secretly took over the business of Schratter[.]"   (*Id.* at ¶ 95)

Additionally, the SAC alleges that Defendants' representatives used Schratter's audited financial statements, along with a series of oral and written communications, to make a series of misrepresentations about Schratter's financial condition and/or Voss's role at Schratter.   (*Id.* at ¶¶ 110-14)   These included the following misrepresentations made by "Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss[] and Proust":

- Schratter's financial statements correctly reflected Schratter's liabilities.

---

[4]       At another point, however, the SAC asserts that the documents in this data room were controlled by "Ragnet, Bongrain, Gitlin, Swartele[] and Wild[.]"   (D.I. 147 at ¶ 79)

- Schratter's financial statements were accurate and were prepared and presented in accordance with U.S. GAAP, GAAS and IFRS.

- Schratter's internal controls and procedures were sufficient to ensure that Schratter's financial statements were accurate in all material respects.

- The information provided in the financial statements was a full, fair and accurate disclosure of all material information relative to Schratter's financial position and operations.

- The financial statements revealed all related party transactions.

- No material information relative to Schratter's financial position and operations was withheld from the financial statements.

(*Id*. at ¶¶ 111-12)  And they included the following misrepresentations made by "Bongrain, Ragnet, Wild, Gitlin, Swartele[] and Voss":

- Voss was the President and CEO of Schratter, in form and substance, and in charge of Schratter's day-to-day operations.

- Schratter's value as an operating business was a direct result of, and dependent upon, Voss being its President and CEO.

- Schratter's books and records were accurate in all material respects and all documents material to Plaintiffs' purchase of Schratter were provided in the data room.

- The transactions set forth in Schratter's books and records represented bona fide transactions and complied with all applicable laws and industry standards.

- Schratter's revenues, expenses, assets and liabilities had been properly recorded, in all material respects, in Schratter's books and records.

- Schratter was able to pay, and was current in the payment of, its debts and other obligations.

- Schratter's operations were conducted in the ordinary course of business.

10

- Schratter complied with all laws in its operations.

- VEI was paid $10 million for its 25 percent interest in Schratter.

- Schratter was in compliance with all of its financial obligations.; and

- Schratter suffered no adverse events in the months before the closing of the sale.

(*Id*. at ¶ 114)

The SAC alleges that one reason Plaintiffs were not tipped off to these various wrongful acts or false statements in the run up to the sale of Schratter is because of the work of Voss and Proust. To that end, the SAC asserts that "[u]sing their positions of trust and confidence, Voss and Proust hid the many red flags and acts that would have alerted the ECB Representatives and Plaintiffs to the frauds." (*Id*. at ¶ 118) As to Voss in particular, the SAC alleges that "as a fiduciary of Plaintiffs, but in furtherance of the conspiracy," he: "(a) fraudulently helped persuade Plaintiffs to purchase Schratter at an inflated price; (b) took control of Plaintiffs' due diligence to advance the fraud; (c) helped Zausner, Savencia, [] Bongrain, Swartele, Ragnet, Wild, Gitlin[] and Proust in their wrongful efforts to drain Schratter of its assets and drive it into insolvency; and (d) covered up the misdeeds of [Defendants and their representatives]." (*Id*. at ¶ 29)

After the due diligence period concluded, the parties closed the purchase in several stages. On December 5, 2014, ECB was formed. (*Id*. at ¶ 119) Then on December 6, 2014, the parties to the SPA executed the SPA; ECB and VEI were the "Buyers," ZNHC was the "Seller" and Zausner was the "Guarantor" (Schratter was also a party to the SPA). (*Id*.; SPA at 1, 75-76) Pursuant to the SPA, 100 percent of Schratter's shares were to be purchased for $27 million, which was payable in the following stages: $2 million at closing, $15 million six months after

11

closing, and $10 million in four equal annual installments over the next four years.  (*Id.* at ¶ 119; SPA at Art. II.1(a)-(c))  Three days after the SPA's execution, on December 9, 2014, ECB and VEI formed Atlantic Ventures, which was to serve as a holding company for Schratter.  (D.I. 147 at ¶ 120)  Atlantic Ventures was owned 55 percent by ECB and 45 percent by VEI.  (*Id.*; *see also id.*, ex. 1 at ex. C)  On December 9, 2014, Atlantic Ventures appointed Voss as its "[P]resident and a director."  (*Id.* at ¶ 123; *see also id.* at ¶ 28)  And on or about December 31, 2014, Atlantic Ventures closed its purchase of Schratter's stock and paid the initial $2 million.  (*Id.* at ¶ 129)

After closing, the parties continued to have communications related to the purchase of Schratter.  During this time, Voss maintained his role as director and President of Atlantic Ventures and President and CEO of Schratter; Proust was CFO of Schratter.  (*Id.* at ¶ 130) Although Plaintiffs continued to trust Voss, they did not know that Voss was in fact the "inside man" of the Savencia Conspiracy, as he "continued his charade of pretending to represent Plaintiffs' interests[.]"  (*Id.* at ¶¶ 131-33)  Plaintiffs continued to rely on Voss during negotiations related to Schratter's continuing operations, and they intended to rely on the "newly available audited financial statements for Schratter and additional due diligence derived from financial statements for the year 2014."  (*Id.* at ¶¶ 134-35)  On February 23, 2015, Gitlin, at the direction of Zausner and Savencia, transmitted these 2014 audited financial statements to ECB. (*Id.* at ¶ 137)  The SAC alleges that those 2014 audited financial statements contained several alleged misrepresentations, including:

- Schratter's financial statements correctly reflected Schratter's liabilities.

- Schratter's financial statements were accurate, and were prepared and presented in accordance with U.S. GAAP, GAAS and IFRS.

- Schratter's internal controls and procedures were sufficient to ensure that Schratter's financial statements were accurate in all material respects.

- The information provided in the financial statements was a full, fair and accurate disclosure of all material information relative to Schratter's financial position and operations.

- The financial statements revealed all related party transactions.; and

- No material information relative to Schratter's financial position and operations was withheld from the financial statements.

(*Id.* at ¶ 138)  Defendants and their representatives "Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss[] and Proust" are alleged to have both known of the 2014 audited financial statements' misrepresentations and to have intended for Plaintiffs to rely on them during continuing negotiations; this ultimately led to an Amendment to the SPA, signed in June 2015, and to Plaintiffs' $15 million payment to ZNHC in June 2015.  (*Id.* at ¶¶ 139-40, 143; *see id.*, ex. 1 at ex. B)

Next, the SAC alleges that Defendants took wrongful action in an effort to "attempt to establish their own distribution company" because "Schratter was in the cheese distribution business and was an obstacle" to the success of such a company.  (*Id.* at ¶ 148)  The SAC asserts that one of the material inducements for Plaintiffs to enter the SPA was a commitment from Defendants that Schratter would be given discounted pricing on, and the rights to distribute, Savencia products for a period of 10 years.  (*Id.* at ¶ 149)  However, Defendants and "Bongrain, Ragnet, Wild, Gitlin, Voss[] and Proust" allegedly caused Schratter to "revoke and give away [these] substantial pricing discounts and rights" through the execution of a June 30, 2015 distribution agreement (the "Distribution Agreement").  (*Id.* at ¶ 34)  Voss "secretly undermine[d] and t[ook] away discounts granted in the [SPA]" via the execution of the

Distribution Agreement, which "gave away" those discount rights.  (*Id.* at ¶¶ 151-52; *see also id.* at ¶¶ 153-55)  Defendants and "Bongrain, Ragnet, Wild, Gitlin, Voss[] and Proust concealed this fraud from Plaintiffs by . . . using Voss and Proust to misreport information to Plaintiffs and alter the financial statements of Schratter[.]"  (*Id.* at ¶ 156)  This, in turn, allegedly allowed Savencia to overcharge for the foreign cheeses it sold to Schratter and also to cease distributing other foreign cheeses to Schratter.  (*Id.* at ¶ 35)

The SAC then alleges that in the three years after the December 2014 closing, Voss and Proust "'cooked the books' of Schratter to make it appear that Schratter's business was doing far better than it actually was"; they are alleged to have done so by "misreport[ing] Schratter's financial condition and conceal[ing] the frauds and other criminal activities."  (*Id.* at ¶¶ 160-61)  Voss and Proust are alleged to have also continued to conceal the conspiracy thereafter, such that it "prevented Schratter and Plaintiffs from pursuing available remedies[.]"  (*Id.* at ¶ 162)

Defendants' malfeasance allegedly continued until 2017, at which point Schratter and Atlantic Ventures terminated Voss and Proust.  (*Id.* at ¶¶ 163-64)  It was only at this point, "[w]ith Voss and Proust no longer in their positions," that Plaintiffs uncovered "significant financial discrepancies and other fraudulent activities within Schratter[,]" while still "continu[ing] to infuse additional capital into Schratter hoping Schratter could avoid insolvency."  (*Id.* at ¶ 165)  On April 30, 2018, an insolvent Schratter "became subject to an assignment for the benefit of creditors in Florida."  (*Id.* at ¶ 166)

## B.    Procedural Background

In its July 10, 2020 R&R, the Court set out some of the lengthy procedural background of this case, up through the filing of the then-pending motions to dismiss the FAC.  (D.I. 135 at 8-9)  The Court incorporates by reference that discussion and will not repeat it here.

14

The FAC had contained nine counts:  Count I for breach of contract by ECB and Atlantic Ventures against Zausner, (D.I. 77 at ¶¶ 53-56), Count II for fraud in the inducement by ECB against both Defendants, (*id.* at ¶¶ 57-61), Count III for fraud in the inducement by Atlantic Ventures against both Defendants, (*id.* at ¶¶ 62-66), Count IV for fraud by ECB against both Defendants, (*id.* at ¶¶ 67-71), Count V for fraud by Atlantic Ventures against both Defendants, (*id.* at ¶¶ 72-76), Count VI for fraud by then-Plaintiff G.I.E. C2B (which is no longer a party in this case) against both Defendants, (*id.* at ¶¶ 77-81), Count VII for aiding and abetting a breach of fiduciary duty by Plaintiffs and G.I.E. C2B against both Defendants, (*id.* at ¶¶ 82-88), Count VIII for conspiracy to commit breach of fiduciary duty by Plaintiffs and G.I.E. C2B against both Defendants, (*id.* at ¶¶ 89-93), and Count IX for conspiracy to commit constructive fraud by Plaintiffs and G.I.E. C2B against both Defendants, (*id.* at ¶¶ 94-99).  Ultimately in the July 10, 2020 R&R, the Court recommended that:  (1) Zausner's motion to dismiss the FAC be granted-in-part and denied-in-part with respect to Count I and granted with respect to Counts II-IX; and (2) Savencia's motion to dismiss the FAC be denied with regard to a personal jurisdiction challenge, but that it be granted with respect to all of the counts against it (Counts II-IX).  (D.I. 135 at 45-46)[5]  On September 8, 2020 United States District Judge Richard G. Andrews adopted the July 10, 2020 R&R, dismissing without prejudice all counts of the FAC except for the surviving parts of Count I against Zausner.  (D.I. 142; *see also* D.I. 141)

On September 22, 2020, Plaintiffs filed the operative SAC.  (D.I. 147)  Thereafter, the Court granted Defendants' motion to stay the case with the exception of Plaintiffs' claim for

---

[5]      In a separate July 10, 2020 Memorandum Order, the Court also denied Defendants' motion for sanctions.  (D.I. 136)

breach of contract against Zausner (i.e., the one claim that had survived the first round of

motion-to-dismiss briefing).  (D.I. 154)

On October 20, 2020, Defendants filed the instant Motions.  (D.I. 155; D.I. 157)  Briefing

was completed on both Motions on December 4, 2020.  (D.I. 163)  The Court heard oral

argument on both motions by videoconference on March 3, 2021.  (D.I. 170, (hereinafter, "Tr."))

## II.    STANDARD OF REVIEW

The sufficiency of pleadings for non-fraud claims is governed by Federal Rule of Civil

Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is

entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  A claim alleging fraud or mistake, however, is

subject to the more stringent pleading requirements of Federal Rule of Civil Procedure 9(b),

which mandates that the "circumstances constituting fraud or mistake" be "state[d] with

particularity[.]"  Fed. R. Civ. P. 9(b); *see also Frederico v. Home Depot*, 507 F.3d 188, 200 (3d

Cir. 2007).

When presented with a Rule 12(b)(6) motion to dismiss for failure to state a claim, a

court conducts a two-part analysis.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir.

2009).  First, the court separates the factual and legal elements of a claim, accepting "all of the

complaint's well-pleaded facts as true, but [disregarding] any legal conclusions."  *Id.* at 210-11.

Second, the court determines "whether the facts alleged in the complaint are sufficient to show

that the plaintiff has a 'plausible claim for relief.'"  *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556

U.S. 662, 679 (2009)).  In assessing the plausibility of a claim, the court must "'construe the

complaint in the light most favorable to the plaintiff, and determine whether, under any

reasonable reading of the complaint, the plaintiff may be entitled to relief.'"  *Id.* at 210 (quoting

*Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

### III.    DISCUSSION

In the SAC, Plaintiffs now again assert nine Counts; these Counts are largely similar to the Counts in the FAC, though they differ in some ways.  (D.I. 156 at 1 & n.1)  The SAC's Counts are:  Count I for breach of contract by Plaintiffs against Zausner, (D.I. 147 at ¶¶ 170-79), Count II for fraud by ECB against Zausner, (*id.* at ¶¶ 180-87), Count III for fraud by ECB against Savencia, (*id.* at ¶¶ 188-95), Count IV for fraud by Atlantic Ventures against Zausner, (*id.* at ¶¶ 196-203), Count V for fraud by Atlantic Ventures against Savencia, (*id.* at ¶¶ 204-11), Count VI for aiding and abetting a breach of fiduciary duty by Plaintiffs against Zausner, (*id.* at ¶¶ 212-24), Count VII for aiding and abetting a breach of fiduciary duty by Plaintiffs against Savencia, (*id.* at ¶¶ 225-37), Count VIII for conspiracy to commit breach of fiduciary duty by Plaintiffs against both Defendants, (*id.* at ¶¶ 238-45), and Count IX for conspiracy to commit fraud and constructive fraud by Plaintiffs against both Defendants, (*id.* at ¶¶ 246-55). Defendants refer to Counts II to V as "the Fraud Claims[,]" Count VI and VII as the "Aiding and Abetting Claims" and Counts VIII and IX as the "Conspiracy Claims[,]" and the Court will do the same here.  (D.I. 156 at 15; D.I. 158 at 5-18)  The parties agree that Florida substantive law applies to all claims.  (D.I. 135 at 22 (citations omitted); D.I. 156 at 14 n.5)

Defendants, in their respective Motions, raise numerous challenges to Plaintiffs' claims. Most of those challenges relate to individual claims or groups of claims.  The Court will first address those challenges below.  Thereafter, it will separately address one challenge that goes to all Counts—that relating to the relevant statute of limitations (i.e., the "time-bar" challenge).

### A.    Challenges to Individual Claims or Groups of Claims[6]

Defendants raise particularized challenges to the breach of contract claim (Count I), the Fraud Claims (Counts II-V), the Aiding and Abetting Claims (Counts VI-VII) and the Conspiracy Claims (Counts VIII-IX).  The Court will address these various challenges in turn.

### 1.    Breach of Contract (Count I)

In Count I, ECB and Atlantic Ventures bring breach of contract claims against Zausner. (D.I. 147 at ¶¶ 170-79)  Below, the Court will first address Plaintiffs' argument that Defendants have waived or forfeited their right to challenge Count I.  Thereafter, having concluded that Defendants did not do so, the Court will go on to address the merits.

### a.    Waiver and Federal Rule of Civil Procedure 12(g)

Plaintiffs assert that Defendants have "waived" their ability to challenge Count I, because when Defendants previously moved to dismiss the breach of contract claim in the FAC, they did not make many or all of the same arguments for dismissal that they now make as to Count I. Some background is required in order to better understand this issue.

In the FAC, Plaintiffs alleged that Zausner had breached 14 different Articles of the SPA: Articles III.1, III.3, III.7(a), III.7(b), III.7(c), III.8, III.9, III.11, III.20, III.21, VI.1, VI.1(u), VI.2 and VI.4.  (D.I. 77 at ¶ 55(a)-(e))  In arguing for dismissal of that breach of contract claim in the FAC, Defendants spent much of their briefing asserting that all of the breach of contract allegations should be dismissed (with the exception of the allegations of breach as to Articles III.1 and III.11) because they were precluded by the governing statute of limitations (an

---

[6]      Even though certain of the claims discussed below are brought by less than all Plaintiffs, the Court will simply refer to arguments about them as "Plaintiffs'" arguments, for ease of reference.  And even though certain of the claims are brought against less than all Defendants, the Court will refer to arguments about them as "Defendants'" arguments or as arguments relating to the "Motions."

18

argument that the Court ultimately disagreed with).  (*See* D.I. 83 at 14-15)  Thus, when it came

time to make a substantive argument on the merits about why the claims for breach of contract

should be dismissed, Defendants did not make any *specific* arguments about most of the asserted

SPA Articles.  The only Articles that Defendants did specifically address were Articles III.1 and

III.11 (i.e., the two articles that would not have been dismissed if Defendants' time-bar

arguments had been successful).  As to those Articles, Defendants actually did make

particularized arguments about why the FAC's allegations could not plausibly establish a breach

of contract claim.  (*See id.* at 14-15, 31-32).  In the July 10, 2020 R&R, the Court found that as

to the claims of breach of all Articles other than III.1 and III.11, because "Defendants never

provided a real argument regarding the insufficiency of those allegations of breach[,]"

Defendants' merits-based challenges were "insufficiently developed and therefore waived at the

pleading stage."  (D.I. 135 at 39-40 & n.35)  But as to the claims of breach of Articles III.1 and

III.11, the Court concluded that Defendants' arguments for dismissal made sense and that

Plaintiffs had "not really explain[ed] how the FAC *does* plausibly suggest that [those Articles]

have been breached (nor can the Court figure that out on its own)."  (*Id.* at 40 (emphasis in

original))  Thus, the Court recommended dismissal of the breach of contract claim in the FAC

only as to the allegations of breach of Articles III.1 and III.11; it recommended that the motions

to dismiss be denied as to that claim in all other respects.  (*Id.*)

The Court now turns back to Plaintiffs' assertions of waiver, an analysis that implicates

Federal Rule of Civil Procedure 12(g).  That rule imposes restrictions on the filing of successive

motions to dismiss:  "'[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion

under [Rule 12] must not make another motion under [Rule 12] raising a defense or objection

that was available to the party but omitted from its earlier motion.'"  *Leyse v. Bank of Am. Nat'l*

*Ass'n*, 804 F.3d 316, 320 (3d Cir. 2015) (quoting Fed. R. Civ. P. 12(g)(2)) (alteration in original).  "This 'consolidation rule' is intended to eliminate unnecessary delay at the pleading stage by encouraging the presentation of an omnibus pre-answer motion in which the defendant advances every available Rule 12 defense simultaneously rather than interposing these defenses and objections in piecemeal fashion."  *Id.* (certain internal quotation marks and citation omitted).

In Count I of the SAC, Plaintiffs now allege that Defendants breached the following 13 Articles of the SPA:  Articles III.7(a), III.7(b), III.7(c), III.8, III.9, III.11, III.20, VI.1(i), VI.1(ii), VI.1(u), VI.2, VI.4 and VI.19(d)(iii).  (D.I. 147 at ¶¶ 172-78)  Plaintiffs appear to acknowledge that because in the FAC, they never alleged a breach of Article VI.19(d)(iii), they cannot now make a Rule 12(g) waiver argument regarding Defendants' motion to dismiss that part of Count I.  (D.I. 161 at 13; *see also* D.I. 156 at 6 n.2)  But as to every other Article that they now assert was breached, Plaintiffs argue that because Defendants "never provided a real argument regarding the insufficiency of those allegations of breach [as to the FAC]" they have "waived these issues and cannot raise them on a subsequent motion to dismiss."  (D.I. 161 at 13 (internal quotation marks and citations omitted))

The Court disagrees.  It does so for the following reasons.

For one thing, certain of the SAC's allegations of breach are completely new, even though they may relate to an Article of the SPA that was referenced in the FAC's breach of contract claim.  For example, both in the FAC and in the SAC, Plaintiffs alleged that Zausner breached Article VI.1.  (D.I. 77 at ¶ 55(b); D.I. 147 at ¶¶ 173-74)  But in the FAC, the allegation was only that Zausner had breached that Article by "failing to operate Schratter in the ordinary course during fiscal year 2014[.]"  (D.I. 77 at ¶ 55(b))  In the SAC, Plaintiffs do re-make that same allegation, asserting that it is a violation of Article VI.1(i).  (D.I. 147 at ¶ 173)  But

Plaintiffs *also* allege in the SAC that Zausner breached Article VI.1*(ii)* as well, on a different rationale ("by amending Schratter's bylaws through the secret corporate governance documents rendering the offices of [P]resident and [CEO] subordinate to the office of the [E]xecutive [V]ice [P]resident"); that allegation about Article VI.1 was never made in the FAC. (*Id*. at ¶ 174; D.I. 156 at 6 n.2) Additionally, while Plaintiffs alleged in the FAC that Zausner breached Article VI.2, they did so by asserting that Zausner had simply "conceal[ed] the June 2014 Agreements from Plaintiffs"; now in the SAC, while Plaintiffs again allege a breach of that same Article, the basis is said to be different and far broader (i.e., that Zausner did so by "failing to provide all books and records, contracts, agreements and other documents and data related to Schratter and by failing to furnish Plaintiffs with complete and accurate financial, operating, and other data and information related to the Company"). (D.I. 77 at ¶ 55(d); D.I. 147 at ¶ 176) At the time of their motions to dismiss the FAC, Defendants surely did not have a "defense or objection that was available to" them regarding these new allegations of breach—because the allegations were not even being made.

As to the remaining allegations of breach (relating to Articles III.7(a), III.7(b), III.7(c), III.8, III.9, III.11, III.20, VI.1(i), VI.1(u) and VI.4), it could be that in the FAC, Plaintiffs were alleging breach of these Articles on the very same legal theory that they now put forward in the SAC.[7] But even if that is so, by Plaintiffs' own admission, the SAC now "sets forth 117 additional factual allegations detailing 'how' the SPA was breached[.]" (D.I. 161 at 1; *see also* Tr. at 31 (Plaintiffs' counsel emphasizing at oral argument that the SAC "contains 169 allegations, factual allegations, 117 of which are new and were not in the [FAC]")) If the SAC is

---

[7] This can be a little hard to tell as to the FAC's allegations regarding breach of any of the portions of Article III, because in the breach of contract count in the FAC, Plaintiffs did not actually spell out their theory as to *why or how* those Articles had been breached.

alleging breach of contract of Articles that were also at issue in the breach of contract claim in the FAC, but it is doing so based on *dozens of new factual allegations* that were not contained in the FAC, then Rule 12(g) is not a barrier to Defendants' Motions.  *See, e.g.*, *Bhatti v. Republican Caucus of Pa. House of Representatives*, Civil No. 18-cv-2178, 2020 WL 3412661, at *3 (M.D. Pa. June 22, 2020) ("[W]here an amended complaint contains new factual allegations in support of a claim, Rule [12](g)(2) does not apply and the defendant may raise new defenses and objections to that claim") (citing cases); *Negron v. Sch. Dist. of Phila.*, 994 F. Supp. 2d 663, 666-67 (E.D. Pa. 2014) (finding that while Rule 12(g)(2) prohibited the defendant from moving to dismiss a claim that was found in a prior challenged pleading because the new amended complaint "did not alter any of the factual allegations relevant to" that claim, the Rule did not prohibit a challenge to a claim found in the prior pleading where the amended complaint at issue contained "supplement[al] [] factual allegations" as to that claim).  And that is what has happened here.

For all of these reasons, the Court concludes that Defendants have not waived their right to challenge the SAC's breach of contract claim pursuant to Rule 12(g)(2).

### b.      The Merits of Defendants' Challenges to Count I

Having found no waiver, the Court now turns to the merits of Defendants' challenges to Count I.  Under Florida law, the elements of a breach of contract claim are:  (1) the existence of a contract; (2) a breach of the contract and (3) damages that resulted from the breach.  *DNA Sports Performance Lab., Inc. v. Club Atlantis Condo. Assoc., Inc.*, 219 So. 3d 107, 109 (Fla. Dist. Ct. App. 2017).  Here, Defendants challenge the allegations as to the second element above—i.e., as to whether a breach occurred.  On that front, Plaintiffs are required to plead sufficient facts to establish "how Defendants breached th[ose] terms" of the SPA.  *Soria v. Metro. Life Corp. in*

*NY*, No. 12-CV-80228, 2012 WL 3614408, at *3 (S.D. Fla. Aug. 21, 2012); *see also Caribbean*

*Airmail, Inc. v. Norjay Enters., L.L.C.*, CASE NO. 09-21478-CIV-ALTONAGA/Brown, 2009

WL 10698789, at *3 (S.D. Fla. July 21, 2009) (same).  In making their arguments here,

Defendants do what they should have done last time—i.e., they address all 13 Articles of the

SPA that Zausner is alleged to have breached, and they attempt to explain why the SAC does not

plausibly allege a breach of each of those Articles.  (D.I. 156 at 5-12)

The Court agrees with Defendants that as to most of these Articles, there is no plausible

allegation of breach.  But as to a few such Articles, the Court concludes that the breach

allegations are sufficiently plausible to state a claim.  Below, the Court will go Article-by-Article

and explain why it recommends grant or denial of the Motions as to Count I regarding the

allegations as to each of the 13 Articles at issue:

- Article III.7(a), *inter alia*, states that certain "Financial Statements [provided by Zausner to ECB] have been prepared in accordance with U[.]S[.] GAAP[.]"  (SPA at Art. III.7(a)) The SAC alleges that this provision was breached because "Schratter's financial statements were not prepared in accordance with U[.]S[.] GAAP[.]"  (D.I. 147 at ¶ 172(a)) However, in Count I, Plaintiffs do not say what "financial statements" they are referring to.  And in the remainder of the SAC, the only Schratter "financial statements" that are clearly identified are the *2014 audited financial statements*.  (*Id*. at ¶¶ 60, 135, 138-41)  The problem there is that the "Financial Statements" that are being referenced in Article III.7(a) are defined as Schratter's 2011, 2012, 2013 "Audited Financial Statements" along with Schratter's August 31, 2014 "unaudited" interim financial statements.  (SPA at Art. III.7(a)) Since Zausner never made any representations in Article III.7(a) about the 2014 audited financial statements, it cannot have breached that Article due to any problem with or misrepresentations made in those statements.[8]  Additionally,

_____

[8]     In their answering brief, Plaintiffs responded to this argument by stating that "no contract claim is based upon the 2014 audited financial statements; they are the subject of the fraud claims only."  (D.I. 161 at 11-12)  But Plaintiffs never say what "financial statements"

Plaintiffs never state *why or how* it is that the relevant financial statements were not "prepared in accordance with U[.]S[.] GAAP."

Additionally, Article III.7(a) states that the "Financial Statements" "fairly present in all material respects the financial condition of [Schratter,]" that the "books and records of Schratter [] have been maintained accurately[,]" that the "revenues, expenses, assets and liabilities of Schratter [] have been properly recorded" and that the "internal controls and procedures of Schratter [] are designed to insure that the Financial Statements are accurate[.]"  (SPA at Art. III.7(a)) The SAC alleges breach of these provisions by asserting that Schratter's financial statements "did not fairly present in all material respects the financial condition of Schratter" and "Schratter's financial statements were replete with errors, omissions[] and intentional misstatements of transactions (particularly, related-party transactions and trade discounts)" and "the books and records of Schratter were not maintained accurately" and "the internal controls and procedures were not designed to insure that the financial [s]tatements would be accurate, but were designed to conceal the frauds being perpetrated by the Savencia Conspiracy[.]"  (D.I. 147 at ¶ 172(a))  Here again, the only "financial statements" that are clearly called out in the SAC are Schratter's 2014 audited financial statements, and Zausner made no warranties about those statements in Article III.7(a).  Moreover, Plaintiffs never clearly explain in the SAC *why or how* it is that the relevant financial statements "did not fairly present . . . the financial condition of Schratter" or what "errors, omissions and internal misrepresentations" about "related-party transactions or trade discounts" they are referring to, or what was not "maintained accurately" in Schratter's books and records or how Schratter's "internal controls and procedures" were abused (or which controls and procedures they are even referring to).[9]  Thus, the

---

these allegations *are* based on.  And, as noted above, the SAC does not clearly reference any other financial statements at issue.  (D.I. 163 at 4 n.3)

[9]      In the Court's view, the net effect of this "why or how" failure is that Plaintiffs' allegations basically amount to little more than assertions that "Defendants breached Article III.7(a)."  That cannot be sufficient to articulate how a contract was breached.

If the SAC *did* actually provide the missing "why or how," then the place for Plaintiffs to point that out was in their answering brief to the Motions.  But there, the only attempt Plaintiffs make to explain how the SAC articulates why or how any portion of Article III.7 was breached

Court recommends grant of the Motions as to Count I regarding the alleged breach of Article III.7(a).

- Article III.7(b) states that "Schratter [] records the liabilities on its year-end balance sheet in accordance with U[.]S[.] GAAP applied on a consistent basis throughout the period involved." (SPA at Art. III.7(b))  It is not entirely clear in Count I what acts Plaintiffs are asserting amount to a violation of this Article.  The Court's best guess is that it is the allegation that "Schratter's financial statements were not prepared in accordance with U[.]S[.] GAAP[.]"  (D.I. 147 at ¶ 172(a))  And for the reasons set out with regard to Article III.7(a), this does not amount to a plausible claim of breach.  Thus, the Court recommends grant of the Motions as to Count I regarding the alleged breach of Article III.7(b).

- Article III.7(c) states "[s]ince August 31, 2014, the Business of Schratter [] has been operated in the Ordinary Course of Business." (SPA at Art. III.7(c))  The SPA defines "Ordinary Course of Business" to mean an action that "(a) is consistent in nature and amount with the past practices of such Person and is taken in the ordinary course of the normal, day-to-day operations of such Person and (b) does not require authorization by the board of directors of such Person (or by any Person or group of Persons exercising similar authority) and does not require any other separate or special authorization of any nature." (*Id.* at Art. XIII)  Plaintiffs allege that this Article was breached in that "Schratter's business had not been operated in the ordinary course since August 31, 2014, because the secret agreements with Voss and Proust substantially altered the governance and reporting structure of Schratter, all of which was designed to artificially inflate the value of Schratter in the eyes of an investor by making Schratter appear more soundly governed and profitable than it actually was." (D.I. 147 at ¶ 172(a))  Defendants' sole argument as to why this breach claim is implausible is that:  (1) the "secret agreements with Voss and Proust" that affected Schratter's "governance and reporting structure" are alleged to be the June 30 agreements (particularly those memorialized in the Schratter Employment Letter, via which Wild, not Voss, was to serve as the de facto CEO)—agreements that were signed on June 30, 2014, (*see* D.I. 147 at ¶¶ 44-45); (2) Article VII.7(c) "expressly

---

was when they pointed back to the quoted allegations above drawn from paragraph 172(a) of the SAC.  (D.I. 161 at 11)  Yet those allegations do not contain any why or how.  Instead, they basically just parrot back the language of the provisions of the SPA at issue.  (D.I. 163 at 4)

limits the representation regarding 'ordinary course of business' to events arising *after* August 31, 2014"; so (3) Plaintiffs have "failed to allege *any* action Zausner took that breached any representation in the SPA . . . during the time period governed by the SPA." (D.I. 163 at 5 (certain emphasis in original, certain emphasis omitted)) But even though the Schratter Employment Letter may have been signed on June 30, 2014, the SAC is alleging that the secret arrangement regarding Voss's and Wild's duties continued to be in effect after August 31, 2014. So Zausner's "actions" taken regarding this conduct *are* alleged to have occurred after the key August 31, 2014 date. And it is not clear to the Court that such actions could never be plausibly understood to be contrary to Schratter's "Ordinary Course of Business" and its "past practices" (even though the actions began prior to August 31, 2014), particularly if those actions were very unusual for Schratter, and if they ran counter to the way Schratter had operated for months or years prior to June 2014. (Tr. at 46) Thus, the Court recommends denial of the Motions as to Count I regarding the alleged breach of Article III.7(c).

- <u>Article III.8</u> makes reference to the same Financial Statements that are discussed in Article III.7(a), and it contains some representations about those statements. (SPA at Art. III.8) In alleging breach of this Article, Plaintiffs cut and pasted the same allegations that they made with regard to Articles III.7(a), (b) and (c)—even though the wording of Article III.8 is very different than the wording of Articles III.7(a), (b) and (c). (D.I. 147 at ¶ 172(b)) These allegations are deficient for at least two reasons. Most of the allegations relate to alleged wrongdoing with regard to Schratter's "financial statements" but, for the same reasons set out above as to the allegations in Article III.7(a) regarding such financial statements, Plaintiffs' allegations are wanting. The remainder of the breach allegations as to this Article are about Zausner's failure to operate Schratter in the "ordinary course of business" since August 31, 2014. But "the representations and warranties contained in Article III.8 do not address ordinary course of business[.]" (D.I. 156 at 7)[10] Indeed, the phrase "Ordinary Course of Business" is not included anywhere in Article III.8. Thus, the Court recommends grant of the Motions as to Count I regarding the alleged breach of Article III.8.

---

[10]     Zausner made this argument in its opening brief; in their answering brief, Plaintiffs had no answer for it. (D.I. 156 at 7; D.I. 161 at 10-13; D.I. 163 at 4)

- Article III.9 states, *inter alia*, that with limited exception, to Zausner's knowledge, "since July 1, 2014[,] the Business of Schratter [] has been operated in the Ordinary Course of Business[.]" (SPA at Art. III.9)  The SAC alleges that Article III.9 was breached because "(i) Schratter had not been operated in the ordinary course of business since July 2014, considering the secret corporate governance structure; and (ii) Zausner withheld the documents reflecting the real organizational structure of Schratter[.]" (D.I. 147 at ¶ 172(c))  To the extent the SAC alleges breach of the "Ordinary Course of Business" portion of Article III.9, for the reasons set out above with regard to Article III.7(c), the Court concludes that those allegations are plausible.  Thus, the Court recommends denial of the Motions as to Count I regarding the alleged breach of Article III.9.[11]

- Article III.11 states, *inter alia*, that to Zausner's knowledge, "except for violations that would not, individually or in the aggregate, reasonably be likely to have a Company Material Adverse Effect, the Business of Schratter [] has not been, and is not being, conducted in violation of any federal, state or foreign law, statute or ordinance [or] common law[.]" (SPA at Art. III.11)  The SAC alleges that this Article has been breached because "(i) Schratter was not being operated in compliance with applicable laws regarding corporate governance, since it was being operated under a false corporate governance structure; (ii) the Los Angeles facility was being operated in open contravention of Federal immigration law and local ordinances; and (iii) the ongoing frauds and torts violated federal, state and common law[.]" (D.I. 147 at ¶ 172(d))  However, the SAC:  (1) never makes clear what "laws regarding corporate governance" it is talking about (or, relatedly, how they were violated); (2) never states which "immigration law and local ordinances" were violated by the "Los Angeles facility" or how that actually happened (since the

---

[11]    With regard to the SAC's allegations about the withholding of documents reflecting the "real organizational structure" of Zausner, in its opening brief, Zausner noted that "Article III.9 makes no representations about [Schratter]'s organizational structure." (D.I. 156 at 8)  Plaintiffs did not respond to this charge in their answering brief, (D.I. 161 at 10-13; D.I. 163 at 4), and the Court cannot ascertain what other portion of the Article Plaintiffs could be referring to here (if any).  So to the extent this "organizational structure" allegation is meant to allude to a breach of something other than the "Ordinary Course of Business" prong of the Article, the Court concludes that it does not set out a plausible claim of breach.

SAC never otherwise mentions this "Los Angeles facility"); and (3) does not clearly state what "federal, state [or] common law" it is referring to.[12]  Thus, the Court recommends grant of the Motions as to Count I regarding the alleged breach of Article III.11.

- Article III.20 states, *inter alia*, that to Zausner's knowledge, it "has provided to the Buyer full, fair and accurate disclosure of all material information relative to the financial position and operating results of Schratter [] for the three years ended December 31, 2011, 2012 and 2013[, and] for the eight-month interim period ended August 31, 2014." (SPA at Art. III.20) The SAC alleges that this Article was breached because "Zausner did not make a 'full, fair[] and accurate' disclosure of the financial condition of, or anything else about, Schratter." (D.I. 147 at ¶ 172(e))  But the SAC does not allege what "material information" relative to Schratter's financial position or operating results Zausner failed to disclose to ECB, relevant to those timeframes.  And this failure seems particularly important here, because most of the alleged misconduct in the SAC relates to acts occurring after August 31, 2014.  (D.I. 156 at 9)[13]  Thus, the Court recommends grant of the Motions as to Count I regarding the alleged breach of Article III.20.

- Article VI.1(i) states, *inter alia*, that Zausner during fiscal 2014 and in the future, would cause Schratter to "conduct its business in the ordinary course[.]"  (SPA at Art. VI.1(i))  The SAC alleges that Zausner breached this Article by "failing to operate Schratter in the ordinary course during fiscal year 2014 given the secret corporate structure used to operate Schratter during the second half of 2014."  (D.I. 147 at ¶ 173)  Here, it is reasonable to interpret the Article's use of the phrase "ordinary course" to refer to the SPA's definition of "Ordinary Course of Business."  And that definition is broad enough to allow for a

---

[12]    Zausner made these arguments in its opening brief, (D.I. 156 at 8-9), and Plaintiffs did not address them in their answering brief, (D.I. 161 at 10-13; D.I. 163 at 4).  It could be that the "state [or] common law" that Plaintiffs mean to be referring to here is the state or common law of Florida that they are alleging was violated in other portions of the SAC.  But that is not entirely clear to the Court, and if that was the case, the place for Plaintiffs to point that out would have been in their answering brief (so that the Court could have clarity, and so that Defendants could fairly respond to the argument in their reply brief).  But Plaintiffs did not do so.

[13]    After Zausner raised this issue in its opening brief, (D.I. 156 at 9), Plaintiffs never responded to it in their answering brief, (*see* D.I. 161 at 10-13; D.I. 163 at 4).

plausible claim of breach here.  It is alleged that pursuant to the Schratter Employment Letter, Zausner caused Schratter to "falsely purport[] to maintain Voss as [P]resident and [CEO] of Schratter, while, in fact, divesting him of virtually all authority for said positions and secretly vesting such duties and authority in Wild[.]" (*Id*. at ¶ 44)  And for the reasons previously stated, there is enough in the SAC to allow the plausible inference that this amounts to acts not "consistent in nature . . . with the past practices of [Schratter and not] taken in the ordinary course of the normal, day-to-day operations of [Schratter.]" (SPA at Art. XIII)  Thus, the Court recommends denial of the Motions as to Count I regarding the alleged breach of Article VI.1(i).

- Article VI.1(ii) states in part that Zausner would cause Schratter "not to . . . amend its certificate of incorporation or bylaws." (SPA at Art. VI.1(ii)(a))  In the SAC, Plaintiffs allege that Zausner breached this Article by "amending Schratter's bylaws through the secret corporate governance documents rendering the offices of [P]resident and [CEO, i.e., Voss] subordinate to the office of the [E]xecutive [V]ice [P]resident [i.e., Wild]." (D.I. 147 at ¶ 174)  However, in the SAC, the underlying factual allegations about this conduct and the Schratter Employment Letter states that "[c]orporate records . . . *were not amended* to reflect the changes in authority." (*Id.* at ¶ 52 (emphasis added))  So the Court does not see how the allegation is plausible.[14]  Thus, the Court recommends grant of the Motions as to Count I regarding the alleged breach of Article VI.1(ii).

- Article VI.1(u) states that Zausner would cause Schratter not to "forgive any loans to directors, officers or employees of the Company or any of its subsidiaries." (SPA at Art. VI.1(ii)(u))  The SAC alleges that this Article was breached when Zausner had "Schratter forgive loans to directors, officers or employees of Schratter." (D.I. 147 at ¶ 175)  But in the SAC, Plaintiffs never point out what "loans" they are talking about, and the SAC does not refer to any loans that were forgiven.[15]  Thus, the Court recommends grant of the Motions as to Count I regarding the alleged breach of Article VI.1(u).

---

[14]   After Zausner raised this issue in its opening brief, (D.I. 156 at 10), Plaintiffs never responded to it in their answering brief, (*see* D.I. 161 at 10-13; D.I. 163 at 4).

[15]   After Zausner raised this issue in its opening brief, (D.I. 156 at 10), Plaintiffs never responded to it in their answering brief, (*see* D.I. 161 at 10-13; D.I. 163 at 4).

- Article VI.2 warrants that ECB would get "reasonable access to and the right to inspect all of the . . . books and records, contracts, agreements and other documents and data related to [Schratter]" and would be furnished with "financial, operating and other data . . . related to Schratter" that it requested prior to November 26, 2014. (SPA at Art. VI.2) The SAC alleges that this Article was breached because Zausner failed to (1) "provide all books and records, contracts, agreements and other documents and data related to Schratter and [(2) failed] to furnish Plaintiffs with complete and accurate financial, operating[] and other data and information related to [Schratter.]" (D.I. 147 at ¶ 176) With regard to the second allegation, the Court agrees with Defendants that the SAC contains no allegations of any formal *request* for records that went unfulfilled, and so the breach allegation is not plausible there. (D.I. 156 at 11) However, with regard to the first allegation, Plaintiffs have alleged that Zausner: (1) failed to include in the data room the Schratter Employment Letter and Corman Employment Letter (which "established that Wild, and not Voss, was the *de facto* [CEO], holding virtually all day-to-day control over Schratter"); (2) included two documents in the data room that misrepresented Schratter's management structure (in that they did not identify Voss's and/or Wild's true role at the company); and (3) failed to include in the data room the June 30, 2014 contract in which ZNCH purchased VEI's shares in Schratter for only $3 million. (D.I. 147 at ¶¶ 84, 86-88, 109; *see also* D.I. 161 at 12) The SAC alleges that the data room was the place where Zausner agreed to provide information that Plaintiffs would need to conduct due diligence on the Schratter transaction. (D.I. 147 at ¶¶ 78-79, 81) If those allegations are taken as true, then it seems plausible that the data room was the place that Zausner had established to provide "reasonable access" to key documents regarding the Schratter transaction. And if Zausner failed to include the above-referenced documents and data in the data room during the due diligence period, then this could amount to a breach of this Article. Thus, the Court recommends denial of the Motions as to Count I regarding the alleged breach of Article VI.2.[16]

---

[16]     Defendants argue that a breach of this part of this Article is not plausible because the SPA made a reference (in Articles VI.17 and XIII.1) to the existence of the Schratter Employment Letter and the Corman Employment Letter. (D.I. 156 at 10-11; *see also* D.I. 158 at 7 (arguing that this also means that a fraud claim based on the lack of disclosure of the letters is not viable)) But even if the letters were *referenced* in these Articles, were the letters not made

- Article VI.4 warrants, *inter alia*, that Zausner would "pay off or contribute to the equity of [Schratter] any and all inter-company indebtedness owed by [Schratter.]" (SPA at Art. VI.4)  The SAC alleges that Zausner breached this Article by "failing to pay off, or contributing equity to pay off, all inter-company indebtedness owed by Schratter." (D.I. 147 at ¶ 177)  But the SAC never makes any other clear reference to Schratter's inter-company indebtedness nor to any acts or failures to act by Zausner that relate to this subject matter.[17]  Thus, the Court recommends grant of the Motions as to Count I regarding the alleged breach of Article VI.4.

- Article VI.19(d)(iii) states:

    "During the period commencing on the date which is day after the date which is one year from the Closing and ending on the date which is ten years from the Closing, the price to [Schratter] of each SKU bearing a Foreign Affiliate Brand purchased from a Foreign Affiliate of Seller and picked up by [Schratter] from such Foreign Affiliate of Seller's warehouse shall be calculated using [Schratter]'s warehouse pick-up price[,] as of August 31, 2014 (as may be adjusted from time to time by Seller in its sole discretion) for its least favored customer, minus a discount of 10 [percent] applied to such price." (SPA at Art. VI.19(d)(iii))

    The SAC alleges that this Article was breached because "[i]nstead of honoring this contractual obligation, Zausner, together with its co-conspirators, caused Schratter and Zausner's affiliate Savencia [] to secretly enter into the Distribution Agreement which eradicated the agreed discounts." (D.I. 147 at ¶ 178)  Earlier in the SAC, Plaintiffs do make some further allegations regarding this subject, by asserting that "Voss, on behalf of Schratter, and Savencia [] executed a Distribution Agreement which gave away valuable

---

available to Plaintiffs in the data room, then Plaintiffs may not have been aware of the *substance* of the letters.  The Court thus does not see how these references to the letters in the SPA makes a breach claim implausible. (D.I. 161 at 20 (Plaintiffs arguing that because the SAC alleges that the "*substance or significance* of the[] terms [of the letters] were [n]ever presented [or] disclosed" to them, the fact of the SPA's brief reference to the letters is not significant) (internal quotation marks and citations omitted) (certain emphasis omitted, certain emphasis in original))

[17]     After Zausner raised this issue in its opening brief, (D.I. 156 at 11), Plaintiffs never responded to it in their answering brief, (*see* D.I. 161 at 10-13; D.I. 163 at 4).

distribution discount rights provided for in the [SPA].”  (*Id.* at ¶¶ 151-52)  And Plaintiffs baldly state that “Zausner[ and] Savencia [] induced Voss to sign away those valuable discount rights, purportedly on behalf of Schratter.”  (*Id.* at ¶ 155)  But absent from the SAC is any clear allegation about *how* Zausner caused Schratter/Voss to enter into the Distribution Agreement (i.e., some clear assertion about what Zausner’s role was in this process, or who at Zausner was involved, or really any Zausner-specific fact relating to these activities).[18]  As Defendants note, Gitlin, Zausner’s chief legal officer, is the only individual that the SAC identifies as acting “on behalf of” Zausner, (D.I. 156 at 13; *see also* D.I. 147 at ¶ 12; D.I. 161 at 4), but none of the SAC’s paragraphs regarding these Distribution Agreement allegations discuss Gitlin having engaged in any act that would actually further this alleged breach of contract.  (D.I. 147 at ¶¶ 148-59)  Thus, the Court recommends grant of the Motions as to Count I regarding the alleged breach of Article VI.19(d)(iii).

In sum then, the Court concludes that the SAC has plausibly alleged breach of contract only as to Articles III.7(c), III.9, VI.1(i) and VI.2, for the reasons set out above.[19]  The Court recommends denial of the Motions as to the allegations about those Articles, and grant of the Motions as to all remaining portions of Count I.

---

[18]     Nor did Plaintiffs address this issue in their briefing.

[19]     As was explained above, the plausibly-alleged breaches of these four Articles turn either on:  (1) Zausner’s alleged involvement in making Voss Schratter’s President and CEO in name only, but having Wild actually perform the roles of those positions (via, *inter alia*, the Schratter Employment Letter); and (2) Zausner’s alleged involvement in withholding key documents from the data room that would have disclosed Voss’s and Wild’s true roles, or in putting key documents in the data room that obscured those roles.  To the extent that Zausner argues that, as to these alleged breaches in Count I, Plaintiffs have engaged in improper “group pleading” or did not sufficiently identify which agent of Zausner facilitated the breaches, (D.I. 156 at 13-14), the Court disagrees.  The SAC alleges that Gitlin, who is said to have been acting on behalf of Zausner (his employer), played a key role in preparing the June 30 agreements, and that he also controlled what documents were and were not included in the data room.  (*See, e.g.*, D.I. 147 at ¶¶ 12, 41, 88)

### 2.     Fraud Claims (Count II-V)

Next, the Court addresses the Fraud Claims in Counts II-V of the SAC.  (D.I. 147 at ¶¶ 180-211)  In order to make out a claim of fraud (i.e., fraudulent misrepresentation or fraudulent inducement) under Florida law, a plaintiff must sufficiently allege:  (1) a false statement concerning a material fact; (2) knowledge by the person making the statement that the representation is false; (3) the intent by the person making the statement that the representation will induce another to act on it; and (4) reliance on the representation to the injury of the other party.  *Lance v. Wade*, 457 So. 2d 1008, 1011 (Fla. 1984); *Moriber v. Dreiling*, 194 So. 3d 369, 373 (Fla. Dist. Ct. App. 2016).  A claim for fraudulent concealment (i.e., of fraud due to the failure to disclose a fact) has the following elements:  (1) the concealment or failure to disclose a material fact; (2) knowledge by the person who failed to disclose the fact that it should have been disclosed; (3) knowledge by that person that their concealment or failure to disclose would induce the plaintiff to act; (4) a duty to disclose the material fact; and (5) that the plaintiff detrimentally relied on the misinformation.  *Hess v. Philip Morris USA, Inc.*, 175 So. 3d 687, 691 (Fla. 2015).

The substance of the Counts II-V are nearly identical;[20] the only difference between the Counts is that the names of the relevant party bringing the claim (ECB in Counts II and III, Atlantic Ventures in Count IV and V) and the relevant party accused of misconduct (Zausner in Counts II and IV, Savencia in Counts III and V) are changed, depending on the Count.  (D.I. 147 at ¶¶ 180-211)  These Counts all allege that Zausner or Savencia intentionally made 20 "false

---

[20]     Because this is so, for simplicity's sake, when the Court is referring to one of relevant allegations as to these Counts, it will cite by way of example to Count II.

representations of material facts[,]" (*id.* at ¶¶ 181, 189, 197, 205),[21] and concealed 10 types of

"material information[,]" (*id.* at ¶¶ 183, 191, 199, 207).[22]  The Court will refer to the former as

the "false representations" and the latter as the "material omissions."

---

[21]       The 20 allegedly false representations are:  "(a) Voss was the [P]resident and
[CEO] of Schratter[,] and concealed that he had been stripped of said authority and offices; (b)
Zausner and Savencia had complete trust and confidence in Voss's performance and character;
(c) Voss was trusted, important, and indispensable to the continued success of Schratter; (d)
Schratter's value as an operating business was a direct result of, and dependent upon, Voss being
its [P]resident and [CEO]; (e) Wild was the [E]xecutive [V]ice [P]resident of Schratter when, in
fact, he was *de facto* [CEO]; (f) [t]he purpose of the data room was to 'provide financial
information and third-party agreements by which the company is, or may be, bound . . .' and the
data room contained all pertinent documents and that the documents were complete, accurate[]
and truthful; (g) ZNHC/Zausner purchased Voss's [25] percent interest in Schratter for $10
million; (h) Schratter's financial statements correctly reflected Schratter's liabilities; (i)
Schratter's financial statements were accurate and were prepared and presented in accordance
with U[.]S[.] GAAP, GAAS[] and IFRS; (j) Schratter's internal controls and procedures were
designed to ensure that Schratter's financial statements were accurate in all material respects; (k)
the information provided in the financial statements was a full, fair[] and accurate disclosure of
all material information relative to Schratter's financial position and operations; (l) no material
information relative to Schratter's financial position and operations was withheld from the
financial statements; (m) Schratter's books and records were accurate in all material respects and
all documents material to Plaintiffs' purchase of Schratter were provided in the 'data room'; (n)
the transactions set forth in Schratter's books and records represented bona fide transactions in
compliance with all applicable laws and industry standards; (o) Schratter's revenues, expenses,
assets[] and liabilities had been properly recorded, in all material respects, in Schratter's books
and records; (p) Schratter was able to pay, and was current in the payment of, its debts and other
obligations; (q) Schratter's operations were conducted in the ordinary course of business; (r)
Schratter complied with all laws in its operations; (s) Schratter was in compliance with all of its
financial obligations to its lenders; and (t) Schratter suffered no adverse events in the months
before the closing of the sale."  (D.I. 147 at ¶ 181)

[22]       The 10 types of allegedly concealed material information are:  "(a) Voss had been
stripped of his day-to-day control over Schratter; (b) Voss was [P]resident and CEO in name
only, and virtually all corporate power and duties had been given to Wild; (c) Voss was an
'inside man' for [] Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild[] and Gitlin, and his
loyalties were to himself and [] Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild[] and
Gitlin; (d) Voss, acting *ultra vires*, entered into a secret amendment to the [SPA] that lowered the
value of Schratter; (e) Proust was acting for the benefit of the Savencia Conspiracy and against
the interests of Schratter and Plaintiffs; (f) Proust's loyalties were to [] Zausner, Savencia,
Bongrain, Swartele, Ragnet, Wild, Gitlin[] and Voss, and not to Plaintiffs; (g) Constantin did not
follow applicable GAAP, GAAS[] and IFRS standards when performing the audits of Schratter;
(h) Constantin was not independent from Schratter in its performance of its audits; (i) [t]he 2014

In order to satisfy Rule 9(b), a plaintiff claiming fraud must allege, at a minimum, the "date, time and place of the alleged fraud" or must "otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200; *see also Bray v. Gamestop Corp.*, 1:17-cv-1365, 2018 WL 11226516, at *6 (D. Del. Mar. 16, 2018) ("The Third Circuit has further described the [Rule 9(b)] pleading standard as requiring allegations as to 'the who, what, when, where and how of the events at issue.'") (quoting *United States ex rel. Judd v. Quest Diagnostics Inc.*, 638 F. App'x 162, 168 (3d Cir. 2015)). And where allegations of fraud are brought against multiple defendants, "the complaint must plead with particularity . . . the [specific] allegations of fraud appl[icable] to each defendant." *MDNet, Inc. v. Pharmacia Corp.*, 147 F. App'x 239, 245 (3d Cir. 2005) (citation omitted); *Hicks v. Boeing Co.*, Civil Action No. 13-393-SLR-SRF, 2014 WL 1284904, at *6 (D. Del. Mar. 21, 2014).[23]

For most of the allegedly "false representations" and "material omissions" the Court agrees that Plaintiffs have not pleaded enough pursuant to Rule 9(b), and so the Court recommends dismissal of those claims.[24] The Court briefly summarizes the reasons why below:

---

Audit and other audits contained material misrepresentations and omissions; and (j) [t]he actual amount of money paid to VEI for the purchase of its shares for Schratter." (D.I. 147 at ¶ 183)

[23]    The Court does not agree with Plaintiffs that Defendants have "waived any objection based upon particularity." (D.I. 161 at 19; *see also* Tr. at 34-35) In Savencia's Motion, which Zausner joined, (D.I. 156 at 12), Savencia cites the applicable Rule 9(b) standard with supporting case law and then makes a number of arguments against the Fraud Claims that apply equally to both Defendants, (D.I. 158 at 5-13). Additionally, in Savencia's and Zausner's briefing, each Defendant explains why they believe the Fraud Claims are wanting due to improper group pleading. (D.I. 156 at 13-14; D.I. 158 at 4-5)

[24]    At the outset here, the Court notes that in the July 10, 2020 R&R, it recommended that Plaintiffs' fraud-based claims be dismissed due to rampant "group pleading" (i.e., for insufficiently failing to plead at least the "who" of the fraud), because the FAC would simply allege that certain acts were taken by the "Savencia Defendants" or the "Savencia Defendants and their co-conspirators" and nothing more. (D.I. 135 at 42) Yet in the SAC, Plaintiffs at times attempt to cure this problem by lumping together Savencia, Zausner and/or all or nearly all of Bongrain, Ragnet, Wild, Gitlin, Swartele, Voss and Proust; the SAC will then say that all of

- With regard to <u>false representations (c), (d) and (f) and the second of the representations listed in false representation (m)</u>, they are insufficiently vague as to amount to "group pleading." As to each of them, the Court cannot find particular paragraphs in the SAC where these representations are mentioned and where the SAC lays out, with specificity, "who" exactly made the assertion, and "where" and "when" they did so. *See supra* n.24; *see also* (D.I. 147 at ¶¶ 76-79, 82, 96, 114-15, 125, 128).

- <u>False representation (g)</u> is that Zausner "purchased Voss's [25] percent interest in Schratter for $10 million" and <u>material omission (j)</u> relates to the actual amount of money paid to VEI for the shares (said to be $3 million). Voss is alleged to have made the false statement and omission to the ECB Representatives in September 2014 (and again thereafter). (D.I. 147 at ¶ 103; *see id.* at ¶ 108) Here, the Court does not understand (and Plaintiffs did not explain) how this representation or omission can be attributed to Zausner or Savencia.

- With regard to <u>false representations (h)-(l)</u>, the Court agrees with Defendants that they are "entirely conclusory" and do not sufficiently plead the "what." (D.I. 158 at 12 n.7) These allegations are all about certain "financial statements[,]" and

---

these persons and entities did or said the exact same thing in some vague or undifferentiated time period in some unspecified place. (*See, e.g.*, D.I. 147 at ¶¶ 114-15 ("[D]uring the period of time from October 1, 2014 through the closing of the [SPA], Bongrain, Ragnet, Wild, Gitlin, Swartele[] and Voss made one or more of the following misrepresentations" in "writing and in oral communications to . . . Plaintiffs.")) If that is all there is in the SAC as to one of these false misrepresentations/omissions, the Court will be recommending dismissal of the Fraud Claims to the extent they are premised on those misrepresentations/omissions. That is because, in the Court's view, such allegations do not plausibly set out the "who," "when" or "where" of the alleged fraud. It simply does not seem plausible that, over and over again, five, six or seven people all said or did the exact same thing regarding the matters at issue here (and Plaintiffs largely should know who said what to whom, or who did what, since their representatives are the ones who interacted with the various Defendant-affiliated individuals referenced in the SAC). (Defendants' Hearing Presentation, Slides 12-13) When the SAC engages in this technique, the SAC reads as if Plaintiffs have simply replaced "Savencia Defendants" or "Savencia Defendants and their co-conspirators" with a laundry list of names of persons or entities. (Tr. at 26) This lack of specificity is not in keeping with Rule 9(b)'s dictates.

That said, if the SAC goes beyond that type of blanket allegation and actually lists a particular statement/omission, states who made it/omitted it and (if applicable) states when and where they did so, then the allegation could survive. Below, the Court will assess the Fraud Claims with this in mind.

for the reasons expressed above, they must all be referring to the 2014 audited financial statements, as those are the only financial statements actually referenced with specificity in the SAC. *See supra* pps. 23-24; (D.I. 161 at 11-12). But the SAC never explains how or why Defendants' statements about these financial statements were false, in that it does not explain why the financial statements did not "correctly reflect[] Schratter's liabilities" or were not "accurate [or] prepared and presented in accordance with U[.]S[.]. GAAP, GAAS[] and IFRS" or were not "designed to ensure that [they] were accurate in all material respects" or "were not "a full, fair[] and accurate disclosure" regarding Schratter's financial position and operations or why material information was "withheld" from them. The above rationale also applies to <u>material omission (g)</u> (that "Constantin did not follow applicable GAAP, GAAS[] and IFRS standards when performing the audits of Schratter") and <u>material omission (i)</u> (that "[t]he 2014 [a]udit and other audits contained material misrepresentations and omissions"). The SAC does not contain any details about how Constantin's audits of Schratter did not meet these standards or how any 2014 audit was lacking.

- The same is true for <u>the first of the representations listed in false representation (m)</u>. There, there are no pleaded facts to explain why "Schratter's books and records were [not] accurate in all material respects[.]"

- And it is also true for <u>false representations (n)-(t)</u>. The SAC contains no particularized facts explaining why Schratter's books and records did not reference "bona fide transactions" or did not record relevant financial information. For reasons previously articulated above, the SAC does not explain why any statements were false to the extent they indicated that Schratter was able to pay or was current on payment of "debts and other obligations[,]" or that it "complied with all laws in its operations" or was in compliance with its "financial obligations to its lenders" or "suffered no adverse events in the months before the closing[.]"

- With regard to <u>material omission (c)</u> (that Voss was an "'inside man'") and <u>material omission (h)</u> (that "Constantin was not independent from Schratter while it performed Schratter's

audits"), the SAC never clearly alleges who is responsible for these omissions.[25]

- With regard to material omission (d) (that Voss "entered into a secret agreement to the [SPA] that lowered the value of Schratter[,]") there is a failure to plead the "what" or "how," since the Court does not really understand the allegation. There was an amendment to the SPA, but it was signed by C. Blandin on behalf of ECB. (SPA, ex. B (signature page)) So Plaintiffs' characterization of this amendment as "secret" is baffling, and unsupported by the SAC.

- With regard to material omission (e) (that Proust was "acting for the benefit of [Savencia]" and "against the interests of Schratter and Plaintiffs") and material omission (f) (that Proust's loyalties were not to Plaintiffs but to the Savencia Conspiracy participants), the SAC does allege that "Zausner and Savencia, through Ragnet and Voss, agreed to pay Proust, through Schratter, $50,000 after the completion of the fraudulent sale of Schratter" to compensate him for his role in the conspiracy. (D.I. 147 at ¶ 56) But in terms of what Proust actually is alleged to have done that amounts to fraudulent or wrongful conduct, the SAC is never specific. Nearly every time Proust is referenced in the SAC, he is lumped in with a litany of other people who are generically said to have done or not done certain things, *see supra* n.24, or he is alleged to have done something wrongful regarding Savencia's financial statements that is never actually specified. These vague allegations cannot meet Rule 9(b)'s (or even Rule 8's) requirements.

However, the Court concludes that the Fraud Claims should survive to the extent they are premised on the following false representations and material omissions:

- False representation (a) is that "Voss was the [P]resident and [CEO] of Schratter" (when in fact he had been essentially stripped of that authority in June 2014), and false representation (e) is that "Wild was [E]xecutive [V]ice

_____

[25]   *See Robinson v. Gen. Motors LLC*, Civil Action No. 20-663-RGA-SRF, 2021 WL 3036353, at *4 (D. Del. July 19, 2021) (noting that as to fraud-by-omission allegations, Rule 9(b) requires, *inter alia*, that a plaintiff allege with particularity not only what was omitted, but who should have made the representation).

[P]resident of Schratter" (when in reality he was "*de facto* [CEO]").[26]  The SAC alleges that Gitlin, Zausner's chief legal officer, misrepresented Voss's status in both a draft version and the final version of a "letter of intent to purchase Schratter dated October 1, 2014[,]" which Gitlin drafted and executed in either Pennsylvania or New Jersey and that was ultimately sent to the ECB Representatives on September 25, 2014 and October 1, 2014.  (D.I. 147 at ¶¶ 71, 89, 91; Tr. at 36)  Furthermore, Gitlin and Savencia's secretary general, Ragnet,[27] are alleged to have "caused to be included in the data room [in late 2014] two documents that misrepresented the management structure of Schratter."  (D.I. 147 at ¶ 88)  Those documents are:  (1) "a list of Schratter's directors and officers, identifying Voss as [P]resident and [CEO]" which "made no mention of Wild"; and (2) "a management chart that identified Voss as the [P]resident and [CEO] and Wild as the [E]xecutive [V]ice [P]resident, making no mention of the fact that Wild was *de facto* [CEO]."  (*Id.*; *see also* D.I. 158, ex. 2 at exs. C-D; Tr. at

---

[26]    Defendants attached to Savencia's opening brief a June 27, 2014 document titled "Special Action by Written Consent of the Board of Directors" (the "Special Action"), (D.I. 158, ex. 2 at ex. E), and asked the Court to consider it, (D.I. 158 at 8-9; D.I. 163 at 7 & n.4). Defendants argue that the document, which appears to describe a resolution by Schratter's Board of Directors, was "placed in the data room during the due diligence period"; Defendants also note that the document states that Mr. Wild was approved "to serve as [Schratter's] de facto Interim [CEO] while maintaining the title of Executive Vice President[.]"  (D.I. 158 at 8; *id.* ex. 2 at ex. E)  But in resolving motions to dismiss pursuant to Rule 12(b)(6), courts may consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record and documents integral to or explicitly relied upon in the complaint.  *See, e.g.*, *U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  The "Special Action" document was never specifically referenced in the SAC, nor does the SAC make any indirect reference to it. And the SAC certainly does not indicate that this document was placed in the data room at any point.  In fact, the SAC affirmatively alleges that there "was no resolution of [Schratter's] board of directors" that disclosed that Voss's duties had been assigned to Wild.  (D.I. 147 at ¶ 52)  The Court does not yet know if Plaintiffs' allegations in the SAC can be reconciled with the content of this document.  Nor does it know if this document is authentic, and if it is, whether it was actually in the data room in the relevant time period.  But what the Court does know is that because the document is not referenced in, attached to or integral to the SAC, the Court cannot take it into account here in resolving the Motions at the pleading stage.  *Cf. Buttermore v. Nationstar Mortg. LLC*, Case No. 16-14267, 2017 WL 2306446, at *6 (E.D. Mich. May 26, 2017); (D.I. 161 at 7, 21).

[27]    Defendants claim that Ragnet "acted at all times on behalf of Zausner, not as an 'agent' of Savencia."  (D.I. 158 at 5 (emphasis omitted))  But the SAC alleges that Ragnet was "at all relevant times, secretary general of Savencia" and "[a]cting on behalf of Savencia[.]" (D.I. 147 at ¶ 9)  That is a plausible allegation at the pleading stage.  (*See* D.I. 161 at 18)

37)  And Gitlin and Ragnet are further alleged to have made similar misrepresentations in drafts and the execution copy of the SPA which were sent to Plaintiffs.  (D.I. 147 at ¶¶ 74, 121)  So these allegations are specific enough to meet Rule 9(b)'s requirements.  And the above rationale also applies to <u>material omission (a)</u> (that "Voss had been stripped of his day-to-day control over Schratter") and <u>material omission (b)</u> (that Voss was President and CEO "in name only").[28]

- <u>False representation (b)</u> is that Defendants had "complete trust and confidence in Voss's performance and character[.]"  This representation was alleged to have been made by Gitlin and Ragnet to the ECB Representatives in Delaware and Pennsylvania.  (*Id.* at ¶ 63)  It is also said to have been made by Bongrain, Savencia's chairman, to C. Blandin in Paris, France in or around November or December 2014.  (*Id.* at ¶ 75)[29]

---

[28]      Defendants assert that, as to the material omissions alleged here, the claims are insufficiently pleaded.  They argue that under Florida law, for fraud by omission to be actionable, there must have been a duty to disclose this information and the omissions must have been material, *see R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1068 (Fla. Dist. Ct. App. 2010); Defendants claim that they had no duty to disclose Voss's or Wild's true job responsibilities, and that this information would not in fact have been material to Plaintiffs.  (D.I. 158 at 9)  However, with regard to the duty to disclose, because Defendants disclosed *some* information about Voss's and Wild's roles (i.e., that Voss was Schratter's President and CEO and that Wild was Executive Vice President), then at a minimum they had a duty to disclose *all other material facts* (i.e., the additional facts about Voss's and Wild's "true" status).  *See Deman Data Sys., LLC v. Schessel*, No. 8:12-cv-2580-T-24 EAJ, 2013 WL 6768401, at *3 (M.D. Fla. Dec. 19, 2013); *Friedman v. Am. Guardian Warranty Servs., Inc.*, 837 So. 2d 1165, 1166 (Fla. Dist. Ct. App. 2003) (citing *Gutter v. Wunker*, 631 So. 2d 1117, 1118-19 (Fla. Dist. Ct. App. 1994)).  As for materiality, the SAC alleges that Defendants told Plaintiffs that Voss was the President and CEO of Schratter, and that Voss's knowledge and experience in light of those roles were all key factors in convincing Plaintiffs to move forward with the Schratter transaction.  (*See, e.g.,* D.I. 147 at ¶¶ 27-28, 64-68, 96)  If Plaintiffs had known that as of June 2014, Voss was not in fact acting as the President and CEO of Schratter at all, then it seems plausible to the Court that (as Plaintiffs' allege) Plaintiffs may not have gone on to rely on Voss's advice or to purchase Schratter at all.  (*Id.* at ¶ 145; Tr. at 41-42)

Moreover, Plaintiffs argue that—in part due to these misrepresentations about Voss's and Wild's true status—they decided to buy Schratter and expend significant monies that (had they known the truth) they would never have expended.  (Tr. at 41-42)  Contrary to Defendants' argument otherwise, (D.I. 158 at 9), this amounts to a plausible allegation that Plaintiffs were damaged by these misrepresentations and omissions, (D.I. 161 at 22; Tr. at 41-42).

[29]      Defendants argue that this cannot be an actionable misrepresentation because it amounts to "puffing" and a matter of opinion, not a statement about an existing fact.  (*See* D.I.

For the above reasons, the Court recommends that Defendants' Motions be denied with regard to Plaintiffs' Fraud Claims, to the extent those claims are premised on false representations (a), (b) and (e) and material omissions (a) and (b), and that the Motions otherwise be granted as to those claims.[30]

---

158 at 6-7; D.I. 161 at 19-20)  However, Florida law counsels that whether a representation is a fact or opinion "requires consideration of the surrounding circumstances[,]" and that a representation should be treated as fact if it "can be viewed as coming from one with superior knowledge of the subject of the statement[.]"  *Grimes v. Lottes*, 241 So. 3d 892, 896 (Fla. Dist. Ct. App. 2018) (internal quotation marks and citations omitted).  At the pleading stage, where we do not have a full airing of the "surrounding circumstances" of the allegations, the Court is hesitant to recommend dismissal of a claim on this ground.  And Bongrain, Ragnet and Gitlin are high-level Savencia and Zausner executives who are said to have worked closely with Voss for years; surely they would have "superior knowledge" of the merit of the statement-at-issue as compared to the ECB Representatives.  (D.I. 161 at 20); *see also Mejia v. Jurich*, 781 So. 2d 1175, 1177-78 (Fla. Dist. Ct. App. 2001).  For these reasons, the Court declines to recommend dismissal of this part of the Fraud Claims on "puffing" grounds.

[30]     Defendants also move to dismiss all of Plaintiffs' Fraud Claims on three other legal grounds, none of which should have an impact here.  (*See* D.I. 158 at 11-13; D.I. 163 at 7)  First, Defendants assert that the independent tort doctrine forecloses Plaintiffs from raising fraud claims that are premised on alleged breaches of representations and warranties in the SPA.  But the Court need not reach the issue, as above, the Court has recommended dismissal of all of the portions of the Fraud Claims that Defendants assert are "expressly covered by enumerated representations and warranties contained in the SPA."  (D.I. 158 at 11-12)  Second, Defendants argue that the merger clause in Article XII.2 of the SPA bars the Fraud Claims.  However, the various surviving fraudulent representations/omissions listed above were all made prior to the execution of the SPA and do not mirror representations found in the SPA.  Instead, Plaintiffs appear to be alleging that these representations/omissions fraudulently induced them to enter into the SPA.  *See CEMEX Constr. Materials Fla., LLC v. Armstrong World Indus., Inc.*, Case No. 3:16-cv-186-J-34JRK, 2018 WL 905752, at *11 (M.D. Fla. Feb. 15, 2018) (noting that while a fraud claim cannot be sustained under Florida law if it is inextricably intertwined with the performance of a contract, Florida courts recognize the tort of fraud in the inducement as an independent fraud claim that can be brought despite the existence of contractual privity).  (D.I. 158 at 10; D.I. 161 at 23)  And under Florida law, a merger clause cannot preclude this type of fraud claim, because a party may not contract against liability for its own prior fraud.  *See Global Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1028-29 (11th Cir. 2017) (citing *Oceanic Villas, Inc. v. Godson*, 4 So. 2d 689, 690 (Fla. 1941)); *see also* (D.I. 135 at 41 n.37; D.I. 161 at 22-23).  Third, Defendants argue that the SPA's indemnification provisions (which are referenced in Articles IX.3 and IX.5, and state that any claims for breach of the SPA's terms or claims that relate to the SPA's subject matter shall be made pursuant to the indemnification provisions) foreclose Plaintiffs' fraud claims.  (D.I. 158 at 13)  But the Florida law discussed

### 3.    Aiding and Abetting Breach of Fiduciary Duty Claims (Counts VI-VII)

Plaintiffs next bring claims for aiding and abetting a breach of fiduciary duty against

Zausner, (D.I. 147 at ¶¶ 212-24), and against Savencia, (*id.* at ¶¶ 225-37).  Voss and Proust are

the persons who are alleged to have owed fiduciary duties to Plaintiffs with regard to these

claims.  (*Id.* at ¶¶ 212-37)  Under Florida law, a plaintiff bringing such a claim must sufficiently

allege:  (1) a fiduciary duty on the part of the wrongdoer; (2) a breach of fiduciary duty; (3)

knowledge of the breach by the alleged aider and abettor; and (4) the aider and abettor's

substantial assistance or encouragement of the wrongdoing.  *S&B/BIBB Hines PB 3 Joint*

*Venture v. Progress Energy Fla., Inc.*, 365 F. App'x 202, 207 (11th Cir. 2010); *Fonseca v.*

*Taverna Imports, Inc.*, 212 So. 3d 431, 442 (Fla. Dist. Ct. App. 2017).[31]

Defendants challenge all four elements of these claims.  The Court will address these

challenges as they relate to Voss's alleged breach of fiduciary duties.[32]

---

above (i.e., with regard to the merger clause issue) appears to negate this argument, as it
mandates that if Defendants committed fraud in order to get Plaintiffs to sign the SPA,
Defendants cannot contract away liability for that fraud in the SPA itself (i.e., via an
indemnification provision).  (D.I. 161 at 24)

[31]    Defendants suggest that the allegations as to these counts must meet Rule 9(b)
muster.  (D.I. 158 at 15)  On the one hand, there is some case law stating that Rule 9(b)'s
"heightened pleading requirement generally does not apply to [] state law claims of . . . aiding
and abetting breach of fiduciary duty[.]"  *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 197-98 &
nn. 26 & 31 (D. Del. 2000) (citing cases).  But on the other hand, these claims (and the SAC
itself) pretty clearly "sound in" fraud; indeed Counts VI and VII make explicit reference to such
"frauds[.]"  (D.I. 147 at ¶¶ 219, 230)  The Court need not decide this issue, however, as none of
its decisions below turn on whether Rule 8 or Rule 9(b) applies.  The claims are either
meritorious or deficient under either standard.
.

[32]    With regard to Proust, similar to what the Court indicated earlier regarding the
Fraud Claims, *see supra* p. 38, while the SAC alleges that Proust received $50,000 from
Defendants, it never really states with any clarity or specificity what it is Proust has done that
amounts to a breach of fiduciary duty.  Thus the Court recommends that Counts VI and VII be
dismissed to the extent that they allege conduct premised on Proust's breach of fiduciary duties.

With regard to the existence of a fiduciary duty, Defendants focus their arguments on what the parties refer to as the "pre-closing" time period (or the period of time prior to the December 31, 2014 closing of Schratter's purchase).  (D.I. 158 at 14-15)[33]  They argue that, in the pre-closing time period, Plaintiffs have failed to allege any facts supporting the existence of a fiduciary duty owed to them by Voss.  (*Id*. at 14)  The earliest time that Voss could have owed fiduciary duties to either Plaintiff was December 5 and 9, 2014, as those are the dates on which ECB and Atlantic Ventures, respectively, were formed.  (D.I. 147 at ¶¶ 119-20; *see also* D.I. 161 at 25 (Plaintiffs acknowledging the same))  Under Florida law, a corporate fiduciary "must act in good faith and in the best interest of the corporation" and, in their dealings on behalf of the fiduciary beneficiary, they may not "make any profit or acquire any other personal benefit or advantage, not also enjoyed by the fiduciary beneficiary[.]"  *Cohen v. Hattaway*, 595 So. 2d 105, 107 (Fla. Dist. Ct. App. 1992); *see also McCoy v. Durden*, 155 So. 3d 399, 403 (Fla. Dist. Ct. App. 2014) ("corporate officers and directors owe both a duty of loyalty and a duty of care to the corporation that they serve").  With regard to Voss, he became Atlantic Ventures' President and director on December 9, 2014 and so he surely owed fiduciary duties to Atlantic Ventures as of that date.  (D.I. 147 at ¶ 123)  Defendants argue that Voss did not owe any such duty to *ECB* pre-closing (or post-closing) because he was never a director or officer of ECB.  (D.I. 158 at 14 n.8)  But under Florida law, the concept of a fiduciary duty is defined broadly, covering any relationship where one party has a relation of trust and confidence with the other and relies on the other to act for it or to give advice for its benefit upon matters within the scope of the relationship.  *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002); *McCoy*, 155 So. 3d at 403.  And the

---

[33]     The Court is unsure why it is necessary to assess these claims separately as to "pre-closing" or "post-closing" activity.  But because it finds Defendants' challenge here not to be well-taken, it will address the issue anyway.

SAC alleges that ECB took on Voss as a fiduciary, relied upon him for assistance with due diligence on the Schratter transaction, made him its partner in Schratter's purchase, and placed him in control of Schratter thereafter.  (D.I. 147 at ¶¶ 28, 214)[34]  So both Plaintiffs have sufficiently alleged that Voss owed fiduciary duties to them pre-closing (and post-closing).

Next, Defendants argue that Plaintiffs have failed to allege how Voss breached any fiduciary duty.  (D.I. 158 at 15-16)  However, the Court concludes that the SAC provides plausible allegations of breach.  The SAC sufficiently alleges that Voss engaged in such breaches at least when he:  (1) agreed to misrepresent his office and authority to Plaintiffs, while simultaneously working with Plaintiffs to convince them to purchase Schratter; (2) falsely represented Schratter's value to Plaintiffs in advance of the purchase; (3) entered the Distribution Agreement after the purchase, which removed discounts that should have been otherwise provided to Schratter pursuant to the SPA.  (D.I. 147 at ¶¶ 38, 44-47, 63-68, 71-76, 86-92, 95-100, 103-109, 125, 128, 134, 152, 155, 162, 168, 216, 229)  And Voss is alleged to have engaged in self-dealing here; that is, he is alleged to have been promised and/or provided various financial benefits by Defendants that he otherwise should not have been entitled to, all in order to encourage Voss to help Defendants at Schratter's and Plaintiffs' expense.  (*Id.* at ¶¶ 48, 54)[35]  In

---

[34]     Defendants argue that because Voss, like ECB, was a party to the SPA, this means that regardless of the allegations in the SAC about Voss's role and relationship with ECB, he could not have had a pre-closing fiduciary relationship with ECB.  (D.I. 158 at 14-15)  However, the caselaw that Defendants cite on this point does not clearly support this argument, (*id.*), and so the Court cannot use the argument as a basis to dismiss this portion of the claims at issue.

[35]     In their briefing, Defendants quibble with certain of these "benefit-related" allegations.  (D.I. 158 at 15-16)  In the Court's view, however, Defendants' arguments amount to assertions that are inappropriate at the pleading stage.  In the SAC, as noted above, Plaintiffs allege that Voss was "provided compensation" for his alleged breaches of fiduciary duty in various forms, which appear to total millions of dollars in value.  (D.I. 147 at ¶ 54)  Defendants' arguments here largely amount to arguments that:  (1) the SAC is incorrect when it states that

the Court's view, these are plausible allegations that Voss breached his fiduciary duties to Plaintiffs.

Lastly, Defendants argue that Plaintiffs fail to allege that any Defendant had sufficient knowledge of Voss's breach of fiduciary duties or that Defendants provided substantial assistance or encouragement of this wrongdoing.  (D.I. 158 at 17-18)  Here, the Court concludes that at least with regard to two of the types of alleged breaches of fiduciary duty described above—the scheme to misrepresent Voss's office and authority to Plaintiffs, and Voss's false representation of Schratter's value—the allegations do explain how persons associated with both Defendants knew about this conduct and assisted or encouraged the conduct.[36]  As to the scheme to misrepresent Voss's office and authority, Plaintiffs allege that representatives of both Savencia and Zausner made statements in support of the scheme, drafted documents in support

---

Voss received some of these benefits or (2) these allegations "overlook" other facts that, when put in a context more favorable to Defendants, might suggest that no wrong occurred or (3) these allegations are implausible because they suggest that Voss paid more to acquire Schratter than he received in allegedly ill-gotten payments from Defendants.  (D.I. 158 at 15-16)  The pleading stage, however, is the wrong time for the Court to weigh all of the evidence.  In the end, Defendants' factual arguments "cannot be resolved at the motion to dismiss stage."  *F.T.C. v. Shire ViroPharma Inc.*, Civil Action No. 17-131-RGA, 2018 WL 1401329, at *7 (D. Del. Mar. 20, 2018).

[36]    With regard to the other breach of fiduciary duty by Voss that the Court found above was sufficiently pleaded—i.e., that Voss entered into the Distribution Agreement after the purchase—the Court agrees with Defendants that the allegations regarding Defendants' knowledge or assistance/encouragement of such conduct are too vague to plausibly state a claim. In the key paragraphs of the SAC, Plaintiffs never go beyond group pleading, and they never articulate how a particular representative of each Defendant knew of the conduct or assisted/encouraged it.  (D.I. 147 at ¶¶ 154-56); *see also S&B/BIBB Hines PB 3 Joint Venture*, 365 F. App'x at 207 (affirming dismissal of a claim for aiding and abetting a breach of fiduciary duty under Florida law, where the allegations with regard to the "substantial assistance or encouragement" element were little more than "conclusory allegations"); *VM Glob. Partners, LLC v. Laxai Pharma, Ltd.*, No. 8:14-cv-01343-T-27EAJ, 2015 WL 1612009, at *2 (M.D. Fla. Apr. 9, 2015) (dismissing such a claim in light of the plaintiffs' failure to sufficiently allege facts suggesting that certain defendants knew of the breaches of fiduciary duty or assisted or encouraged them); *see also Turnberry Vill. N. Tower Condo. Ass'n, Inc. v. Turnberry Vill. S. Tower Condo. Ass'n, Inc.*, 224 So. 3d 266, 267 (Fla. Dist. Ct. App. 2017).

of the scheme, and/or withheld documents from Plaintiffs that would have disclosed the scheme. (D.I. 147 at ¶¶ 63, 71, 74-76, 88-92)  As to Voss's false representations about Schratter's value, Plaintiffs allege that representatives of Defendants knew about the false representation, had control over what documents were provided in the data room, and intentionally withheld documents from the data room that would have demonstrated the falsity of this representation. (*Id.* at ¶¶ 79, 84, 85, 88, 104, 109)

The Court, therefore, recommends that Counts VI and VII for aiding and abetting breach of fiduciary duties should not be dismissed to the extent they are directed to Defendants' aiding and abetting of Voss's alleged breaches discussed above.  Otherwise, the Court recommends that they be dismissed.

### 4.     Conspiracy Claims (Counts VIII and IX)

In Counts VIII and IX, Plaintiffs bring claims of conspiracy to commit breach of fiduciary duty against both Defendants, (D.I. 147 at ¶¶ 238-45), and conspiracy to commit fraud and constructive fraud against both Defendants, (*id.* at ¶¶ 246-55).  Under Florida law, a civil conspiracy requires:  (1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the commission of an overt act in furtherance of the conspiracy; and (4) damage to plaintiff as a result.  *Eagletech Commc'ns, Inc. v. Bryn Mawr Inv. Grp., Inc.*, 79 So. 3d 855, 863 (Fla. Dist. Ct. App. 2012) (citation omitted).  Furthermore, Florida law states that a valid claim must allege an independent underlying illegal act or tort on which the conspiracy is based.  *See Carney v. IDI-DX, Inc.*, No. 2:12-cv-00449-FtM-29DNF, 2013 WL 4080326, at *3 (M.D. Fla. Aug. 13, 2013); *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997).

Defendants first argue that Plaintiffs have failed to state underlying claims for fraud or for a breach of a fiduciary duty, and so their related conspiracy claims must fail.  (D.I. 158 at 18)

Above, however, the Court has concluded that Plaintiffs have pleaded viable claims in some respects regarding these torts, and so this argument for dismissal falls away.

Next, Defendants argue that Count IX must fail because "the parties to the SPA indisputably dealt with each other at arm['s ]length[,]" such that no constructive fraud could have occurred. (*Id.*) Under Florida law, constructive fraud occurs when "a duty under a confidential or fiduciary relationship has been abused or where an unconscionable advantage has been taken." *Am. Honda Motor Co., Inc. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1179 (M.D. Fla. 2005) (internal quotation marks and citations omitted). To state a claim for constructive fraud, a party must allege "some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel[] and protect the weaker party"; however, Florida law does not allow for constructive fraud claims "where the parties are dealing at arm['s ]length because there is no duty imposed on either party to protect or benefit the other." *Id.* (internal quotation marks and citations omitted). As was discussed above regarding Counts VI-VII, the SAC alleges that Voss[37] had a fiduciary relationship with Plaintiffs, and that Plaintiffs depended on Voss's guidance and advice throughout the due diligence process regarding Schratter's purchase (and thereafter). (D.I. 147 at ¶ 28) If that is true (as the Court must assume it to be at this stage), then Voss did not act at "arm's length"[38] from Plaintiffs with regard to Schratter's purchase.

---

[37] To the extent that these Counts are premised on the underlying acts of Proust, for the same reasons set out above with regard to Counts VI and VII, the allegations cannot stand. *See supra* n.32.

[38] *See, e.g., Ellis Sarasota Bank & Tr. Co. v. United States*, No. 76-138-Civ-T-H, No. 76-139-Civ-T-H, 1977 WL 1275, at *4 (M.D. Fla. Apr. 19, 1977) (defining an "arm's length transaction" as "one wherein each party is striving for the best possible bargain for himself as opposed to person or persons with whom he is transacting business" and that it normally occurs in a transaction between "strangers").

Defendants also argue that both conspiracy claims should be dismissed in light of the intra-corporate conspiracy doctrine. (D.I. 158 at 19) This doctrine "provides that neither an agent nor an employee can conspire with his or her corporate principal[.]" *Mancinelli v. Davis*, 217 So. 3d 1034, 1036 (Fla. Dist. Ct. App. 2017) (internal quotation marks and citation omitted). "Where corporate agents are acting within the scope of their employment, their actions are attributed to the corporation itself, thereby negating the multiplicity of actors needed for a conspiracy." *Weisman v. S. Wine & Spirits of Am., Inc.*, 297 So. 3d 646, 652 (Fla. Dist. Ct. App. 2020) (internal quotation marks and citation omitted). However, there is a "personal stake" exception to the intra-corporate conspiracy doctrine. This exception states that "a corporation conspiring with its own agents can be held liable where its agent has a personal stake in the activities that are separate and distinct from the corporation's interest." *Id.* (internal quotation marks and citation omitted). The personal stake exception "applies only where corporate employees are shown to have been motivated *solely* by personal bias." *Id.* (emphasis in original) (internal quotation marks and citation omitted). Under Florida law, the intra-corporate conspiracy doctrine "is not an affirmative defense[,]" and requiring a plaintiff to plead facts establishing the personal stake exception "does no more than require that the complainant allege facts showing the base requirement that 'two or more persons' have entered into an agreement." *Mancinelli*, 217 So. 3d at 1038 (citations omitted).

Here, the Court concludes that Defendants' argument about the intra-corporate conspiracy doctrine is not well taken. Even if one could otherwise consider Zausner or Savencia to have been Voss's "corporate principal" (and the Court is not sure if one can), the SAC otherwise pleads sufficient facts demonstrating that Voss had a personal stake in the alleged misconduct. The SAC alleges that after Schratter's sale, VEI (Voss's company) owned a 45

percent interest in Schratter and Atlantic Ventures.  (D.I. 147 at ¶ 120)  It seems that if Voss was able to help ensure Schratter's sale, then the benefits to him of that sale (via his ownership of VEI and also in light of the other monies said to have been paid to him by Defendants) could plausibly be seen as being motivated solely by personal bias.  That is, his interests could be understood to be wholly different from those of Defendants.  *Cf. HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 302 F. Supp. 3d 1319, 1326 (M.D. Fla. 2016) (explaining that a corporate agent's interest in a conspiracy was not solely personal where the agent's compensation from the conspiracy was bonus-earning potential that was premised on the corporation's success, as there, the "agent's compensation [was] directly related to the corporation's success [because] the two interests cannot be separated").[39]

Lastly, Defendants assert that Plaintiffs have failed to allege the essential elements of a conspiracy because "the information allegedly concealed or withheld from Plaintiffs was expressly disclosed in the SPA, and neither Defendant paid anything to Voss[.]"  (D.I. 158 at 20)  The Court has addressed these arguments above as to other claims, and has explained why they are insufficient to form a basis for dismissal.

The Court, therefore, recommends that Counts VIII and IX should not be dismissed, to the extent they are directed to:  (1) Defendants' alleged conspiracy with Voss (2) regarding Voss's conduct that suffices to state a claim in Counts II to VII.  Otherwise, the Court recommends that they be dismissed.

---

[39]     In a footnote in their opening brief, Defendants argue that Plaintiffs are engaging in improper claim-splitting by asserting the same civil conspiracy claims against Bongrain, Ragnet, Wild, Swartele and Gitlin in a related Florida action.  (D.I. 158 at 19 n.9)  Arguments raised in passing (such as in a footnote), but that are not squarely argued, like this one, are considered waived.  *See Idenix Pharms. LLC v. Gilead Scis., Inc.*, 271 F. Supp. 3d 694, 698 n.6 (D. Del. 2017); *Robocast, Inc. v. Apple Inc.*, Civil Action No. 11-235-RGA, 2014 WL 2622233, at *1 (D. Del. June 11, 2014).

**B.      Time-bar Challenges**

Defendants also assert time-bar challenges to all counts of the SAC.  (D.I. 156 at 14-20; D.I. 158 at 20)

In the July 10, 2020 R&R, the Court went through a rigorous review of all of Defendants' many time-bar-related bases for dismissal.  (D.I. 135 at 22-37)[40]  In deciding that Plaintiffs' claims were not clearly time-barred (and thus not subject to dismissal on that ground at the pleading stage), the Court resolved a number of issues, concluding as follows:  (1) Delaware's statute of limitations law (not Florida's law) applies to the claims in this case, and Delaware law provides for a three-year statute of limitations as to all of the claims, (*id.* at 23-28); (2) the SPA's shortened survival period did not alter the three-year statute of limitations as to the FAC's breach of contract claim, (*id.* at 29-31); (3) Plaintiffs' claims could be argued to have all accrued at least as of December 2014 (and thus the applicable statute of limitations might have run at least by December 2017); and (4) however, Plaintiffs had plausibly pleaded a basis to believe that equitable tolling applied here, such that the statute of limitations would not have run by the time of the filing of the original Complaint, (*id.* at 31-37).  The District Court overruled Defendants' objections to the Court's decisions with regard to these time-bar issues.  (D.I. 141 at 5-6)  In doing so, it found that Defendants did not make the arguments associated with their objections to the Court in the first instance, such that those arguments were not proper grounds for an objection.  (*Id.*)[41]  The District Court also later denied Defendants' "Motion for Clarification" with regard to the equitable tolling issue.  (D.I. 143; D.I. 164)

---

[40]      The Court incorporates by reference and assumes familiarity with the Court's July 10, 2020 R&R's as it relates to those previous time-bar challenges.

[41]      The District Court also noted that it had "some doubts that Defendants' objections would have succeeded on the merits[,]" had the merits been considered.  (D.I. 141 at 6 n.4)

Now, in opposing the SAC, Defendants once again assert that all of Plaintiffs' claims are time-barred. Defendants argue that they are entitled to make this challenge again, even in light of the Court's prior decision to the contrary regarding the FAC, because Plaintiffs have now added so many new factual allegations in the SAC. (D.I. 163 at 13) Even assuming that is so, the Court does not see a reason to retreat from its prior decision: that Plaintiffs have plausibly pleaded a basis to believe that equitable tolling applies here.[42]

As the Court previously noted in the July 10, 2020 R&R, (D.I. 135 at 34), at the motion to dismiss stage, a plaintiff must plead the applicability of the equitable tolling doctrine. It must do so by alleging: (1) a fiduciary relationship; (2) actionable or fraudulent self-dealing; and (3) lack of inquiry notice. *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 193 (D. Del. 2000).

Defendants challenge the allegations as insufficiently establishing the first two elements: —the existence of a fiduciary relationship and actionable or fraudulent self-dealing—for the same reasons they put forward in addressing other claims referenced above (e.g., Counts VI and VII). (D.I. 156 at 16 n.7; D.I. 158 at 20 n.10) For the reasons the Court set out in addressing those other claims, it concludes that Plaintiffs have sufficiently pleaded facts relating to these two elements.

Defendants also assert that the SAC does not plausibly plead the third equitable tolling element: lack of inquiry notice. (D.I. 156 at 18-20) In that regard, "[i]nquiry notice exists when person[s] of ordinary intelligence and prudence [have facts sufficient to place them] on inquiry which, if pursued, would lead to the discovery of the injury." *Eluv Holdings (BVI) Ltd. v.*

---

[42]     To the extent Defendants address the failure to plead facts regarding the fraudulent concealment tolling doctrine, (D.I. 156 at 16-18), as it explained in the July 10, 2020 R&R, the Court need not address those issues here, as Plaintiffs have sufficiently alleged facts establishing that the equitable tolling doctrine applies, (D.I. 135 at 33).

*Dotomi, LLC*, C.A. No. 6894-VCP, 2013 WL 1200273, at *7 (Del. Ch. Mar. 26, 2013) (certain alteration in original) (emphasis omitted) (internal quotation marks and citation omitted). Defendants argue that Plaintiffs were "on inquiry notice, at the very latest, on June 30, 2015" because they should have known of any alleged fraud or wrongdoing as of the December 2014 closing of the Schratter sale (or soon after), when they "became the owners of [Schratter]." (D.I. 156 at 18-19)

Above, the Court has concluded that Plaintiffs have sufficiently pleaded misconduct in the SAC that relates to at least two general categories of alleged wrongdoing: (1) Defendants' and Voss's efforts to misrepresent Voss's office and authority to Plaintiffs from June 2014 through December 2014; and (2) Voss's false representation about Schratter's value to Plaintiffs in advance of the purchase (and Defendants' efforts to conceal that fact). Because Plaintiffs filed this case on October 23, 2018, (D.I. 135 at 8), if they were on inquiry notice as of October 23, 2015 or earlier regarding this misconduct, then equitable tolling would not save their claims, (D.I. 156 at 19). But in light of the SAC, the Court cannot conclude (as Defendants urge), that Plaintiffs were surely on inquiry notice as of October 2015. For one thing, the SAC alleges otherwise.[43] Moreover, while it is true that the SPA made reference to the Schratter Employment Letter and the Corman Employment Letter, (D.I. 156 at 19), it is not clear to the Court that Plaintiffs ever actually learned of Voss's "true" June 2014-December 2014 employment status at the time of closing or in 2015. Nor is it clear that Plaintiffs learned the truth as to Voss's statements about Schratter's value at the time of closing or in 2015. And as for whether Plaintiffs otherwise had possession of facts sufficient to place them on inquiry notice of

---

[43]     The SAC pleads that Plaintiffs did not uncover the wrongdoing at issue until 2017, when Voss was no longer in his position at Schratter. (D.I. 147 at ¶ 165)

52

these things between December 2014 and October 2015, again, this is not clear to the Court either.  This is an issue much better addressed at a case-dispositive stage, on a much more full record than the Court now has.

For these reasons, the Court reaffirms its prior decision that Plaintiffs have plausibly pleaded a basis to believe that equitable tolling applies here, such that the statute of limitations would not have run by the time of the filing of the original Complaint.  (D.I. 135 at 37)

## IV. CONCLUSION

For the foregoing reasons, the Court recommends that the Motions be GRANTED-IN-PART and DENIED-IN-PART.  More specifically, the Court recommends that:  (1) the Motions should be granted as to Count I, except for the allegation of breach of contract as to Articles III.7(c), III.9, VI.1(i) and VI.2; (2) the Motions should be granted as to Counts II-V, except to the extent that the claims are premised on false representations (a), (b) and (e) and material omissions (a) and (b); (3) the Motions should be granted as to Counts VI and VII, except to the extent the Counts are directed to Defendants' aiding and abetting of certain of Voss's alleged breaches of fiduciary duty (as set out above); and (4) the Motions should be granted as to Counts VIII and IX, except to the extent that the Counts are directed to (a) Defendants' alleged conspiracy with Voss (b) regarding certain aspects of Voss's conduct (as set out above).[44]

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the

---

[44]      The Court will address the issue of Plaintiffs' ability to further amend its pleading when it deals with Plaintiffs' pending motion in that regard.  (D.I. 173)

loss of the right to *de novo* review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated:  July 28, 2021

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE