## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ECB USA, INC., a Florida corporation, and
ATLANTIC VENTURES CORP., a Florida
corporation,

      Plaintiffs,

          vs.

SAVENCIA, S.A., and ZAUSNER FOODS
CORP., a Delaware corporation, on behalf of
itself, and as successor in interest to ZNHC,
INC., a Delaware corporation,

      Defendants.

ZAUSNER FOODS CORP., a Delaware
corporation, on behalf of itself, and as successor
in interest to ZNHC, INC., a Delaware
corporation,

      Counterclaim-Plaintiff,

          vs.

ECB USA, INC., a Florida corporation, and
ATLANTIC VENTURES CORP., a Florida
corporation,

      Counterclaim-Defendants,

ZAUSNER FOODS CORP., a Delaware
corporation, on behalf of itself, and as successor
in interest to ZNHC, INC., a Delaware
corporation,

      Third-Party Plaintiff,

          vs.

G.I.E. C2B, a French entity, and JOHN DOE
DEFENDANTS 1-10,

      Third-Party Defendants.

Case No. 1:19-CV-00731-RGA

**DEMAND FOR JURY TRIAL**

Defendant Savencia S.A. ("Savencia") and Defendant, Counterclaim Plaintiff, and Third-Party Plaintiff Zausner Foods Corp. ("Zausner"), on behalf of itself and as successor in interest to ZNHC, Inc. ("ZNHC") (collectively, "Defendants"), by and through their undersigned counsel, and with the written consent of the Plaintiffs, Counterclaim Defendants, and identified Third-Party Defendant pursuant to Fed. R. Civ. P. 15(a)(2), hereby file this amended pleading that amends both (i) Defendants' Answer and Additional Defenses to Plaintiffs' Second Amended Complaint in *ECB USA, Inc. et al. v. Savencia S.A., et al.*, No. 1:19-cv-00731-RFA, and (ii) Zausner's First Amended Complaint in *Zausner Foods Corp. v. ECB USA, Inc., et al.*, No. 1:20-cv-01769-RGA.[1]

## DEFENDANTS' AMENDED ANSWER AND ADDITIONAL DEFENSES TO PLAINTIFFS' SECOND AMENDED COMPLAINT

Defendants, by and through their undersigned counsel, submit the following answer and additional defenses to the Second Amended Complaint ("SAC") of Plaintiffs ECB USA, Inc. ("ECB USA") and Atlantic Ventures Corp. ("Atlantic Ventures") ("Plaintiffs"). Defendants specifically deny all allegations not expressly admitted below.

## I.     NATURE OF THE CASE[2]

It is admitted only that the Complaint purports to state causes of action against Defendants. It is specifically denied that Defendants engaged in any "tortious acts," fraud, or conspiracy, as alleged by Plaintiffs in the SAC. The allegations of this paragraph are otherwise denied.

1.     Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00 and there is complete diversity of citizenship among the parties.

**Answer:**   The allegations of this paragraph contain conclusions of law to which no

---

[1]     The purpose of this amended pleading is to reflect (i) the consolidation of the two actions into a single proceeding (*see* D.I. 213), and (ii) the dismissal of certain third-party defendants from the case for lack of personal jurisdiction (*see* D.I. 222).

[2]     Certain headers from the SAC have been included herein for convenience. Any allegations in the headers and sub-headers in the SAC are specifically denied.

response is required and they are therefore denied.

2.      This action was transferred to this Court from the United States District Court for the Southern District of Florida.  Jurisdiction and venue are appropriate in Delaware because Defendants have consented to jurisdiction and venue in this Court.  *See* September 8, 2020, Order (D.I. 142) entered by this Court, denying Savencia's motion to dismiss (D.I. 82) on personal jurisdiction grounds.

**Answer:**  Admitted in part; denied in part.  It admitted only that this action was transferred to this Court from the United States District Court for the Southern District of Florida because the parties' Stock Purchase Agreement contains an exclusive choice of forum clause mandating that all disputes arising in connection with same were required to be brought in Delaware.  *See* ECF Nos. 4, 55.  The September 8, 2020 Order referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.   The remaining allegations in this paragraph are denied.

3.      ECB USA is a Florida corporation with its principal place of business in Miami-Dade County, Florida.

**Answer:**  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and they are therefore denied.

4.      Atlantic Ventures is a Florida corporation with its principal place of business in Miami-Dade County, Florida.

**Answer:**  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and they are therefore denied.

5.      Savencia is a multinational conglomerate with its principal place of business in France.  Savencia directed, and participated in, the frauds and other tortious acts addressed in this action.  Savencia acted through its officers and directors to commit the frauds and other illegal acts set forth in this Second Amended Complaint.

**Answer:**  It is admitted only that Savencia's principal place of business in in France.  The remaining allegations in this paragraph are denied.

6.      Zausner is a Delaware corporation doing business throughout the United States.  Zausner was an active participant in the frauds and other tortious acts addressed in this action.

**Answer:** It is admitted only that Zausner is a Delaware corporation. The remaining allegations in this paragraph are denied.

7. ZNHC was a Delaware corporation that merged into Zausner. As such, ZNHC no longer exists as an entity. ZNHC was an active participant in the frauds and other tortious acts addressed in this action. As successor in interest to ZNHC, Zausner is liable for ZNHC's wrongful conduct. For the purposes of this Second Amended Complaint, any reference to Zausner includes ZNHC.

**Answer:** It is admitted only that ZNHC was a Delaware corporation that merged into Zausner and Zausner is the successor in interest to ZNHC. The remaining allegations in this paragraph are denied.

8. Alex Bongrain ("Bongrain") was, at all relevant times, the chairman of Savencia. Acting on behalf of Savencia, Bongrain participated in, and directed, the frauds and other torts in Florida addressed in this action.

**Answer:** It is admitted only that Alex Bongrain was the chairman of Savencia (a French corporation). The remaining allegations in this paragraph are denied.

9. Pierre Ragnet ("Ragnet") was, at all relevant times, secretary general of Savencia. Ragnet was president of Zausner and is now president of AFP Advanced Food Products, LLC (another affiliate of Savencia). Acting on behalf of Savencia, Ragnet participated in, and directed, the frauds and other torts in Florida addressed in this action.

**Answer:** It is admitted only that Pierre Ragnet was a secretary general of Savencia (a French corporation), was at one time President of Zausner, and is now president of Advanced Food Products, LLC. The remaining allegations in this paragraph are denied.

10. J. M. Wild ("Wild") was, at all relevant times, the group chief financial officer for the North American affiliates of Savencia. Wild also was, unbeknownst to the ECB Representatives, secretly the *de facto* chief executive officer of Schratter from June 30, 2014, until December 31, 2014. Wild undertook his secret role on behalf of Savencia and reported directly to Bongrain – Savencia's chairman. Wild participated in, and directed, the frauds and other torts in Florida addressed in this action.

**Answer:** It is admitted only that J. M. Wild, while maintaining the title of Executive Vice President of Schratter Foods, Inc. ("SFI"), was approved by the board of SFI to serve as *de facto* interim Chief Executive Officer of SFI, which was disclosed to Plaintiffs prior to the closing of

the Stock Purchase Agreement.

11.    Thomas Swartele ("Swartele") was, at all relevant times, a director of Savencia. Acting on behalf of Savencia and reporting to Bongrain, Swartele participated in, and directed, the frauds and other torts in Florida addressed in this action.

**Answer:** It is admitted only that Thomas Swartele was a director of Savencia (a French corporation) and a director of SFI. The remaining allegations in this paragraph are denied.

12.    Lewis Gitlin ("Gitlin") was, at all relevant times, chief legal officer of Zausner. Acting on behalf of Zausner, Gitlin participated in, and directed, the frauds and other torts in Florida addressed in this action.

**Answer:** It is admitted only that Lewis Gitlin was previously the chief legal officer of Zausner. The remaining allegations in this paragraph are denied.

13.    Savencia Cheese USA, LLC ("Savencia Cheese"), formerly named Alouette Cheese USA, LLC, was, at all relevant times, an affiliate of Savencia and Zausner and distributed cheese to Schratter and other companies. Savencia Cheese, Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Bertrand Proust ("Proust") conspired to commit the frauds and other torts in Florida addressed in this action.

**Answer:** It is admitted only that Savencia Cheese USA, LLC is an affiliate of Savencia. The remaining allegations in this paragraph are denied.

14.    Voss was a fiduciary of the ECB Representatives and Plaintiffs and an officer and director of Atlantic Ventures and Schratter. Voss reported directly to Bongrain – Savencia's chairman – and acted as the "inside man" within Plaintiffs' organizations, all the while serving his own interests and those of Savencia Cheese, Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Proust and Gitlin.

**Answer:** It is admitted only that Voss was an officer and director of Atlantic Ventures and SFI, with Plaintiffs hiring Voss for those roles. The remaining allegations are denied.

15.    At all relevant times, Proust was the chief financial officer for Schratter. Proust was a fiduciary of Atlantic Ventures, but all the while serving his own interests and the interests of Savencia Cheese, Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Voss and Gitlin.

**Answer:** It is admitted only that Proust was the chief financial officer for SFI. The remaining allegations in this paragraph are denied.

16.     Savencia is the second largest producer of cheese in France with over $5 billion in sales.  Savencia manufactures and sells cheese and other dairy products in over 120 countries.

**Answer:**  It is admitted only that Savencia manufactures and sells cheese and other dairy products in over 120 countries.  The remaining allegations in this paragraph are denied.

17.     The Savencia brands include many of the products found in supermarkets in the United States and in Florida.

**Answer:**  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and they are therefore denied.

18.     Over twenty years ago, Savencia, then known as Bongrain, S.A., purchased Schratter to develop it as its distribution arm in the United States.

**Answer:**  Denied.

19.     Over time, Schratter became a market leader for the distribution of specialty cheese and other dairy products to supermarket chains, grossing over $200 million in 2012, much of which was from the sale and distribution of Savencia products.

**Answer:**  Denied.

20.     For over twenty years, Voss was president and CEO of SFI.  Through his company, Voss Enterprises, Inc. ("VEI"), Voss owned twenty-five percent of SFI's shares.

**Answer:**  It is admitted only that Voss owned twenty-five percent of SFI's shares prior to June 30, 2014 and that Voss was president and CEO of SFI.  The allegations of this paragraph are otherwise denied.

21.     Until the end of June 2014, Zausner owned seventy-five percent of Schratter's stock.  Thereafter, until the sale of Schratter to Atlantic Ventures, Zausner owned one hundred percent of Schratter's stock.

**Answer:**  Admitted.

22.     Sometime in the first half of 2013, Savencia began migrating the distribution business away from Schratter and into Alouette Cheese USA, Inc.

**Answer:**  Denied.

23.     In mid-to-late 2014, the ECB Representatives became enmeshed with Zausner, Savencia, Savencia Cheese, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust, who then

began their efforts to fraudulently induce the ECB Representatives, and ultimately Plaintiffs, to enter into a stock purchase agreement for the purchase of all of Schratter's stock.

**Answer:** Denied.

24. As more fully discussed *infra*, Zausner, Savencia Cheese, Swartele, Wild, Voss, Proust, and Gitlin acted at the direction of Savencia and its senior officers Bongrain and Ragnet.

**Answer:** Denied.

25. As more fully set forth, *infra*, Zausner, Savencia, Savencia Cheese, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust each engaged in at least two or more separate but related frauds and other wrongful acts, victimizing Plaintiffs and Schratter.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.

26. Zausner, Savencia, Savencia Cheese, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust each understood that the ECB Representatives did not have any experience in the cheese distribution business and, if they were to buy Schratter, they would have had to do so with Schratter's senior management in place. Moreover, Zausner, Savencia, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust each understood that the senior members of ECB did not have permission to work in the United States. These facts created an opportunity for Zausner, Savencia, Savencia Cheese, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust to fraudulently induce the ECB Representatives, and thereafter Plaintiffs, to accept Voss as a fiduciary and partner.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.

27. Accordingly, even though Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, and Gitlin had been involved in stripping Voss of his powers and offices as president and chief executive officer of Schratter (*see infra*); Zausner, Savencia, Bongrain, Ragnet, Wild, Gitlin, and Voss lied to the ECB Representatives and told them that Voss was the extant president and chief executive officer of Schratter. Zausner, Savencia, Bongrain, Ragnet, Wild, Gitlin, and Voss also held Voss out as Schratter's trusted, knowledgeable, and effective chief, for the purpose of persuading the ECB Representatives to accept Voss as a fiduciary and to partner with him to purchase Schratter.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.

28. In reliance on the representations made by Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, and Voss, the ECB Representatives, and thereafter Plaintiffs: (a) took Voss

as a fiduciary; (b) partnered with Voss to purchase Schratter; (c) relied on Voss for much of the due diligence regarding the acquisition of Schratter; (d) "retained" Voss as president and chief executive officer of Schratter; and (e) appointed Voss as the president of Atlantic Ventures.

**Answer:** It is admitted only that Plaintiffs hired Voss as president and chief executive officer of SFI. The remaining allegations in this paragraph are denied.

29.    Voss, as a fiduciary of Plaintiffs, but in furtherance of the conspiracy undertaken by Voss, Zausner, Savencia, Savencia Cheese, Bongrain, Swartele, Ragnet, Wild, Gitlin, and Proust: (a) fraudulently helped persuade Plaintiffs to purchase Schratter at an inflated price; (b) took control of Plaintiffs' due diligence to advance the fraud; (c) helped Zausner, Savencia, Savencia Cheese, Bongrain, Swartele, Ragnet, Wild, Gitlin, and Proust in their wrongful efforts to drain Schratter of its assets and drive it into insolvency; and (d) covered up the misdeeds of Zausner, Savencia, Savencia Cheese, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust (collectively, the "Inside Man Fraud").

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

30.    Voss committed acts in furtherance of the Savencia Conspiracy while a director and president of Atlantic Ventures, a Florida corporation. Voss continued to act in furtherance of the conspiracy after Schratter moved its headquarters to Florida, committing many tortious acts in Florida.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

31.    After convincing the ECB Representatives to accept Voss as a fiduciary, Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust induced Plaintiffs to purchase Schratter at a grossly inflated price (the "Stock Purchase Fraud").

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

32.    The Stock Purchase Fraud was committed in Florida because, *inter alia*, Article VIII.1 of the December 6, 2014 Stock Purchase Agreement stated that Plaintiffs would close on the purchase of Schratter "on December 29, 2014, at the offices of Morgan, Lewis & Bockius LLP, 200 S. Biscayne Blvd., Suite 5300, Miami, Florida ...."

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied. By way of further response, the Stock

Purchase Agreement referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.

33.     Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust accomplished the Stock Purchase Fraud through various misrepresentations and concealment of material information surrounding the purchase of Schratter.  Most of the acts and communications surrounding the purchase and sale of Schratter, and leading up to the Stock Purchase Fraud, took place in Florida and were directed to Florida corporations whose principal place of business was and is Miami-Dade County, Florida.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

34.     The third fraud consisted of the revocation of discounts and rights to purchase foreign cheese products that were negotiated as consideration for Plaintiffs' purchase of Schratter. Savencia Cheese, Zausner, Savencia, Bongrain, Ragnet, Wild, Gitlin, Voss, and Proust caused Schratter to revoke and give away substantial pricing discounts and rights through the execution of a distribution agreement between Savencia Cheese and Schratter on June 30, 2015 (the "Distribution Agreement").  The Distribution Agreement purported to change the terms of the Stock Purchase Agreement without the written consent of Plaintiffs, who were parties to the Stock Purchase Agreement (the "Distribution Agreement Fraud").

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.  By way of further response, the Distribution Agreement referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.

35.     The Distribution Agreement Fraud allowed Savencia Cheese to (a) overcharge for the foreign cheeses it sold to Schratter; and (b) to cease distributing other foreign cheeses to Schratter.  The inflated prices and denial of products, together with the loss of value of Schratter as an ongoing concern, damaged Plaintiffs and Schratter.  A substantial portion of the injuries resulting from the Distribution Agreement occurred in Florida.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.  By way of further response, the Distribution Agreement referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.

36.     Together, the Inside Man Fraud, the Stock Purchase Fraud, and the Distribution Agreement Fraud are referred to as the "Savencia Conspiracy."

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied. By way of further response, the documents referenced in this paragraph speak for themselves and Plaintiffs' characterization of those documents is denied.

37.     As participants in the Savencia Conspiracy, Bongrain, Swartele, Gitlin, Ragnet, and Wild, the senior group of Savencia and Zausner officers and directors, seized day-to-day operational control and complete corporate control of the affairs of Schratter so that they could implement the Savencia Conspiracy. With the other members of the Savencia Conspiracy, and without regard to corporate formalities, Savencia and Zausner shared corporate and operational control of Schratter commencing in June 2014 and continuing through the end of 2014. The Savencia Conspiracy also required the participation of Savencia Cheese to abrogate Plaintiffs' negotiated discounts provided for in the purchase of Schratter.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

38.     In the months before June 30, 2014, Zausner, Savencia, Savencia Cheese, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust agreed to implement the Savencia Conspiracy. They agreed that they would take the steps necessary to strip Schratter of assets, to strip Voss of his corporate offices and authority, to make the necessary misrepresentations to sell Schratter at an inflated price, and to take such further action as was needed to harm Schratter, and any ultimate purchaser of Schratter, for the benefit of Savencia and its affiliates. The agreement to misrepresent the offices and authority of Voss as the extant president and CEO of Schratter was a material aspect of the agreement to defraud the ultimate purchaser of Schratter. Zausner, Savencia, Savencia Cheese, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust each committed an overt act in furtherance of the Savencia Conspiracy and worked in concert with and on behalf of each other to commit the frauds and unlawful acts at issue in this action.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

39.     At the time of the formation of the Savencia Conspiracy, Zausner, Savencia, Savencia Cheese, Bongrain, Swartele, Ragnet, Wild, and Gitlin decided to recruit Voss and Proust, (the then CFO of Schratter) as co-conspirators.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

40.    As an incentive for Voss to agree to join and act in furtherance of the Savencia Conspiracy, the other members of the Savencia Conspiracy negotiated and caused Schratter and Zausner to enter into a series of agreements with Voss to lock-down his loyalty and participation (the "June 30 Agreements").

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.  By way of further response,  the documents dated June 30 referenced in this paragraph are documents that speak for themselves and Plaintiffs' characterization of those documents is denied.

41.    The agreement and participation of Zausner, Savencia, Savencia Cheese, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust assisted the implementation of the conspiracy and securing Voss as a co-conspirator.  The June 30 Agreements were prepared in Delaware or Pennsylvania by Gitlin and executed by Gitlin, Voss, and Ragnet in Delaware and Pennsylvania. The June 30 Agreements were executed by Voss in New Jersey.  The June 30 Agreements required Bongrain, Wild, Ragnet, Swartele, Voss, and Gitlin to participate in the management of Schratter.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.  By way of further response, the documents dated June 30 referenced in this paragraph are documents that speak for themselves and Plaintiffs' characterization of those documents is denied.

42.    Among the June 30 Agreements was a letter signed by Savencia chairman Bongrain that set up a secret corporate structure in violation of the documents defining Schratter's corporate governance.   While it is not yet known to Plaintiffs where Bongrain signed the June 30 Agreements, it is undisputed that the June 30 Agreements were delivered to New Jersey and Pennsylvania.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.  By way of further response, the documents dated June 30 referenced in this paragraph are documents that speak for themselves and Plaintiffs' characterization of those documents is denied.  Defendants further state that Alex Bongrain signed the referenced documents dated June 30 in his capacity as chairman of SFI and Corman Ship Supplies, LLC and not in any corporate capacity for Savencia.

43.    Article IV(3) of Schratter's by-laws provides, in pertinent part:

> **The president shall be the chief executive officer** of the corporation; he shall preside at all meetings of the shareholders and of the board; **he shall have the management of the business of the corporation**....

(Emphasis added).

**Answer:** Denied. The by-laws referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.

44.     Despite the clear mandate of the by-laws, one of the June 30 Agreements falsely purported to maintain Voss as president and chief executive officer of Schratter, while, in fact, divesting him of virtually all authority for said positions and secretly vesting such duties and authority in Wild (the "Schratter Employment Letter").

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied. By way of further response, the documents dated June 30 referenced in this paragraph are documents that speak for themselves and Plaintiffs' characterization of those documents is denied.

45.     The Schratter Employment Letter explains:

> The parties understand that, in view of [Voss's] history with [Schratter], **the title President/Chief Executive Officer (other than as it applies to [Schratter's] Corman Shipping Supplies Division) is mainly to enhance the effectiveness of Employee's sales efforts.**
>
> **All other aspects of the operation of [Schratter] shall be the responsibility of J. Wild, who although carrying the title of Executive Vice President, will have the de facto position of Chief Executive Officer.** These responsibilities shall include, but not be limited to:
>
> 1.     Finance
> 2.     Human Resources
> 3.     Quality
> 4.     Information Systems
> 5.     **All other corporate functions.**

(Emphasis added).

**Answer:** Denied. The Schratter Employment Agreement referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.

46.    Pursuant to the Schratter Employment Letter, Voss was not even to report to the *de facto* Chief Executive Officer Wild, but "to the Chairman [Bongrain] ... and his special designate, [Ragnet]."

**Answer:**  Denied.  The Schratter Employment Agreement referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.

47.    In an effort to conceal the corporate deceit, Savencia Cheese, Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, and Gitlin, required Voss to sign a confidentiality agreement regarding the secret terms of his continued employment.  The confidentiality agreement attached to the Schratter Employment Letter was executed by the parties thereto in Pennsylvania, New Jersey and/or Delaware.

**Answer:**  Denied.  The Schratter Employment Agreement referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

48.    In addition to paying Voss his full salary for his fictitious role as president/chief executive officer of Schratter, Zausner and Savencia, acting through Bongrain, Swartele, Ragnet, Wild, and Gitlin, further promised to pay Voss, through Schratter, an additional $350,000 for the year 2015 (one of the years during which the Savencia Conspiracy took place) through a second employment letter between Voss and a newly-created shell company: Corman Ship Supplies, LLC ("Corman") (the "Corman Employment Letter").  Corman was a company with no activities and no assets.

**Answer:**  Denied.  The Corman Employment Agreement referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.

49.    The Corman Employment Letter was also signed by Savencia chairman Bongrain and directed Voss to report directly to Bongrain or, in his absence, Ragnet.

**Answer:**  Denied.  The Corman Employment Letter referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization that document is denied.  By way of further response, Alex Bongrain signed the referenced Corman Employment Letter in his capacity as chairman of Corman Ship Supplies, LLC and not in any corporate capacity for Savencia.

50.    As with the Schratter Employment Letter, the Corman Employment Letter contained a confidentiality agreement, also signed by Gitlin.

**Answer:**  Denied.  The Schratter Employment Letter and Corman Employment Letter referenced in this paragraph are documents that speak for themselves and Plaintiffs' characterization of those documents is denied.

51.    In sum, from June 30, 2014, through December 31, 2014, Schratter's management was taken over by a select group comprised of the most senior management of the Savencia family of companies, specifically: Bongrain, chairman and controlling shareholder of Savencia; Ragnet, general secretary of Savencia, president of Zausner and AFP Advanced Food Products, LLC; Wild, CFO of the North American Affiliates of Savencia; Gitlin, chief legal officer and secretary of the North American Affiliates of Savencia; and Swartele, director and former president of Savencia. Swartele and Bongrain controlled Schratter's board of directors.  Voss, a co-conspirator, was the third member of the Schratter board of directors.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

52.    Schratter's corporate books made no reference to the secret terms of the Schratter Employment Letter.  There was no resolution of either the board of directors or the shareholders authorizing or referring to the fact that the Schratter Employment Letter had stripped Voss of his duties and that his duties had been assigned to Wild.  Corporate records filed in the various applicable jurisdictions were not amended to reflect the changes in authority.  The misleading corporate books and records were provided to Plaintiffs through the due diligence data room during the months of October through December 2014, and were accessed by Plaintiffs and their agents from, among other places, Florida and France.

**Answer:**  Denied.  The Schratter Employment Letter referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.  By way of further response, Defendants produced a document entitled "Special Action by Written Consent of the Board of Directors," dated June 27, 2014, that was placed in the data room during the due diligence period, which expressly disclosed to Plaintiffs that Mr. Wild was approved to be the *de facto* Interim CEO of SFI.

53.    Neither the Schratter Employment Letter nor the Corman Employment Letter, nor the substance or significance of their terms, were ever presented in, nor were their terms disclosed in, the due diligence in connection with the purchase of Schratter.  The terms of the Schratter Employment Letter were kept secret for the next five years until discovered in late July 2019.

**Answer:** Denied. The Schratter Employment Agreement and Corman Employment Letter referenced in this paragraph are documents that speak for themselves and Plaintiffs' characterization of those documents is denied. By way of further response, Defendants produced a document entitled "Special Action by Written Consent of the Board of Directors," dated June 27, 2014, that was placed in the data room during the due diligence period, which expressly disclosed to Plaintiffs that Mr. Wild was approved to be the *de facto* Interim CEO of SFI. Defendants further state that the Schratter Employment Letter and the Corman Employment Letter were specifically referenced in the SPA.

54.     The June 2014 Agreements also provided compensation to Voss for his participation in the Savencia Conspiracy as follows:

(a)     The purchase of Voss's twenty-five percent interest in Schratter for $3 million;

(b)     Payment of a bonus of up to an additional $1 million determined primarily in the discretion of Bongrain;

(c)     Payment to Voss of twenty-five percent of the net proceeds from the sale of Corman;

(d)     the transfer of Chocolate Stars, a valuable division of Schratter, to Voss for one dollar;

(e)     The financing of Voss's "purchase" of Chocolate Stars' inventory with an unsecured loan in the amount of $676,852.97, bearing interest at one percent per annum; and

(f)     The continuation of Voss's salary of at least $400,000 per year at Schratter, together with fringe benefits, even though he had been stripped of his duties and authority.

**Answer:** Denied. The agreements referenced in this paragraph are documents that speak for themselves and Plaintiffs' characterization of those documents is denied. By way of further response, it is specifically denied that Voss received any payments pursuant to the Corman Employment Letter. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

55.     Bongrain, Ragnet, Gitlin, Swartele, and Wild committed acts in furtherance of the Savencia Conspiracy by, among other actions, drafting, approving and signing resolutions and other documents authorizing the secret terms of the employment letters (which documents did not disclose the secret terms), and concealing the June 2014 Agreements.  The drafting, approving and signing of the resolutions occurred in Delaware, Pennsylvania, and/or New Jersey.

**Answer:**  Denied.  Defendants also state that the agreements referenced in this paragraph

are documents that speak for themselves and Plaintiffs' characterization of those documents is

denied.

56.     In furtherance of the Savencia Conspiracy and cover-up, Zausner, Savencia, Bongrain, Ragnet, Wild, Gitlin, and Voss recruited Schratter's then CFO, Proust.  In exchange for Proust's assistance, Zausner and Savencia, through Ragnet and Voss, agreed to pay Proust, through Schratter, $50,000 after the completion of the fraudulent sale of Schratter.

**Answer:**  Denied.  It is admitted only that Bertrand Proust, along with three other

employees, received a $50,000 retention bonus, which was expressly disclosed in the SPA.  The

remaining allegations in this paragraph are denied.

57.     Voss and Proust were recruited at the then corporate headquarters of Schratter which was located in New Jersey.

**Answer:**  Denied.

58.     Proust's involvement was helpful to the conspiracy because he had been a senior manager at Constantin Associates, LLP ("Constantin"), the accounting firm that audited Schratter's financial statements.  As a senior manager of Constantin, Proust was in charge of Schratter's audits from 2007 through 2012, before becoming employed by Schratter in 2013.

**Answer:**  It is admitted only that Bertrand Proust was previously employed at Constantin

Associates, LLP.  The remaining allegations in this paragraph are denied.

59.     When a manager of an auditor is hired by an audit client, the new employment creates independence and familiarity issues that allow an audit client to exercise undue influence over, and to corrupt, audits.  This is one of the key reasons why laws and auditor standards prohibit auditors from immediately commencing employment with their audit clients when their auditing firm retains the client relationship.

**Answer:**  Denied.

60.     Commencing in 2014, Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, and Gitlin, primarily through the acts of Voss and Proust, exercised undue influence over the audits of

Schratter's financial statements and internal controls. The wrongful conduct continued as Schratter moved its headquarters to Miami-Dade County, Florida, which move started in 2015 and continued through 2017.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.

61.    Using Proust and Voss, Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, and Gitlin had the ability to fraudulently inflate Schratter's financial statements, conceal and misrepresent Schratter's financial condition and deficiencies in its internal controls, hide related-party transactions, and hide Schratter's true corporate organization and management structure. This created an environment of financial fraud, misrepresentation, misreporting, omissions, and confusion.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.

62.    In late summer of 2014, Voss was introduced to the ECB Representatives.

**Answer:** Defendants lack knowledge or information sufficient to form a belief about the

truth of the allegations in this paragraph and they are therefore denied.

63.    Zausner, Savencia, Voss, Bongrain, Gitlin, Ragnet, and Wild, along with the other members of the Savencia Conspiracy, misrepresented to the ECB Representatives and their advisors and agents, that Voss was the president and chief executive officer of Schratter, and that Zausner, Savencia, and Bongrain, had complete trust and confidence in Voss's ability to control and manage the operations of Schratter. These misrepresentations were made by Voss from New Jersey and in France, by Bongrain and others in France, and repeated by Gitlin, Ragnet, and Wild from Delaware and Pennsylvania.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.

64.    Zausner, Savencia, Voss, Bongrain, Gitlin, Ragnet, and Wild, along with the other members of the Savencia Conspiracy, kept secret the fact that Voss had been stripped of his duties and powers as Schratter's president and chief executive officer as of June 30, 2014, and that Wild was, in fact, the *de facto* chief executive officer, and holder of virtually all corporate authority for Schratter.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied. By way of further response,

Defendants produced a document entitled "Special Action by Written Consent of the Board of Directors," dated June 27, 2014, that was placed in the data room during the due diligence period, which expressly disclosed to Plaintiffs that Mr. Wild was approved to be the *de facto* Interim CEO of SFI. Defendants further state that the Schratter Employment Letter and the Corman Employment Letter were specifically referenced in the SPA.

65.    Zausner, Savencia, Voss, Bongrain, Gitlin, Ragnet, and Wild, along with the other members of the Savencia Conspiracy, also concealed the terms of the Schratter Employment Letter, which stripped Voss of his offices and authority, and the Corman Employment Letter.

**Answer:** Denied. By way of further response, Defendants produced a document entitled "Special Action by Written Consent of the Board of Directors," dated June 27, 2014, that was previously placed in the data room during the due diligence period, which expressly disclosed to Plaintiffs that Mr. Wild was approved to be the *de facto* Interim CEO of SFI. Defendants further state that the Schratter Employment Letter and the Corman Employment Letter were specifically referenced in the SPA.

66.    Over the ensuing months, Zausner, Savencia, Bongrain, Ragnet, Wild, Gitlin, Voss, and Proust continued to hold Voss out as chief executive officer and president of Schratter, keeping secret the fact that Voss had been stripped of virtually all authority in June 2014.

**Answer:** Denied.

67.    Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust concealed the fact that a small group of Savencia's senior managers controlled the day-to-day operations of Schratter.

**Answer:** Denied.

68.    Zausner and Savencia, through at least Bongrain and Voss, knew that ECB and the ECB Representatives had no experience in the cheese and other dairy business, and thus, would not acquire Schratter without Schratter's purported senior management in place. Zausner and Savencia, through at least Bongrain and Voss, also knew that the members of ECB's senior management were not eligible to work in the United States and, as such, needed to employ trusted representatives who could represent their interests while they were outside of the country.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.

69.    During October 2014, the ECB Representatives hired Richard A. Freeman ("Freeman"), an attorney located in Miami-Dade County, Florida, to represent them, and ultimately, Plaintiffs, with regard to the purchase of Schratter.

**Answer:**  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and they are therefore denied.

70.    During the period commencing October 1, 2014 and continuing through and including the closing of the Stock Purchase Agreement, Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust misled the ECB Representatives, and their professional advisors and agents, to believe that Voss was the extant president and chief executive officer of Schratter with day-to-day control over its operations.

**Answer:**  Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

71.    By way of example, Gitlin misrepresented Voss's status in the letter of intent to purchase Schratter dated October 1, 2014.  Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Voss, and Proust misrepresented, among other things, Voss's title and Schratter's financials, in the drafts of the Stock Purchase Agreements which were circulated between November 1, 2014, and December 6, 2014.  These drafts were sent from Pennsylvania to Freeman in Florida.  Many of the drafts were prepared and sent by Morgan Lewis & Bockius, LLP from their offices in Pennsylvania.

**Answer:**  Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.  By way of further response, the letter of intent and drafts of the Stock Purchase Agreements referenced in this paragraph are documents that speak for themselves and Plaintiffs' characterization of those documents is denied.

72.    Zausner and Savencia, through their officers and directors, controlled a data room used for due diligence undertaken by the ECB Representatives, and ultimately Plaintiffs, and their respective agents.  Zausner and Savencia directed employees to place documents in the data room which misrepresented Voss's status.  The documents were uploaded into the due diligence data room in Pennsylvania and New Jersey during the period between October 1, 2014 and December 31, 2014.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.  By way of further response,

Defendants produced a document entitled "Special Action by Written Consent of the Board of Directors," dated June 27, 2014, that was placed in the data room during the due diligence period, which expressly disclosed to Plaintiffs that Mr. Wild was approved to be the *de facto* Interim CEO of SFI. Defendants further state that the Schratter Employment Letter and the Corman Employment Letter were specifically referenced in the SPA.

73.     From the inception of the ECB Representative's dealings with Voss in the fall of 2014, Voss, on behalf of himself and each of the other co-conspirators, repeatedly misrepresented to the ECB Representatives, and then Plaintiffs, that he was the president and chief executive officer of Schratter. Voss made these misrepresentations to, among others, Leoni, C. Blandin, and Freeman in communications in New Jersey, Florida, and France.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

74.     Ragnet made the same misrepresentations in drafts, and in the execution copy, of the Stock Purchase Agreement which were sent to Plaintiffs in Florida.

**Answer:** Denied. The drafts and execution copy of the Stock Purchase Agreement referenced in this paragraph are documents that speak for themselves and Plaintiffs' characterization of those documents is denied.

75.     On behalf of Zausner, Savencia, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust, and in furtherance of the Savencia Conspiracy, Bongrain, in or around November or December 2014, misrepresented to C. Blandin in Paris, France, that he had complete confidence and trust in Voss to have complete day-to-day control over and run a $200 million cheese company.

**Answer:** Denied.

76.     Zausner, Savencia, Bongrain, Ragnet, Wild, Gitlin, and Voss represented that Voss was indispensable to the operation of Schratter. Voss made this representation to the ECB Representatives and Plaintiffs on many different occasions during the period of August 2014 through December 31, 2014. Zausner, Savencia, Bongrain, Ragnet, Wild, Gitlin, and Voss encouraged the ECB Representatives, and thereafter Plaintiffs, to accept Voss as a fiduciary and a partner and "retain" him as president and chief executive officer.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

77.      On October 1, 2014, Voss, as principal of VEI, signed a letter of intent to purchase Schratter from ZNHC/Zausner in New York or New Jersey.  At that time, Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, and Voss all were aware that Voss was in discussions with the ECB Representatives who wanted to undertake due diligence regarding Schratter prior to entering a contract to purchase Schratter.  The letter of intent specifically referred to "Investors" and a "Newco" and required that any Investors be disclosed to Wild and Ragnet.  The letter of intent required potential Investors to sign a non-disclosure agreement prepared by Gitlin in Delaware or Pennsylvania.

**Answer:**  Denied.  Defendants also state that the letter of intent referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.

78.      The letter of intent provided that Zausner would establish a virtual data room in which Zausner and Savencia, through Voss, Proust, and Zausner and Savenica's officers, directors, principals and/or employees, would provide the information to be reviewed and relied upon by ECB, the ECB Representatives, and ultimately Plaintiffs, and their professional consultants, in connection with due diligence.  The data room was designed to, and did, provide online access to information and documents from Zausner to the ECB Representatives, and ultimately Plaintiffs, and their professional advisors and agents, who accessed the data room from, among other places, Florida.  The data room was also designed to afford Plaintiffs and the ECB Representatives, and their respective professionals and agents, reasonable access to, and the right to inspect, all of the properties, assets, premises, books and records, contracts, agreements, and other documents and data related to Schratter.

**Answer:**  Denied.  Defendants also state that the letter of intent referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.

79.      The letter of intent specifically stated:

Subject to signature of NDAs, buyer's investors may receive financial information about [Schratter], third party agreements by which [Schratter] is, or may be, bound and such other documents may agree **through a data room controlled by [Zausner]**.

(Emphasis added).  The documents contained in the data room were controlled by Ragnet, Bongrain, Gitlin, Swartele, and Wild by virtue of their positions within Zausner and/or Savencia from Pennsylvania.  Each of them made a concerted effort to conceal the true terms of Voss's employment by keeping its terms secret amongst themselves as a group.

**Answer:**  Denied.  Defendants also state that the letter of intent referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.  By way of further response, Defendants produced a document entitled "Special Action by Written

Consent of the Board of Directors," dated June 27, 2014, that was placed in the data room during the due diligence period, which expressly disclosed to Plaintiffs that Mr. Wild was approved to be the *de facto* Interim CEO of SFI. Defendants further state that the Schratter Employment Letter and the Corman Employment Letter were specifically referenced in the SPA.

80.     During the first two weeks of October 2014, Zausner's IT Technical Services Manager sent emails to the ECB Representatives with "USERNAME and PASSWORD credentials" for the "data room."

**Answer:** It is admitted only that ECB Representatives had full access to the due diligence data room prior to the closing of the Stock Purchase Agreement. The remaining allegations are denied.

81.     Access to the data room was provided by Zausner to, among others, Plaintiffs, the ECB Representatives, and their respective consultants and lawyers, in, among other places, Florida, New York, and France.

**Answer:** It is admitted only that Plaintiffs and their consultants and lawyers had full access to the due diligence data room prior to the closing of the Stock Purchase Agreement. The remaining allegations are denied.

82.     Between October 1, 2014 and December 31, 2014, Gitlin, Ragnet, Wild, Bongrain, and Voss represented to the ECB Representatives, Plaintiffs, and their professional advisors and agents, including Freeman in Florida, that *all* pertinent documents had been uploaded into the data room and the documents were ***complete, accurate, and truthful***.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

83.     The above representations are also set forth in the drafts of the Stock Purchase Agreement exchanged with Freeman in Florida, as well as in the executed Stock Purchase Agreement and other documents.

**Answer:** Denied. Defendants also state that the drafts and executed Stock Purchase Agreement are documents that speak for themselves and Plaintiffs' characterization of those documents is denied.

84.     Acting from New Holland, Pennsylvania; Fairfield, New Jersey; and/or from Viroflay, France; Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust controlled what documents were included in the data room and acted to exclude documents which would reveal the true terms of Voss's employment with Schratter.

**Answer:**  Denied.  By way of further response, Defendants produced a document entitled "Special Action by Written Consent of the Board of Directors," dated June 27, 2014, that was placed in the data room during the due diligence period, which expressly disclosed to Plaintiffs that Mr. Wild was approved to be the *de facto* Interim CEO of SFI.  Defendants further state that the Schratter Employment Letter and the Corman Employment Letter were specifically referenced in the SPA.

85.     Gitlin communicated with Freeman in Florida, advising Freeman that documents were available for review in the data room.  Freeman accessed documents in the data room from Miami-Dade County, Florida.

**Answer:**  Denied.

86.     The information in the data room was ***incomplete, inaccurate, and untruthful***.  For example, the data room included documents falsely stating that Voss was the president and the chief executive officer of Schratter.

**Answer:**  Denied.  By way of further response, Defendants produced a document entitled "Special Action by Written Consent of the Board of Directors," dated June 27, 2014, that was placed in the data room during the due diligence period, which expressly disclosed to Plaintiffs that Mr. Wild was approved to be the *de facto* Interim CEO of SFI.  Defendants further state that the Schratter Employment Letter and the Corman Employment Letter were specifically referenced in the SPA.

87.     Zausner and Savencia, through the above-identified individuals, withheld from the data room documents, such as the Schratter Employment Letter and the Corman Employment Letter, that established that Wild, and not Voss, was the *de facto* chief executive officer, holding virtually all day-to-day control over Schratter.

**Answer:**  Denied.  By way of further response, Defendants produced a document entitled "Special Action by Written Consent of the Board of Directors," dated June 27, 2014, that was

placed in the data room during the due diligence period, which expressly disclosed to Plaintiffs that Mr. Wild was approved to be the *de facto* Interim CEO of SFI.  Defendants further state that the Schratter Employment Letter and the Corman Employment Letter were specifically referenced in the SPA.

88.    Gitlin and Ragnet, individually and on behalf of Zausner, Savencia, Bongrain, Swartele, Wild, and Voss, caused to be included in the data room two documents that misrepresented the management structure of Schratter.  The first document was a list of Schratter's directors and officers, identifying Voss as president and chief executive officer.  The list made no mention of Wild.  The second document was a management chart that identified Voss as the president and chief executive officer and Wild as the executive vice president, making no mention of the fact that Wild was *de facto* chief executive officer.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.  By way of further response, Defendants produced a document entitled "Special Action by Written Consent of the Board of Directors," dated June 27, 2014, that was previously placed in the data room during the due diligence period, which expressly disclosed to Plaintiffs that Mr. Wild was approved to be the *de facto* Interim CEO of SFI.

89.    Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, and Voss, also misrepresented Voss's role with Schratter in both the draft of the letter of intent and the signed letter of intent relating to the purchase of Schratter.  These documents were initially transmitted by Gitlin by email from his offices in New Jersey or Pennsylvania on September 25 and October 1, 2014, and later re-transmitted by Voss to the ECB Representatives.

**Answer:**  Denied.  By way of further response, the draft letter intent and signed letter of intent are documents that speak for themselves and Plaintiffs' characterization of those documents is denied.

90.    During October 2014, the letter of intent was transmitted by email to Freeman in Florida.

**Answer:**  Denied.

91.    The final version of the letter of intent was prepared and executed by Gitlin in either Pennsylvania or New Jersey, and executed by Voss in New Jersey or New York

**Answer:** It is admitted only that Lew Gitlin signed the final version of the letter of intent. The remaining allegations are denied.

92.     All versions of the letter of intent misrepresent that Schratter was "owned by Seller but **managed on a day-to-day basis by [Voss]... in his role as Company President/CEO.**" (Emphasis added).

**Answer:** Denied.  The letter of intent reference in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.

93.     On an issue as straightforward and simple as corporate governance, Zausner and Savencia provided false and misleading documents concerning corporate governance which failed to reflect the secret governance of Schratter.  These documents included Schratter's bylaws and corporate book.

**Answer:** Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.  By way of further response, the bylaws and corporate book referenced in this paragraph are documents that speak for themselves and Plaintiffs' characterization of those documents is denied.

94.     The documents regarding corporate governance were sent to Freeman in Florida through their inclusion in the data room.

**Answer:** Denied.  By way of further response, the corporate governance documents referenced in this paragraph are documents that speak for themselves and Plaintiffs' characterization of those documents is denied.

95.     During the period commencing in August 2014, and continuing through the closing in December 2014, Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust misrepresented that Schratter was being operated in the ordinary course of business when, in fact, it was being run by a group of Savencia senior managers who secretly took over the business of Schratter to commit the frauds and other wrongful acts addressed in this action.  These misrepresentations were made from France, Florida, New York, New Jersey and Pennsylvania.

**Answer:** Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

96.     The ECB Representatives, and thereafter Plaintiffs, relied upon the misrepresentations that Voss was president and chief executive officer of Schratter, that Voss was

- 24 -

a trusted executive who controlled and ran the day-to-day operations of Schratter, and that Voss was indispensable to the success of Schratter.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

97.     Voss, in furtherance of the Savencia Conspiracy, invited the ECB Representatives, and thereafter Plaintiffs, to take him as a fiduciary as a partner in purchasing Schratter and as a fiduciary in his capacity of president and CEO of Schratter, and president of Atlantic Ventures.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

98.     Consequently, the ECB Representatives, and thereafter Plaintiffs, entered a fiduciary relationship with Voss, took him as a partner to purchase Schratter, appointed him as president of Atlantic Ventures, and "retained" him as president and chief executive officer of Schratter.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

99.     The Savencia Conspiracy succeeded in the effort to install Voss as the "inside man" in Schratter and within Atlantic Ventures, allowing the conspiracy to fraudulently induce Plaintiffs to purchase Schratter to proceed.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

100.     Voss remained in his positions with Atlantic Ventures and Schratter until mid-2017. Commencing in early 2015, Schratter moved its headquarters to Miami, Florida. During the period that Schratter was headquartered in Miami, and until his termination, Voss continued to be the Inside Man for the Savencia Conspiracy and committing wrongful acts designed to continue and conceal the frauds.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

101.     In August 2014, Zausner and Savencia, acting through Bongrain, Ragnet, Wild, Gitlin, and Voss, began negotiations with the ECB Representatives for the sale of Schratter. These negotiations took place in New Jersey, Florida and Viroflay, France.

**Answer:** It is admitted only that Zausner was negotiating the sale of SFI in August 2014.

- 25 -

The remaining allegations are denied.

102.    Spearheaded by Voss on behalf of Zausner and Savencia, negotiations continued with the ECB Representatives reasonably believing that Voss represented their interests and, ultimately, Plaintiffs' interests, while, in fact, he was representing his own interests and those of the Savencia Conspiracy.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.

103.    At the outset of negotiations, Voss, from Schratter's principal place of business in Fairfield, New Jersey, as well as in France, falsely represented to the ECB Representatives that Schratter was valued at $40 million.  In support of this, in September 2014, Voss told the ECB Representatives that ZNHC purchased VEI's twenty-five percent interest in Schratter for $10 million.  These false representations were later reaffirmed to the ECB Representatives and Plaintiffs prior to the purchase of Schratter.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.  By way of further response, the

company Voss owned, Voss Enterprises, Inc., was a Buyer under the SPA.

104.    The representation as to Schratter's value were false when they were made.  ZNHC had not purchased VEI's shares for $10 million, but rather for $3 million.  ZNHC (now Zausner) and Zausner's representatives who authorized the purchase of VEI's shares and signed the documents evidencing the purchase (specifically, Bongrain, Swartele, Gitlin, Ragnet, and Wild) knew that this representation was false when it was made.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.  By way of further response,

Defendants state that the company Voss owned, Voss Enterprises, Inc., was a Buyer under the

SPA.

105.    During the end of September 2014, Voss, Bongrain, Ragnet, Wild, and Gitlin prepared a letter of intent which outlined a potential deal pursuant to which Voss, together with ECB, would purchase Schratter.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.

106.    Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, and Voss fraudulently persuaded the ECB Representatives to install Voss as a fiduciary on the buy-side of the transaction to lull the ECB Representatives, and thereafter Plaintiffs, into a false sense of security based on the fact that Voss had both operational control of the business and was going to have "skin in the game" by becoming also an equity investor in it.  None of this was true, however, given the secret June 30, 2014 Agreements and the much more substantial secret compensation paid to Voss to advance the Savencia Conspiracy.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.  The allegations of this paragraph are otherwise denied.  By way of further response, the June 30, 2014 Agreements referenced in this paragraph are documents that speak for themselves and Plaintiffs' characterization of them is denied.  Defendants further state that the Schratter Employment Letter and the Corman Employment Letter were specifically referenced in the SPA.

107.    Pursuant to the letter of intent, the purchase price for Schratter was $35 million.

**Answer:**  Denied.  The letter of intent referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.

108.    During the period commencing in September 2014 and continuing thereafter, Voss repeatedly misrepresented that VEI had been paid $10 million for its twenty-five percent of Schratter.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.  By way of further response, the company Voss owned, Voss Enterprises, Inc., was a Buyer under the SPA.

109.    Zausner, Savencia, Bongrain, Ragnet, Wild, Gitlin, Voss, and Proust concealed the true purchase price for VEI's interest in Schratter.  The data room did not include the June 30, 2014 contract for the purchase of VEI's shares for $3 million.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.  By way of further response, the Schratter Employment Letter and the Corman Employment Letter were specifically referenced in the SPA.

110.    Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust
intended for the ECB Representatives and, ultimately Plaintiffs, to rely upon Schratter's audited
financial statements.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.

111.    Knowing the importance of the audited financial statements, Voss, Bongrain,
Ragnet, Gitlin, and Wilde used the financial statements to misrepresent the viability of Schratter.
By virtue of the absolute control exercised by Voss, Bongrain, Ragnet, Gitlin, Wild, and Swartele
over the affairs of Schratter, the misrepresentations in the financial statements are imputed to
Zausner and Savencia.  Zausner and Savencia represented that the audited financials disclosed all
material issues and were free of misrepresentations.  Zausner, Savencia, Bongrain, Swartele,
Ragnet, Wild, Gitlin, Voss, and Proust controlled the representations contained in the financial
statements.  Specifically, they misrepresented that:

(a)    Schratter's financial statements correctly reflected Schratter's liabilities;

(b)    Schratter's financial statements were accurate, and were prepared and
presented in accordance with US GAAP, GAAS, and IFRS;

(c)    Schratter's internal controls and procedures were sufficient to ensure that
Schratter's financial statements were accurate in all material respects;

(d)    the information provided in the financial statements was a full, fair, and
accurate disclosure of all material information relative to Schratter's financial position and
operations;

(e)    the financial statements revealed all related party transactions; and

(f)    no material information relative to Schratter's financial position and
operations was withheld from the financial statements.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.

112.    The misrepresentations regarding the audited financial statements were made orally
and in writing.  Among the instances of written misrepresentations are the multiple drafts of the
purchase documents for sale of Schratter, transmitted by, among others, Gitlin, Ragnet, and Voss,
including, but not limited to, on November 7, 10, 25, 26, and 27, 2014 and on December 4 and 5,
2014 from New Holland and Philadelphia, Pennsylvania to Plaintiffs in Miami, Florida.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.  By way of further response, the drafts

of the purchase document referenced in this paragraph are documents that speak for themselves

and Plaintiffs' characterization of those documents is denied.

113.    All the above representations regarding Schratter's audited financial statements were false when they were made, and Zausner and Savencia knew the representations were false when they were made.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.

114.    In addition to the misrepresentations and omissions set forth above, during the period of time from October 1, 2014 through the closing of the Stock Purchase Agreement, Bongrain, Ragnet, Wild, Gitlin, Swartele, and Voss made one or more of the following misrepresentations in order to induce Plaintiffs to execute the purchase documents:

(a)    Voss was the president and chief executive officer of Schratter in form and substance and in charge of Schratter's day-to-day operations;

(b)    Schratter's value as an operating business was a direct result of, and dependent upon, Voss being its president and chief executive officer;

(c)    Schratter's books and records were accurate in all material respects and all documents material to Plaintiffs' purchase of Schratter were provided in the data room;

(d)    The transactions set forth in Schratter's books and records represented bona fide transactions and complied with all applicable laws and industry standards;

(e)    Schratter's revenues, expenses, assets, and liabilities had been properly recorded, in all material respects, in Schratter's books and records;

(f)    Schratter was able to pay, and was current in the payment of, its debts and other obligations;

(g)    Schratter's operations were conducted in the ordinary course of business;

(h)    Schratter complied with all laws in its operations;

(i)    VEI was paid $10 million for its twenty-five percent interest in Schratter;

(j)    Schratter was in compliance with all of its financial obligations; and

(k)    Schratter suffered no adverse events in the months before the closing of the sale.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.

115.    The foregoing representations were made in writing and in oral communications to Freeman in Miami, Florida, as well as to the ECB Representatives and Plaintiffs.  Unbeknownst to the ECB Representatives and Plaintiffs, prior to and during the negotiations for the purchase of Schratter, Schratter had been stripped of valuable assets, including business relationships, further depleting Schratter's value.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

116.    Zausner and Savencia also caused Schratter to pay vendors and debts related to Savencia, while failing to pay third-party debts, all in an effort to bleed assets out of Schratter before closing the sale.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

117.    The Stock Purchase Fraud and the Inside Man Fraud worked together to ensure the sale of a diminished Schratter at an inflated price.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

118.    Using their positions of trust and confidence, Voss and Proust hid the many red flags and acts that would have alerted the ECB Representatives and Plaintiffs to the frauds.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

119.    On December 5, 2014, ECB formed ECB USA.  The next day, ECB USA, together with Voss and his company, VEI, signed the Stock Purchase Agreement with ZNHC for the purchase of 100 percent of Schratter's shares for $27 million, payable as follows: $2 million at closing; $15 million six months later; and $10 million over the next four years.

**Answer:**  The Stock Purchase Agreement referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.    Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and they are therefore denied.

120.    Four days later, on December 9, 2014, VEI and ECB USA formed Atlantic
Ventures.  The purpose of Atlantic Ventures was to serve as the holding company for Schratter.
At that time, Atlantic Ventures was owned fifty-five percent by ECB USA and forty-five percent
by VEI.  Prior to closing, ECB USA and VEI assigned their rights in the Stock Purchase Agreement
to Atlantic Ventures.

**Answer:**  It is admitted only that Atlantic Ventures was formed on December 9, 2014; VEI

owned forty-five percent of Atlantic Ventures; and that ECB USA and VEI assigned their rights

in the Stock Purchase Agreement to Atlantic Ventures.  The remaining allegations are denied.

121.    During the two months leading up to the execution of the Stock Purchase
Agreement, Zausner and Savencia, through Gitlin, repeatedly communicated with Freeman in
Miami, Florida.  In furtherance of the Savencia Conspiracy, Gitlin repeatedly emailed Freeman
and sent him multiple drafts of the Stock Purchase Agreement.  Outside counsel for ZNHC and
Zausner, Morgan Lewis & Bockius, also sent drafts of the Stock Purchase Agreement and many
other related documents to Freeman in Miami, Florida.  Ragnet signed the Stock Purchase
Agreement on behalf of Zausner, and in furtherance of the Savencia Conspiracy.

**Answer:**  It is admitted only that Pierre Ragnet signed the Stock Purchase Agreement on

behalf of Zausner.  The allegations of this paragraph also contain conclusions of law to which no

response is required and they are therefore denied.  The allegations of this paragraph are otherwise

denied.

122.    The Stock Purchase Agreement specifically contemplated that the transaction was
a Florida transaction.  Pursuant to its terms, the Stock Purchase Agreement was to be interpreted
and enforced in accordance with Florida law, and the transaction was to close at Morgan Lewis &
Bockius' office at 200 Biscayne Blvd., Suite 5300, Miami, Florida 33131.

**Answer:**  Denied.  By way of further response, the Stock Purchase Agreement referenced

in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that

document is denied.

123.    On December 9, 2014, Atlantic Ventures appointed Voss as its president and a
director.  Atlantic Ventures was, at all times, based in Miami, Florida.

**Answer:**  It is admitted only that Atlantic Ventures appointed Voss as its president and a

director.  Defendants lack knowledge or information sufficient to form a belief about the truth of

the remaining allegations in this paragraph and they are therefore denied.

124.    While he was supposed to be acting as president and director of Atlantic Ventures, Voss acted in furtherance of the Savencia Conspiracy by representing his own interests and those of the Savencia Conspiracy, rather than those of Atlantic Ventures, ECB USA, and Schratter.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.

125.    During the period between December 9, 2014, and the closing on December 31, 2014, Plaintiffs continued their due diligence under the supervision of Voss.  The data room remained open to Plaintiffs and their agents to complete their due diligence.  Zausner and Savencia, through Bongrain, Swartele, Ragnet, Wild, Gitlin, and Voss, continued to represent that they provided Plaintiffs and their professional advisors and consultants with full and complete access to accurate information.  Zausner and Savencia also continued to represent that Voss was Schratter's president and chief executive officer, in substance and fact, and that he would continue as a loyal and indispensable chief executive going forward.

**Answer:**  It is admitted only that the data room remained open to Plaintiffs and their agents

to complete their due diligence.  The remaining allegations in this paragraph are denied.

126.    These continuing misrepresentations were known by Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust to be false when they were made, Plaintiffs continued to reasonably rely on these misrepresentations.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.

127.    During December 2014, Voss, Bongrain, Ragnet, Wild, Swartele, and Gitlin each, once again, represented that the accounting records of Schratter were accurate and that the audits were completed in accordance with US GAAP, GAAS, and IFRS standards.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.

128.    During the period between the execution of the Stock Purchase Agreement and closing, Zausner and Savencia, through Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust, continued to represent that the documents contained in the data room were complete and accurate in all material respects.  Gitlin, Wild, and Voss continued to provide false and misleading information and documents to Plaintiffs in Florida.  Additionally, Voss had continuing communications with Freeman in Florida.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.

129.    On or about December 31, 2014, Atlantic Ventures closed its purchase of Schratter's stock and paid the initial $2 million.  The escrow and payment arrangements associated with the transaction were made with Freeman in Florida.

**Answer:**  It is admitted only that Atlantic Ventures closed its purchase of Schratter's stock and paid $2 million on or about December 31, 2014.  By way of further response, the escrow and payment arrangements referenced in this paragraph are documents that speak for themselves and Plaintiffs' characterization of those documents is denied.  The allegations of this paragraph are otherwise denied.

130.    After closing, Atlantic Ventures "maintained" Voss in the positions of president and chief executive officer of Schratter, and Proust in his position as CFO of Schratter.  ECB USA maintained Voss's position as a director and president of Atlantic Ventures.

**Answer:**  It is admitted only that Voss was hired by Plaintiffs to be the president and chief executive officer of SFI and director and president of Atlantic Ventures, and that Proust was hired as CFO of SFI.  The remaining allegations in this paragraph are denied.

131.    Plaintiffs continued to put their trust in Voss and believed that Voss would honor his duties of loyalty, care, and good faith.

**Answer:**  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and they are therefore denied.

132.    Zausner, Savencia, Savencia Cheese, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust each knew that Plaintiffs had appointed Voss as president and chief executive officer of Schratter and president of Atlantic Ventures, that Voss was a fiduciary of Plaintiffs, and that Plaintiffs placed their trust and confidence in Voss.  Voss continued his charade of pretending to represent Plaintiffs' interest when, in fact, he was representing the interests of the Savencia Conspiracy.

**Answer:**  It is admitted only that Voss was hired by Plaintiffs to be the president and chief executive officer of SFI and president of Atlantic Ventures.  The remaining allegations in this paragraph are denied.

133.    Plaintiffs did not know, nor could they have known, that Voss was the "inside man" of a conspiracy, whose real loyalties were to himself and the Savencia Conspiracy.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

134.     Plaintiffs, not suspecting that Voss was the "inside man" of the Savencia Conspiracy and believing Voss to be a fiduciary appropriately loyal to Plaintiffs, allowed Voss to take the lead with regard to the continuing negotiations of all matters relating to the purchase of Schratter, and its continuing operations thereafter.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

135.     Further, Plaintiffs intended to rely on the newly available audited financial statements for Schratter and additional due diligence derived from financial statements for the year 2014.

**Answer:**  Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and they are therefore denied.

136.     Zausner and Savencia knew and expected that Plaintiffs would rely on the audited financial statements because Zausner was required to deliver the audited financial statements to Plaintiffs pursuant to the Stock Purchase Agreement.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

137.     On February 23, 2015, Gitlin, at the direction of Zausner and Savencia, and in furtherance of the Savencia Conspiracy, transmitted the audited financial statements from Wilmington, Delaware, and/or New Holland, Pennsylvania to, among others, Freeman, in Miami, Florida.

**Answer:**  It is admitted only that the 2014 audited financial statements were transmitted post-Closing on February 23, 2015.  The remaining allegations are denied.

138.     The 2014 audited financial statements contained numerous misrepresentations including, *inter alia*, the following:

(a)     Schratter's financial statements correctly reflected Schratter's liabilities;

(b)     Schratter's financial statements were accurate, and were prepared and presented in accordance with US GAAP, GAAS, and IFRS;

(c)    Schratter's internal controls and procedures were sufficient to ensure that Schratter's financial statements were accurate in all material respects;

(d)    the information provided in the financial statements was a full, fair, and accurate disclosure of all material information relative to Schratter's financial position and operations;

(e)    the financial statements revealed all related party transactions; and

(f)    no material information relative to Schratter's financial position and operations was withheld from the financial statements.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.  By way of further response, SFI's 2014 audited financial statements are documents that speak for themselves and Plaintiffs' characterization of those documents is denied.

139.    Zausner and Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust knew of the material misrepresentations in the 2014 audited financial statements at the time that the financial statements were made available to Plaintiffs and their agents.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

140.    Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust intended for Plaintiffs and their agents to rely on the 2014 audited financial statements in the negotiations leading to the Amendment to the Stock Purchase Agreement in June 2015, and in making the $15 million payment to ZNHC in June 2015.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

141.    Plaintiffs did not know, nor could they have known, that Voss, aided by Proust, exercised undue influence on Constantin's audit team, which permitted Zausner and Savencia to present Schratter's 2014 financial statements with material misstatements.  The financial statements and the certifications by the auditors were not in compliance with US GAAP, GAAS, and IFRS standards.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.  By way of further response, SFI's

2014 audited financial statements are documents that speak for themselves and Plaintiffs'

characterization of those documents is denied.

142.    Upon information and belief, Voss was paid additional and secret sums by Savencia and/or Savencia Cheese, Zausner, Bongrain, or other Savencia affiliates for the role he played as their "inside man" during the due diligence process.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to

which no response is required and they are therefore denied.

143.    In June 2015, in reliance upon (i) the misrepresentations made by Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust; (ii) Voss as president and chief executive officer of Schratter; and (iii) the misrepresentations that the financial statements had been completed in accordance with US GAAP, GAAS, and IFRS, Plaintiffs paid the second installment of $15 million to Zausner.

**Answer:**  Defendants lack knowledge or information sufficient to form a belief about the

truth of the remaining allegations in this paragraph and they are therefore denied.  The allegations

of this paragraph also contain conclusions of law to which no response is required and they are

therefore denied.

144.    During the period between January 1, 2015, and June 30, 2015, Plaintiffs made millions of dollars of additional investments in Schratter and paid large sums of monies to various Savencia affiliates.

**Answer:**  Defendants lack knowledge or information sufficient to form a belief about the

truth of the remaining allegations in this paragraph and they are therefore denied.

145.    But for the fraud, misrepresentations, misreporting of financial information, and omissions of material information, Plaintiffs would not have (i) purchased Schratter, (ii) paid $2 million at closing, (iii) funded the ongoing operations of Schratter, (iv) approved or executed the First Amendment to the Stock Purchase Agreement; or (v) paid the $15 million installment of the purchase price.

**Answer:**  Defendants lack knowledge or information sufficient to form a belief about the

truth of the remaining allegations in this paragraph and they are therefore denied.  The allegations

of this paragraph also contain conclusions of law to which no response is required and they are

therefore denied.

146.    Additionally, but for the fraud, misrepresentations, misreporting of financial information, and omissions of material information, Plaintiffs would not have invested millions of dollars of additional monies into Schratter and its operations.

**Answer:**  Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and they are therefore denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

147.    Shortly after closing, on January 12, 2015, Plaintiffs memorialized their decision to move Schratter to Miami, Florida and to set up Schratter's corporate offices in Miami, Florida. During the ensuing years, Voss in his conflicting roles as Schratter's president and CEO, Atlantic Venture's president and director, and the Savencia Conspiracy's inside man, continued his tortious conduct on behalf of the Savencia Conspiracy in Miami.

**Answer:**  Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and they are therefore denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

148.    Schratter was in the cheese distribution business and was an obstacle to Savencia's and Zausner's attempt to establish their own distribution company.

**Answer:**  Denied.

149.    One of the material inducements for Plaintiffs to enter the Stock Purchase Agreement was the commitment by Savencia and Zausner that Schratter would be given discounted pricing on, and the rights to distribute, Savencia products for a period of ten years.

**Answer:**  Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and they are therefore denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

150.    Savencia Cheese was the distributor of the cheeses subject to the discounted pricing and distribution rights.

**Answer:**  Denied.

151.    Just as they had done with regard to the sale of Schratter, Zausner and Savencia used Voss, their "inside man," to secretly undermine and take away discounts granted in the Stock Purchase Agreement.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

152.    Specifically, unbeknownst to Plaintiffs, Voss, on behalf of Schratter, and Savencia Cheese executed a Distribution Agreement which gave away valuable distribution discount rights provided for in the Stock Purchase Agreement.

**Answer:** Denied. Defendants also state that the Distribution Agreement referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.   By way of further response, SFI signed the Distribution Agreement, and at that time, Plaintiffs had full control and ownership of SFI.

153.    The Stock Purchase Agreement could only be amended in writing executed by the parties to the Stock Purchase Agreement.

**Answer:** Denied. By way of further response, the Stock Purchase Agreement referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.

154.    Savencia Cheese, Zausner, Savencia, Bongrain, Swartele, Wild, Gitlin, and Voss knew that the Stock Purchase Agreement, and the bargained-for discount rights provided for therein, could not be amended solely with Voss's signature.

**Answer:** Denied.

155.    Notwithstanding the foregoing, Zausner, Savencia and Savencia Cheese induced Voss to sign away those valuable discount rights, purportedly on behalf of Schratter.

**Answer:** Denied. By way of further response, SFI signed the Distribution Agreement, and at that time, Plaintiffs had full control and ownership of SFI.

156.    Savencia Cheese, Zausner, Savencia, Bongrain, Ragnet, Wild, Gitlin, Voss, and Proust concealed this fraud from Plaintiffs by, among other things, using Voss and Proust to misreport information to Plaintiffs and alter the financial statements of Schratter so that the Distribution Fraud would not become evident.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied. By way of further response, SFI signed the Distribution Agreement, and at that time, Plaintiffs had full control and ownership of SFI.

157. During the years 2016 through 2018, Savencia Cheese directed communications in furtherance of the Distribution Fraud to Plaintiffs in Florida, including, but not limited to, sending invoices for payment for foreign affiliate cheeses and domestic cheeses to Florida.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

158. Plaintiffs suffered the majority of their injuries from the Distribution Fraud during the period that Schratter was headquartered in Florida.

**Answer:** Denied.

159. Once again, Voss, the "inside man" for Zausner and Savencia, had played an indispensable role in the completion of another fraudulent scheme.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

160. During the three years after Atlantic Ventures' purchase of Schratter, Voss and Proust, much of the time from Miami, "cooked the books" of Schratter to make it appear that Schratter's business was doing far better than it actually was. Zausner and Savencia, through Bongrain, Ragnet, Wild, Gitlin, Voss, and Proust, used various accounting devices to conceal the frauds and wrongful acts addressed in this action.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

161. Both before and after the closing of the Schratter purchase, Voss and Proust worked in concert to misreport Schratter's financial condition and conceal the frauds and other criminal activities.

**Answer:** Denied. The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

162.    Voss and Proust concealed the Savencia Conspiracy and effectively prevented Schratter and Plaintiffs from pursuing available remedies worth millions of dollars against [sic] ZausnerSavencia Cheese, Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

163.    Schratter terminated Voss and Proust in 2017.

**Answer:**  Admitted.

164.    Atlantic Ventures terminated Voss in 2017.

**Answer:**  Admitted.

165.    With Voss and Proust no longer in their positions, Plaintiffs started uncovering significant financial discrepancies and other fraudulent activities within Schratter.  Plaintiffs continued to infuse additional capital into Schratter hoping Schratter could avoid insolvency.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

166.    On April 30, 2018, an insolvent Schratter became subject to an assignment for the benefit of creditors in Florida.

**Answer:**  Admitted.

167.    But for the fraud, misrepresentations, misreporting of Schratter's finances, and concealments, Plaintiffs would not have purchased or otherwise capitalized the acquisition or operations of Schratter nor would they have taken Voss as a fiduciary or appointed him as Atlantic Ventures' president, and "retained" him as Schratter's president and chief executive officer.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

168.    The ruse of holding Voss out as president and chief executive officer of Schratter, after having stripped him of his duties and powers, enabled Zausner and Savencia to conceal frauds and other wrongful acts.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

169.    All conditions precedent to bringing this action have been performed, satisfied, excused, waived, or are futile.

**Answer:**  Denied.  The allegations of this paragraph also contain conclusions of law to which no response is required and they are therefore denied.

**COUNT I**
**BREACH OF CONTRACT**
(Plaintiffs against Zausner)

170.    ECB USA and Atlantic Ventures adopt and incorporate the allegations in paragraphs 1 through 169 of this Second Amended Complaint as though more fully set forth herein, and further allege:

**Answer:**  Defendants incorporate by reference the proceeding paragraphs as if fully set forth herein.

171.    ECB USA entered into the Stock Purchase Agreement with Zausner which was then assigned to Atlantic Ventures.

**Answer:**  The Stock Purchase Agreement referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.  The remaining allegations in this paragraph are denied.

172.    Zausner breached the Stock Purchase Agreement because:

a.    The representations and warranties regarding the matters set forth in Article III.7(a), (b), and (c) were breached because: (i) Schratter's financial statements were not prepared in accordance with US GAAP; (ii) did not fairly present in all material respects the financial condition of Schratter; (iii) Schratter's financial statements were replete with errors, omissions, and intentional misstatements of transactions (particularly, related-party transactions and trade discounts); (iv) the books and records of Schratter were not maintained accurately; (v) the revenues, expenses, assets, and liabilities of Schratter were not properly recorded; (vi) the internal controls and procedures were not designed to insure that the financial Statements would be accurate, but were designed to conceal the frauds being perpetrated by the Savencia Conspiracy; and (vii) Schratter's business had not been operated in the ordinary course since August 31, 2014, because the secret agreements with Voss and Proust substantially altered the governance and reporting structure of Schratter, all of which was designed to artificially inflate the value of Schratter in the eyes of an investor by making Schratter appear more soundly governed and profitable than it actually was.

b.    The representations and warranties regarding the matters set forth in Article III.8 were breached because, *inter alia*, (i) Schratter's financial statements were not prepared in

accordance with US GAAP; (ii) did not fairly present in all material respects the financial condition of Schratter; (iii) Schratter's financial statements were replete with errors, omissions, and intentional misstatements of transactions (particularly, related-party transactions and trade discounts); (iv) the books and records of Schratter were not maintained accurately; (v) the revenues, expenses, assets, and liabilities of Schratter were not properly recorded; (vi) the internal controls and procedures were not designed to insure that the financial Statements would be accurate, but were designed to conceal the frauds being perpetrated by the Savencia Conspiracy; and (vii) Schratter's business had not been operated in the ordinary course since August 31, 2014, because the secret agreements with Voss and Proust substantially altered the governance and reporting structure of Schratter, all of which was designed to artificially inflate the value of Schratter in the eyes of an investor by making Schratter appear more soundly governed and profitable than it actually was.

      c.    The representations and warranties regarding the matters set forth in Article III.9 were breached because: (i) Schratter had not been operated in the ordinary course of business since July 2014, considering the secret corporate governance structure; and (ii) Zausner withheld the documents reflecting the real organizational structure of Schratter;

      d.    The representations and warranties regarding the matters set forth in Article III.11 were breached because, *inter alia*, (i) Schratter was not being operated in compliance with applicable laws regarding corporate governance, since it was being operated under a false corporate governance structure; (ii) the Los Angeles facility was being operated in open contravention of Federal immigration law and local ordinances; and (iii) the ongoing frauds and torts violated federal, state, and common law; and

      e.    The representations and warranties regarding the matters set forth in Article III.20 were breached because Zausner did not make a "full, fair, and accurate" disclosure of the financial condition of, or anything else about, Schratter. To the contrary, Zausner and Savencia orchestrated a detailed fraud to make Schratter appear more profitable than it really was, as set forth *supra*, and misrepresented or failed to disclose material facts that, as set forth above and in the subsequent counts, grossly misrepresented Schratter's actual financial and operating conditions.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied. By way of further response, the Stock Purchase Agreement referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.

173. Zausner breached Article VI.1(i) by failing to operate Schratter in the ordinary course during fiscal year 2014 given the secret corporate structure used to operate Schratter during the second half of 2014.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied.

174. Zausner breached Article VI.1(ii) by amending Schratter's bylaws through the secret corporate governance documents rendering the offices of president and chief executive officer subordinate to the office of the executive vice president.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied.

175. Zausner breached Article VI.1(u) by having Schratter forgive loans to directors, officers or employees of Schratter.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied.

176. Zausner breached Article VI.2 by failing to provide all books and records, contracts, agreements and other documents and data related to Schratter and by failing to furnish Plaintiffs with complete and accurate financial, operating, and other data and information related to the Company.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied.

177. Zausner breached Article VI.4 by failing to pay off, or contributing equity to pay off, all inter-company indebtedness owed by Schratter.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied.

178. Zausner breached Article VI.19(d)(iii) of the Stock Purchase Agreement which provides that:

During the period commencing on the date which is day after the date which is one year from the Closing and ending on the date which is ten years from the Closing, the price to the Company of each SKU bearing a Foreign Affiliate Brand purchased from a Foreign Affiliate of Seller and picked up by the Company from such Foreign Affiliate of Seller's warehouse shall be calculated using the Company's warehouse pick-up price, as of August 31, 2014 (as may be adjusted from time to time by Seller in its sole discretion) for its least favored customer, minus a discount of 10% applied to such price.

Instead of honoring this contractual obligation, Zausner, together with its co-conspirators, caused Schratter and Zausner's affiliate Savencia Cheese to secretly enter into the Distribution Agreement which eradicated the agreed discounts.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied. By way of further response, the Stock Purchase Agreement referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.

179.    As a direct and proximate result of Zausner's breaches, ECB USA and Atlantic Ventures have been damaged in an amount to be proven at trial.

**Answer:** Denied. The allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied.

WHEREFORE, ECB USA and Atlantic Ventures demand judgment against Zausner for compensatory and consequential damages, together with costs, attorneys' fees pursuant to Article XII.5 of the Stock Purchase Agreement, and for such further relief as this Court deems just and proper.

**Answer:** The allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied.

## COUNT II
## FRAUD
### (ECB USA against Zausner)

180.    ECB USA adopts and incorporates the allegations of paragraphs 1 through 169 of this Second Amended Complaint as though more fully set forth herein, and further alleges:

**Answer:**  Defendants incorporate by reference the proceeding paragraphs as if fully set forth herein.

181.    As set forth in detail above, Zausner, through its officers, directors, principals and agents, including Voss and Proust, intentionally made false representations of material facts to ECB USA, including, but not limited to the following:

(a)    Voss was the president and chief executive officer of Schratter and concealed that he had been stripped of said authority and offices;

(b)    Zausner and Savencia had complete trust and confidence in Voss's performance and character;

(c)    Voss was trusted, important, and indispensable to the continued success of Schratter;

(d)    Schratter's value as an operating business was a direct result of, and dependent upon, Voss being its president and chief executive officer;

(e)    Wild was the executive vice president of Schratter when, in fact, he was *de facto* chief executive officer;

(f)    The purpose of the data room was to "provide financial information and third-party agreements by which the company is, or may be, bound..." and the data room contained all pertinent documents and that the documents were complete, accurate, and truthful;

(g)    ZNHC/Zausner purchased Voss's twenty-five percent interest in Schratter for $10 million;

(h)    Schratter's financial statements correctly reflected Schratter's liabilities;

(i)    Schratter's financial statements were accurate and were prepared and presented in accordance with US GAAP, GAAS, and IFRS;

(j)    Schratter's internal controls and procedures were designed to ensure that Schratter's financial statements were accurate in all material respects;

(k)    the information provided in the financial statements was a full, fair, and accurate disclosure of all material information relative to Schratter's financial position and operations;

(l)    no material information relative to Schratter's financial position and operations was withheld from the financial statements;

(m)    Schratter's books and records were accurate in all material respects and all documents material to Plaintiffs' purchase of Schratter were provided in the "data room;"

(n)    the transactions set forth in Schratter's books and records represented bona fide transactions in compliance with all applicable laws and industry standards;

(o)    Schratter's revenues, expenses, assets, and liabilities had been properly recorded, in all material respects, in Schratter's books and records;

(p)    Schratter was able to pay, and was current in the payment of, its debts and other obligations;

(q)    Schratter's operations were conducted in the ordinary course of business;

(r)    Schratter complied with all laws in its operations;

(s)    Schratter was in compliance with its financial obligations to its lenders; and

(t)    Schratter suffered no adverse events in the months before the closing of the sale.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

182.    The representations in paragraph 181 were false and material when they were made, and Zausner knew they were false and material when they were made.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.  By way of further response, the Stock Purchase Agreement referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.

183.    Similarly, as more fully set forth herein, Zausner concealed material information that was in the exclusive possession of Zausner and Savencia, and their officers, directors, principals and agents, the nature of the information being such that Zausner knew that it was material and that Zausner was obligated to disclose it to ECB USA because Zausner had represented to Plaintiffs that *all* pertinent documents had been uploaded into the data room and the

documents were complete, accurate, and truthful and because Zausner had fraudulently induced Plaintiffs to take Voss as a fiduciary. The concealment included, among other things, the fact that:

(a)    Voss had been stripped of his day-to-day control over Schratter;

(b)    Voss was president and CEO in name only, and virtually all corporate power and duties had been given to Wild;

(c)    Voss was an "inside man" for Savencia Cheese, Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, and Gitlin, and his loyalties were to himself and Savencia Cheese, Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, and Gitlin;

(d)    Voss, acting *ultra vires*, entered into a secret amendment to the Stock Purchase Agreement that lowered the value of Schratter;

(e)    Proust was acting for the benefit of the Savencia Conspiracy and against the interests of Schratter and Plaintiffs;

(f)    Proust's loyalties were to Savencia Cheese, Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, and Voss, and not to Plaintiffs;

(g)    Constantin did not follow applicable GAAP, GAAS, and IFRS standards when performing the audits of Schratter;

(h)    Constantin was not independent from Schratter in its performance of its audits;

(i)    The 2014 Audit and other audits contained material misrepresentations and omissions; and

(j)    The actual amount of money paid to VEI for the purchase of its shares of Schratter.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied.

184.    ECB USA justifiably relied to its detriment on the misrepresentations and on the absence of the information that had been concealed in: (i) entering the Stock Purchase Agreement; (ii) funding the initial $2 million payment; (iii) funding the $15 million second installment; (iv) approving the First Amendment to the Stock Purchase Agreement; and (v) in financing the operations of Schratter.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent

a response is required, the allegations of this paragraph are denied.

185.    As a direct and proximate result of the fraudulent conduct described above, ECB USA has sustained damages in an amount to be proven at trial.  Zausner's wrongful conduct caused special damages, including the diminution of the value of Schratter.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

186.    Zausner acted with malicious disregard for the rights of ECB USA, knowing that the continuing deceptions would wreak financial havoc upon Schratter and ECB USA.  Zausner's conduct and material concealments and misrepresentations were willful and wanton and were the direct and proximate cause of ECB USA's injuries.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

187.    Zausner's intentional misconduct warrants the imposition of punitive damages.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

WHEREFORE, ECB USA demands entry of a judgment against Zausner for compensatory, consequential, special, and punitive damages, plus costs, pre-judgment and post-judgment interest, and for such further relief as this Court deems just and proper.

**Answer:**  The allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

### COUNT III
### FRAUD
(ECB USA against Savencia)

188.    ECB USA adopts and incorporates the allegations of paragraphs 1 through 169 of this Second Amended Complaint as though more fully set forth herein, and further alleges:

**Answer:** Defendants incorporate by reference the proceeding paragraphs as if fully set forth herein.

189.    As set forth in detail above, Savencia, through its officers, directors, principals and agents, including Voss and Proust, intentionally made false representations of material facts to ECB USA, including, but not limited to the following:

(a)    Voss was the president and chief executive officer of Schratter and concealed that he had been stripped of said authority and offices;

(b)    Zausner and Savencia had complete trust and confidence in Voss's performance and character;

(c)    Voss was trusted, important, and indispensable to the continued success of Schratter;

(d)    Schratter's value as an operating business was a direct result of, and dependent upon, Voss being its president and chief executive officer;

(e)    Wild was the executive vice president of Schratter when, in fact, he was *de facto* chief executive officer;

(f)    The purpose of the data room was to "provide financial information and third-party agreements by which the company is, or may be, bound..." and the data room contained all pertinent documents and that the documents were complete, accurate, and truthful;

(g)    ZNHC/Zausner purchased Voss's twenty-five percent interest in Schratter for $10 million;

(h)    Schratter's financial statements correctly reflected Schratter's liabilities;

(i)    Schratter's financial statements were accurate and were prepared and presented in accordance with US GAAP, GAAS, and IFRS;

(j)    Schratter's internal controls and procedures were designed to ensure that Schratter's financial statements were accurate in all material respects;

(k)    the information provided in the financial statements was a full, fair, and accurate disclosure of all material information relative to Schratter's financial position and operations;

(l)    no material information relative to Schratter's financial position and operations was withheld from the financial statements;

(m)    Schratter's books and records were accurate in all material respects and all documents material to Plaintiffs' purchase of Schratter were provided in the "data room;"

(n)    the transactions set forth in Schratter's books and records represented bona fide transactions in compliance with all applicable laws and industry standards;

(o)    Schratter's revenues, expenses, assets, and liabilities had been properly recorded, in all material respects, in Schratter's books and records;

(p)    Schratter was able to pay, and was current in the payment of, its debts and other obligations;

(q)    Schratter's operations were conducted in the ordinary course of business;

(r)    Schratter complied with all laws in its operations;

(s)    Schratter was in compliance with its financial obligations to its lenders; and

(t)    Schratter suffered no adverse events in the months before the closing of the sale.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

190.    The representations in paragraph 189 were false and material when they were made, and Savencia knew they were false and material when they were made.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied. By way of further response, the Stock Purchase Agreement referenced in this paragraph is a document that speaks for itself and Plaintiffs' characterization of that document is denied.

191.    Similarly, as more fully set forth herein, Savencia concealed material information that was in the exclusive possession of Savencia and Zausner, and their officers, directors, principals and agents, the nature of the information being such that Savencia knew that it was material and that Savencia was obligated to disclose it to ECB USA because Savencia had represented to Plaintiffs that *all* pertinent documents had been uploaded into the data room and the documents were complete, accurate, and truthful and because Savencia had fraudulently induced Plaintiffs to take Voss as a fiduciary.  The concealment included, among other things, the fact that:

(a)    Voss had been stripped of his day-to-day control over Schratter;

        (b)     Voss was president and CEO in name only, and virtually all corporate power and duties had been given to Wild;

        (c)     Voss was an "inside man" for Zausner, Savencia, and the Savencia Conspiracy, and his loyalties were to himself and the participants in the Savencia Conspiracy;

        (d)     Voss, acting *ultra vires*, entered into a secret amendment to the Stock Purchase Agreement that lowered the value of Schratter;

        (e)     Proust was acting for the benefit of the Savencia Conspiracy and against the interests of Schratter and Plaintiffs;

        (f)     Proust's loyalties were to himself and the participants in the Savencia Conspiracy, and not to Plaintiffs;

        (g)     Constantin did not follow applicable GAAP, GAAS, and IFRS standards when performing the audits of Schratter;

        (h)     Constantin was not independent from Schratter in its performance of its audits;

        (i)     The 2014 Audit and other audits contained material misrepresentations and omissions; and

        (j)     The actual amount of money paid to VEI for the purchase of its shares of Schratter.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied.

192.    ECB USA justifiably relied to its detriment on the misrepresentations and on the absence of the information that had been concealed in: (i) entering the Stock Purchase Agreement; (ii) funding the initial $2 million payment; (iii) funding the $15 million second installment; (v) agreeing to the First Amendment to the Stock Purchase Agreement; and (vi) in financing the operations of Schratter.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied.

193.    As a direct and proximate result of the fraudulent conduct described above, ECB USA has sustained damages in an amount to be proven at trial. Savencia's wrongful conduct caused special damages, including the diminution of the value of Schratter.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

194.     Savencia acted with malicious disregard for the rights of ECB USA, knowing that the continuing deceptions would wreak financial havoc upon Schratter and ECB USA.  Savencia's conduct and material concealments and misrepresentations were willful and wanton and were the direct and proximate cause of ECB USA's injuries.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

195.     Savencia's intentional misconduct warrants the imposition of punitive damages.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

WHEREFORE, ECB USA demands entry of a judgment against Savencia for compensatory, consequential, special, and punitive damages, plus costs, pre-judgment and post-judgment interest, and for such further relief as this Court deems just and proper.

**Answer:**  The allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

<u>**COUNT IV**</u>
<u>**FRAUD**</u>
(Atlantic Ventures against Zausner)

196.     Atlantic Ventures adopts and incorporates the allegations of paragraphs 1 through 169 of this Second Amended Complaint as though more fully set forth herein, and further alleges:

**Answer:**  Defendants incorporate by reference the proceeding paragraphs as if fully set forth herein.

197.    As set forth in detail above, Zausner, through its officers, directors, principals and agents, including Voss and Proust, intentionally made false representations of material facts to Atlantic Ventures, including, but not limited to the following:

(a)    Voss was the president and chief executive officer of Schratter and concealed that he had been stripped of said authority and offices;

(b)    Zausner and Savencia had complete trust and confidence in Voss's performance and character;

(c)    Voss was trusted, important, and indispensable to the continued success of Schratter;

(d)    Schratter's value as an operating business was a direct result of, and dependent upon, Voss being its president and chief executive officer;

(e)    Wild was the executive vice president of Schratter when, in fact, he was *de facto* chief executive officer;

(f)    The purpose of the data room was to "provide financial information and third-party agreements by which the company is, or may be, bound..." and the data room contained all pertinent documents and that the documents were complete, accurate, and truthful;

(g)    ZNHC/Zausner purchased Voss's twenty-five percent interest in Schratter for $10 million;

(h)    Schratter's financial statements correctly reflected Schratter's liabilities;

(i)    Schratter's financial statements were accurate and were prepared and presented in accordance with US GAAP, GAAS, and IFRS;

(j)    Schratter's internal controls and procedures were designed to ensure that Schratter's financial statements were accurate in all material respects;

(k)    the information provided in the financial statements was a full, fair, and accurate disclosure of all material information relative to Schratter's financial position and operations;

(l)    no material information relative to Schratter's financial position and operations was withheld from the financial statements;

(m)    Schratter's books and records were accurate in all material respects and all documents material to Plaintiffs' purchase of Schratter were provided in the "data room;"

(n)    the transactions set forth in Schratter's books and records represented bona fide transactions in compliance with all applicable laws and industry standards;

(o)    Schratter's revenues, expenses, assets, and liabilities had been properly recorded, in all material respects, in Schratter's books and records;

(p)    Schratter was able to pay, and was current in the payment of, its debts and other obligations;

(q)    Schratter's operations were conducted in the ordinary course of business;

(r)    Schratter complied with all laws in its operations;

(s)    Schratter was in compliance with its financial obligations to its lenders; and

(t)    Schratter suffered no adverse events in the months before the closing of the sale.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

198.    The representations in paragraph 197 were false and material when they were made, and Zausner knew they were false and material when they were made.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

199.    Similarly, as more fully set forth herein, Zausner concealed material information that was in the exclusive possession of Zausner and Savencia, and their officers, directors, principals and agents, the nature of the information being such that Zausner knew that it was material and that Zausner was obligated to disclose it to Atlantic Ventures because Zausner had represented to Plaintiffs that ***all*** pertinent documents had been uploaded into the data room and the documents were complete, accurate, and truthful and because Zausner had fraudulently induced Plaintiffs to take Voss as a fiduciary.  The concealment included, among other things, the fact that:

(a)    Voss had been stripped of his day-to-day control over Schratter;

(b)    Voss was president and CEO in name only, and virtually all corporate power and duties had been given to Wild;

(c)    Voss was an "inside man" for Savencia Cheese, Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, and Gitlin, and his loyalties were to himself and Savencia Cheese, Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, and Gitlin;

(d)    Voss, acting *ultra vires*, entered into a secret amendment to the Stock Purchase Agreement that lowered the value of Schratter;

(e)    Proust was acting for the benefit of the Savencia Conspiracy and against the interests of Schratter and Plaintiffs;

(f)    Proust's loyalties were to himself and Savencia Cheese, Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, Gitlin, and Voss, and not to Plaintiffs;

(g)    Constantin did not follow applicable GAAP, GAAS, and IFRS standards when performing the audits of Schratter;

(h)    Constantin was not independent from Schratter in its performance of its audits;

(i)    The 2014 Audit and other audits contained material misrepresentations and omissions; and

(j)    The actual amount of money paid to VEI for the purchase of its shares of Schratter.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

200.    Atlantic Ventures justifiably relied to its detriment on the misrepresentations and on the absence of the information that had been concealed in: (i) entering the Stock Purchase Agreement; (ii) closing its purchase of Schratter; (iii) making the initial $2 million payment; (iv) making the $15 million second installment; (v) entering the First Amendment to the Stock Purchase Agreement; and (vi) in financing the acquisition and operations of Schratter.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

201.    As a direct and proximate result of the fraudulent conduct described above, Atlantic Ventures has sustained damages in an amount to be proven at trial.  Zausner's wrongful conduct caused special damages, including the diminution of the value of Atlantic Ventures' interest in Schratter caused by Voss's execution of the Distribution Agreement.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent

a response is required, the allegations of this paragraph are denied.

202.    Zausner acted with malicious disregard for the rights of Atlantic Ventures, knowing that the continuing deceptions would wreak financial havoc upon Schratter and Plaintiffs. Zausner's conduct and material concealments and misrepresentations were willful and wanton and were the direct and proximate cause of Atlantic Ventures' injuries.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

203.    Zausner's intentional misconduct warrants the imposition of punitive damages.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

WHEREFORE, Atlantic Ventures demands entry of a judgment against Zausner for compensatory, consequential, special, and punitive damages, plus costs, pre-judgment and post-judgment interest, and for such further relief as this Court deems just and proper.

**Answer:**  The allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

## COUNT V
## FRAUD
(Atlantic Ventures against Savencia)

204.    Atlantic Ventures adopts and incorporates the allegations of paragraphs 1 through 169 of this Second Amended Complaint as though more fully set forth herein, and further alleges:

**Answer:**  Defendants incorporate by reference the proceeding paragraphs as if fully set forth herein.

205.    As set forth in detail above, Savencia, through its officers, directors, principals and agents, including Voss and Proust, intentionally made false representations of material facts to Atlantic Ventures, including, but not limited to the following:

(a)    Voss was the president and chief executive officer of Schratter and concealed that he had been stripped of said authority and offices;

(b)    Zausner and Savencia had complete trust and confidence in Voss's performance and character;

(c)    Voss was trusted, important, and indispensable to the continued success of Schratter;

(d)    Schratter's value as an operating business was a direct result of, and dependent upon, Voss being its president and chief executive officer;

(e)    Wild was the executive vice president of Schratter when, in fact, he was *de facto* chief executive officer;

(f)    The purpose of the data room was to "provide financial information and third-party agreements by which the company is, or may be, bound..." and the data room contained all pertinent documents and that the documents were complete, accurate, and truthful;

(g)    ZNHC/Zausner purchased Voss's twenty-five percent interest in Schratter for $10 million;

(h)    Schratter's financial statements correctly reflected Schratter's liabilities;

(i)    Schratter's financial statements were accurate and were prepared and presented in accordance with US GAAP, GAAS, and IFRS;

(j)    Schratter's internal controls and procedures were designed to ensure that Schratter's financial statements were accurate in all material respects;

(k)    the information provided in the financial statements was a full, fair, and accurate disclosure of all material information relative to Schratter's financial position and operations;

(l)    no material information relative to Schratter's financial position and operations was withheld from the financial statements;

(m)    Schratter's books and records were accurate in all material respects and all documents material to Plaintiffs' purchase of Schratter were provided in the "data room;"

(n)    the transactions set forth in Schratter's books and records represented bona fide transactions in compliance with all applicable laws and industry standards;

(o)    Schratter's revenues, expenses, assets, and liabilities had been properly recorded, in all material respects, in Schratter's books and records;

(p)    Schratter was able to pay, and was current in the payment of, its debts and other obligations;

(q)    Schratter's operations were conducted in the ordinary course of business;

(r)    Schratter complied with all laws in its operations;

(s)    Schratter was in compliance with its financial obligations to its lenders; and

(t)    Schratter suffered no adverse events in the months before the closing of the sale.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

206.    The representations in paragraph 205 were false and material when they were made, and the Savencia knew they were false and material when they were made.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

207.    Similarly, as more fully set forth herein, Savencia concealed material information that was in the exclusive possession of Savencia and Zausner, and their officers, directors, principals and agents, the nature of the information being such that Savencia knew that it was material and that Savencia was obligated to disclose it to Atlantic Ventures because Savencia had represented to Plaintiffs that *all* pertinent documents had been uploaded into the data room and the documents were complete, accurate, and truthful and because Savencia had fraudulently induced Plaintiffs to take Voss as a fiduciary.  The concealment included, among other things, the fact that:

(a)    Voss had been stripped of his day-to-day control over Schratter;

(b)    Voss was president and CEO in name only, and virtually all corporate power and duties had been given to Wild;

(c)    Voss was an "inside man" for Savencia Cheese, Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, and Gitlin, and his loyalties were to himself and Savencia Cheese, Zausner, Savencia, Bongrain, Swartele, Ragnet, Wild, and Gitlin;

(d)    Voss, acting *ultra vires*, entered into a secret amendment to the Stock Purchase Agreement that lowered the value of Schratter;

(e)    Proust was acting for the benefit of the Savencia Conspiracy and against the interests of Schratter and Plaintiffs;

(f)    Proust's loyalties were to himself and the participants in the Savencia Conspiracy, and not to Plaintiffs;

(g)    Constantin did not follow applicable GAAP, GAAS, and IFRS standards when performing the audits of Schratter;

(h)    Constantin was not independent from Schratter in its performance of its audits;

(i)    The 2014 Audit and other audits contained material misrepresentations and omissions; and

(j)    The actual amount of money paid to VEI for the purchase of its shares of Schratter.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

208.    Atlantic Ventures justifiably relied to its detriment on the misrepresentations and on the absence of the information that had been concealed in: (i) entering the Stock Purchase Agreement; (ii) closing its purchase of Schratter; (iii) making the initial $2 million payment; (iv) making the $15 million second installment; (v) entering the First Amendment to the Stock Purchase Agreement; and (vi) in financing the acquisition and operations of Schratter.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

209.    As a direct and proximate result of the fraudulent conduct described above, Atlantic Ventures has sustained damages in an amount to be proven at trial.  Savencia's wrongful conduct caused special damages, including the diminution of the value of Atlantic Ventures' interest in Schratter caused by Voss's execution of the Distribution Agreement.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

210.    Savencia acted with malicious disregard for Atlantic Ventures, knowing that the continuing deceptions would wreak financial havoc upon Schratter and Plaintiffs.  Savencia's

conduct and material concealments and misrepresentations were willful and wanton and were the
direct and proximate cause of Atlantic Ventures' injuries.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain

conclusions of law to which no response is required and they are therefore denied.  To the extent

a response is required, the allegations of this paragraph are denied.

211.    Savencia's intentional misconduct warrants the imposition of punitive damages.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain

conclusions of law to which no response is required and they are therefore denied.  To the extent

a response is required, the allegations of this paragraph are denied.

WHEREFORE, Atlantic Ventures demands entry of a judgment against Savencia for
compensatory, consequential, special, and punitive damages, plus costs, pre-judgment and post-
judgment interest, and for such further relief as this Court deems just and proper.

**Answer:**   The allegations of this paragraph contain conclusions of law to which no

response is required and they are therefore denied.  To the extent a response is required, the

allegations of this paragraph are denied.

### <u>COUNT VI</u>
### <u>AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY</u>
(Plaintiffs against Zausner)

212.    Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 169 of this
Second Amended Complaint as though more fully set forth herein and further allege:

**Answer:**  Defendants incorporate by reference the proceeding paragraphs as if fully set

forth herein.

213.    Zausner aided and abetted Voss in his breaches of fiduciary duties through its
scheme to induce Plaintiffs to take Voss as a fiduciary and through its payments to Voss and VET
for his role in breaching his fiduciary duties.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain

conclusions of law to which no response is required and they are therefore denied.  To the extent

a response is required, the allegations of this paragraph are denied.

214.     Voss owed fiduciary duties to Plaintiffs in several ways.  First, Voss owed a common law fiduciary duty because he invited Plaintiffs to enter a relationship of trust and confidence with him, and Plaintiffs accepted Voss's invitation and entered a relationship of confidence and trust with him.  Moreover, Plaintiffs appointed Voss as a president and director of Atlantic Ventures and, through such positions, Voss owed both Atlantic Ventures and its shareholder ECB USA a fiduciary duty.  Further, Plaintiffs "retained" Voss as the president and CEO of Schratter and, through such positions, Voss owed a fiduciary duty to Schratter's shareholder, Atlantic Ventures.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

215.     Zausner both intended and knew that Plaintiffs took Voss as a fiduciary.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

216.     At the bidding of Zausner, Voss breached his fiduciary duties to Plaintiffs by: making misrepresentations to Plaintiffs; manipulating the due diligence process; by aiding Zausner in the negotiation of the Stock Purchase Agreement and the First Amendment to the Stock Purchase Agreement; execution of the Distribution Agreement while his duties of loyalty and diligence were owed to Plaintiffs; and by inducing Plaintiffs to fund and pay both the $2 million initial installment and the $15 million second installment, as well as to fund the operations of Schratter.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

217.     While Voss was a fiduciary to Plaintiffs, Zausner aided and abetted Voss in breaching his fiduciary duties and duties of good faith and fair dealing, and in acting contrary to the best interests of Plaintiffs; instead paying and incentivizing Voss to act for his own benefit and for the benefit of the Savencia and Zausner as their "inside man."

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent

a response is required, the allegations of this paragraph are denied.

218.    Similarly, while Proust was a fiduciary to Plaintiffs, Zausner knew of his status as a fiduciary and aided and abetted Proust in breaching his fiduciary duties and duties of good faith and fair dealing, and in acting contrary to the best interests of Plaintiffs; instead acting for his own benefit and for the benefit of Savencia and Zausner.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

219.    Moreover, Voss and Proust acted to conceal the frauds and other wrongful conduct which was the purpose of the Savencia Conspiracy.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

220.    Zausner continued to aid and abet Voss' breach of fiduciary duties for the entire period that Voss remained in his positions as an officer and/or director of Schratter and Atlantic Ventures.  Similarly, Zausner continued to aid and abet Proust's breach of fiduciary duties for the entire period that Proust remained in his position as CFO of Schratter.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

221.    As a direct and proximate result of the fraudulent conduct described above, Plaintiffs have sustained damages in an amount to be proven at trial.  Zausner's wrongful conduct caused special damages, including the diminution of the value of Schratter.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

222.    Zausner acted with malicious disregard for rights of Plaintiffs, knowing that the continuing deceptions would wreak financial havoc upon Schratter and Plaintiffs.  Zausner's conduct and material concealments and misrepresentations were willful and wanton and were the direct and proximate cause of Plaintiffs' injuries.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied.

223. Zausner's intentional misconduct warrants the imposition of punitive damages.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied.

224. As a direct and proximate result of the above-described wrongful conduct, Plaintiffs have been damaged in an amount to be proven at trial.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied.

WHEREFORE, Plaintiffs demand judgment against Zausner for compensatory, consequential, and punitive damages, together with costs, pre- and post-judgment interest, and for such further relief as this Court deems just and proper.

**Answer:** The allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied.

## COUNT VII
## AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY
(Plaintiffs against Savencia)

225. Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 169 of this Second Amended Complaint as though more fully set forth herein and further allege:

**Answer:** Defendants incorporate by reference the proceeding paragraphs as if fully set forth herein.

226.    Savencia aided and abetted Voss in his breaches of fiduciary duties through its scheme to induce Plaintiffs to take Voss as a fiduciary and through its payments to Voss and VET for his role in breaching his fiduciary duties.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied.

227.    Voss owed fiduciary duties to Plaintiffs in several ways. First, Voss owed a common law fiduciary duty because he invited Plaintiffs to enter a relationship of trust and confidence with him, and Plaintiffs accepted Voss's invitation and entered a relationship of confidence and trust with him. Moreover, Plaintiffs appointed Voss as a president and director of Atlantic Ventures, in which positions he owed both Atlantic Ventures and its shareholder ECB USA a fiduciary duty. Further, Plaintiffs "retained" Voss as the president and CEO of Schratter, in which positions he owed a fiduciary duty to its shareholder, Atlantic Ventures.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied.

228.    Savencia both intended and knew that Plaintiffs took Voss as a fiduciary.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied.

229.    At the bidding of Savencia, Voss breached his fiduciary duties to Plaintiffs by: making misrepresentations to Plaintiffs; manipulating the due diligence process; aiding Savencia in the negotiation of the Stock Purchase Agreement and the First Amendment to the Stock Purchase Agreement; execution of the Distribution Agreement while his duties of loyalty and diligence were owed to Plaintiffs; and by inducing Plaintiffs into paying both the $2 million initial installment and the $15 million second installment, and to fund the operations of Schratter.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied. By way of further response, the Stock Purchase Agreement, First Amendment to the Stock Purchase Agreement, and

Distribution Agreement referenced in this paragraph are documents that speak for themselves and Plaintiffs' characterization of those documents is denied.

230.    Moreover, Voss and Proust acted to conceal the frauds and other wrongful conduct intended by Savencia Conspiracy.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

231.    While Voss was a fiduciary to Plaintiffs, Savencia aided and abetted Voss in breaching his fiduciary duties and duties of good faith and fair dealing, and in acting contrary to the best interests of Plaintiffs; instead paying and incentivizing Voss to act for his own benefit and for the benefit of the Savencia Defendants as their "inside man."

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

232.    Similarly, while Proust was a fiduciary to Plaintiffs, Savencia knew of his status as a fiduciary and aided and abetted Proust in breaching his fiduciary duties and duties of good faith and fair dealing, and in acting contrary to the best interests of Plaintiffs; instead acting for his own benefit and for the benefit of the Savencia Defendants.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

233.    Savencia continued to aid and abet Voss' breach of fiduciary duties for the entire period that Voss remained in his positions as an officer, CEO, and/or director of Schratter and Atlantic Ventures.  Similarly, Savencia continued to aid and abet Proust's breach of fiduciary duties for the entire period that Proust remained in his position as CFO of Schratter.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

234.    As a direct and proximate result of the above-described wrongful conduct, Plaintiffs have been damaged in an amount to be proven at trial.

**Answer:**  Denied.  By way of further response,  the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

235.    Savencia acted with malicious disregard for rights of Plaintiffs, knowing that the continuing deceptions would wreak financial havoc upon Schratter and Plaintiffs.  Zausner's conduct and material concealments and misrepresentations were willful and wanton and were the direct and proximate cause of Plaintiffs' injuries.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

236.    Savencia's intentional misconduct warrants the imposition of punitive damages.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

237.    As a direct and proximate result of the above-described wrongful conduct, Plaintiffs have been damaged in an amount to be proven at trial.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

WHEREFORE, Plaintiffs demand judgment against Savencia for compensatory, consequential, and punitive damages, together with costs, pre- and post-judgment interest, and for such further relief as this Court deems just and proper.

**Answer:**  The allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

## COUNT VIII
## CONSPIRACY TO COMMIT BREACH OF FIDUCIARY DUTY
### (Plaintiffs against Zausner and Savencia)

238.    Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 169 and 212 through 237 of this Second Amended Complaint as though more fully set forth herein and further allege:

**Answer:**  Defendants incorporate by reference the proceeding paragraphs as if fully set forth herein.

239.    Zausner and Savencia conspired with Savencia Cheese, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust to cause Plaintiffs to take Voss as a fiduciary and put him in a position of control in both Atlantic Ventures and Schratter where he could breach the duties that he owed to Plaintiffs while, in fact, acting in the interest of the Savencia Conspiracy.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

240.    It was the intent of Zausner and Savencia that Voss, as a fiduciary to Plaintiffs and their principals, commit acts in furtherance of the Savencia Conspiracy and to the detriment of Plaintiffs.  These acts included: making misrepresentations in furtherance of the Savencia Conspiracy; controlling due diligence so that the frauds were not exposed; influencing the negotiation of the Stock Purchase Agreement, the First Amendment to the Stock Purchase Agreement, and the Distribution Agreement to the detriment of Plaintiffs; and concealing and continuing the frauds through the payment of the $2 million installment and the $15 million second installment, and for the entire period that Voss was an officer and director of Atlantic Ventures and Schratter.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

241.    As intended by Zausner and Savencia, and pursuant to the purpose of the Savencia Conspiracy, Voss breached the fiduciary duties that he owed to Plaintiffs.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

242.    As set forth in paragraphs 1 through 169 in the Second Amended Complaint, both Savencia and Zausner committed acts in furtherance of the Savencia Conspiracy through their officers and directors.

**Answer:**  Denied.  Defendants also incorporate by reference the proceeding paragraphs as if fully set forth herein.

243.    As a direct and proximate result of the above-described wrongful conduct, Plaintiffs have sustained damages in an amount to be proven at trial.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

244.    Savencia and Zausner acted with malicious disregard for the rights of Plaintiffs, knowing that the wrongful conduct would wreak financial havoc upon Schratter and Plaintiffs. Savencia and Zausner's conduct was willful and wanton and was the direct and proximate cause of Plaintiffs' injuries.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

245.    Savencia and Zausner's intentional misconduct warrants the imposition of punitive damages.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

WHEREFORE, Plaintiffs demand judgment against the Savencia and Zausner, jointly and severally, for compensatory, consequential, special, and punitive damages, together with costs, pre-judgment and post-judgment interest, and for such further relief as this Court deems just and proper.

**Answer:**  The allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

<u>COUNT IX</u>
<u>CONSPIRACY TO COMMIT FRAUD AND CONSTRUCTIVE FRAUD</u>
(Plaintiffs against Zausner and Savencia)

246.    Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 169 of this Second Amended Complaint as though more fully set forth herein, and further allege:

**Answer:** Defendants incorporate by reference the proceeding paragraphs as if fully set forth herein.

247.    Savencia and Zausner made an agreement with Savencia Cheese, Bongrain, Swartele, Ragnet, Wild, Gitlin, Voss, and Proust to commit the acts necessary to implement the Savencia Conspiracy.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied. To the extent a response is required, the allegations of this paragraph are denied.

248.    To this end and as set forth in detail above, Zausner and Savencia, together with their co-conspirators, intentionally made false representations of material facts to Plaintiffs, including, but not limited to the following:

(a)    Voss was the president and chief executive officer of Schratter;

(b)    Zausner and Savencia had complete trust and confidence in Voss's performance and character;

(c)    Voss was trusted, important, and indispensable to the continued success of Schratter;

(d)    Schratter's value as an operating business was a direct result of, and dependent upon, Voss being its president and chief executive officer;

(e)    Wild was the executive vice president of Schratter when, in fact, he was *de facto* chief executive officer;

(f)    The purpose of the data room was to "provide financial information and third-party agreements by which the company is, or may be, bound..." and the data room contained all pertinent documents and that the documents were complete, accurate, and truthful;

(g)    ZNHC/Zausner purchased Voss's twenty-five percent interest in Schratter for $10 million;

(h)    Schratter's financial statements correctly reflected Schratter's liabilities;

(i)    Schratter's financial statements were accurate and were prepared and presented in accordance with US GAAP, GAAS, and IFRS;

(j)    Schratter's internal controls and procedures were designed to ensure that Schratter's financial statements were accurate in all material respects;

(k)    the information provided in the financial statements was a full, fair, and accurate disclosure of all material information relative to Schratter's financial position and operations;

(l)    no material information relative to Schratter's financial position and operations was withheld from the financial statements;

(m)    Schratter's books and records were accurate in all material respects and all documents material to Plaintiffs' purchase of Schratter were provided in the "data room;"

(n)    the transactions set forth in Schratter's books and records represented bona fide transactions in compliance with all applicable laws and industry standards;

(o)    Schratter's revenues, expenses, assets, and liabilities had been properly recorded, in all material respects, in Schratter's books and records;

(p)    Schratter was able to pay, and was current in the payment of, its debts and other obligations;

(q)    Schratter's operations were conducted in the ordinary course of business;

(r)    Schratter complied with all laws in its operations;

(s)    Schratter was in compliance with its financial obligations to its lenders; and

(t)    Schratter suffered no adverse events in the months before the closing of the sale.

**Answer:** Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

249.    The representations in paragraph 248 were false and material when they were made, and Zausner and Savencia knew they were false and material when they were made.

**Answer:** Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

250.    Similarly, as more fully set forth herein, Zausner and Savencia concealed material information that was in the exclusive possession of Zausner, Savencia, and their officers, directors, principals and agent, the nature of the information being such that Zausner and Savencia knew that it was material and that Zausner and Savencia were obligated to disclose it to Plaintiffs because Zausner had represented to Plaintiffs that *all* pertinent documents had been uploaded into the data room and the documents were complete, accurate, and truthful and because Zausner had fraudulently induced Plaintiffs to take Voss as a fiduciary.  The concealment included, among other things, the fact that:

(a)    Voss had been stripped of his day-to-day control over Schratter;

(b)    Voss was president and CEO of Schratter in name only, and virtually all corporate power and duties had been given to Wild;

(c)    Voss was an "inside man" for the Savencia Conspiracy, and his loyalties were to himself and the participants of the Savencia Conspiracy;

(d)    Voss, acting *ultra vires*, entered into a secret amendment to the Stock Purchase Agreement that lowered the value of Schratter;

(e)    Proust was acting for the benefit of the Savencia Conspiracy and against the interests of Schratter and Plaintiffs;

(f)    Proust's loyalties were to himself and the participants of the Savencia Conspiracy, and not to Plaintiffs;

(g)    Constantin did not follow applicable GAAP, GAAS, and IFRS standards when performing the audits of Schratter;

(h)    Constantin was not independent from Schratter in its performance of its audits;

(i)    The 2014 Audit and other audits contained material misrepresentations and omissions; and

(j)    The actual amount of money paid to VEI for the purchase of its shares of Schratter.

**Answer:**  Denied.  By way of further response, the allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.  To the extent a response is required, the allegations of this paragraph are denied.

251.    ECB USA and Atlantic Ventures justifiably relied to their detriment on the misrepresentations and on the absence of the information that had been concealed in: (i) entering the Stock Purchase Agreement; (ii) in closing the purchase of Schratter; (iii) making the initial $2 million payment; (iv) making the $15 million second installment; (v) entering the First

Amendment to the Stock Purchase Agreement; and (vi) in financing the acquisition and operations
of Schratter.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain

conclusions of law to which no response is required and they are therefore denied. To the extent

a response is required, the allegations of this paragraph are denied.

252.    As a direct and proximate result of the fraudulent conduct described above, ECB
USA and Atlantic Ventures have sustained damages in an amount to be proven at trial.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain

conclusions of law to which no response is required and they are therefore denied. To the extent

a response is required, the allegations of this paragraph are denied.

253.    Zausner's and Savencia's wrongful conduct caused special damages, including the
diminution of the value of Atlantic Ventures' interest in Schratter caused by Voss's execution of
the Distribution Agreement.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain

conclusions of law to which no response is required and they are therefore denied. To the extent

a response is required, the allegations of this paragraph are denied.

254.    Zausner and Savencia acted with malicious disregard for the rights of Atlantic
Ventures and ECB USA, knowing that the continuing deceptions would wreak financial havoc
upon Schratter and Plaintiffs. Zausner's and Savencia's conduct and material concealments and
misrepresentations were willful and wanton and were the direct and proximate cause of ECB
USA's and Atlantic Ventures' injuries.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain

conclusions of law to which no response is required and they are therefore denied. To the extent

a response is required, the allegations of this paragraph are denied.

255.    Zausner's and Savencia's intentional misconduct warrants the imposition of
punitive damages.

**Answer:** Denied. By way of further response, the allegations of this paragraph contain

conclusions of law to which no response is required and they are therefore denied. To the extent

a response is required, the allegations of this paragraph are denied.

WHEREFORE, ECB USA and Atlantic Ventures demand entry of a judgment against Zausner and Savencia for compensatory, consequential, special, and punitive damages, plus costs, pre-judgment and post-judgment interest, and for such further relief as this Court deems just and proper.

**Answer:**   The allegations of this paragraph contain conclusions of law to which no response is required and they are therefore denied.   To the extent a response is required, the allegations of this paragraph are denied.

## <u>DEFENDANTS' ADDITIONAL DEFENSES</u>

Without assuming the burden of proof on any matters that would otherwise rest with Plaintiffs, and expressly denying any and all wrongdoing, Defendants assert the following additional defenses in response to the allegations of the SAC.  Defendants expressly reserve the right to assert additional defenses that may become known through the course of discovery or otherwise.

1.      The SAC fails to state a claim for which relief can be granted.

2.      Defendants acted in good faith and did not act with any intentional recklessness.

3.      The SAC fails to plead with the particularity as required by Federal Rule of Civil Procedure 9(b).

4.      Plaintiffs' damages, if any, are speculative, and thus not recoverable.

5.      Plaintiffs' claims are barred on the ground that Plaintiffs have not paid $6.1 million of the Deferred Installment Payments pursuant to the December 6, 2014 Stock Purchase Agreement.

6.      Plaintiffs' alleged damages should be barred or reduced due to failure to mitigate or avoid the alleged injuries and damages.

7.      Plaintiffs did not actually, justifiably, reasonably, or otherwise rely upon any of the

alleged misstatements pled in the SAC.

8.      Plaintiffs' losses, if any, were caused by factors other than the conduct at issue in this litigation.

9.      Defendants had, after reasonable investigation, reasonable grounds to believe and did believe, at the time they made the challenged statements, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

10.     Defendants did disclose the information that Plaintiffs allege Defendants omitted.

11.     The allegedly untrue statements of material fact, omissions of material fact or misleading statements were, in fact, true and accurate and/or not material.

12.     Plaintiffs had actual or constructive knowledge, or in the exercise of reasonable care should have known, of the alleged untruths and omissions.

13.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver because Plaintiffs have expressly and/or impliedly waived the right to assert such causes of action by virtue of their verbal and/or written expressions or conduct.

14.     Plaintiffs' claims are barred under the doctrine of unclean hands.

15.     Plaintiffs' claims are barred under the doctrine of laches and the governing statute of limitations.

* * *

WHEREFORE, having answered Plaintiff's SAC in its entirety, Defendants request that judgment be entered in their favor and against Plaintiffs on all claims in the SAC. Defendants further request that:

a.      Plaintiffs' claims be dismissed with prejudice;

b.      the Court award Defendants their costs and expenses, including reasonable attorneys' fees; and

c.      the Court award Defendants any such other order and further relief as the Court deems just and proper.

**ZAUSNER FOOD CORP.'S COUNTERCLAIMS AND THIRD-PARTY COMPLAINT**

Plaintiffs and Counterclaim Defendants ECB USA and Atlantic Ventures, the Buyers of SFI, commenced this lawsuit (and another in Florida) for one reason: to excuse their failure and refusal to pay Zausner $6.1 million of Deferred Installment Payments due as part of their purchase of SFI from Zausner under a December 6, 2014 Stock Purchase Agreement ("SPA"). The SAC contrives baseless claims of fraud and amorphous breaches of the SPA's representations and warranties in a transparent attempt to seize the narrative from Zausner before it could pursue its claims relating to ECB USA's and Atlantic Ventures' failure and refusal to pay the remaining $6.1 million of their negotiated $23.1 million purchase price for the SFI business.

Accordingly, Zausner asserts a claim for breach of contract seeking the payment of the $6.1 Deferred Installment Payments due under the SPA, as well as breach of the related January 5, 2015 Stock Pledge Agreement (the "Stock Pledge Agreement"), the agreement that created a security interest in 90% of the shares of SFI in the event ECB USA and Atlantic Ventures defaulted on the Deferred Installment Payments. ECB USA and Atlantic Ventures not only failed and refused to pay Zausner what they owed, they also destroyed the value of that security interest by bankrupting SFI after selling off all of its valuable assets to Atalanta Corporation ("Atalanta") in or around February 2018 for at least $12 million (or more). Though the details are sketchy, the true value that ECB USA and Atlantic Ventures and other John Doe Defendants received, in cash and other value as proceeds from the Atalanta sale, will become clearer through fact and expert discovery. Zausner also seeks damages in tort because ECB USA and Atlantic Ventures and their co-conspirator principals, the members of the Blandin family, concocted a scheme to avoid their obligations to pay the Deferred Installment Payments and destroyed Zausner's collateral securing that interest.

What did ECB USA and Atlantic Ventures and their co-conspirators do with this influx of millions of dollars in Atalanta deal proceeds? They did not pay Zausner the $6.1 million due on the Deferred Installment Payments. They also did not pay SFI's outstanding liabilities owed to affiliates of Zausner or many of SFI's other creditors. Instead, after selling off SFI's most valuable assets and failing to pay the Deferred Installment Payments, they caused SFI to be liquidated, by forcing it to file an Assignment for the Benefit of Creditors Proceeding (an "ABC Proceeding") on April 30, 2018 in Florida, which is a "bankruptcy-light" procedure that is widely known for minimizing the principals' exposure to unwanted scrutiny.

Zausner asserts the following claims against the Counterclaim Defendants and Third-Party Defendants for their participation in this elaborate scheme.

First, Zausner seeks damages for ECB USA's and Atlantic Ventures' failure and refusal to pay the $6.1 million of Deferred Installment Payments, including attorneys' fees incurred by Zausner in connection with this litigation.

Second, Zausner seeks contractual damages under the Stock Pledge Agreement for the intentional disposal of Zausner's security interests in the shares of SFI when SFI was placed in ABC Proceedings. Alternatively, Zausner seeks damages for breach of the implied covenant of good faith and fair dealing.

Third, Zausner seeks an equitable accounting from ECB USA and Atlantic Ventures, their affiliates, and their principals, to trace the deal proceeds from the asset sale to Atalanta, so that Zausner can identify any potential fraudulent transferees (the John Doe Defendants) from whom Zausner can recoup the Deferred Installment Payments it is owed.

Fourth, Zausner seeks damages in tort by way of conspiracy claims and tortious interference with contract claims against Third-Party Defendant C2B, which, along with non-

parties and the John Doe Defendants as co-conspirators, contrived this elaborate plan to deprive Zausner of the Deferred Installment Payments.

Zausner alleges as follows:

## PARTIES

1.      Zausner is a Delaware corporation with its principal place of business in the Commonwealth of Pennsylvania.

2.      Counterclaim Defendant ECB USA is a Florida corporation with its principal place of business in the State of Florida.

3.      Counterclaim Defendant Atlantic Ventures is a Florida corporation with its principal place of business in the State of Florida.

4.      Third-Party Defendant C2B is a French "cash-pooling" entity based in the French territory of Guadeloupe that is tasked with managing and funding the activities of the French family-owned group *Établissements Claude Blandin et Fils* (the "Blandin Entities"). C2B is the entity that financially controls all of its affiliates, and through which the Defendants transfer funds back and forth across entities.

5.      ZNHC was a Delaware corporation that merged into Zausner and, as such, no longer exists as a separate entity. ZNHC was a party to both the SPA and the Stock Pledge Agreement.

6.      Non-party SFI is a Delaware corporation, which was headquartered in Fairfield, New Jersey prior to the closing of the SPA.  At some point following the closing of the SPA, SFI headquarters were moved to Florida.

7.      Through the December 6, 2014 SPA, ECB USA and Voss Enterprises, Inc. ("VEI") acquired SFI from ZNHC.

8.    On December 10, 2014, ECB USA and VEI assigned their interests in SFI to Atlantic Ventures through an Assignment and Assumption Agreement. ECB USA and Atlantic Ventures are the counterparties to the SPA, and pursuant to Amendment No. 1 to the SPA, are the entities that owe Zausner $6.1 million in Deferred Installment Payments.

9.    Non-parties Claude Blandin, Bruno Blandin, and Patrick Blandin (referred to collectively, where appropriate, as the "Blandins"), are the owners and operators of the Blandin Entities, through which they own and operate ECB USA, Atlantic Ventures, and C2B, among 33 other companies and shell companies.

10.    Non-party Arno Leoni is an associate of the Blandins and was appointed the CFO of SFI in the third quarter of 2015, which was at all times a Delaware corporation. He also became co-CEO of SFI in February 2017 and sole CEO of SFI in May 2017. Upon information and belief, he is the sole owner of Ilafy Development, LLC, which became a 2% owner of Atlantic Ventures after the Blandins purchased SFI.  Upon information and belief, Leoni is a French citizen who now resides in France or Guadeloupe.  Arno Leoni frequently did business with Delaware corporations.

11.    Following the closing of the SPA, Claude Blandin became the President of SFI, which was at all times a Delaware corporation.  Upon information and belief, Claude Blandin is a French citizen who resides either in France or in the French territory of Guadeloupe or Martinique where he owns significant business interests. Upon information and belief, Claude Blandin may have a residence in Florida, as well.  Claude Blandin frequently did business with Delaware corporations.

12.    Following the closing of the SPA, Bruno Blandin was a Director and Officer of SFI, which was at all times a Delaware corporation.  Upon information and belief, Bruno Blandin is a French citizen who resides either in France or in the French territory of Guadeloupe where he

owns significant business interests. Bruno Blandin frequently did business with Delaware corporations.

13.    Following the closing of the SPA, Patrick Blandin was a Director and Officer of SFI, which was at all times a Delaware corporation. Upon information and belief, Patrick Blandin is a French citizen who resides either in France or in the French territory of Guadeloupe where he owns significant business interests. Patrick Blandin frequently did business with Delaware corporations.

14.    There is significant organizational overlap between the executives, owners, and business addresses of C2B, ECB USA, and Atlantic Ventures:

    a.    Bruno Blandin and Claude Blandin are the French equivalents of officers/directors of the Blandin Entities, including C2B.

    b.    Patrick Blandin, Bruno Blandin, Claude Blandin, and Arno Leoni are officers of ECB USA and Atlantic Ventures.

    c.    ECB USA and Atlantic Ventures share the exact same registered address: 3001 SW 3rd Avenue, Miami, FL 33129.

15.    C2B shares a business address with ECB USA. To the extent there are additional individuals who were involved with the transfer of proceeds from ECB USA or Atlantic Ventures or who were the recipient(s) of such proceeds, the identities of whom are currently unknown to Zausner, Zausner reserves the right to seek leave to join them to the present action once their identities are ascertained. Thus, until such time as Zausner learns their identities, currently unknown Third-Party Defendants shall be known as the John Doe Defendants 1-10.

16.    Non-party Constantin Associates LLP ("Constantin") is a New York limited liability partnership that is part of a network of entities that comprises the accounting and

consulting firm "Constantin – Serval & Associates." Prior to the Closing of the SPA, Constantin was engaged by SFI to audit its financial statements, including preparing audit opinions of SFI's financial statements from 2010 through 2017.

17.     Non-party Deloitte Transactions and Business Analytics LLP ("Deloitte") is a Delaware corporation that had an extensive business relationship with SFI and each of Claude Blandin, Bruno Blandin, and Patrick Blandin.  Following the closing of the SPA, Deloitte worked with Claude Blandin, Bruno Blandin, and Patrick Blandin as a consultant, including working with SFI on obtaining its line of credit with Wells Fargo and appointing Deloitte employee Ron Lottman as a temporary Chief Financial Officer.

18.     Non-party Wells Fargo Capital Finance ("Wells Fargo") is a Delaware corporation that had an extensive business relationship with SFI and each of Claude Blandin, Bruno Blandin, and Patrick Blandin.  Following the closing of the SPA, Wells Fargo worked with Claude Blandin, Bruno Blandin, and Patrick Blandin to restrict various lines of credit to require that SFI meet certain financial benchmarks.  Claude Blandin, Bruno Blandin, and Patrick Blandin were required to submit accurate financial information to Wells Fargo on a routine basis.  Upon information and belief, certain proceeds from the sale of the assets of SFI to Atalanta were used to pay down SFI's line of credit with Wells Fargo.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over the claims alleged herein pursuant to 28 U.S.C. § 1332 and Zausner seeks damages in excess of $75,000.

20.     This Court has personal jurisdiction over ECB USA and Atlantic Ventures because they consented to the mandatory and exclusive jurisdiction of the Delaware courts in the parties' SPA, which governs the claims between the parties in this action. A true and accurate copy of the SPA is attached hereto as Exhibit 1.

21.     ECB USA, Atlantic Ventures and C2B consented to this Court's jurisdiction by filing multiple complaints in this Court against Zausner, asserting claims that involve the same conduct underlying Zausner's Counterclaims and Third-Party Claims.  *See* D.I. 55, D.I. 77.  Due to the relatedness of the factual allegations underlying those claims, and because ECB USA, Atlantic Ventures and C2B subjected themselves to the personal jurisdiction of this Court by asserting those claims, this Court also has personal jurisdiction over ECB USA, Atlantic Ventures and C2B for purposes of Zausner's Counterclaims and Third-Party Claims.

22.     SFI entered into a distribution agreement dated June 30, 2015 with Alouette Cheese USA LLC, a Delaware company (the June 30, 2015 SFI Distribution Agreement) for the distribution, resale, and marketing of dairy and dairy-based products in the United States (among other territories).

23.     Upon information and belief, Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni engaged in conduct related to the business and operation of SFI, a Delaware corporation and conspired to destroy any value remaining in SFI, a Delaware corporation.

24.     Upon information and belief, Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni transferred the assets of SFI (a Delaware corporation) to C2B, against SFI's interest.

25.     The Third-Party Defendants also conspired to and committed the torts alleged in detail in this pleading, which torts harmed Zausner (and its predecessor ZNHC), a Delaware corporation and a citizen of the state of Delaware, in Delaware.  In committing the torts that harmed Zausner and ZNHC, the Third-Party Defendants specifically directed actions toward the state of Delaware.

26.     Representatives of ECB USA, Atlantic Ventures, and SFI engaged in extensive discussions and negotiations with ZNHC and Zausner, both Delaware corporations, for

Amendment No. 1 to the SPA ("Amendment No. 1").  As discussed herein, Amendment No. 1

provided a downward adjustment of the total Deferred Installment Payments from $10 million to

$6.1 million.  By conducting negotiations with the Delaware corporations, the Counterclaim

Defendants specifically directed actions toward the state of Delaware.

      27.     Representatives of C2B conducted significant business and had an extensive

business relationship with Deloitte, a Delaware corporation, in connection with the activities of

SFI following the closing of the SPA, including but not limited to accounting, financial, or

consulting work, all of which are directly relevant to the Third-Party Defendants' tortious conduct

directed towards Zausner.  Further, representatives of C2B directed communications to Deloitte

regarding SFI's finances, which, upon information and belief, included communications expressly

relating to the Deferred Installment Payments owed under the SPA, as well as relating to the debts

and obligations owed by SFI to other individuals and entities.

      28.     Representatives of ECB USA, Atlantic Ventures, and SFI conducted significant

business and had an extensive business relationship with Wells Fargo, a Delaware corporation, in

connection with various SFI loan agreements directly relevant to the activities of SFI following

the closing of the SPA, and the Third-Party Defendants' tortious conduct directed towards Zausner.

Further, these representatives directed communications to Wells Fargo regarding SFI's finances,

which, upon information and belief, included communications expressly relating to the Deferred

Installment Payments owed under the SPA, as well as relating to the debts and obligations owed

by SFI to other individuals and entities.

      29.     Venue is proper in the Wilmington Division of the United States District Court,

District of Delaware pursuant to 28 U.S.C. §1391 and pursuant to the terms of the SPA, the parties

thereto agreed that any disputes arising from the contract would be heard exclusively in the Delaware courts.

## **FACTUAL ALLEGATIONS**

30.     SFI was a specialty food supply company that both imported and distributed various food products, such as cheeses and other dairy products.

31.     SFI was a subsidiary of ZNHC, which was a subsidiary of Zausner.

32.     SFI had two divisions: All Nations Cheese Organization ("ANCO"), which focused on cheese importation and distribution; and Corman Ship Supplies, LLC, ("Corman"), which focused on supplying cruise ships with SFI's specialized products.

33.     Alain Voss ("Voss") had been the President and CEO of SFI for more than twenty years and owned a 25% stake in SFI.

34.     In early 2014, Voss decided that he no longer wanted to run SFI and wanted to exit the business, as well as his investment in SFI, to focus on other entrepreneurial pursuits.

35.     In 2014, ZNHC began to explore the sale of SFI and hired an investment banker in connection with that effort.

36.     During that time period, J Wild was brought in as the Executive Vice President of SFI to assist in the transition and acted as the interim de facto CEO by unanimous consent of the SFI board, which was disclosed to ECB USA and Atlantic Ventures' representatives during due diligence in the fall of 2014.

37.     Subsequently, Voss changed his mind about leaving SFI and approached ZNHC about acquiring 100% of SFI, along with Claude Blandin, Bruno Blandin, and Patrick Blandin, whom Voss introduced to ZNHC.

38.     On December 5, 2014, Claude Blandin, Bruno Blandin, and Patrick Blandin formed ECB USA for the sole purpose of entering into the SPA.

39.     The parties negotiated the sale of SFI, and on December 6, 2014, Zausner (as Guarantor), ZNHC (as Seller), ECB USA and VEI (as Buyers), Voss, and SFI entered into the SPA through which ECB USA and VEI purchased all of the outstanding shares of SFI from ZNHC.

40.     On December 10, 2014, ECB USA and VEI assigned their interests in SFI to Atlantic Ventures, and owned 55% and 45% of Atlantic Ventures respectively.

**The Structure of the Deal: The SPA and The Stock Pledge Agreement**

41.     Pursuant to Section II.1 of the SPA, ECB USA and Atlantic Ventures purchased SFI from ZNHC and Zausner for $27 million, to be paid as follows:

     a.     $2 million of cash at closing on December 31, 2014 ("Closing");

     b.     $15 million of cash on June 30, 2015; and

     c.     $10 million of deferred payments, payable in four equal annual installments of $2.5 million (collectively, the "Deferred Installment Payments").

42.     Along with the SPA, ZNHC entered into the Stock Pledge Agreement with ECB USA and VEI, which was incorporated into the SPA at Section II.3(b).

43.     Pursuant to the Stock Pledge Agreement, Counterclaim Defendants ECB USA and Atlantic Ventures pledged ***90% of the stock in SFI to ZNHC*** (the "Pledged Shares") specifically to secure the Deferred Installment Payments due to ZNHC in the event of ECB USA's and Atlantic Ventures' default. *See* Stock Pledge Agreement ¶¶ 1(d), 2, 3, attached as Exhibit C to SPA.

44.     The Stock Pledge Agreement was critically important to ZNHC, as a significant portion of the purchase price was being paid after Closing, and ZNHC negotiated for this meaningful collateral.

45.     ECB USA and Atlantic Ventures represented and warranted that "the pledge of the Collateral pursuant to this Agreement creates a valid and perfected first priority security interest

in the Collateral, securing the payment and performance when due of the Secured Obligations [*i.e.*, the Deferred Installment Payments]." *Id*. ¶ 5(b).

46.    The Stock Pledge Agreement created a continuing first priority lien and security interest in the Collateral that inured to the benefit of ZNHC and its successors (*i.e.*, Zausner), was binding on SFI and its successors and assigns (i.e., ECB USA and Atlantic Ventures), and remained in effect until the Deferred Installment Payments were paid to ZNHC (which never happened). *Id*. ¶ 17.

47.    All of ZNHC's right, liens, and security interests in the Stock Pledge Agreement were "absolute and unconditional irrespective of" (i) "any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any waiver, amendment or other modification of the Stock Purchase Agreement, . . ." (ii) "any manner of sale, disposition or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations;" or (iii) "any default, failure or delay, wilful or otherwise, in the performance of the Secured Obligations." Id. ¶ 14(b), (d), (e).

48.    ECB USA and Atlantic Ventures also agreed they would:

> *[N]ot* sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, ***any of the Collateral or any interest therein except as expressly provided for herein or with the prior written consent of Secured Party***.

*Id*. at ¶ 8.

49.    In the event that Counterclaim Defendants ECB USA and Atlantic Ventures defaulted on their obligation to pay the Deferred Installment Payments, Zausner was entitled to an ownership interest in 90% of the outstanding shares of SFI, which represented millions of dollars of value.

**Amendment No. 1 to SPA: Changes to the Deferred Installment Payments**

50.    Section II.2 of the SPA also provided ECB USA and Atlantic Ventures with a mechanism to negotiate downward the $27 million purchase price of SFI post-Closing, once ECB USA and Atlantic Ventures and their independent auditor, Crowe Horwath, LLC ("Crowe"), had an opportunity to review and audit SFI's 2014 audited financial statements.

51.    SFI's 2014 audited financial statements were prepared by Constantin, who was SFI's third-party accountant and auditor and who had worked with SFI since 2010. The 2014 audited financial statements were transmitted on February 23, 2015, roughly seven weeks post-Closing.

52.    After ECB USA, Atlantic Ventures, and Crowe, the auditor of ECB USA's and Atlantic Ventures' choosing, reviewed SFI's 2014 audited financial statements and had full access and control of SFI's books and records, on April 8, 2015, under Section II.2 of the SPA, ECB USA and Atlantic Ventures sent ZNHC a Closing Net Equity Statement ("CNES"), containing an externally audited balance sheet of SFI to begin negotiations for a downward adjustment to SFI's purchase price.

53.    Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni engaged in extensive discussions and negotiations with ZNHC for a downward adjustment to SFI's purchase price.  The negotiations were regarding the purchase price of SFI, a Delaware corporation.

54.    Following receipt of the CNES and extensive discussions and negotiations, the parties to the SPA entered Amendment No. 1 to the SPA, dated June 16, 2015. A true and accurate copy of Amendment No. 1 is attached hereto as Exhibit 2.

55.    In Amendment No. 1, the parties agreed to a downward adjustment of the total Deferred Installment Payments from $10 million to $6.1 million. Thus, each Deferred Installment Payment became $1.525 million (instead of $2.5 million), due beginning on December 31, 2016,

and continuing on the third, fourth and fifth anniversaries of the Closing (i.e., December 31, 2017, December 31, 2018, and December 31, 2019). *See* Amendment No. 1, ¶ 3. As a result, the final purchase price for SFI was reduced by agreement by $3.9 million, from $27 million to $23.1 million.

56.    Subsequently, after ZNHC had already agreed to significantly reduce the Deferred Installment Payments, Defendants ECB USA and Atlantic Ventures sought extensions of the deadlines to pay the Deferred Installment Payments. Again, Zausner acquiesced in good faith.

57.    All of those extensions have expired, and to date, Counterclaim Defendants ECB USA and Atlantic Ventures have failed to pay any of the $6.1 million of remaining Deferred Installment Payments they owe.

### Post-Closing: The Ownership and Operation of SFI by Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni

58.    Post-Closing, the Counterclaim Defendants appointed Voss as CEO of SFI, and SFI was thereafter led by both Voss and Claude Blandin: (i) Voss remained President and CEO of SFI, and (ii) Claude Blandin, as co-owner and President of the Blandin Entities (and an officer at ECB USA), joined as Vice Chairman and Executive Vice President of SFI.

59.    On January 12, 2015, the Counterclaim Defendants and Third-Party Defendant brought SFI into the Blandin family of companies. Specifically, on January 12, 2015, SFI entered into an agreement with C2B, entitled the Agreement to Centralize Intra-Group Treasury Operations (the "Treasury Agreement"), which was signed by Bruno Blandin on behalf of C2B. A true and accurate copy of the Treasury Agreement is attached hereto as Exhibit 3.

60.    Upon information and belief, Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni, caused SFI to enter into the Treasury Agreement for their ulterior motives, and against the interest of SFI, ECB USA and Atlantic Ventures.

61.     The Treasury Agreement provided that:

    a.    "[C2B] is the entity that has agreed with its members to coordinate all financial and business activities on a centralized basis in order to avoid redundant and unnecessary administrative expenses with a view to obtaining optimal operational financial results and credit availability and access for its members";

    b.    It was being entered into to "view to optimizing the management thereof through diminution of unnecessary expenses and maximizing the utilization of financial products to improve cash flows and treasury functions..."; and

    c.    "WHEREAS, SCHRATTER FOODS INC; a corporation organized pursuant to the laws of the State of Delaware, having become a member of GIE C2B, also desires to centralize its treasury operations through the aegis of GIE C2B". *See* Ex. 3 at 1.

62.     The Treasury Agreement also expressly provided that ***SFI's cash management would "be effectuated by [C2B] through its own systems and methods"*** (emphasis added). In other words, while the Treasury Agreement purported to maintain an aura of legitimacy, its terms plainly contemplated that ***all of SFI's funds would flow to and be controlled by C2B***. *See* Ex. 3 at § 1.2.

63.     This agreement bestowed upon C2B the purported authority to control SFI's books and records.

64.     Each member of C2B (*i.e.*, all of the Blandin shell companies), including SFI, was given at least one share of C2B. Indeed, there were 34 companies (many of which, upon information and belief, are shell companies) owned and operated by Claude Blandin, Bruno

Blandin, and Patrick Blandin, and listed as single-share shareholders of C2B, before SFI was placed into ABC proceedings.

65.    While the Agreement purported to require the documentation of such transfers, upon information and belief, no proper documentation existed, and money was merely transferred subject to the whims of Claude Blandin, Bruno Blandin, and Patrick Blandin around the dozens of Blandin family-controlled shell companies, leaving it virtually impossible to tell to which entity's assets rightfully belonged where.

66.    Notably, pursuant to the Amended Articles of Association of C2B, the members of C2B, including ECB USA, are jointly and severally liable for each other's respective debts. *See* Exhibit 4, Certified English Copy of C2B Amended Articles of Association, ("ARTICLE 10. LIABILITY OF THE GROUP MEMBERS, In accordance with the law, the group members are liable for their debts on their own assets. They are also joint and several, unless otherwise agreed with the third party contractors.").

67.    After bringing SFI into the Intra-Group Treasury, Claude Blandin, Bruno Blandin, and Patrick Blandin began to terminate the employees of SFI from the pre-Closing time period and replace them with new employees who had personal relationships with the Blandin family.  Upon information and belief, Claude Blandin, Bruno Blandin, and Patrick Blandin's actions had ulterior motives and were against the interests of SFI, ECB USA, and Atlantic Ventures.

68.    In the third quarter of 2015, Claude Blandin, Bruno Blandin, and Patrick Blandin appointed long-time family loyalist Arno Leoni as CFO of SFI.

69.    Counterclaim Defendants ECB USA and Atlantic Ventures, along with Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni, then demoted Bertrand Proust, who had served as SFI's CFO for several years, to Treasurer.

70.     Claude Blandin, Bruno Blandin, and Patrick Blandin claimed they could make SFI profitable. However, without the requisite experience in the perishable food business, they were unsuccessful in operating SFI as a profitable enterprise.

71.     Not surprisingly, SFI's performance and cash flow deteriorated. As a result, SFI began to breach its performance obligations as a cheese distributor for Zausner's affiliates. SFI began to amass millions of dollars of payables to affiliates of Zausner.

72.     Other customers of SFI reached out to Zausner post-Closing to complain about delays, damaged products, and the overall mismanagement of SFI under the control of Claude Blandin, Bruno Blandin, and Patrick Blandin.

73.     SFI also began failing to pay suppliers, failing to deliver products, and failing to meet its obligations to pay off its debt.

74.     In or around July 2015, SFI had obtained an asset-based line of credit from Wells Fargo, which is incorporated in Delaware, contingent upon SFI maintaining certain minimum profitability benchmarks to be reported on a regular basis.

75.     In early 2016, SFI was in arrears on its loan commitments with Wells Fargo, and Claude Blandin, Bruno Blandin, and Patrick Blandin were under significant financial pressure.

76.     Pleadings filed in other lawsuits against ECB USA and Atlantic Ventures reveal that SFI was engaged in a variety of alleged unethical conduct. Bertrand Proust, then-Treasurer of SFI, alleged that Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni repeatedly directed him to "cook the books" of SFI to make it appear the company was performing better than it actually was.[3]

---

[3] *Proust v. Schratter Foods Incorporated*, C.A. No. 2018-004370-CA-01 (February 12, 2018), Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade, Florida; ECF No. 2 (the "Proust Complaint").

77.    Specifically, Leoni directed Proust to (i) recognize as revenue unclaimed or unused customer credits and cash overpayments that represented amounts owed to customers or, if they remained unclaimed, to the relevant state pursuant to escheat law, and (ii) ignore liabilities resulting from excessive trade discounts or billbacks from SFI's payments made for inventory purchases.

78.    Proust refused to make these false accounting adjustments and identified many other fraudulent financial accounting endeavors engaged in by SFI, at the express direction of Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni, including, among other things:

a.    Steve Blandin (financial analyst) determined that Alouette had been charged excessive trade discounts or bill backs in the aggregate amount of $600,000, which were improperly deducted from payments made for inventory purchases and needed to be paid back to Alouette and reflected as a liability on SFI's books. Leoni, acting at the direction of Claude Blandin, Bruno Blandin, and Patrick Blandin, refused to recognize these liabilities (Proust Complaint ¶¶ 28-30).

b.    Proust identified other examples of vendors who were entitled to refunds because a discount was never authorized or promotion conditions had not been met (*e.g.*, Toscana Cheese Company for $211,000). Leoni told Proust to continue to recognize the unauthorized trade discounts to bolster financial results and include those in reports to Wells Fargo. (*Id.*, ¶¶ 30-33, 39);

c.    SFI's balance sheet contained unclaimed customer credits, which were then concealed from customers to prevent them from claim the credits, after which SFI could absorb those credits into revenue for purposes of artificially inflating revenues (by as much as $2 million of more) (*Id.* ¶¶ 38, 56(a), 64);

d.    Intentionally understating insurance expense by overstating prepaid insurance (*Id.* ¶ 56(e));

e.    Falsely adjusting downward the necessary write-off amounts for unsalable inventory (*Id.* ¶ 56(f));

f.    Reclassifying income items as sales instead of other operating income (in an effort to falsely inflate net revenue, one of the important financial performance indicators for Wells Fargo) (*Id.* ¶ 56(g)); and

g.      In April and May 2017, Leoni, at the direction of Claude Blandin, Bruno Blandin, and Patrick Blandin, refused to correct these fraudulent accounting practices in order to make SFI appear more profitable to Wells Fargo, so SFI would not default on its loan (*Id*. ¶¶ 55-60).

79.    Similarly, Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni ordered Voss to fire mission-critical employees and cut costs that were essential to the running of the business in a proper and ethical way.

80.    As a reward for his loyalty, Claude Blandin, Bruno Blandin, and Patrick Blandin gave Leoni's company, Ilafy Development, LLC, a 2% stake in Atlantic Ventures.

81.    Because of SFI's financial difficulties, SFI—led by each of Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni—renegotiated its financial covenants with Wells Fargo, which would commence in May 2016.

82.    More specifically, Claude Blandin and Arno Leoni each had extensive discussions with Wells Fargo relating to SFI's business relationship with Wells Fargo, including submitting information relating to SFI's finances and debts owed to other parties.  These discussions also included the Deferred Installment Payments owed under the SPA.

83.    SFI was unable to meet the minimum profitability benchmarks required to continue accessing its line of credit with Wells Fargo.

84.    On December 31, 2016, the Initial Deferred Payment of $1.525 million became due. Prior to its due date, Counterclaim Defendants ECB USA and Atlantic Ventures requested an extension. Pursuant to Section II.2 of the SPA and by an agreement of the parties dated December 26, 2016, Zausner agreed to defer this payment. To date, it remains unpaid.

85.    Leoni, at the direction of Claude Blandin, Bruno Blandin, and Patrick Blandin, instructed Proust to change the financial results as of March 31, 2017, to be submitted to Wells

Fargo, such that they would falsely reflect the forecasts that SFI had previously provided to Wells Fargo.  Proust refused to do so.

86.    In May 2017, Proust was terminated from his employment because of his refusals (i) to falsify financial information intended for distribution to Wells Fargo and other creditors, (ii) to falsely adjust amounts owed to creditors, and (iii) to misappropriate unused credits and cash overpayments owed to customers.

87.    As a result of the above, as well as more detailed allegations contained therein, Proust filed the Proust Complaint, a Florida Whistleblower action against SFI.

88.    Counterclaim Defendants also fired Voss because, like Proust, he would not participate in financial fraud at the direction of Claude Blandin, Bruno Blandin, and Patrick Blandin.

89.    Before firing Voss, Claude Blandin, Bruno Blandin, and Patrick Blandin caused SFI to name Leoni as Co-CEO from mid-February 2017 through April 30, 2017, and then sole CEO from May 1, 2017 forward.

90.    Meanwhile, Counterclaim Defendants ECB USA and Atlantic Ventures, and each of Claude Blandin, Bruno Blandin, and Patrick Blandin, continued to run SFI into the ground due to a dangerous combination of mismanagement and financial fraud.

<u>The Sale of Substantially All of SFI's Assets</u>

91.    As early as Fall of 2017 and by no later than February 2018, Counterclaim Defendants ECB USA and Atlantic Ventures, Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni put the most valuable assets of SFI up for sale. Despite the substantial operational and financial performance issues, exacerbated by the conduct described above, SFI still had valuable assets. Accordingly, Claude Blandin, Bruno Blandin, Patrick Blandin, supported by Leoni, decided

to sell the ANCO division of SFI to Atalanta, and the Corman division of SFI to Swiss Chalet, a division of Atalanta, while retaining the accounts receivable and accounts payable of SFI.

92.    Counterclaim Defendants ECB USA and Atlantic Ventures, Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni intentionally structured the sale to Atalanta and Swiss Chalet as an asset sale to avoid triggering the notice and consent provisions of the Stock Pledge Agreement.

93.    Tom Gellert, Atalanta's President, noted that "ANCO has been one of the most established importers of specialty cheese to the U.S.[,]" and that through this acquisition, Atalanta had "the unique opportunity to solidify [Atalanta's] position as leaders in the specialty cheese and deli categories." *See* Kayla Webb, *Atalanta Corp Acquires ANCO Fine Cheese & Corman Ship Supplies*, Deli Market News (Feb. 7, 2018).

94.    Similarly, Swiss Chalet President Steven D'Onofrio touted the benefits of acquiring Corman, explaining that Corman's "history of tailored service to the Cruise Lines will allow us to expand our reach to this growing market segment." *Id.*

95.    The sale of these assets was in excess of $12 million.

96.    Despite this influx of deal proceeds, SFI failed to pay off any of the Deferred Installment Payments or the payables owed to Zausner's affiliates. It is unclear how the deal proceeds were ultimately distributed and who ultimately received any or portions of those proceeds.

97.    Upon information and belief, Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni caused at least some of the deal proceeds to be distributed to C2B for their own ulterior motives and against the interest of SFI, ECB USA, and Atlantic Ventures.  Upon information and

belief, Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni personally profited from the distribution of at least some of the deal proceeds to C2B.

98.     While the Treasury Agreement provided that accurate books and records would be kept of all transfers, upon information and belief, no such records were kept, and funds were transferred across the Blandin Entities and individuals without formal documentation, and transfers back and forth were abundant, making it nearly impossible to trace the flow of funds. Accordingly, Zausner is entitled to an accounting to trace the flow of funds to the transferees.

99.     After Counterclaim Defendants ECB USA and Atlantic Ventures, Claude Blandin, Bruno Blandin, Patrick Blandin, Leoni, and Third-Party Defendant C2B disbursed the SFI deal proceeds, SFI was left without adequate funding and became insolvent.

**Immediately After the Sale, Counterclaim Defendants and
Third-Party Defendant Retrocede SFI's Share in C2B and Place SFI into Insolvency**

100.     On April 30, 2018, an ABC Petition was filed in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, alleging that SFI is indebted to creditors and is unable to pay its debts. *In Re: Assignment for the Benefit of Creditors of Schratter Foods Incorporated*, Case No. 2018-013998-CA-01 ("ABC Proceedings").

101.     By forcing SFI into liquidation, Counterclaim Defendants ECB USA and Atlantic Ventures, Claude Blandin, Bruno Blandin, Patrick Blandin, Leoni, and Third-Party Defendant C2B destroyed, dissipated and disposed of the value of Zausner's security interest in 90% of the shares of SFI, which was intended to secure ECB USA's and Atlantic Ventures' obligations to pay the Deferred Installment Payments.

102.     Likewise, they improperly disposed of the Pledged Shares without the requisite prior written notice to and consent from Zausner, as mandated by the Stock Pledge Agreement.

103.     On the very same day the ABC Petition was filed, Claude Blandin, Bruno Blandin, and Patrick Blandin held an "extraordinary general meeting" to amend C2B's Articles of Association and to effect a share assignment of SFI's share in C2B. *See* Exhibit 4.

104.     Indeed, the control over SFI by Claude Blandin, Bruno Blandin, and Patrick Blandin was so absolute and complete that SFI assigned to Third-Party Defendant C2B its likely sole remaining valuable asset, its share in C2B, for no remuneration (other than an inconsequential €10) and against its own interests.

105.     At the "extraordinary general meeting," Bruno Blandin presided as Chairman, while Claude Blandin and Patrick Blandin were identified as "scrutineers." Bruno Blandin attended as the representative of the Blandin Entities, and Patrick Blandin attended as the representative of three additional entities controlled by the Blandins. Claude Blandin attended as the representative of SFI, ECB USA, and Atlantic Ventures.

106.     The meeting minutes state that "the company SCHRATTER FOODS is in the process of the assignment of its assets and liabilities [i.e., ABC Proceedings], and that it has been decided that the share of the GIE C.2.B that it currently holds would be retroceded to the company ETABLISSEMENTS CLAUDE BLANDIN ET FILS." *See* Exhibit 4.

107.     The Assignment of Share document was signed by Claude Blandin on behalf of SFI, and by Bruno Blandin on behalf of the Blandin Entities.

108.     By these acts, Claude Blandin, Bruno Blandin, and Patrick Blandin destroyed one of the only remaining assets of value possessed by SFI (its equity in C2B) as well as Zausner's collateral interest in SFI's stock.

109.    Incredibly, after forcing SFI to retrocede its share, C2B then alleged that it was the largest creditor of the SFI Assignor Estate, claiming that SFI owed it $12 million. *See* Exhibit 5, Amended Claims Register.

110.    Zausner's affiliates are also creditors of SFI's Assignor Estate for an amount in excess of $4 million as a result of all of SFI's post-Closing unpaid payables.

111.    But for the ABC Proceedings, SFI would be named a Defendant in this instant action.

### Counterclaim Defendants Contrive Multiple Lawsuits as a Pretext to Justify Their Failure to Make Any Deferred Installment Payments

112.    After stripping SFI of its assets without paying Zausner the Deferred Installment Payments, Counterclaim Defendants ECB USA and Atlantic Ventures, and Claude Blandin, Bruno Blandin, and Patrick Blandin began "part two" of their scheme:  initiate a broad litigation campaign to paint themselves as the victims. To that end, Counterclaim Defendants ECB USA and Atlantic Ventures sued Voss and Constantin in separate lawsuits, settling with both.

113.    On August 10, 2018, ECB USA and Atlantic Ventures sued Voss and VEI for contract and fraud claims in *ECB USA, Inc. and Atlantic Ventures v. Alain Voss and VEI*, Circuit Court, in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Complex Business Litigation Division, Case No. 2018-cv-027234-CA-01.  On January 6, 2020, Voss and VEI settled this lawsuit.

114.    On August 22, 2018, ECB USA sued Constantin and Proust for tort and contract claims in *ECB USA, Inc. v. Constantin Associates, LLP*, Circuit Court, in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Complex Business Litigation Division, 2018-028627-CA-01 (44).  On October 24, 2019, the Constantin lawsuit settled pursuant to a settlement

agreement, which terms are confidential. ECB USA's and Atlantic Ventures' claims against Proust were dismissed.

115.    Pursuant to Section IX.2 of the SPA, in the unlikely event that Constantin were to pay any money to Counterclaim Defendants ECB USA and Atlantic Ventures in connection with their claims, Zausner is entitled to contribution in this action: "Payments by an Indemnifying Party in respect of any Loss shall be limited to the amount of any liability or damage that remains after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received or reasonably expected to be received by the Indemnified Party (or the Company) in respect of any such claim. The Indemnified Party shall use its commercially reasonable efforts to recover under insurance policies or indemnity, contribution or other similar agreements for any Losses prior to seeking indemnification under this Agreement."

116.    On October 23, 2018, Counterclaim Defendants ECB USA and Atlantic Ventures commenced this action in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Complex Business Litigation Division, in contravention of the express forum selection provision in the SPA. The case was removed to federal court, and then transferred to this Court on motion by Zausner.

117.    To date, Counterclaim Defendants ECB USA and Atlantic Ventures have failed to pay any Deferred Installment Payment.

118.    On January 31, 2019, pursuant to Section IX.3(c) of the SPA, Zausner provided written notice of its indemnity claim (the "Claim Notice"), the sole and exclusive remedy between the parties for a breach of the SPA, to Counterclaim Defendants ECB USA and Atlantic Ventures for breach of their contractual obligation to pay the Deferred Installment Payments.

119.     Specifically, pursuant to Section IX.1(b) of the SPA, Zausner provided written notice of breach and demanded that Counterclaim Defendants ECB USA and Atlantic Ventures "defend, indemnify and hold harmless the Seller, . . . from and against any Loss incurred by the Seller arising from, out of or in connection with or related to the . . . willful breach of any of the . . . covenants or agreements of the Buyer[s] contained in this Agreement," including without limitation interest and attorneys' fees.

120.     On November 30, 2020, Zausner provided an updated written notice of its indemnity claim for all four unpaid Deferred Installment Payments.

121.     All conditions precedent to bringing these Claims have been performed, satisfied, excused, or waived. *See* Section IX.3(c) of the SPA,

## FIRST CAUSE OF ACTION

### (Breach of Contract (SPA) – ECB USA and Atlantic Ventures)

122.     Zausner repeats and realleges the allegations set forth in paragraphs 1 through 121, as though fully set forth herein.

123.     Zausner and Counterclaim Defendants ECB USA and Atlantic Ventures entered into a written contract, namely the SPA, for the sale of stock in SFI to Counterclaim Defendants ECB USA and Atlantic Ventures.

124.     Zausner is a successor in interest to ZNHC.  ZNHC assigned its rights under the SPA to Zausner.  Florida Law expressly permits the assignment of the right to receive contractual payments under a contract irrespective of whether the contract at issue (here, the SPA) contains any restriction on assignments without consent.

125.     Moreover, Counterclaim Defendants ECB USA and Atlantic Ventures consented to, waived any right to challenge, or are otherwise estopped from challenging the assignment of rights in the SPA from ZNHC to Zausner, for several reasons.

126.    Counterclaim Defendants ECB USA and Atlantic Ventures consented to the assignment by negotiating and executing Amendment No. 1 to the SPA, to which Zausner is a party, and which states: "This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors, heirs, legal representatives and permitted assigns."

127.    Counterclaim Defendants ECB USA and Atlantic Ventures consented to ZNHC's assignment of its rights in the SPA to Zausner through their actions in this litigation, in which they expressly named Zausner as a party.  Indeed, Counterclaim Defendants ECB USA and Atlantic Ventures seek damages from Zausner in this action for claims arising under the SPA.

128.    Counterclaim Defendants ECB USA and Atlantic Ventures have expressly alleged and argued in this Court that Zausner is the "successor in interest to ZNHC".[4]

129.    Counterclaim Defendants ECB USA and Atlantic Ventures, Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni continued to correspond with Zausner post-Closing and after the ZNHC merger.  Upon information and belief, in February 2018, Zausner sent Claude Blandin, Bruno Blandin, and Leoni (on behalf of Counterclaim Defendant ECB USA) a letter informing them that Zausner was the successor in interest to ZNHC, and that ECB USA and Atlantic Ventures owed outstanding payments to Zausner under the SPA.  Upon information and belief, Bruno Blandin, on behalf of Counterclaim Defendant ECB USA, met with a Zausner employee to discuss a deferred payment of SFI's purchase price in February 2018, two months after ZNHC merged into Zausner.

130.    Upon information and belief, Arno Leoni corresponded with Zausner regarding SFI's debts in March 2018, three months after ZNHC merged into Zausner.  Upon information and

---

[4]    *See* ECB USA and Atlantic Ventures' Second Amended Complaint.  D.I. 147 ¶ 7; *see also* ECB and AVC's Motion to Consolidate.  D.I. 165 ¶ 3 (characterizing the SPA and Amendment No. 1 as being "between Defendant Zausner and Plaintiffs.")

belief, Counterclaim Defendants ECB USA and Atlantic Ventures, Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni treated the assignment of rights in the SPA from ZNHC to Zausner as valid after the merger.

131.    Further, Zausner sent a notice of claim to Counterclaim Defendants ECB USA and Atlantic Ventures in November 2020, in which Zausner explicitly stated it was the "successor in interest to ZNHC."  Defendants responded to the notice of claim and requested additional information on the claims but did not dispute that Zausner was the successor in interest.

132.    Zausner performed all or substantially all of its obligations under the SPA, including fulfilling all conditions precedent, or it was excused from performing its obligations due to ECB USA's and Atlantic Ventures' conduct.

133.    Counterclaim Defendants ECB USA and Atlantic Ventures breached the contract by failing to pay the Deferred Installment Payments of $1.525 million each on December 31, 2017 and December 31, 2018, as well as the two installments, totaling $3.05 million, due on December 31, 2019 (totaling $6.1 million), as required under the SPA, Amendment No. 1, and the Parties' agreement to defer the December 31, 2016 payment.

134.    Pursuant to Section IX.1(b) of the SPA, Zausner is entitled to indemnification for ECB USA's and Atlantic Ventures' breach of the SPA.

135.    Zausner has been damaged as a direct and proximate result of ECB USA's and Atlantic Ventures' breaches of the SPA in the amount of $6.1 million, plus pre- and post-judgment interest and attorneys' fees and expenses under Section XII.5 of the SPA.

136.    Zausner is entitled by law to claim entitlement to payment of the $6.1 million, plus pre- and post-judgment interest and attorneys' fees and expenses under Section XII.5 of the SPA.

## SECOND CAUSE OF ACTION

**(Breach of Contract (Stock Pledge Agreement) – ECB USA and Atlantic Ventures)**

137.    Zausner repeats and realleges the allegations set forth in paragraphs 1 through 136, as though fully set forth herein.

138.    Zausner and Counterclaim Defendants ECB USA and Atlantic Ventures entered into a written contract, namely the Stock Pledge Agreement, as part of the SPA.

139.    Zausner is a successor in interest to ZNHC.

140.    ZNHC has assigned its rights to Zausner under the Stock Pledge Agreement.

141.    Zausner performed all or substantially all of its obligations under the Stock Pledge Agreement or it was excused from performing its obligations due to ECB USA's and Atlantic Ventures' conduct. Counterclaim Defendants ECB USA and Atlantic Ventures breached the Stock Pledge Agreement by causing SFI to enter ABC proceedings without prior notice to and consent from Zausner, thereby disposing of Zausner's collateral for Deferred Installment Payments, in breach of the Stock Pledge Agreement.

142.    As a direct result of ECB USA's and Atlantic Ventures' breaches, Zausner has been damaged in the amount of $6.1 million in unpaid Deferred Installment Payments, prejudgment interest on those payments, and reasonable attorneys' fees and costs incurred in attempting to collect on those unpaid sums.

## THIRD CAUSE OF ACTION

**(Breach of Contract (Amendment No. 1) – ECB USA and Atlantic Ventures)**

143.    Zausner repeats and realleges the allegations set forth in paragraphs 1 through 142, as though fully set forth herein

144.    Zausner and Counterclaim Defendants ECB USA and Atlantic Ventures entered into a written contract, namely Amendment No. 1, which provided a downward adjustment of the total Deferred Installment Payments from $10 million to $6.1 million

145.    Zausner is a party to Amendment No. 1.

146.    Zausner performed all or substantially all of its obligations under Amendment No. 1, including fulfilling all conditions precedent, or it was excused from performing its obligations due to ECB USA's and Atlantic Ventures' conduct.

147.    Counterclaim Defendants ECB USA and Atlantic Ventures breached Amendment No. 1 by failing to pay the Deferred Installment Payments of $1.525 million each on December 31, 2017 and December 31, 2018, as well as the two installments, totaling $3.05 million, due on December 31, 2019 (totaling $6.1 million), as required under Amendment No. 1, and the Parties' agreement to defer the December 31, 2016 payment.

148.    Zausner has been damaged as a direct and proximate result of ECB USA's and Atlantic Ventures' breaches of Amendment No. 1 in the amount of $6.1 million, plus pre- and post-judgment interest and attorneys' fees and expenses under Paragraph 3 of Amendment No. 1.

## FOURTH CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing (Stock Pledge Agreement) – ECB USA and Atlantic Ventures)

149.    Zausner repeats and realleges the allegations set forth in paragraphs 1 through 148, as though fully set forth herein.

150.    Zausner and Counterclaim Defendants ECB USA and Atlantic Ventures entered into a written contract, namely the Stock Pledge Agreement, as part of the SPA.

151.    Zausner is a successor in interest to ZNHC.

152.    ZNHC has assigned its rights to Zausner under the Stock Pledge Agreement.

153.    As a result of the assignment, Zausner is a party to the Stock Pledge Agreement.

154.    Zausner performed all or substantially all of its obligations under the Stock Pledge Agreement or it was excused from performing its obligations due to ECB USA's and Atlantic Ventures' conduct.

155.    Counterclaim Defendants ECB USA and Atlantic Ventures intentionally structured the transaction with Atalanta as an asset sale to avoid triggering the notice and consent provisions of the Stock Pledge Agreement. The assets sold to Atalanta composed the primary value supporting Zausner's Pledged Shares.

156.    By forcing SFI into liquidation, Counterclaim Defendants ECB USA and Atlantic Ventures destroyed, dissipated and disposed of the value of Zausner's security interest in 90% of the shares of SFI, which was intended to secure ECB USA's and Atlantic Ventures' obligations to pay the Deferred Installment Payments.

157.    ECB USA's and Atlantic Ventures' actions thus unfairly frustrated the agreed common purpose of the Stock Pledge Agreement and disappointed Zausner's reasonable expectations, namely protecting Zausner's collateral (*i.e.*, the Pledged Shares) securing the Deferred Installment Payments.

158.    As a direct result of ECB USA's and Atlantic Ventures' conduct, Zausner has been damaged in the amount of $6.1 million in unpaid Deferred Installment Payments, prejudgment interest on those payments, and reasonable attorneys' fees and costs incurred in attempting to collect on those unpaid sums.

### **FIFTH CAUSE OF ACTION**

### **(Equitable Accounting – ECB USA, Atlantic Ventures, and C2B)**

159.    Zausner repeats and realleges the allegations set forth in paragraphs 1 through 158, as though fully set forth herein.

160.    Zausner entered into a complex transaction with ECB USA and Atlantic Ventures, through the SPA, as modified by Amendment No. 1. Zausner is the successor to ZNHC in this transaction by law.  The transaction's multi-tiered structure for securing payment from Defendants ECB USA and Atlantic Ventures due under the SPA, which set up a series of Deferred Installment Payments over multiple years with security in the stock of SFI pursuant to the Stock Pledge Agreement, is sufficiently complex and indicative of complex negotiations the parties to the SPA, each of whom was represented by counsel.

161.    ECB USA's and Atlantic Ventures' multiple attempts to avoid their obligations under the deferred payment schedule, including initiating the ABC Proceedings, demonstrate that the breach of contract remedy at law is inadequate to make Zausner whole. It is unlikely that any judgment on the basis of Zausner's breach of contract claim would be obtainable.

162.    ECB USA's and Atlantic Ventures' actions have created exceptional circumstances that justify an equitable accounting of their assets and finances to determine whether and where ECB USA and Atlantic Ventures have fraudulently transferred the funds from the sale of SFI assets that could be used to pay off ECB USA and Atlantic Ventures' existing debts to Zausner.

163.    The control of SFI by Counterclaim Defendants ECB USA and Atlantic Ventures, and Third-Party Defendant C2B, stems from the same complex transaction, and although C2B is not an individual party to the SPA, it entered into the Treasury Agreement, through which Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni could control all of SFI's assets and cash and distributed them as needed to other Blandin Entities.  The terms of the Treasury Agreement are vague and provide little detail on the cash-pooling arrangement contained therein.

164.    Further, Zausner has no insight into where the proceeds from the Atalanta transaction went after SFI received the funds, in particular, whether the proceeds were directed to the personal accounts of Claude Blandin, Bruno Blandin, Patrick Blandin, and/or Leoni.

165.    Because C2B is not a party to the SPA, Zausner cannot assert a breach of contract claim directly against it. As a result, Zausner has no breach of contract claim through which it can obtain an adequate remedy at law.

166.    Under such exceptional circumstances, an equitable accounting is appropriate.

## SIXTH CAUSE OF ACTION

### (Tortious Interference with Contract—C2B)

167.    Zausner repeats and realleges the allegations set forth in paragraphs 1 through 166, as though fully set forth herein.

168.    A valid contract existed between ZNHC, Zausner's predecessor in interest, and ECB USA and Atlantic Ventures, namely the SPA, Amendment No. 1 thereto, and the Stock Pledge Agreement.

169.    Zausner, as ZNHC's successor in interest, is a party to the contract.

170.    C2B had knowledge of the SPA, Amendment No. 1, and the Stock Pledge Agreement having been intimately involved in the negotiations over both contracts.

171.    C2B took affirmative steps with ulterior motives to prevent ECB USA and Atlantic Ventures from paying the $6.1 million in Deferred Installment Payments owed to Zausner, including, but not limited to, causing ECB USA and Atlantic Ventures (i) to sell SFI's most valuable assets to Atalanta and Swiss Chalet and divert the proceeds of those sales elsewhere instead of having ECB USA and Atlantic Ventures use those funds to pay the Deferred Installment Payments, (ii) to breach the Stock Pledge Agreement by initiating ABC Proceedings for SFI, which destroyed Zausner's collateral interest in 90% of SFI's stock, and retroceding SFI's share in C2B

(its last remaining valuable asset), and (iii) to otherwise not pay the Deferred Installment Payments from existing funds within ECB USA's and Atlantic Ventures' possession, separate and apart from the proceeds from the SFI asset sale to Atalanta and Swiss Chalet.

172.    There was no legal justification for the wrongful actions of C2B, nor was it in ECB USA and Atlantic Ventures' best interest.

173.    As a result of this tortious interference, Zausner has been damaged by an amount to be determined at trial, but no less than $6.1 million.

**SEVENTH CAUSE OF ACTION**

**(Conspiracy to Commit Tortious Interference with Contract—C2B)**

174.    Zausner repeats and realleges the allegations set forth in paragraphs 1 through 173, as though fully set forth herein.

175.    Claude Blandin, Bruno Blandin, Patrick Blandin, Leoni, and C2B agreed amongst themselves that Defendants ECB USA and Atlantic Ventures would not pay any portion of the $6.1 million due to Zausner under the SPA, as amended by Amendment No. 1.

176.    To accomplish this agreed-upon goal, Claude Blandin, Bruno Blandin, Patrick Blandin, Leoni, and C2B caused the sale of the primary assets of SFI to Atalanta and Swiss Chalet and structured the deal as an asset sale to avoid triggering the notice and consent provisions of the Stock Pledge Agreement which would have alerted Zausner of their plan.

177.    Claude Blandin, Bruno Blandin, Patrick Blandin, Leoni, and C2B then caused SFI to enter ABC Proceedings, thus wrongfully disposing of the Pledged Shares of SFI, in which Zausner retained a 90% interest and retroceding SFI's equity interest in C2B, paving the way for SFI to initiate ABC Proceedings and for C2B to claim it was SFI's largest creditor who was owed over $12 million.

178.    Claude Blandin, Bruno Blandin, Patrick Blandin, Leoni, and C2B also agreed amongst themselves not to pay the Deferred Installment Payments from existing funds within ECB USA's and Atlantic Ventures' possession and caused such non-payment, separate and apart from the proceeds from the SFI asset sale to Atalanta and Swiss Chalet.

179.    As a result of this conspiracy, Zausner has been damaged by an amount to be determined at trial, but no less than $6.1 million.

## PRAYER FOR RELIEF

WHEREFORE, Zausner prays for relief as follows:

1.    An award to Zausner of damages according to proof at trial, but in no event less than $6.1 million;

2.    For pre-and post-judgment interest at the maximum rate allowable by law;

3.    An equitable accounting;

4.    For Zausner's costs of suit and attorneys' fees under Section XII.5 of the SPA; and

5.    For such other and further relief as the Court may deem just and appropriate.

## JURY TRIAL DEMAND

Zausner demands a jury trial in this action on all issues so triable.

Date:  March 31, 2022

*/s/ David W. Marston Jr.*
David W. Marston Jr. (DE Bar No. 3972)
Brian F. Morris (DE Bar No. 6235)
Morgan, Lewis & Bockius LLP
1201 N. Market Street, Suite 2201
Wilmington, Delaware 19801
Telephone: 302.574.3000
david.marston@morganlewis.com
brian.morris@morganlewis.com

Troy S. Brown (admitted *pro hac vice*)
 Email: troy.brown@morganlewis.com
Margot G. Bloom (admitted *pro hac vice*)
 Email: margot.bloom@morganlewis.com
Su Jin Kim (admitted *pro hac vice*)
 Email: su.kim@morganlewis.com
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921
Telephone:  215.963.5214

*Counsel for Defendant Savencia S.A., and*
*Defendant, Counterclaim-Plaintiff, and Third-*
*Party Plaintiff Zausner Foods Corp.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 31, 2022 I electronically served the foregoing document via CM/ECF on all counsel of record.

<u>/s/ David W. Marston Jr.</u>
David W. Marston Jr.
