## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ECB USA, INC. and ATLANTIC VENTURES CORP., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 19-731-GBW-CJB |
| SAVENCIA, S.A. and ZAUSNER FOODS CORP., on behalf of itself and as successor in interest to ZNHC, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

### MEMORANDUM ORDER

Presently pending in this action is Plaintiffs ECB USA, Inc. and Atlantic Ventures Corp.'s (collectively, "Plaintiffs") motion ("Motion") regarding the applicability of the crime-fraud exception to the attorney-client privilege (the "crime-fraud exception"). (D.I. 258) With the Motion, Plaintiffs seek the Court's finding that: (1) they have made out a prima facie case that the elements of the crime-fraud exception have been met; and (2) an evidentiary hearing on the Motion should be held. (*Id.*) Defendants Savencia, S.A. ("Savencia") and Zausner Foods Corp. ("Zausner," and collectively with Savencia, "Defendants") oppose the Motion. For the reasons set out below, the Court GRANTS the Motion, in that it ORDERS that an evidentiary hearing shall be held to allow for a final determination as to whether the crime-fraud exception applies here.

## I.    BACKGROUND

### A.    Factual Background

In this action, Plaintiffs assert claims against Defendants for, *inter alia*, breach of contract and fraud. (D.I. 147) Plaintiffs' claims arise out of or relate to a Stock Purchase Agreement

1

("SPA") that they entered into with ZNHC, Inc. ("ZNHC"). The effect of the SPA and some related transactions was that Plaintiffs and non-party Voss Enterprises, Inc. purchased the shares of Schratter Foods Incorporated ("SFI"), a company in the cheese distribution business. (*Id*.) The seller, ZNHC, was a Delaware corporation that later merged into Defendant Zausner. (D.I. 147 at ¶ 7; D.I. 272, ex. 15 at 17)[1]

Negotiations between ZNHC and Plaintiffs regarding the SFI transaction began in mid-to-late 2014, (D.I. 147 at ¶ 23); the parties signed the SPA on December 6, 2014 and closed the transaction at the end of that month, (*id*. at ¶ 32). In this case, Plaintiffs allege, *inter alia*, that in late 2014 Defendants engaged in a conspiracy to fraudulently induce Plaintiffs to purchase shares of SFI via the SPA.

Any further factual background relevant to the Motion will be discussed in Section II.

### B.    Procedural Background

This action was transferred to the United States District Court for the District of Delaware in 2019 from another federal district court; thereafter, the case was referred to the Court for all purposes through the case-dispositive motion deadline. (D.I. 56; D.I. 118) Plaintiffs filed the instant Motion on November 17, 2022, via which they also raised certain (now-resolved) discovery disputes. (D.I. 258) Initial briefing on the Motion (which included a sur-reply brief, filed by Defendants after the Court granted their request to do so) was completed on January 6, 2023. (D.I. 295; D.I. 297) Thereafter, although the Court had already received approximately 52 pages of briefing on the issue, Defendants sought leave to have them and Plaintiffs file still further supplemental briefing. (D.I. 328; D.I. 336) The Court permitted this,

---

[1]    Defendant Savencia, for its part, is a wholly-owned subsidiary of Zausner. (D.I. 272, ex. 15 at 16)

and supplemental briefing was completed by February 21, 2023.  (D.I. 355)  The Court then held

oral argument on the Motion on February 28, 2023.  (D.I. 549 (hereafter, "Tr."))

## II.    DISCUSSION

With the Motion, Plaintiffs contend that Defendants, including via the actions of and

furthered by the advice of their attorney Lewis Gitlin ("Mr. Gitlin"),[2] committed fraud regarding

SFI's sale.  Plaintiffs argue that in light of this, the crime-fraud exception should be applied to

vitiate Defendants' attorney-client privilege with regard to certain communications between

Defendants and Mr. Gitlin.  (D.I. 272 at 1)

Below, the Court will first address the relevant legal standards applicable to the Motion.

Thereafter, it will apply those standards to the parties' arguments.

### A.    Relevant Legal Standards

In federal civil cases, privilege disputes are governed by state law.  Fed. R. Evid. 501.  In

the briefing here, Plaintiffs contended that Florida law regarding privilege rules—including the

application of the crime-fraud exception—applies to this dispute.  (D.I. 272 at 17-18)  For their

part, Defendants cited to both Florida and Delaware law regarding the crime-fraud exception.

(D.I. 281 at 14-15 & n.12)  During oral argument, however, both sides agreed that Florida and

Delaware law are not in conflict with each other on this score.  (Tr. at 8, 32; *see also* D.I. 281 at

15 n.12)[3]  In light of this, below the Court will primarily cite to Florida law on these issues.  It

---

[2]    At the relevant time, Mr. Gitlin was in-house counsel (akin to a general counsel) representing all of Savencia's United States subsidiaries.  (D.I. 272, ex. 9 at 174)  For our purposes, there appears to be no dispute that ZNHC (and thus, Zausner) and Savencia were clients of Mr. Gitlin at the relevant time, as to whom he provided legal advice.

[3]    Federal courts sitting in diversity apply the choice of law rules of the forum state. *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 358 (3d Cir. 2007).  Delaware choice of law rules require that before deciding any choice-of-law-dispute, a court would first need to determine whether there is actually a conflict between the competing laws on the issue in dispute.  *Id.*  There is none here.

3

does so only because that State's law:  (1) was cited in both sets of briefing; and (2) is a bit more explicit than is Delaware law in setting out the procedural process that should be followed when a party raises the potential applicability of the crime-fraud exception.  But again, the reader should bear in mind that it is undisputed that there is no daylight between Florida law and Delaware law as to this subject matter.[4]

Florida has adopted the crime-fraud exception, which provides that there is no attorney-client privilege[5] when the "services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew was a crime or fraud."  *Am. Tobacco Co. v. State*, 697 So. 2d 1249, 1253 (Fla. Dist. Ct. App. 1997) (internal quotation marks and citation omitted); *see also First Union Nat'l Bank v. Turney*, 824 So. 2d 172, 186-87 (Fla. Dist. Ct. App. 2001) ("The crime-fraud exception to the attorney-client privilege . . . assure[s] that the seal of secrecy, . . . between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime.") (internal quotation marks and citation omitted, alterations in original).[6]  The reason for the existence of the crime-fraud exception is that while the attorney-client privilege must protect the confidences of wrongdoers,

---

[4]    Below, when summarizing Florida's law regarding the crime-fraud exception, the Court will also provide citations to similar principles set out in Delaware legal decisions.

[5]    The attorney-client privilege, of course, "covers [c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance."  *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 94 (3d Cir. 1992) (internal quotation marks and citation omitted, alteration in original).

[6]    *See also* Del. R. Evid. 502(d) (same); *Buttonwood Tree Value Partners, L.P. v. R.L. Polk & Co., Inc.*, Civil Action No. 9250-VCG, 2018 WL 346036, at *6 (Del. Ch. Jan. 10, 2018) (noting that pursuant to Delaware law, the crime-fraud exception "rests on the premise that when a client seeks out an attorney for the purpose of obtaining advice that will aid the client in carrying out a crime or fraudulent scheme, the client has abused the attorney-client relationship and stripped that relationship of its confidential status") (internal quotation marks and citation omitted, emphasis omitted); *Princeton Ins. Co. v. Vergano*, 883 A.2d 44, 54 (Del. Ch. 2005).

the reasons behind that protection (i.e., the centrality of open attorney-client communication and the proper functioning of our adversary system of justice) cease to operate when the desired advice relates not to prior wrongdoing, but to future wrongdoing. *United States v. Zolin*, 491 U.S. 554, 562-63 (1989).

How does a movant go about establishing the applicability of the crime-fraud exception—such that the party can ultimately obtain access to information otherwise protected by the privilege? In explaining the relevant procedures, Florida courts have prominently relied on a decision of the United States Court of Appeals for the Third Circuit: *Haines v. Liggett Grp. Inc.*, 975 F.2d 81 (3d Cir. 1992). *Am. Tobacco*, 697 So. 2d at 1255-57. In line with the decision in *Haines*, a party seeking to show that the crime-fraud exception applies must first make a "showing of a prima facie case"; to do that, that party must "give colour to the charge" by presenting evidence "'which, if believed by the fact-finder, would be sufficient to support a finding that the elements of the crime-fraud exception were met.'" *Id.* (quoting *Haines*, 975 F.2d at 95-96).[7] Making out a "prima facie case" in this context does not require clearing a high bar. That is, a movant must demonstrate only that there is a "reasonable basis" to suspect the perpetration of a crime or fraud furthered by the assistance of an attorney; the standard is only "reasonably demanding[,]" in that it amounts to something less than a "more likely than not" showing and something more than the proffer of mere speculation. *In re Grand Jury*, 705 F.3d

---

[7]    *See also Drachman v. BioDelivery Scis. Int'l Inc.*, C.A. No. 2019-0728-LWW, 2021 WL 3779539, at *9 (Del. Ch. Aug. 25, 2021) (noting that Delaware law requires that the party seeking to invoke the crime-fraud exception must make "a prima facie showing" that the confidential communications "were made in furtherance of a crime or fraud or to advance the client's criminal or fraudulent purpose") (internal quotation marks and citation omitted, emphasis omitted); *Matter of Sutton*, C.A. No. 96M-08-024, 1996 WL 659002, at *11 (Del. Super. Ct. Aug. 30, 1996) (noting the prima facie evidence standard and citing to *Haines* in support of an articulation of the relevant law).

133, 153-54 (3d Cir. 2012) (internal quotation marks and citation omitted) (expanding on the description of a "prima facie case" set out in *Haines*). Setting out this type of prima facie case has at times been likened to making a showing of probable cause in the criminal context. *See Haines*, 975 F.2d at 95 (noting, without disapproval, that the United States Court of Appeals for the Second Circuit has equated the prima facie case and probable cause standards); *see also In re Grand Jury*, 705 F.3d at 153 (same).[8]

What are the elements of the crime-fraud exception—that is, the elements as to which the movant must make out a prima facie case? First, Plaintiffs must sufficiently demonstrate that "a fraud was perpetrated or planned[.]" *Jones v. Gen. Motors Corp.*, 24 F. Supp. 2d 1335, 1339 (M.D. Fla. 1998) (applying Florida law); *see also Haines*, 975 F.2d at 95 (noting that in "matters referring to fraud or crime generally we have required that the party seeking discovery must make a prima facie showing of fraud or crime"); *Horning-Keating v. State*, 777 So. 2d 438, 446 (Fla. Dist. Ct. App. 2001).[9] Second, they must show that "the attorney-client communications

---

[8]        In their presentations to the Court, the parties differed as to the nature of the burden that Plaintiffs face here. Plaintiffs repeatedly referred to the prima facie case standard as one that required only a "minimal showing" or "de minimis" showing. (D.I. 286 at 4; *see also* Tr. at 76-77) Defendants repeatedly called the standard a "very heavy burden" to meet. (D.I. 281 at 1; Tr. at 35, 44) In the Court's view, the above guidance provided by the Third Circuit makes it pretty clear that Plaintiffs are correct, and that the burden is in fact not a heavy one. *See In re Grand Jury*, 705 F.3d at 153 (flatly stating that the burden is "not a particularly heavy one") (internal quotation marks and citation omitted); *United States v. Stein*, CASE NO. 21-20321-CR-ALTONAGA/Torres, 2023 WL 2585033, at *3 (S.D. Fla. Mar. 21, 2023) (describing the prima facie case showing as a "low hurdle") (internal quotation marks and citation omitted); *cf. Kaley v. United States*, 571 U.S. 320, 338 (2014) ("Probable cause . . . is not a high bar [and] requires only the kind of fair probability on which reasonable and prudent [people] . . . act.") (internal quotation marks and citations omitted).

[9]        Florida and Delaware courts have explained that while the acts at issue must at least be in service of a *planned* or *attempted* fraud, the fraud need not be *actually completed* in order for the crime-fraud exception to be invoked. *See Jones*, 24 F. Supp. 2d at 1339; *Turney*, 824 So. 2d at 187; *Matter of Sutton*, 1996 WL 659002, at *11. In the instant case, Plaintiffs'

were in furtherance of the fraud." *Jones*, 24 F. Supp. 2d at 1339 (explaining that the movant must produce prima facie evidence that its adversary "sought the advice of counsel to procure a fraud") (internal quotation marks and citation omitted); *see also Haines*, 975 F.2d at 95 (same); *Horning-Keating*, 777 So. 2d at 446 (same).[10]

   If the moving party makes its *prima facie* case showing,[11] then the burden of persuasion shifts to the party asserting the privilege to provide a reasonable explanation for the conduct or

_____

allegations are that the fraud at issue was in fact completed, so this wrinkle in the law is not particularly relevant here.

   [10]   *See also Buttonwood*, 2018 WL 346036, at *6 (explaining that, similarly under Delaware law, to invoke the crime-fraud exception the proponent of the exception must not only (1) make an allegation of fraud, but must also (2) make a prima facie showing that the confidential communications at issue were made in furtherance of that crime or fraud, in that the client must intend that the advice advance the client's criminal or fraudulent purpose).

   During oral argument on the Motion, Plaintiffs' counsel suggested that he was not certain whether, in addition to making out a prima facie case that a fraud or crime was perpetrated or planned, that Plaintiffs *also* had to make out a prima facie case that an attorney's advice was sought in order to further the fraud. (Tr. at 12) As noted in the cases cited above, clearly that second showing also needs to be made pursuant to both Florida and Delaware law. (*Id.* at 14)

   [11]   As part of its assessment as to whether the movant has made out a prima facie case, the trial court may (though it is not required to) review the impacted attorney-client communications at issue *in camera*. *See Butler, Pappas, Weihmuller, Katz, Craig, LLP v. Coral Reef of Key Biscayne Devs., Inc.*, 873 So. 2d 339, 342 (Fla. Dist. Ct. App. 2003). Before a court engages in *in camera* review, "'the judge should require a showing [by the party challenging the privilege] of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.'" *Am. Tobacco*, 697 So. 2d at 1255 (quoting *Zolin*, 491 U.S. at 572) (certain internal quotation marks and citations omitted, emphasis added); *see also Matter of Sutton*, 1996 WL 659002, at *13 (same). If such a showing is made, "the decision whether to engage in *in camera* review rests in the sound discretion of the district court." *Zolin*, 491 U.S. at 572.

   Here, the Court will not order an *in camera* review of any impacted communications before making a decision on the Motion. This is in part because neither side provided the Court with much information about the number of or content of any attorney-client communications that might be impacted by the Motion. Nor has either side made significant argument as to why reviewing such communications at this stage would actually help further the Court's decision. *See Zolin*, 491 U.S. at 572 (noting that factors going into the determination of whether to allow an *in camera* review include the volume of materials for review, as well as the likelihood that the

communication at issue.  *Am. Tobacco*, 697 So. 2d at 1256.  Such a party must be given the

opportunity to be heard at an evidentiary hearing; at this hearing, each side can present evidence

and make further argument on whether the evidence presented, if believed by the fact-finder,

suffices to support a finding that the elements of the crime-fraud exception have been satisfied.

*Id*. at 1255 (citing *Haines*, 975 F.2d at 97); *see also Merco Grp. of the Palm Beaches, Inc. v.

McGregor*, 162 So. 3d 49, 51 (Fla. Dist. Ct. App. 2014) (noting that an "evidentiary hearing

should occur after the court determines that the prima facie showing of the crime-fraud exception

has been established").  After this hearing, if the court accepts the explanation of the party

asserting the privilege and deems it sufficient to rebut the evidence presented by the party

opposing the privilege, then the privilege remains.  *Am. Tobacco*, 697 So. 2d at 1256.  On the

other hand, if the explanation and evidence presented by the party asserting the privilege is *not*

sufficient to rebut the evidence presented by the opposing side, then the privilege is lost.  *Id*.  In

weighing the evidence on this point after an evidentiary hearing, the court uses a preponderance

of the evidence standard.  *Id*.

**B.    The Parties' Arguments**

As noted above, Plaintiffs argue that Defendants committed fraud[12] regarding the sale of

SFI and that Mr. Gitlin himself participated in this fraud and furthered the fraud with his legal

---

evidence produced through such review will aid the court's assessment of the crime-fraud
exception issue).

[12]    In order to make out a claim of fraud (i.e., fraudulent misrepresentation or
fraudulent inducement) under Florida law, a plaintiff must sufficiently allege:  (1) a false
statement concerning a material fact; (2) knowledge by the person making the statement that the
representation is false; (3) the intent by the person making the statement that the representation
will induce another to act on it; and (4) reliance on the representation to the injury of the other
party.  *Lance v. Wade*, 457 So. 2d 1008, 1011 (Fla. 1984); *Moriber v. Dreiling*, 194 So. 3d 369,
373 (Fla. Dist. Ct. App. 2016).  A claim for fraudulent concealment (i.e., of fraud due to the
failure to disclose a fact) has the following elements:  (1) the concealment or failure to disclose a

advice.  For purposes of the instant Motion, Defendants are alleged to have committed such fraudulent conduct in three particular ways:  (1) by misrepresenting the position of and authority held in mid-to-late-2014 by Alain Voss ("Mr. Voss"), the then-President and Chief Executive Officer ("CEO") of SFI (the "Voss misrepresentations issue"); (2) by deliberately excluding from a "data room"[13] certain documents that would have disclosed Mr. Voss' true position and authority, or by including documents in the data room that were misleading as to Mr. Voss' true position and authority (the "data room issue"), and (3) by misrepresenting SFI's financial position in certain ways (the "financial misrepresentations issue").  (D.I. 272 at 1)  Below, the Court will address only the Voss misrepresentations issue and the data room issue.[14]  And to a

---

material fact; (2) knowledge by the person who failed to disclose the fact that it should have been disclosed; (3) knowledge by that person that their concealment or failure to disclose would induce the plaintiff to act; (4) a duty to disclose the material fact; and (5) that the plaintiff detrimentally relied on the misinformation.  *Hess v. Philip Morris USA, Inc.*, 175 So. 3d 687, 691 (Fla. 2015).

[13]    The data room was a virtual grouping of documents regarding SFI's sale; the data room was made available to Plaintiffs' representatives in late 2014, in order to allow them to perform due diligence regarding the sale.  (D.I. 272 at 11; *see also* D.I. 185 at 8)

[14]    As for the financial misrepresentations issue, there Plaintiffs argue that Defendants, including Mr. Gitlin, committed fraud by misrepresenting SFI's financial position to Plaintiffs in different ways—i.e., by misrepresenting or concealing the fact that SFI's financial statements were not accurate and were not compliant with "GAAP, GASS and IFRS[,]" or by failing to disclose the purported lack of independence of Bertrand Proust, SFI's Chief Financial Officer.  (D.I. 272 at 1, 15-17)  The Court will not address the Motion as it relates to the financial misrepresentations issue, because in its July 28, 2021 Report and Recommendation ("July 28 R&R"), the Court concluded that Plaintiffs had failed to state a plausible fraud claim regarding those types of alleged misrepresentations or omissions.  (D.I. 185 at 36-38)  In later adopting in part the July 28 R&R, United States District Judge Richard G. Andrews (the District Judge who was then presiding over the case) noted that since each count of the operative complaint (including the fraud counts) contained at least one plausible theory or allegation of fraud that had not been recommended for dismissal, then each count of the operative complaint would not be dismissed.  (D.I. 198 at 1-2 (noting that the Court's decision was premised on the fact that "Plaintiffs have plausibly stated a claim for each count, as the Magistrate Judge held" and that in that regard the Court would "allow [] Plaintiffs to move forward with each Count in their Second Amended Complaint"))  In light of his ruling, Judge Andrews dismissed Plaintiffs' remaining

great degree, it will address the two issues together.  This is because the two issues overlap factually to a significant degree—in that both relate to Defendants' alleged misrepresentations and omissions on the same subject:  Mr. Voss' role at SFI as of the second half of 2014.

In assessing the Motion as to the Voss misrepresentations issue and the data room issue, the Court will first explain why—were it assessing only the evidence proffered by Plaintiffs to this point—it would conclude that Plaintiffs have made out a sufficient prima facie case.  Next, the Court will explain why—were it to take into account *all* of the record before it (i.e., not just Plaintiffs' proffered evidence but also the evidence *Defendants* submitted along with their briefing), while using a preponderance of the evidence standard, it would conclude that the crime-fraud exception should not apply here.  Lastly, the Court will revisit what is its proper role in adjudicating this Motion; in doing so, it will conclude that the proper outcome here is to find that a prima facie case has been made and that an evidentiary hearing should be scheduled.

      **1.**    **Plaintiffs, in Light of the Evidence They Have Presented to Date, Have Established a Prima Facie Case Sufficient to Support a Finding that the Elements of the Crime Fraud Exception Were Met.**

The Court first turns to whether, as to the Voss misrepresentations issue and the data room issue, Plaintiffs have presented evidence sufficient to make out a prima facie case that the

---

objections to the July 28 R&R as moot.  (*Id*. at 2)  The Court understands the impact of its July 28 R&R and Judge Andrews' decision to be as follows:  (1) the July 28 R&R found that Plaintiffs had not, pursuant to Federal Rule of Civil Procedure 9(b), sufficiently pleaded any theories of fraud in this case that relate to SFI's financial statements or to Mr. Proust; (2) no ruling of a District Judge has contradicted that decision, nor has a District Judge determined that Plaintiffs *did* sufficiently plead such theories of fraud in this case; and (3) thus, the status quo is that Plaintiffs have not properly given notice of these types of fraud claims to Defendants, such that Plaintiffs cannot move forward with such claims herein.  In light of this understanding, the Court will not address the "financial misrepresentations issue" in this Memorandum Opinion.

elements of the crime-fraud exception have been met. To start, the Court will provide some additional background about the nature of Plaintiffs' fraud allegations regarding these subjects.

Plaintiffs assert that, starting in around mid-2014, their representatives Claude Blandin, Bruno Blandin and Arno Leoni ("Mr. Leoni")[15] were beginning to discuss purchasing SFI. They claim that at this time, Mr. Voss: (1) introduced himself to Plaintiffs as the President and CEO of SFI; and (2) communicated that he had day-to-day managerial and autonomous control over SFI and that he ran SFI without interference. (D.I. 272, ex. 2 at ¶¶ 5, 9-10; *see also* D.I. 272 at 3) But Plaintiffs allege that these assertions about Mr. Voss' role and authority, which were also made by other Defendant representatives around this same time, were false.

In support, Plaintiffs cite to evidence indicating that in the first half of 2014, Mr. Voss was having "reputational problems" at SFI, which stemmed from the fact that he was not meeting the business' financial objectives, was not exhibiting strong management skills and was not handling SFI's day-to-day operations very well. (D.I. 272, ex. 31 at 64-65, 145-46; *id.*, ex. 33 at 35-36, 102-03; *id.*, ex. 34 at 43, 127-28) In light of these challenges, Plaintiffs assert that in mid-2014, Defendants effectively stripped Mr. Voss of his offices and authority at SFI. (D.I. 272 at 8-9; Tr. at 13)

More specifically, Plaintiffs allege that Mr. Voss entered into a "secret employment agreement" with Defendants, dated June 30, 2014 (the "Voss EA"). (D.I. 272 at 8) The Voss EA purportedly "stripped [Mr.] Voss of all power in [SFI] but allowed him to nominally retain the title of" President and CEO, while vesting much of Mr. Voss' former authority in J.M. Wild ("Mr. Wild"), who was then the group Chief Financial Officer for the North American Affiliates

---

[15]     Plaintiffs have provided a declaration from Mr. Leoni as part of the record relating to the instant Motion. (D.I. 272, ex. 2) The Court will refer to this declaration as the "Leoni Declaration."

of Savencia. (*Id.*; *see also* D.I. 147 at ¶ 10) On this score, Plaintiffs note that the Voss EA states in part that:

> [I]n view of [Voss'] history with [SFI], the title President/[CEO] . . . is mainly to enhance the effectiveness of Employee's sales efforts.
>
> All other aspects of the operation of SFI shall be the responsibility of J. Wild, who although carrying the title of Executive Vice President, will have the de facto position of [CEO]. These responsibilities shall include, but not be limited to
>
> 1. Finance
> 2. Human Resources
> 3. Quality
> 4. Information Systems
> 5. All other corporate functions.

(D.I. 272, ex. 37 at Zausner_000009948) The Voss EA further notes that Mr. Voss was required to "coordinate . . . any commitment by the company of a material nature with [Mr.] Wild and Pierre Ragnet" ("Mr. Ragnet," then Savencia's secretary general and Zausner's President), and that Mr. Wild and Mr. Ragnet would "have the authority to determine details of the foregoing[.]" (*Id.*; *see also* D.I. 147 at ¶ 9)

Plaintiffs allege that their representatives had no experience with the cheese or dairy business as of late 2014. As a result, they say that they would never have purchased SFI "unless incumbent key management was in place"—and that they informed Defendants of this fact. (D.I. 272, ex. 2 at ¶¶ 16-18) And Plaintiffs argue that during SFI's sale process, they were never made aware of the content of the Voss EA (that is, of the fact that Defendants had such a negative opinion of Mr. Voss that they stripped him of much of his prior duties and powers as CEO, and had instead installed Mr. Wild as *de facto* CEO), nor was the Voss EA disclosed in the data room. And Plaintiffs state that had they known of the key terms of the Voss EA, they never would have purchased SFI—i.e., a company that facially was holding out Mr. Voss as its

12

effective, trusted and empowered CEO and President, when in fact the opposite was the case. (D.I. 272 at 4, 10, 13; *see also* D.I. 147 at ¶¶ 27-28, 64-66, 68, 96, 168; D.I. 272, ex. 2 at ¶¶ 17-18, 30-33; D.I. 355 at 1-2; Tr. at 26-27)

Having now explained Plaintiffs' relevant theories of fraud, the Court next articulates why it believes—were it to look only at the evidence cited by Plaintiffs—that a prima facie case has been made as to the elements of the crime-fraud exception.

As an initial matter, the Court notes that in its July 28 R&R, it concluded that Plaintiffs had pleaded plausible fraud allegations regarding the Voss misrepresentations issue and the data room issue; as a result, the Court did not recommend dismissal of such claims. (D.I. 185 at 38-41) Of course, that decision came at the pleading stage, and we are now at a point where Plaintiffs have to muster some actual evidence to support these allegations. But the Court starts here simply as a way of explaining why, if Plaintiffs actually *do* provide some such evidence on this score, then the conduct at issue could well amount to a fraud under Florida law. As the Court explained in the July 28 R&R, "If Plaintiffs had known that as of June 2014, [Mr.] Voss was not in fact acting as the President and CEO of [SFI] at all, then it seems plausible to the Court that (as Plaintiffs allege) Plaintiffs may not have gone on to rely on [Mr.] Voss' advice or to purchase [SFI] at all." (*Id*. at 40 n.28)

The Court next turns to Plaintiffs' proffered evidence. On that front, Plaintiffs have submitted documents and testimony providing some support for the conclusion that: (1) Defendants, including Mr. Gitlin and/or otherwise furthered by communications of Mr. Gitlin,[16]

---

[16]    In this case, Plaintiffs are not just alleging that Defendants committed fraud that was furthered in some way by Mr. Gitlin's advice; instead, they are alleging that Mr. Gitlin was an active participant in and committer of the fraud at issue.

made false statements or omissions to Plaintiffs in late 2014 about the extent of Mr. Voss' role and authority; and (2) Defendants, including Mr. Gitlin and/or furthered by communications of Mr. Gitlin, provided documents in the data room that misled on this score.

For example, Plaintiffs point to the Leoni Declaration.[17]  Therein, Mr. Leoni declares that he, Bruno Blandin and Claude Blandin had meetings with Mr. Ragnet, Mr. Voss and Mr. Gitlin in France in late November and early December 2014.  (D.I. 272, ex. 2 at ¶ 13)  He states that in those meetings, Mr. Ragnet, Mr. Voss and Mr. Gitlin "*each* told us that [Mr.] Voss [] was the president and chief executive officer of [SFI] in day-to-day and autonomous managerial control over [SFI]."  (*Id.* (emphasis added))[18]  To be sure, the Court recognizes that aspects of this declaration are fairly self-serving.  After all, in it Mr. Leoni is making statements that are both incriminating of Mr. Gitlin and very helpful to his side as to this crime-fraud exception issue—and he does so by providing very little detail as to exactly what was said by whom during these meetings.  In Section II.B.2, when the Court describes how it would assess *all* of the evidence of record now before it on this issue, this part of the Leoni Declaration would not hold up well against the contrary evidence put forward by Defendants.  But simply as a matter of assessing whether Plaintiffs have made out their prima facie case, the declaration certainly amounts to

---

[17]    In their briefing, the parties have cited to various documents of record.  The Court will not address all of them herein.  Instead, it will only address those documents that the Court believes actually make a material difference to the overall evidentiary calculus.

[18]    Relatedly, in a separate declaration, Bruno Blandin states that he met with Mr. Ragnet and Alex Bongrain ("Mr. Bongrain," then the Chairman of Savencia), (D.I. 147 at ¶ 8), in November 2014 in France, and that Mr. Ragnet and Mr. Bongrain both told him that Mr. Voss was "the President and CEO of SFI, was a key player in the management of SFI, [] had been instrumental to the success of SFI for many years, [] was well respected and trusted in the industry [and] that [Mr.] Voss managed [SFI] alone and was autonomous."  (D.I. 272, ex. 10 at ¶ 9)

*some* evidence that not only did Defendants make the fraudulent misrepresentations/omissions at issue, but that Mr. Gitlin participated in doing so and/or furthered the fraud with his input.

Plaintiffs next point to evidence indicating that, during the SFI sale process, Defendants made additional false statements suggesting that Mr. Voss was fully empowered as SFI's CEO and President. For example, Plaintiffs cite to a November 2014 e-mail sent from Mr. Ragnet to Plaintiffs' attorney, in which Mr. Ragnet refers to Mr. Voss' position as "the current CEO of the company" and to how Mr. Voss "has always benefitted from significant autonomy" in that role and "is very autonomous[.]" (D.I. 272, ex. 39 at Zausner 0000020213 (*cited in* D.I. 272 at 10)) Plaintiffs also point to another e-mail from Mr. Ragnet, sent in that same month to Bruno Blandin, in which Mr. Ragnet says that it was Mr. Voss "alone who manages" SFI. (*Id.*, ex. 11 at 1 (*cited in* D.I. 272 at 10))[19]

Next, Plaintiffs cite to a few documents that were placed in the data room[20] that list Mr. Voss' title as President and CEO (and/or Mr. Wild's title as Executive Vice President)—without providing any indication about how Mr. Voss was stripped of much of his authority or how Mr. Wild was named *de facto* CEO in June 2014. One example is a list of "SFI—Officers and Directors" that noted only that Mr. Voss was then SFI's "President/CEO[.]" (D.I. 272, ex. 50; *see also* D.I. 272 at 13)[21] Of course, it is literally true that at the time this document was placed

---

[19]     Mr. Gitlin is not copied on these e-mails, and there is no other indication that he advised Mr. Ragnet to refer to Mr. Voss in such a way.

[20]     There is no dispute that Mr. Gitlin had control over what documents would or would not be placed in the data room. (D.I. 286, exs. 2-3 (testimony of Mr. Ragnet and Mr. Wild indicating that Mr. Gitlin made decisions about what documents would be provided in the data room and that he downloaded such documents to the data room) (*cited in* D.I. 286 at 1); Tr. at 15)

[21]     In their briefing, Plaintiffs speculate that Mr. Gitlin "likely" created the "SFI—Officers and Directors" list, "given his position and control over the data room[.]" (D.I. 272 at 13) But there is no evidence of record to suggest that Mr. Gitlin did so. And during oral

in the data room, Mr. Voss did officially hold the roles referenced therein. But the Court can see Plaintiffs' point about how the failure to reference the actual content of the Voss EA (including how Mr. Wild had become the *de facto* CEO) in such documents could be said to be misleading.[22]

Additionally, in the record is an October 31, 2014 e-mail (the "October 31 e-mail") from Mr. Gitlin to Mr. Voss (copying Mr. Wild). (D.I. 272, ex. 48 (*cited in* D.I. 281 at 12)) In this e-mail, Mr. Gitlin indicates that Mr. Voss has requested that Defendants "not disclose [the] details" of "his two employment offers" (one of which was the Voss EA). (*Id.*) Mr. Gitlin goes on to advise Mr. Voss and Mr. Wild that because Plaintiffs had asked to review contracts involving executive compensation, Mr. Gitlin believed that ZNHC "needs to at least recognize the existence of" the two Voss employment agreements; Mr. Gitlin proposes doing so by inserting reference to the agreements in the SPA itself. (*Id.*; *see also* D.I. 281 at 12-13; Tr. at 24-25)

---

argument, Plaintiffs' counsel said that metadata suggests that Mr. Wild created this list. (Tr. at 24)

[22]    Plaintiffs cited to two other documents that they suggest were similarly false or misleading. But the Court does not see how either document helps Plaintiffs' case much. One of those documents is a December 31, 2014 certificate of incumbency signed by Mr. Gitlin, which states that Mr. Voss is SFI's "President and Chief Executive Officer"; the document does not mention Mr. Wild. (D.I. 272, ex. 41 at Zausner_000000244 (*cited in* D.I. 272 at 10-11)) But the Court is not sure how persuasive this document is as to the alleged frauds at issue, in that: (1) Plaintiffs' key assertion here is that these frauds wrongly induced them to purchase SFI; but (2) the certificate of incumbency is dated December 31, 2014, the date the SFI sale closed (and weeks after Plaintiffs signed the SPA). Thus, it is not clear how Plaintiffs could have relied on this document in deciding to proceed forward with the SFI sale. (D.I. 281 at 11) The other document is an October 1, 2014 letter of intent regarding SFI's sale, which was signed by both Mr. Voss and Mr. Gitlin. (D.I. 272, ex. 40 (*cited in* D.I. 272 at 10)) In their briefing, Plaintiffs assert that this letter of intent stated that SFI was "'owned by [ZNHC] but managed on a day-to-day basis by [Mr. Voss] . . . in his role as Company President/CEO[.]'" (D.I. 272 at 10 (citing *id.*, ex. 40)) But the Court has reviewed two versions of this document in the record (one incomplete version provided by Plaintiffs and one full version provided by Defendants) and cannot find the quoted language anywhere therein. (D.I. 272, ex. 40; D.I. 281, ex. 3)

Indeed, the final executed SPA did include specific reference to the Voss EA (referring to it as "that certain employment offer letter of Alain Voss, dated as of June 30, 2014, with respect to his employment by the Company"). (D.I. 272, ex. 1 at 67; *see also id.* at 39) On the one hand, one could argue (as Defendants do) that the October 31 e-mail shows how Mr. Gitlin is *not* participating in or furthering the alleged fraud at issue—in that he is advocating for disclosure of the existence of the Voss EA. (D.I. 281 at 12-13, 18) There is something to that argument. And (as discussed in Section II.B.2), were that fact to be considered along with all of the other evidence that Defendants have put forward at this stage, it can help work against a finding that the crime-fraud exception should apply. But for now, with the Court considering this October 31 e-mail only alongside the other record evidence that *Plaintiffs* have cited, the Court can see how the document could also provide some support to Plaintiffs' case. There is no dispute that Mr. Gitlin was aware of the Voss EA at the time of the October 31 e-mail. And in the e-mail, Mr. Gitlin is noting that Plaintiffs want to see that document. Yet Mr. Gitlin does not advocate sharing the contents of the Voss EA with Plaintiffs (either by placing the document in the data room or otherwise). Instead he proposes only mentioning the fact of the document's existence in the SPA. This could be read as an instance of Mr. Gitlin providing legal advice that furthered Defendants' alleged efforts to hide key information about Mr. Voss' true role and authority from Plaintiffs. (*Cf.* D.I. 185 at 30-31 n.16 (making a similar point in assessing related breach of contract claims in the case); *see also* D.I. 355 at 3; Tr. at 62)

In sum, if the Court looks only at the evidence noted above—i.e., the key evidence put forward by Plaintiffs in support of their Motion—it would conclude that Plaintiffs have made out a prima facie case that the elements of the crime-fraud exception have been met. That is, the above evidence can help show that Defendants: (1) failed to share key information about Mr.

Voss' reduced role (i.e., the information found in the Voss EA) with Plaintiffs prior to the sale of SFI; and (2) made statements to Plaintiffs indicating the contrary was true—i.e., statements indicating that Mr. Voss was an "autonomous" CEO at the time.  And this evidence also could support a claim that Mr. Gitlin personally played a role in the alleged fraud and/or that his advice furthered that fraud.  *Cf. Finley Assocs., Inc. v. Sea & Pines Consol. Corp.*, 714 F. Supp. 110, 118 (D. Del. 1989) (applying Delaware law and concluding that the movant had established a prima facie case regarding the crime-fraud exception elements, and relying on deposition testimony and sworn statements submitted by the movant, which indicated that an attorney had furthered the alleged fraudulent land transaction at issue by suggesting that the transaction occur).

> **2.    Were the Court Permitted to Assess the Entire Record Before It Using a Preponderance of the Evidence Standard—Including All of the Evidence Provided by Defendants—It Would Conclude that Plaintiffs Have Not Made a Sufficient Showing that the Crime-Fraud Exception Applies.**

Having come to this conclusion, the Court notes that the record regarding the Motion is a bit unusual.  That is because in contesting whether Plaintiffs had made out a prima facie case, Defendants did not simply try to poke holes in the *evidence submitted by Plaintiffs* and explain why that evidence could not suffice for Plaintiffs to meet their burden.  Defendants also went on the offensive.  That is, they submitted a substantial amount of *additional documentary evidence* into the record (i.e., as exhibits to their briefs).  Below, in order to provide additional guidance to the parties, the Court will explain why—were its job at this point to review all of the evidence before it, using the preponderance of the evidence standard, and to now make a final decision as to whether the crime-fraud exception applies—it would conclude in Defendants' favor.

In significant part, here the Court is influenced by the following pieces of evidence that were either submitted by or highlighted by Defendants.

First, Defendants point to the fact that Mr. Gitlin and Defendants placed SFI's Board Meeting Minutes in the data room, which undisputedly included a June 27, 2014 document titled "Special Action by Written Consent of the Board of Directors" (the "June 27 Special Action"). (D.I. 343, ex. 5; *see also* D.I. 281 at 7; Tr. at 27)  Now, keep in mind that Plaintiffs argue that central to the Voss misrepresentations issue and the data room issue is that Defendants failed to disclose that, post-June 2014, Mr. Wild "had been vested with all power and authority, as *de facto* Chief Executive Officer" and that Mr. Voss had been "stripped of [such] power and authority[.]" (D.I. 272 at 14)  Yet the June 27 Special Action *in fact discloses this reality*.  The document flatly states that it was in the "best interest of [SFI] to make an offer to [Mr.] Voss to serve as the Company's President and CEO . . . until December 31, 2014 [or some future time, wherein Mr. Voss will] focus on the Company's wholly-owned subsidiary, Corman Ship Supplies LLC ['Corman']" and that that it was also in the "best interest of [SFI] for [Mr. Wild] to serve as the Company's *de facto Interim Chief Executive Officer* while maintaining his title of Executive Vice President . . . until such time as he is succeeded[.]" (D.I. 343, ex. 5 at ECBSAV0000493 (emphasis added))  Despite Plaintiffs' arguments to the contrary,[23] the Court does not see how this document does anything other than make plain certain essential facts that Plaintiffs say were concealed from them:  that Mr. Wild was, as of June 2014, the *de facto* CEO of SFI and that Mr. Voss was a CEO largely in name only.  (Tr. at 29-30 (Plaintiffs' counsel

---

[23]    In Plaintiffs' reply brief, they make a convoluted argument that:  (1) because SFI's bylaws at the time stated that during the absence or disability of SFI's President, SFI's Vice President would have the powers of the President; then (2) the June 27 Special Action was merely conveying that "Voss is President and CEO, and that Wild would be interim president in his absence or disability." (D.I. 286 at 7)  The Court disagrees that this is a reasonable reading of the June 27 Special Action.  After all, the document clearly refers to Mr. Wild as *de facto* SFI CEO and it says nothing about the concept of absence or disability.  (D.I. 343, ex. 5 at ECBSAV0000493)

acknowledging that "there's a distinct possibility one could try to read [the June 27 Special Action]" as stating that Mr. Wild was the *de facto* SFI CEO))[24]

Second, Defendants point to a PowerPoint chart titled "Management Level Organization" regarding SFI (the "PowerPoint chart"), which Mr. Gitlin and Defendants also placed in the data room. (D.I. 281 at 7; D.I. 286 at 2) The chart lists Mr. Wild as the "EVP" (or Executive Vice President) and Mr. Voss as "CEO / President." (D.I. 272, ex. 51) But the chart *also* depicts how SFI's head of finance (its "Chief Financial Officer"), head of human resources (its "HR Director"), head of operations (its "Chief Operations Officer") and its head of information systems (its "IT Director") all now directly report to Mr. Wild (under the "Corporate Services" umbrella) and not to Mr. Voss. (*Id.*) And it depicts how only certain other executives (including a marketing manager, a purchasing director and a general manager of Corman), listed under the "Business Units" umbrella, report directly to Mr. Voss. (*Id.*) As Defendants note, this chart therefore tracks almost exactly the content of the key portion of the Voss EA at issue. That is because the Voss EA stated that Mr. Voss would be keeping his CEO / President title "mainly to enhance the effectiveness of Employee's sales efforts" while "[a]ll other aspects of the operation of [SFI] shall be the responsibility of J. Wild" including "1. Finance[;] 2. Human Resources[;] 3. Quality[;] 4. Information Systems[;] 5. All other corporate functions." (D.I. 272, ex. 37 at Zausner_000009948) In other words, by placing this PowerPoint chart in the data room, Mr.

---

[24]    In the July 28 R&R, when assessing Defendants' motion to dismiss, the Court noted how Defendants had brought the existence of the June 27 Special Action to its attention. (D.I. 185 at 39 n.26) But as the Court explained at the time, it could not credit Defendants' assertion that this document had been placed in the data room during the due diligence period—since the document and/or facts relating to it were not referenced in the operative complaint. (*Id.*) However, we are at a different phase of the case now. And here, as stated above, there is now no dispute that this document *was* placed in the data room prior to SFI's sale.

Gitlin and Defendants were *disclosing* the key information about Mr. Voss' and Mr. Wild's true

responsibilities that Plaintiffs say was kept hidden from them.  (D.I. 281 at 8 (Defendants noting

that Mr. Voss' and Mr. Wild's responsibilities in the Voss EA "line up almost perfectly with the

division of responsibilities set forth in the [PowerPoint chart]."))[25]  And there can also be no

dispute that Plaintiffs were *actually aware* of the PowerPoint chart.  On that score, Defendants

have cited to deposition testimony of Claude Blandin, wherein Mr. Blandin states that he

reviewed this chart in the data room, prior to the closing.  (D.I. 343, ex. 1 at 166-70)[26]

Third, as previously noted above, Mr. Gitlin and Defendants did at least reference the

Voss EA (and another Voss employment letter) in the text of the SPA.  (*See, e.g.*, D.I. 272, ex. 1

at 39, 67)  As the Court has stated already, it could be a fair inference that Defendants generally

(and Mr. Gitlin specifically) were not intending to hide the content of the Voss EA if they

specifically referenced the document multiple times in the SPA.  And Defendants also note that

in his deposition, Claude Blandin testified that he was aware of the SPA's references to the Voss

---

[25]        Indeed, in their briefing, Plaintiffs seem to implicitly acknowledge this fact.
Therein, they describe this PowerPoint chart as a document depicting how the "stripping of
authority [from Mr. Voss] was so complete that [SFI's] three general managers were no longer
reporting to [Mr.] Voss, but rather to [Mr.] Wild."  (D.I. 272 at 9 (citing *id.*, ex. 38))  The Court
agrees that the document appears to do just that.

[26]        Technically, the PowerPoint chart is not a document first provided to the Court by
Defendants; instead, Plaintiffs cited to this document and discussed it in their opening brief.
(D.I. 272 at 14)  But the Court nevertheless makes reference to the PowerPoint chart in this
subsection of the Memorandum Opinion because it is only when this document is considered
along with other evidence proffered solely by Defendants (like the June 27 Special Action) that
the strength of Defendants' position on the current record becomes even clearer.  For example,
while the content of the PowerPoint chart is very helpful to Defendants' argument (for the
reasons noted above), it is true that, as Plaintiffs note, the document does not itself specifically
state that Mr. Wild has been named "*de facto* CEO" of SFI.  (*See* D.I. 286 at 5)  But, of course,
the June 27 Special Action *does* state that Mr. Wild had exactly that role.  And so, it is once the
PowerPoint chart is considered *together* with the June 27 Special Action that Defendants'
position becomes all the more forceful here.  (Tr. at 52 (Defendants' counsel, making this same
point))

EA and of the existence of the Voss EA more generally. (D.I. 343, ex. 1 at 272-76)  In that regard, Mr. Blandin explained that he had asked Mr. Voss to produce the Voss EA, but that Mr. Voss had declined. (*Id.*)

The combined effect of the above-referenced facts amounts to strong evidence that, before the SFI sale, Mr. Gitlin and Defendants disclosed to Plaintiffs that: (1) Mr. Wild had been named *de facto* SFI CEO in June 2014; and (2) various key SFI general managers, whose role related to Corporate Services, were all reporting to Mr. Wild (and not Mr. Voss) as of this time period.  Moreover, there is evidence that Plaintiffs were actually aware of most, if not all, of those facts prior to the closing.  The purported failure to disclose to Plaintiffs this very information is the *essence of the alleged fraud* regarding the Voss misrepresentations issue and the data room issue.

Therefore, if the Court were permitted to take into account *all* of the evidence of record, and were it to be required to now make a decision based on the preponderance of the evidence standard, it would conclude that Plaintiffs have not demonstrated the applicability of the elements of the crime-fraud exception.  At a minimum, this is because the accumulated evidence, in total, would not sufficiently show that Mr. Gitlin participated in the alleged fraud or that his advice had been sought to further the alleged fraud.  Instead, the greater weight of the evidence would support the conclusion that Mr. Gitlin advocated for disclosure of the key material at issue (i.e., the content of the Voss EA) and had actually disclosed the substance of that material to Plaintiffs. *Cf. Buttonwood Tree Value Partners, L.P. v. R.L. Polk & Co., Inc.*, Civil Action No. 9250-VCG, 2018 WL 346036, at *7-8 (Del. Ch. Jan. 10, 2018) (concluding that the plaintiffs had not made out a prima facie case that defendants had sought the advice of their attorneys for the purpose of accomplishing an allegedly fraudulent scheme, where the allegation was that

defendants' failure to disclose material facts had fraudulently induced a self-tender, and where
although there was evidence that defendants had consulted with their attorneys on the subject of
the self-tender, plaintiffs had not sufficiently shown that those attorney consultations were used
to further or perpetrate the scheme).

### 3.    The Court Will Grant the Motion and Schedule an Evidentiary Hearing

With the Court having said all of the above, the question then becomes:  In resolving the
instant Motion, what is the Court's proper role?  Is the Court supposed to look only at the
evidence put forward by Plaintiffs and determine whether that evidence, standing alone, would
make out a prima facie case?  Or is it supposed to take into account all of the evidence provided
to it, including that submitted by Defendants, in making a decision on the issue at this stage?

In *Haines*, the Third Circuit explained that the prima facie case inquiry is one where the
court asks "[H]as the *party seeking discovery* presented evidence which, if believed by the fact-
finder, supports plaintiff's theory of fraud?"  975 F.2d at 95 (internal quotation marks and
citation omitted, emphasis added).  In doing so, the *Haines* Court cited approvingly to a decision
from the United States Court of Appeals for the Fifth Circuit, which explained that "prima facie
evidence" in this context is "[evidence] [s]uch as will suffice until contradicted and overcome by
other evidence . . . [a] case which has proceeded upon sufficient proof to that stage where it will
support [a] finding *if evidence to the contrary is disregarded*."  *Id.* (citing *In re Int'l Sys. &
Controls Corp.*, 693 F.2d 1235, 1242 (5th Cir. 1982)) (internal quotation marks and citation
omitted, alterations in original and emphasis added).

In the Court's view, these portions of *Haines* make clear that in determining whether a
movant has made out a prima facie case, the Court must only assess the strength of the evidence
presented by the *movant*.  *See In re Coll. Landings Ltd. P'ship*, 248 B.R. 619, 623 (Bankr. M.D.

Fla. 1998) ("The Third Circuit's decision in *Haines* is clear that this prima facie showing is an initial showing that is required *of the party seeking the discovery*.") (emphasis added).  Or, to put it differently, the Court's job at this point is not to take the movant's evidence and *consider it alongside with any contrary evidence put in the record by the non-movant*, and then to make a decision as to whether a prima facie showing has been made (or whether a preponderance of the evidence supports Plaintiffs' claim).  *See Am. Tobacco.*, 697 So. 2d at 1256 (explaining that the prima facie case inquiry is one where the Court determines if the movant has produced evidence "which, *if unexplained*," would be prima facie proof of the existence of the exception") (emphasis added).  *Haines* appears to contemplate that if a prima facie showing is made, then an evidentiary hearing should be held, because "fundamental concepts of due process require that the party defending the privilege be given the opportunity to be heard, by evidence and argument" at such a hearing.  975 F.2d at 97.  And even though this type of evidentiary hearing is generally understood as being intended to protect the due process rights of the holder of the privilege (i.e., Defendants here), *see id.*, the case law is clear that at such a hearing, *both sides* are allowed to present additional evidence on the matter.  *See Grutter v. E.I. Dupont De Nemours*, 124 F. Supp. 2d 1291, 1307 (S.D. Fla. 2000) (noting that "*Haines* simply contemplates a hearing in which both parties are given the opportunity to present evidence and argument on whether the evidence, if believed by [the] trier of fact, would be sufficient to support a finding that the elements of the crime/fraud exception were met"); *Am. Tobacco*, 697 So. 2d at 1255 (same, noting that "each party" is permitted to present evidence and argument at such a hearing)).

The Court acknowledges that the way the parties teed up this crime-fraud exception issue seems a bit different from how the courts typically expect the crime-fraud exception challenge

process to go.  As noted above, Defendants did not simply try to argue away the evidence submitted by Plaintiffs; instead, they submitted lots of additional documentary evidence of their own.  This effort by Defendants was persuasive, in the sense that it has convinced the Court that the overall record at this stage (at least, what the Court has seen of it) is in their favor.  But the Court has not yet held an evidentiary hearing on the matter.  And:  (1) since the applicable law contemplates that after a prima facie showing is made, an evidentiary hearing must be held; and (2) because it seems at least possible that at such a hearing, additional evidence (such as testimonial evidence) could be presented that might change the overall evidentiary calculus; then (3) the proper decision here is to simply grant Plaintiffs' Motion and schedule a hearing.[27]

## III.    CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' Motion, in that it determines that (considering only the evidence put forward by Plaintiffs), Plaintiffs have made out a prima facie case that the elements of the crime-fraud exception have been met.  The Court will schedule an evidentiary hearing on the matter with the parties, and will issue a separate order on that score.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order.  Any such redacted version shall be submitted no later than **January 9, 2024** for review by the Court.  It should be accompanied by a motion for redaction that shows that the presumption of public access to judicial records has been rebutted with respect to the proposed redacted material, by including a

---

[27]     That said, in light of what the Court has explained above, if after an evidentiary hearing the record gets no better for Plaintiffs, then the Court will expect to deny Plaintiffs' request to invoke the crime-fraud exception.

factually-detailed explanation as to how that material is the "kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated:  January 4, 2024

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE