# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ECB USA, INC. and ATLANTIC VENTURES CORP., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>SAVENCIA, S.A. and ZAUSNER FOODS )<br>CORP., on behalf of itself and as successor )<br>in interest to ZNHC, INC., )<br>)<br>Defendants. ) | Civil Action No. 19-731-GBW-CJB |

## MEMORANDUM ORDER

Presently before the Court is Defendants Savencia, S.A. and Zausner Foods Corp.'s ("Defendants") renewed motion seeking a determination that Plaintiffs ECB USA, Inc. ("ECB") and Atlantic Ventures Corp. ("Atlantic Ventures," and together with ECB, "Plaintiffs") have waived the attorney-client privilege as to three documents found on a computer server known as the "Miami Server" ("Motion"). (D.I. 407)  For the reasons set out below, the Court ORDERS that the Motion is DENIED.

**I.    BACKGROUND**

The Court writes primarily for the parties, who have filed numerous rounds of briefing relating to this issue and are well familiar with the facts.  The Court will set out a few key facts below, along with some relevant procedural background.  If other facts are relevant to this Motion, they will be referenced in Section II of this Memorandum Order.

**A.    Factual Background**

The Miami Server is a computer server that originally belonged to Schratter Foods, Inc. ("SFI"), an entity that was (at the relevant times relating to this case) an Atlantic Ventures

1

subsidiary. (D.I. 341, ex. 1 at ¶ 4) This case involves various claims stemming from or relating to Plaintiffs' purchase of SFI from Defendants in late 2014.

In April 2018, SFI was placed in an assignment for the benefit of creditors ("ABC") pursuant to Chapter 727, Florida Statutes; an ABC proceeding is a type of alternative to formal bankruptcy proceedings. (*Id*. at ¶ 6; *see also* D.I. 223 at 77; D.I. 326, ex. 1) The Miami Server was transferred (along with various other of SFI's assets) to the possession of Assignee Les Osborne ("the Assignee") after SFI was placed into the insolvency proceeding (the "ABC proceeding"); at that point, the server became the property of the Assignee. (D.I. 341, ex. 1 at ¶¶ 7-8, 12; *id*., ex. 2 at 3-5) After the assignment, Plaintiffs, who at the time were contemplating suit against Defendants regarding SFI's purchase, (*id*., ex. 4 at ¶ 2), obtained the Assignee's permission to preserve SFI's hard drives and certain other of SFI's materials, including the Miami Server, (*id*., ex. 1 at ¶ 9). Plaintiffs paid for the cost to store these hard drives and documents. (*Id*. at ¶ 10)

After this litigation began in 2018, Plaintiffs disclosed to Defendants the existence of the SFI servers and documents in the Assignee's possession. (*Id*., ex. 4 at ¶ 3; *see also* D.I. 326 at 2-3) As of 2021, the parties were still negotiating over how materials located on the Miami Server should be reviewed. (D.I. 326, ex. 4 at 1-2) Defendants' position was that it was Plaintiffs' responsibility to review, log and produce documents on the Miami Server that were responsive to Defendants' discovery requests; Plaintiffs disagreed, emphasizing that the server was not their property and that they had no obligation to undertake such review. (*Id*.; *see also id*., ex. 7 at 1, 3; D.I. 341, ex. 5 at 1) After further discussions, Plaintiffs eventually obtained the Assignee's permission to have the contents of the Miami Server copied, and they then sent that copy to Defendants' counsel, without modification, so that Defendants could conduct their own review

of the server's contents. (D.I. 326, ex. 4 at 2; *id.*, ex. 6 at 1; D.I. 341, ex. 1 at ¶ 14; *id.*, ex. 5 at 1; D.I. 349 at 4) Plaintiffs did this without having first conducted a privilege review of the server's documents. They also copied some of the materials on the server for their own future review. (D.I. 326, ex. 4 at 2)

By mid-2022, Defendants had begun processing, uploading and reviewing some of the data on the Miami Server. (D.I. 326 at 4) This effort resulted in 345,831 documents from the server being uploaded onto Defendants' platform. (*Id*. at 4-5; D.I. 408 at 2) Then, in early-to-mid January 2023, Plaintiffs learned that: (1) Defendants were in possession of a memorandum of Plaintiffs (a document written by Plaintiffs' French counsel), which purportedly is protected by the attorney-client privilege and (2) this memorandum may be located on the Miami Server. (D.I. 341, ex. 4 at ¶¶ 9-10; *id.*, ex. 5 at 2) This alerted Plaintiffs' counsel to the fact that other privileged material of Plaintiffs may also be located on that server. (*Id.*, ex. 5 at 2; *see also id*. at 7)

### B. Procedural Background

The instant Motion is the second motion Defendants have filed seeking similar relief; they filed a first motion to that effect ("the first motion") on February 3, 2023. (D.I. 326) On March 7, 2023, the Court denied the first motion without prejudice to renew it (the "March 7 MO"), on the ground that a final decision on this issue would benefit from a more full record than what had then been presented. (D.I. 369) Thereafter, Defendants filed the instant Motion on May 23, 2023. (D.I. 407) Briefing on the Motion was completed by June 2, 2023. (D.I. 415)[1]

---

[1] The Court has been referred this case for all purposes through the case-dispositive motion deadline. (D.I. 118)

## II.  DISCUSSION

With the Motion, Defendants argue that Plaintiffs inadvertently disclosed the contents of documents protected by the attorney-client privilege in a manner that should lead to a finding that Plaintiffs have waived any claim of privilege regarding those documents.[2]  Defendants focus their request for a finding of waiver on just three documents found on the Miami Server.[3]

Pursuant to Florida law,[4] a court does not apply a strict rule that counsel's inadvertent production of documents alone waives the attorney-client privilege as to such documents.  *Nova*

---

[2]      In their opening letter brief on the Motion, Defendants address only the concept of inadvertent disclosure, (D.I. 408 at 4-5), and so the Court will do the same here as well.

[3]      The three documents at issue are e-mail strings (two from 2018 and one from 2014) that are attached as exhibits to Defendants' opening brief. (D.I. 408 at 3-4 & exs. 1-3) The parties are presuming that these documents (and any others at issue) are all otherwise protected by Plaintiffs' attorney-client privilege.  And for now the Court will assume *arguendo* that this is so (without making any controlling decision on the matter). *See United States v. HCA Holdings Inc.*, Case No. 12-20638-CIV-ZLOCH/HUNT, 2015 WL 11198933, at *5 (S.D. Fla. July 21, 2015).

Defendants say that they focus their request on these three documents alone because "the Court may be hesitant to hold a waiver has taken place without knowing what documents will be allowed into the record, and so this renewed motion only seeks a determination that Plaintiffs have failed to carry their burden as to *three* highly relevant documents." (D.I. 408 at 3 (emphasis in original))  The Court is not exactly sure what the impact here is of Defendants only targeting these three documents.  Perhaps what Defendants are saying is that if the Court finds that waiver has occurred, Defendants only plan to use these three documents (and no others found on the Miami Server) in this litigation.  If so, that is helpful to know.  And it is also helpful to see at least some examples of the documents that are in dispute as to this Motion.  But otherwise, the Court agrees with Plaintiffs that Defendants' focus on these three documents seems like "a difference without a distinction[,]" because if the Court were to find the instant circumstances should result in waiver of the privilege, it seems like such a finding would apply (at a minimum) to all otherwise privileged documents of Plaintiffs located on the server. (D.I. 412 at 1)

[4]      As the Court has previously noted, (D.I. 551 at 3 & n.3), in a federal case like this one (i.e., involving state law claims), privilege disputes are typically governed by state law. (D.I. 326 at 6 & n.4; D.I. 341 at 4)  Both parties cite to Florida state law with regard to this inadvertent disclosure/waiver issue, (D.I. 408 at 4; D.I. 412 at 3-4), and so the Court will also do so herein.  That said, it appears undisputed that Delaware state law is not meaningfully different on the

4

*Se. Univ., Inc. v. Jacobson*, 25 So. 3d 82, 86 (Fla. Dist. Ct. App. 2009). Instead, courts consider the following factors in determining whether the privilege has been waived:

> (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production; (2) the number of inadvertent disclosures; (3) the extent of the disclosure; (4) any delay and measures taken to rectify the disclosures; and (5) whether the overriding interests of justice would be served by relieving a party of its error.

---

question, and the Court assumes that the inquiry pursuant to Delaware law would be the same. (D.I. 408 at 4 n.4)

However, the Court notes that Federal Rule of Evidence 502(b) also deals with inadvertent disclosure and waiver. And Rule 502(b) applies to this Motion, because even though this federal case involves state law claims, Rule 502(b), by its terms, applies in any federal case where a court reviews questions relating to waiver of the privilege. *See Sidney I. v. Focused Retail Prop. I, LLC*, 274 F.R.D. 212, 215 (N.D. Ill. 2011); *Preferred Care Partners Holding Corp. v. Humana, Inc.*, 258 F.R.D. 684, 690 (S.D. Fla. 2009). Rule 502(b) states that in a federal case, an inadvertent disclosure will not operate as a waiver if: "(1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B)." Fed. R. Evid. 502(b). Nevertheless, here neither party suggests that Rule 502(b)'s provisions on inadvertent disclosure/waiver conflict with Florida's law, nor that reliance on the Florida state law factors discussed herein (which appear to either explicitly or implicitly overlap with the factors set out in Rule 502(b)) would otherwise alter the nature of the analysis the Court must conduct. *See HCA Holdings Inc.*, 2015 WL 11198933, at *5 (using the five Florida factors as a way to analyze waiver pursuant to Rule 502(b)); *Regions Bank v. Chi. Title Ins. Co.*, Case No.: 10-CV-80043-RYSKAMP/VITUNAC, 2011 WL 13225147, at *5 & n.7 (S.D. Fla. Nov. 7, 2011) (concluding that there was no substantive difference between the application of the inadvertent disclosure/waiver standard in Rule 502(b) and the five-factor Florida state law test); *Preferred Care*, 258 F.R.D. at 690 (same). For these reasons, and because the parties utilize them in their briefing, the Court will use Florida's state law factors to assess this Rule 502(b) issue (again, understanding that the analysis and outcome would not differ if only Rule 502(b)'s text was consulted).

5

*Id.* The party claiming the attorney-client privilege (here, Plaintiffs) bears the burden of showing that inadvertent disclosure to a third party did not waive the privilege. *RC/PB, Inc. v. Ritz-Carlton Hotel Co.*, 132 So. 3d 325, 326 (Fla. Dist. Ct. App. 2014).[5]

Below, the Court will assess each of the above-referenced five factors. In doing so, it will explain why Plaintiffs have met their burden to demonstrate that this analysis militates in favor of denying the Motion.

### A. The Reasonableness of the Precautions Taken to Prevent Inadvertent Disclosure, in View of the Extent of the Document Production

The first factor is the reasonableness of the precautions taken to prevent inadvertent disclosure, in view of the extent of the document production at issue. Defendants assert that analyzing this factor should be an easy call. They say this is so because before providing them with access to the Miami Server documents, Plaintiffs "took *no* precautions to prevent the disclosure of privileged documents." (D.I. 408 at 5 (emphasis in original)) And the Court understands this point to essentially be undisputed, so far as it goes. In other words, nothing in the record suggests that, prior to Defendants' receiving the server's contents, Plaintiffs' counsel had taken any action to: (1) review the documents on the server; or (2) otherwise try to figure out what types of documents might be found on the server. (D.I. 326 at 8-9; D.I. 349 at 4)

But in the Court's view, the analysis here is not so easy. Again, this factor asks about the "reasonableness" of the precautions taken, in light of the extent of the "document production." But this just begs the following questions: *Would* it have been reasonable for Plaintiffs to have

---

[5] The burden is the same with regard to an analysis under Rule 502(b). *See T&W Holding Co. v. City of Kemah*, 641 F. Supp. 3d 378, 382 (S.D. Tex. 2022); *Excel Golf Prods., Inc. v. MacNeill Eng'g Co.*, No. 11 C 1928, 2012 WL 1570772, at *2 (N.D. Ill. May 3, 2012).

taken any steps to review the server's documents for privilege before they were sent to Defendants? And did Plaintiffs even make any "document production" here in the first place?

With regard to most document "productions" of a party, surely it would be unreasonable if a party failed to make a pre-production review for privilege, assuming what was at issue was: (1) a party's own documents (2) located in that party's own physical possession (3) that were being produced by that party because they were relevant to the opposition's discovery requests. Indeed, in the many cases Defendants cite in support of their argument about a lack of reasonable pre-production precautions, the documents at issue all: (1) belonged to the producing party (i.e., the party holding the privilege) and (2) had seemingly long been in that party's and/or its counsel's own physical possession, prior to production to the other side. *See U.S. Fid. & Guar. Co. v. Liberty Surplus Ins. Corp.*, 630 F. Supp. 2d 1332, 1335 (M.D. Fla. 2007) (citing Florida law) (*cited in* D.I. 408 at 5); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 190 F.R.D. 287, 288-89 (D. Mass. 2000) (citing federal law) (*cited in* D.I. 408 at 5); *S.E.C. v. Cassano*, 189 F.R.D. 83, 83-85 (S.D.N.Y. 1999) (citing federal law) (*cited in* D.I. 408 at 5); *Ciba-Geigy Corp. v. Sandoz Ltd.*, 916 F. Supp. 404, 406-07 (D.N.J. 1995) (citing federal law) (*cited in* D.I. 408 at 5); *cf. In re Fontainebleau Las Vegas Cont. Litig.*, No. 09-02106-MD, 2011 WL 65760, at *1-4, *6 (S.D. Fla. Jan. 7, 2011) (finding a waiver of privilege as to documents located on three servers pursuant to Florida law, where the waiving party owned and shared those servers with two other entities, and where at some point, the waiving party's counsel produced the server documents to third-party lenders that had previously subpoenaed the documents) (*cited in* D.I. 408 at 5). Because the privilege holder's counsel in those cases did not take sufficient steps to try to prevent the disclosure of privileged information prior to production, the courts found that this factor redounded in favor of the movant. *See In re Fontainebleau*, 2011 WL 65760, at *10; *U.S.*

*Fid. & Guar. Co.*, 630 F. Supp. 2d at 1340-41; *Amgen Inc.*, 190 F.R.D. at 292; *Cassano*, 189 F.R.D. at 85-86; *Ciba-Geigy Corp.*, 916 F. Supp. at 413-14.

But here, the key facts are different. As Plaintiffs argue, it is not even correct to say that Plaintiffs "produced" the Miami Server documents to Defendants at all. (D.I. 412 at 3 n.4 (Plaintiffs noting that they "disagree with Defendants' characterization of the turnover of the [SFI] Miami Server as an inadvertent production of documents" because the server "was the property of [SFI] and, after the ABC, the Assignee" and Plaintiffs simply arranged for the "data on the server [to be made] available to Defendants"))[6] After all, it is not like the documents at issue were found in Plaintiffs' own offices, were copied and Bates-labeled by Plaintiffs' attorneys and were then sent out to Defendants as part of a "typical" document production. Instead, as the Court explained in the March 7 MO, (D.I. 369 at 2-3), the documents were: (1) originally located on a server that formerly belonged to a third party (SFI), not Plaintiffs; and (2) at the time they were provided to Defendants, were the property of and were in the physical possession of another third party (the Assignee). (D.I. 341 at 5-6) For this reason, Plaintiffs had to get the Assignee's permission to even be able to copy and send the materials to Defendants. Indeed, in their briefing, even Defendants agreed that Plaintiffs did not "produce" the Miami Server's contents to them. (D.I. 326 at 9 ("Here, Plaintiffs never 'produced' any documents from the Miami Server, having made the server available without bates-numbering any documents . . . [and because they maintained that] the contents of that server are outside of their possession, custody, and control."); D.I. 341, ex. 5 at 1 (Defendants' counsel stating to Plaintiffs' counsel that "The fact of the matter is that you did not 'produce' the server to us. Rather, you

---

[6] Nevertheless, simply for sake of convenience, the Court will at times below refer to Plaintiffs as the "producing" side here.

made it available to us, and we reviewed it[.]")); *see United States v. HCA Holdings Inc.*, Case No. 12-20638-CIV-ZLOCH/HUNT, 2015 WL 11198933, at *6 (S.D. Fla. July 21, 2015) (finding that this first factor did not weigh in favor of waiver, where "based on the unique facts of the instant *qui tam* action, the allegedly privileged documents were not inadvertently *produced*, so as to call into question Defendants' production procedures and require this Court to analyze whether Defendants did not implement appropriate safeguards") (emphasis in original).

Nevertheless, Defendants still suggest that this factor supports their Motion. They argue this is so in part because Plaintiffs "abdicated th[eir] responsibility" to review the server's documents in the first instance and instead "dumped" all of those documents on Defendants. (D.I. 349 at 7; *see also* D.I. 326 at 1) But *was* it Plaintiffs' responsibility to review and produce these documents? Parties do not generally have responsibility for searching through documents in discovery when those materials are not in their physical possession, custody or control. And the Miami Server was not in Plaintiffs' physical possession, custody or control at the relevant time. (D.I. 326 at 6 (Defendants noting that "Plaintiffs have consistently represented that the Miami Server is not within their possession, custody or control, but rather is the exclusive property of a third-party[.]")) In fact, as noted above, the record suggests that neither side (including Defendants) was particularly excited about expending the time, money and effort necessary to review the server's (enormous) contents. Therefore, that Plaintiffs may not have wanted to do so—under the circumstances here—does not seem like an "abdicat[ion]" of any "responsibility" at all.

Now, as Defendants note, it is certainly true that Plaintiffs and SFI were not strangers. Not only was Atlantic Ventures SFI's parent corporation, but a number of persons affiliated with Plaintiffs were associated with SFI in the relevant time frame. For example, in 2017 and 2018,

9

Arno Leoni was the Chief Executive Officer of SFI and was also an officer and director of both Plaintiffs. (D.I. 341, ex. 1 at ¶¶ 2-3) So even though Plaintiffs did not possess or produce the Miami Server documents, perhaps if the record showed that they nevertheless knew or should have known that their privileged documents resided on the server before production, then this factor could cut against them.

But the Court cannot simply presume that just because SFI was a related entity to Plaintiffs, Plaintiffs necessarily had such knowledge. Courts generally respect the corporate form, *cf. Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 614 (D. Del. 2018), and there has been no finding in this case that SFI and Plaintiffs are alter egos. Moreover, Mr. Leoni has stated in a declaration that Plaintiffs did *not* know that any of their privileged documents were located on the Miami Server at the relevant time. (D.I. 341, ex. 1 at ¶ 13)

Defendants push back by arguing that it was "literally impossible" for Plaintiffs not to have this knowledge, since "Plaintiffs—as corporate entities—obviously knew what communications they exchanged with legal counsel, knew the e-mail address they were using for those communications,[] and knew how their IT infrastructure would cause that correspondence to be saved" (including that any e-mails sent to someone using an "@schratterfoods" e-mail address would necessarily be stored on an SFI server). (D.I. 415 at 2) In truth, however, the Court has little of record to go on here. The Court has no idea how any particular document ended up on the Miami Server (as opposed to some other server owned by SFI, or some other SFI-related medium). Nor does it have any idea what Plaintiffs' relevant employees did or did not know about that process. What Defendants say could be right. But without a record providing a basis to draw any such conclusions, the Court cannot assume that what Defendants say is so.

10

In the end, because the documents at issue were not produced by Plaintiffs, because they resided in the possession of an independent third party prior to their production, and in light of the state of the record, the Court cannot conclude that it was unreasonable for Plaintiffs' counsel not to have assessed the documents for privilege prior to their submission to Defendants. Therefore, this factor supports denial of the Motion.

B.  **The Number of Inadvertent Disclosures and the Extent of the Disclosure**

The next two factors relate to the number of inadvertent disclosures and the extent of the disclosure. In the Court's view, it makes sense to review these two factors together. The former factor goes to how many potentially privileged documents were made available to the movant by the producing side, while the latter factor goes to what percentage of the entire production involved such potentially privileged documents. *See, e.g., In re Fundamental Long Term Care, Inc.*, 515 B.R. 874, 882 (Bankr. M.D. Fla. 2014) (noting the same).[7]

Here again, as to these two factors, we have a pretty unusual record. That is because both sides really do not know the full extent of the documents that are actually on the Miami Server. Put differently, this is not a case where a party produced a certain amount of documents, both sides have reviewed all of those documents, and both sides know exactly how many total documents—and how many assertedly privileged documents—there are in the production. To the contrary, partly because the amount of documents on the Miami Server is so massive, and partly due to the associated expense, here neither side has attempted to review anything

---

[7]  It makes sense that such factors could be relevant to the question of whether an inadvertent production of privileged documents should result in waiver of the privilege. In that it could be said that the greater the number and the greater the percentage of potentially privileged documents there are in the total production, the more the producing party should have known about the possibility of adverse disclosure and taken steps to protect against it. *See HCA Holdings Inc.*, 2015 WL 11198933, at *7.

approximating the entire contents of the server. Below is a summary of what the parties have told the Court about the server's contents:

- No one knows exactly how many documents are on the server. Defendants estimate that the server contains between 1 million and 2 million documents. (D.I. 326 at 5 n.2; D.I. 415 at 1; D.I. 416 at ¶ 3) According to Plaintiffs, the total amount of pages on the server is 155 million, and the server includes at least 750,000 e-mails. (D.I. 412 at 1; *id*., ex. 1 at ¶¶ 2-3) To make matters more complex, a number of the server documents are in a foreign language. (D.I. 380 at 3)

- Of the total number of documents on the server, Defendants have processed and reviewed 345,831. (D.I. 408 at 2; D.I. 416 at ¶ 4) These documents were selected for processing and review because they were located in folders that "based solely on their folder names [] seemed likely to contain responsive documents." (D.I. 416 at ¶ 4) For their part, Plaintiffs do not say how many of the server's documents they have processed and reviewed; they assert only that they have done a "reasonable review of the documents on the" server. (D.I. 412, ex. 1 at ¶ 5)

- With regard to how many of the documents on the server might be fairly viewed as documents of *Plaintiffs* or documents involving *Plaintiffs' affairs* (as opposed to *SFI's* documents or documents regarding *SFI's affairs*), Defendants determined that 20,036 of the documents they have reviewed (about 5.8% of the total reviewed documents) involve correspondence where someone is using an "@ecb" e-mail address. (D.I. 408 at 2; D.I. 416 at ¶ 5) Defendants note that this e-mail domain may formally belong to Plaintiffs' parent company. (D.I. 408 at 2 n.2) But they say that Plaintiffs' document productions show that "@ecb" e-mail addresses were the ordinary means by which Plaintiffs communicated on their own behalf (while "@schratterfoods" e-mail addresses were how Plaintiffs communicated on SFI's behalf. (*Id*.)[8]

---

[8] In a further effort to try to demonstrate that a lot of these "@ecb" documents constitute communications that were made on Plaintiffs' behalf or regarding Plaintiffs' affairs, Defendants assert that "many" of these 20,036 documents either predate Plaintiffs' acquisition of SFI or postdate SFI's transfer of assets to the Assignee. (D.I. 408 at 2) As Plaintiffs note, Defendants do not say how many is "many[.]" (D.I. 412 at 2) And Plaintiffs assert to the contrary that: (1) they have only found 10 e-mails on the server that predate Plaintiffs' acquisition of SFI (only one of which is potentially privileged); and (2) they have only found 207

12

- With regard to the total number of documents that might potentially be subject to a claim of privilege by Plaintiffs, Defendants assert that of the 20,036 "@ecb" documents, 5,469 documents (or about 1.6 % of the total reviewed documents) reflect "correspondence with law firms that Plaintiffs identified on their privilege log." (*Id*. at 2; *see also* D.I. 416 at ¶ 5) Defendants say that they have reviewed a "small sample" of these documents, and that this review disclosed that "they reflect Plaintiffs' legal correspondence[.]" (D.I. 408 at 2) Here, Defendants cite to a prior submission, in which they had identified six documents found on the Miami Server that were also on Plaintiffs' privilege log. (*Id*. (citing D.I. 372-1))

- Plaintiffs assert that they have found approximately 70 documents on the server that they believe are protected by their attorney-client privilege. (D.I. 412, ex. 1 at ¶ 5) Again, though, Plaintiffs do not say how many of the server's documents they have reviewed, so it is hard to know how to put that number into context. (D.I. 415 at 2)

There is at least one case interpreting Florida law wherein the court suggests that if 5% or more of a production amounted to the producing party's privileged information, then the volume of the produced privileged documents would be substantial and weigh in favor of granting this type of motion. *U.S. Fid. & Guar. Co.*, 630 F. Supp. 2d at 1341. At the other end of the spectrum, courts applying Florida law have explained that if only a very small amount of the total production (e.g., something amounting to about 1% or less of the total) or just a small number of produced documents were potentially privileged, then a finding of waiver may not be appropriate. *See, e.g., Ramkelawan v. Globus Med. Inc.*, Case No: 5:18-cv-100-Oc-JSM-PRL, 2019 WL 1763237, at *3 (M.D. Fla. Apr. 22, 2019) (applying Florida law and concluding that there was no waiver due to inadvertent disclosure in part because "[t]he extent of the disclosure . . . weighs strongly in favor of Plaintiffs, as the disclosure consisted of a single 35-

---

e-mails on the server that postdate SFI's transfer of assets to the Assignee (of which less than 70 are potentially privileged). (*Id.*)

page document out of over 20,000 pages of documents that Plaintiffs produced"); *In re Murphy*, Case No.: 9:17-bk-07843-FMD, 2018 WL 11205932, at *3 (Bankr. M.D. Fla. Jan. 18, 2018) (concluding the same, in part because "[o]f the hundreds of documents, only seven e-mails were inadvertently disclosed"); *In re Fundamental Long Term Care, Inc.*, 515 B.R. at 882 (concluding the same, in part because "the extent of the disclosure was minimal compared to the extent of the overall production").

Here, of course, the fact that the parties do not have a handle on the entirety of the server's contents complicates the Court's analysis. But even were the Court to make some reasonable inferences from what it does know, the record would be more mixed than Defendants suggest that it is.

For example, as noted above, of the 345,831 server documents that Defendants selected for review, Defendants assert that 1.6% of the documents (or 5,469) may be privileged as to Plaintiffs (because these documents involve correspondence with law firms that Plaintiffs identified on their privilege log). But as Plaintiffs note, Defendants seem to be assuming that *all* of these 5,469 documents: (1) are *privileged* (in that they, for example, do not involve correspondence including third parties); and (2) are privileged documents *of Plaintiffs* (as opposed to privileged documents of SFI). (D.I. 412 at 2 (Plaintiffs asserting that "Defendants conflate the privilege belonging to [SFI] with the privilege belonging to Plaintiffs and make no effort to distinguish between communications involving counsel that are not privileged, i.e., communications also involving third parties."); *id*., ex. 1 (Plaintiffs' counsel asserting that based on his review of the e-mails sent to or from an "@ecb" e-mail address on the SFI server, "the overwhelming percentage of these documents are either: (a) not privileged; or (b) documents protected by the attorney-client communications of [SFI]—not Plaintiffs")) It seems unlikely to

14

the Court that this is so. Additionally, Defendants are extrapolating to the total production (i.e., of somewhere between 1 million and 2 million documents) the results from these 345,831 reviewed documents. This assumes that those 345,831 documents are representative of the whole. But Defendants selected those particular 345,831 documents for a reason—here, because "based . . . on their folder names [they] seemed likely to contain responsive documents." (D.I. 416 at ¶ 4) As such, it seems very possible that Defendants chose to review a subset of the server's contents that may be more likely to be documents of or involving Plaintiffs (as compared to the remainder of the server's contents).

On the one hand, it is not hard to parse the above data and surmise that less than 1% (and perhaps far less than that) of the entire contents of the Miami Server may amount to Plaintiffs' privileged documents.[9] *See In re Murphy*, 2018 WL 11205932, at *3 (finding no waiver when only seven e-mails out of "hundreds" produced, or approximately 1-2% of the whole, were potentially privileged); *Keenan Hopkins Schmidt & Stowell Contractors, Inc. v. Cont'l Cas. Co.*, No. 2:07-cv-383-FtM-99DNF, 2009 WL 10670019, at *2 (M.D. Fla. May 4, 2009) (finding no waiver where only 150 of 25,000 (or 0.6%) of the documents were inadvertently disclosed). On the other hand, even less than 1% of between 1-2 million documents could still amount to a substantial number of potentially privileged documents. *See Amgen Inc.*, 190 F.R.D. at 292-93 (concluding that this factor weighed in favor of wavier, where 200 potentially privileged documents, a "substantial" amount, were among the 70,000 produced documents at issue). With

---

[9] As noted above, the Court knows little about what percentage of the server's contents Plaintiffs have reviewed. And so any numbers or percentages thrown out by Plaintiffs are themselves suspect. But for sake of argument: (1) if there were truly as many as 2 million documents on the server; and (2) if the 70 documents identified by Plaintiffs as potentially privileged were somehow the only such documents on the server, then (3) this would amount to only 0.0035% of the total production.

these considerations in mind, the Court concludes that this factor is neutral, not favoring either side's position.

### C. Any Delay and Measures Taken to Rectify the Disclosures

The next factor relates to any delay and measures taken to rectify the disclosures. As to this factor, the "delay" in question is timed from the point at which the producing party had the ability to understand that an inadvertent disclosure had been made, or from the point when the party actually learned of that fact. *See, e.g.*, *Ramkelawan*, 2019 WL 1763237, at *3 (noting that this factor weighed in favor of the producing party where "their attorney swore in an affidavit that he emailed Defendants *immediately upon learning* the privileged nature of the document which had been disclosed") (emphasis added); *HCA Holdings Inc.*, 2015 WL 11198933, at *5; *U.S. ex rel Baklid-Kunz v. Halifax Hosp. Med. Ctr.*, No. 6:09-cv-1002-Orl-31TBS, 2012 WL 5415108, at *10 (M.D. Fla. Nov. 6, 2012); *Universal City Dev. Partners, Ltd. v. Ride & Show Eng'g, Inc.*, 230 F.R.D. 688, 693-94 (M.D. Fla. 2005); *cf. Liles v. Stuart Weitzman, LLC*, CASE NO. 09-61448-CIV-COHN/SELTZER, 2010 WL 11505149, at *5 (S.D. Fla. June 15, 2010) ("[T]he relevant time under [Rule 502] is how long it took the producing party to act after it learned that the privileged or protected document had been produced.") (internal quotation marks and citations omitted) (citing cases).

As to this factor, Defendants suggest that "once Plaintiffs became aware the Miami Server could contain privileged information, they did not take prompt action to rectify the issue" because Plaintiffs unduly delayed, even then, in conducting a privilege review of the server. (D.I. 326 at 8-9) This is another factor as to which the Court wishes it had more information.

It appears that in early-to-mid-January 2023, immediately after learning that Defendants had obtained and were making use of Plaintiffs' potentially privileged memorandum found on

16

the Miami Server, Plaintiffs did engage on the issue. They then began a back-and-forth with Defendants about the extent to which privilege had been waived as to such documents, and as to what each side's responsibilities were regarding those documents. (D.I. 341, ex. 4 at ¶¶ 9-10; *id.*, ex. 5 at 1-2) By February 3, 2023, the parties had begun motion practice on the issue before the Court. (D.I. 326) This motion practice resulted in the Court's March 7 MO, in which it encouraged both sides to continue to review the server's contents, so as to help make a better record as to this dispute before it could be finally resolved. (D.I. 369) This then led to further motion practice (leading to the instant opinion)—including charges by Plaintiffs that it might pursue sanctions against Defendants and their counsel as to Defendants' review of the server documents. (D.I. 408 at 3 & n.3)

With that said, it appears that as of today's date, Plaintiffs have still not reviewed the entirety of the server's contents for privilege. On the one hand, one could call the failure to do so the type of "delay" that this factor is meant to police. But on the other hand, even Defendants acknowledge that the total amount of documents on the server is colossal. There are potentially as many as two million documents at issue. And Defendants themselves have only accessed about a third of them (in part because they acknowledge it may be financially and logistically impracticable to do more right now).

Taking all of the above into account, certainly Plaintiffs could have made the record clearer as to the various steps they took since January 2023 to rectify the disclosure of potentially privileged information. And perhaps they could have done more to review the server documents at issue, or review them more quickly. But clearly Plaintiffs (as have Defendants) have been active in attempting to press for Court adjudication on this privilege/waiver issue. (*See, e.g.*, D.I. 418) Under these complicated circumstances, the Court finds this factor to be neutral.

### D. Whether the Overriding Interest of Justice Would be Served by Relieving a Party of its Error

As to the last factor—whether the overriding interest of justice would be served by relieving a party of its error—the factor seems kind of nebulous. In other words, when assessing this factor, courts seem to essentially re-consider factors one and four and ask "How bad was the producing party's conduct?" In that vein, courts have suggested that if the performance of producing counsel was particularly egregious, then the interest of justice should militate in favor of a finding of waiver. *U.S. Fid. & Guar. Co.*, 630 F. Supp. 2d at 1341 ("Given the conduct of Liberty's counsel as it relates to the protection of the privilege, the Court finds it would be improper to relieve Liberty of waiver."); *HCA Holdings Inc.*, 2015 WL 11198933, at *7; *Amgen Inc.*, 190 F.R.D. at 293 ("While the Court is sensitive to the fact that Hoechst may be disadvantaged by the carelessness of its attorneys, it would be unjust to reward such gross negligence by providing relief from waiver.").[10]

Defendants suggest that this factor should favor their position because Plaintiffs' conduct in producing the documents at issue was "the result of recklessness or negligence" and "appears to have been a strategic decision by Plaintiffs, who believed they could shift the burden of document review onto Defendants" without having conducted a privilege review. (D.I. 408 at 5) But as the Court noted above as to factor one, there was no such "burden" for Plaintiffs to shift

---

[10] To the extent that Defendants suggest that their Motion should be granted because, if it were, they would be able to use "three highly relevant documents" in this case, (D.I. 408 at 3 (emphasis omitted)), the Court declines to credit that argument. Courts interpreting Florida law on this issue have commented that the "interests of justice" factor should not be resolved by asking "Will a finding of waiver help the moving party obtain access to some helpful documents that might support its claims?" *See, e.g., In re Fundamental Long Term Care, Inc.*, 515 B.R. at 882-83 ("[T]he Trustee's argument is that the public interest would be served because having the privileged documents would help her prosecute her claims for relief in this proceeding.[] But if that were the standard, that factor would always weigh in favor of finding the privilege has been waived.").

here. And in light of the sheer magnitude of the documents located on the Miami Server, it is somewhat understandable why Plaintiffs may have been leery of searching through every such document. *See Keenan Hopkins Schmidt & Stowell Contractors, Inc.*, 2009 WL 10670019, at *2 (noting that "the large volume of documents" at issue suggested that the interests of justice weighed against a finding of waiver). In light of this, the Court concludes that the "interest of justice" factor goes Plaintiffs' way.

E. **Conclusion**

With the Motion, the Court is being asked to make a potentially sweeping decision about the waiver of the attorney-client privilege (1) as to a very unusual factual situation involving the non-"production" of millions of documents and (2) in a circumstance in which it has limited insight into the key facts. Relying as best it can on the incomplete information it has, the Court has applied the relevant factors set out in Florida law (which are in harmony with Rule 502(b)). Having done so, no factor favors grant of the Motion, and a number favor denial. Therefore, the Motion should be denied.

III. **CONCLUSION**

For the foregoing reasons, the Motion is DENIED.[11]

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. Any such redacted version shall be submitted no later than **February 5, 2024** for review by the Court. It should be

---

[11] In light of the Court's decision, the parties should meet and confer about a process for addressing the status of any documents located on the Miami Server as to which Plaintiffs make a claim of attorney-client privilege. (D.I. 412 at 5) The Court will address that issue further by way of a forthcoming Oral Order.

accompanied by a motion for redaction that shows that the presumption of public access to judicial records has been rebutted with respect to the proposed redacted material, by including a factually-detailed explanation as to how that material is the "kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated: January 31, 2024

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE