IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ECB USA, INC. and ATLANTIC VENTURES CORP., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>SAVENCIA, S.A. and ZAUSNER FOODS )<br>CORP., on behalf of itself and as successor )<br>in interest to ZHNC, INC., )<br>)<br>Defendants. ) | Civil Action No. 19-731-GBW-CJB |

## MEMORANDUM ORDER

Pending before the Court in this action is Defendants Savencia, S.A. and Zausner Foods Corp.'s (collectively, "Defendants") motion ("Motion") to exclude the opinions and testimony of Plaintiffs ECB USA, Inc. and Atlantic Ventures Corp.'s (collectively, "Plaintiffs") expert Jonathan Macey ("Macey"), which are set out in Macey's March 6, 2023 report ("report"). (D.I. 428) For the reasons set out below, the Court GRANTS the Motion.

**I.    BACKGROUND**

The Court will write here for the parties, and so it will forego a lengthy recitation of the facts. To the extent certain facts are relevant to resolution of the Motion, they will be set out in Section III.

The Motion was filed on June 28, 2023. (D.I. 428) Briefing on the Motion was completed on August 16, 2023. (D.I. 504) The Court has been referred this case for all purposes through the case-dispositive motion deadline. (D.I. 118)

**II.   STANDARD OF REVIEW**

In its January 10, 2024 Memorandum Order, the Court set out certain legal standards that govern motions like this one, brought pursuant to Federal Rule of Evidence 702. (D.I. 554 at 2-3) Those standards are incorporated by reference here, and the Court will follow them in deciding the instant Motion. To the extent that other legal principles relating to *Daubert* motions like this one are relevant, the Court will address them below.

### III.   DISCUSSION

In this case, Plaintiffs allege that Defendants, *inter alia*, committed breach of contract and fraud, prior to and after Defendants' December 2014 sale of Schratter Foods, Inc. ("Schratter") to Plaintiffs. As the Court has previously noted in various opinions, a key issue in the case is whether, prior to Schratter's sale, Defendants secretly "stripped" Schratter's Chief Executive Officer ("CEO") Alain Voss ("Voss") of certain of his powers and duties as CEO and then "lied" to Plaintiffs' by holding "Voss out as Schratter's trusted, knowledgeable, and effective chief, for the purpose of persuading [Plaintiffs'] representatives to accept Voss as a fiduciary and to partner with him to purchase Schratter." (D.I. 147 at ¶ 27; *see also id.* at ¶¶ 38, 52, 64-66, 168, 181, 183, 191, 197, 199, 205, 207, 250; *see also, e.g.*, D.I. 185 at 4-11; D.I. 551 at 10-17)

At issue with the Motion are the opinions of Macey, who is a professor at Yale Law School and the Yale School of Management. (D.I. 430, ex. A at ¶ 2) Plaintiffs hired Macey to provide "opinions on corporate governance and ordinary and customary corporate behavior." (*Id.* at ¶ 1) More specifically, in his report, Macey provides two principal opinions:

- "**Opinion #1**: Based on commonly understood conceptions on the role of the CEO in business organizations such as [Schratter], Alain Voss was not actually the CEO of Schratter during the period beginning June 30, 2014 and continuing through December 31, 2014, as the term 'CEO' is universally understood in business. During the foregoing period Voss was the CEO of Schratter in name only, without the usual

2

> responsibilities, authority, and duties associated with that position."
>
> - "**Opinion #2**: Analysis of the quality of management of the company being acquired (the target company) is a critical consideration in making a corporate acquisition where the acquisition is being done with management in place. An inevitable implication of this analysis is that the identity of a company's CEO should be fully and accurately disclosed, including, but not limited to, in the governing documents of the target company. To the extent that a selling entity makes disclosures about the quality of management, such disclosures should be accurate."

(*Id*. at ¶¶ 8-9)

With their Motion, Defendants make two different arguments as to why Macey's opinions and testimony should be excluded: (1) that the opinions are unreliable and (2) that the opinions do not "fit" the facts of the case. (D.I. 429 at 1) The Court need only to address the latter argument here in order to resolve the Motion. (*Id*. at 12-20) Below, the Court will explain why it has determined that Plaintiffs have not met their burden to demonstrate that Macey's testimony fits the facts of the case, such that the testimony should be excluded.

In order to meet the "fit" requirement, an expert witnesses' testimony "must be relevant for the purposes of the case and must assist the trier of fact." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003). With regard to relevance, the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue and have a valid connection to the pertinent inquiry as a precondition to admissibility. *See Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). Moreover, expert testimony will assist the trier of fact where it speaks to "an issue [that] is beyond the ken of a lay jury." *McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*, 869 F.3d 246, 267 (3d Cir. 2017). On this front, expert evidence is generally not necessary if "all the primary facts can be accurately and

3

intelligently described to the jury, and if they, as [persons] of common understanding, are as capable of comprehending the primary facts and drawing correct conclusions from them as are witnesses possessed of special or peculiar training of the subject under investigation." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 159 (3d Cir. 2000) (internal quotation marks and citations omitted) (alteration in original).

Here, Macey's expert report is only 50 paragraphs long. (D.I. 430, ex. A) The first 30 of those paragraphs are background, in which Macey lists information about himself and his qualifications, (*id*. at ¶¶ 1-7), summarizes his two main opinions, (*id*. at ¶¶ 8-9), and then provides a lengthy list of facts about the case (particularly as to Voss' role at Schratter, how that role was purportedly communicated to Plaintiffs, and what impact those communications purportedly had on Plaintiffs' decision to purchase Schratter) in a section called "Background/Facts Assumed[,]" (*id*. at ¶¶ 10-30).[1]

Thereafter, the final 20 paragraphs of Macey's report come under the heading: "Support for My Opinions." (*Id*. at 11-18) Here Macey provides the basis for his Opinion #1 and Opinion #2. But both sets of opinions lack the requisite fit in various ways.

---

[1] Of course, to the extent that some or all of these "Facts Assumed" are relevant to this case and are asserted to have actually occurred, then they would become part of the record at trial via lay witness testimony and via the admission of exhibits, not by way of Macey's testimony. And were Macey's only role at trial to simply narrate these facts to the jury, that would be inappropriate expert testimony. *See O'Bryant v. Johnson & Johnson*, Civil Action No. 20-2361 (MAS) (DEA), 2022 WL 7670296, at *13 (D.N.J. Oct. 13, 2022) ("[T]o the extent that Dr. Garely's opinions simply rehash internal corporate documents, those opinions are not properly the subject of expert testimony because they are lay matters. . . . Such testimony is properly presented through fact witnesses and documentary evidence."); *Allscripts Healthcare, LLC v. Andor Health, LLC*, Civil Action No. 21-704-MAK, 2022 WL 3021560, at *42 (D. Del. July 29, 2022) (noting that an expert may not "simply narrate internal documents evident to a lay person from their face").

With regard to Opinion #1, in paragraphs 31-42, Macey explains his view as to why "based on commonly understood conceptions of the role of the CEO . . . [Voss] was not actually the CEO" as of Schratter's sale. (*Id*. at 11-15) Here, although Macey acknowledges that "different CEOs focus on different issues and adjust their duties to address the specific needs of particular firms," he opines that there are "features of the job of CEO that can be generalized across firms." (*Id*. at ¶ 32) Macey then lists out a bunch of these features. (*Id*. at ¶¶ 32-37) Next, he discusses only some of those features and opines that at the time of the sale, Voss' role did not include these particular features. (*Id*. at ¶¶ 38-39) As a result, Macey opines that Voss then "was the CEO of the company in name only" and "did not have the powers of the president and CEO and did not manage the business of Schratter." (*Id.* at ¶¶ 40, 42)

This proposed testimony does not meet the fit requirement in part because it does not align with the relevant allegations in this case. As was noted above, here Plaintiffs allege that: (1) prior to mid-2014, Voss was the CEO of Schratter and held certain duties commensurate with that role; (2) but in June 2014, Defendants secretly "stripp[ed]" Voss of those duties, and gave those duties to another executive at Schratter (J.M. Wild, or "Wild"), who became the "de facto" CEO, such that Voss was thereafter the CEO "in name only"; and (3) yet Defendants did not tell Plaintiffs this before the Schratter deal closed, and instead communicated that Voss was a trusted, effective CEO. (D.I. 147 at ¶ 27 (alleging that Defendants "stripp[ed] Voss of his powers and offices as president and chief executive officer" but thereafter "held Voss out as Schratter's trusted, knowledgeable, and effective chief"); *id*. at ¶ 52 (asserting that the Schratter Employment Letter had "stripped Voss of his duties and that his duties had been assigned to Wild"); *id.* at ¶ 64 (alleging that Defendants had "kept secret the fact that Voss had been stripped of his duties and powers as Schratter's president and chief executive officer as of June 30, 2014,

and that Wild was, in fact, the de facto chief executive officer, and holder of virtually all corporate authority for Schratter"); *see also id.* at ¶¶ 38, 65-66, 168, 181, 183, 191, 197, 199, 205, 207, 250) In order to determine whether these allegations are accurate, it is not relevant (and thus, the jury will not benefit from hearing testimony about) what CEOs at *other* companies "*generally*" do.[2] Instead, what is relevant is what the CEO of *Schratter actually did do* before and after June 2014, and what Defendants communicated on this score.

In order to assess these issues, the jury will need to answer related questions such as: (1) What duties did Voss have prior to early-to-mid 2014 in his role as CEO?; (2) Was he "stripped" of some or all of those duties thereafter, with the duties being given to Wild, such that Voss became the "CEO" in "name only"?; (3) What statements or disclosures did Defendants make to Plaintiffs about Voss' role in the relevant time period, and did Defendants make any misrepresentations or omit important facts on these subjects? (D.I. 465 at 8 (Plaintiffs noting that the evidence in the case "centers" on "Defendants' misrepresentations to Plaintiffs that Voss was the autonomous, competent, effective CEO/president, with the full powers of those offices, and day-to-day managerial control over Schratter"))[3] These are factual questions regarding

---

[2] (D.I. 465 at 12 (Plaintiffs acknowledging that certain of Macey's testimony relates to "testimony on several generic concepts and principles not tied to the specific facts in this case"))

[3] Indeed, in the "Background/Facts Assumed" section of his report, Macey essentially confirms that these factual matters are what will be at issue as to this portion of the case. In nearly the entirety of the paragraphs in this section that relate to the issue of Voss' role, Macey discusses how purportedly: (1) after June 30, 2014, Voss was "stripped of his authority as president and CEO but was left as the president and CEO in name only"; (2) "Voss was held out to Plaintiffs and representatives as the autonomous, highly competent President and CEO of Schratter, who was the indispensable and trusted leader of Schratter's management team"; (3) Defendants created a "secret corporate structure" prior to Schratter's sale that "purported to maintain Voss as Schratter's President and CEO while in fact divesting him of all such authority and secretly vesting that authority with J.M. Wild" who became the "*de facto* chief executive officer"; (4) these efforts started in March 2014 when "Voss was stripped of some authority" and

6

events that either did or did not occur in the past regarding Schratter's sale, and which are not particularly technical or complex. Thus, assessing whether these events occurred and how that relates to the instant claims does not necessitate reliance on expertise beyond the ken of a typical lay juror.[4] (*See* D.I. 429 at 15 (Defendants arguing that "[n]o specialized knowledge is needed for the jury to assess Voss'[] role within [Schratter], or to the extent to which facts about Voss'[] role were disclosed to Plaintiffs" and that "[s]imilarly, no expert testimony is needed for the jury to assess how Voss allegedly was 'held out' to Plaintiffs, whether any representations about Voss'[] role and competence were misleading, and whether Plaintiffs relied upon those

---

Wild "began assuming duties and authority ordinarily reserved for the president and CEO, and which had previously been exercised by Voss[,]" and continued in June 2014 when Voss was "effectively fired from his position as CEO" pursuant to a June 30, 2014 agreement that provided Wild with certain responsibilities that Voss had previously held; (5) thereafter, certain Schratter general managers who had previously reported to Voss began reporting to Wild; (6) "Plaintiffs believed that Voss, rather than Wild, was the autonomous, independent and effective president and CEO of Schratter" based on representations Defendants made to them; and (7) Plaintiffs' relied on these false representations about Voss' role when buying the company. (D.I. 430, ex. A at ¶¶ 12, 15-30 (internal quotation marks and citation omitted)) It is *these* facts about Voss' actual duties as CEO, whether those duties were secretly "stripped" from him, and whether Defendants made misrepresentations or omissions about Voss' role, that will be at issue at trial. Whether other CEOs of other companies "generally" hold certain duties has nothing to do with any of this.

    Additionally, this "Background/Facts Assumed" section notes that one of Schratter's by-laws provided that the CEO of the company must perform certain duties. (*Id*. at ¶ 27) Whether Voss did or did not perform those listed duties after June 2014 are factual questions that a lay jury can discern without the need for expert testimony. Whether other CEOs at other companies held such duties would not be particularly relevant here.

    [4]    This is not a circumstance, for example, where the jury is being asked to assess complex corporate governance concepts like a "freeze out" or "squeeze out," or the convoluted structure of certain types of corporate entities, or the nature of certain duties that directors owe to shareholders, or what it means to "pierce the corporate veil." Those types of concepts might well align with the need for expert guidance. *See, e.g.*, *SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 282-84 (D. Conn. 2017); *CDX Liquidating Tr. ex rel. CDX Liquidating Tr. v. Venrock Assocs*., 411 B.R. 571, 588-89 (N.D. Ill. 2009); *Cary Oil Co. v. MG Refin. & Mktg., Inc*., No. 99 Civ. 1725(VM), 2003 WL 1878246, at *5-6 (S.D.N.Y. Apr. 11, 2003).

representations"); *see also* D.I. 504 at 7) If there is a trial, the jury would be perfectly capable of reviewing these matters on their own. *Cf. Fair Isaac Corp. v. Fed. Ins. Co.*, 447 F. Supp. 3d 857, 873 (D. Minn. 2020) (excluding the testimony of the defendants' expert because the testimony was not beyond the jury's understanding, where the expert's testimony failed to explain any term of art or concept having a specialized meaning); *SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 284 (D. Conn. 2017) (excluding expert testimony offered by Macey as to potential misleading actions taken by the defendants, because the jury had "the ability to determine whether the actions of an investor [were] 'misleading' and to understand, without assistance, the kinds of facts upon which investors may be misled"); *CITGO Petroleum Corp. v. Integrys Energy Servs., Inc.*, No. 10 C 4743, 2012 WL 2129402, at *6 (N.D. Ill. June 12, 2012) (excluding an expert's testimony because, while the law governing the case was complex, "the relevant question in [the] case [was] not").[5]

The Court's conclusion is no different with Macey's Opinion #2. Here, in paragraphs 43-50, Macey opines that "analysis of the quality of management of the company being acquired . . . is a critical consideration in making a corporate acquisition" such that "the identity of a company's CEO should be accurately reflected in the governing documents of the firm." (D.I.

---

[5] Additionally, to the extent that Macey's proffered testimony as to Opinion #1 was meant to further aid the jury's understanding of what a CEO generally does—in order to somehow help answer the questions referenced above—Macey repeatedly states that his opinions in this area are based on "*commonly understood* conceptions of the role of the CEO[.]" (D.I. 430, ex. A at ¶¶ 8, 40 (emphasis added)) If the conceptions that Macey discusses are "commonly understood," then it stands to reason that lay jurors would necessarily bring this understanding with them into the jury room, even absent Macey's testimony. By way of one example, in his deposition Macey conveyed that "the key" to his testimony is that a CEO is "ultimately responsible for the entire organization" (and that this was not the case with Voss). (*Id.*, ex. B at 74) The Court does not see why expert testimony would be needed for a jury to understand that a Chief Executive Officer is ultimately responsible for an entire organization (or whether Voss did or did not have such responsibility after June 2014).

430, ex. A at 15-18) As to this opinion, Macey cites to published articles (some relating to private equity-related or venture capital-related acquisitions) for the proposition that "CEO quality" is "often critical to the success of an acquisition" or that "[t]arget firm management is often viewed by the acquirer" as being important or that "the quality of management of the company being acquired . . . is a critical consideration in making a corporate acquisition." (*Id.* at ¶¶ 43-50)[6]

But again, in this case, the relevant allegations are not about what "often" happens with regard to acquisitions involving *other* entities, such as those in the private equity realm. The allegations are that *these particular Plaintiffs* highly valued the fact that a successful, competent CEO was in place at Schratter (due to their lack of experience in the relevant field) and that this allegedly "created an opportunity for [Defendants] to fraudulently induce [Plaintiffs]" to follow through with the acquisition to their detriment. (D.I. 147 at ¶¶ 26, 68) Indeed, the only portion of paragraphs 43-50 that actually discusses or references the facts of this case make this clear, where Macey writes:

> I understand that Voss was portrayed to Plaintiffs as a successful CEO and the transaction was structured under the assumption that Voss would 'remain' CEO of Schratter after the acquisition was completed. Indeed, under the particular facts of this case, it seems highly unlikely that the Plaintiffs would have proceeded with the acquisition of Schratter if they had known the true facts about Voss' role as the imaginary CEO.

---

[6] Were this testimony relevant here, there would still be further question as to whether it is the proper stuff of expert testimony. For example, among the assertions in this portion of Macey's report are statements like "[a] talented CEO is more likely to achieve value maximization than an untalented CEO" and "[a]cquirers will pay more for firms that are competently managed than they will pay for firms that lack high[-]quality management." (D.I. 430, ex. A at ¶ 48) It is hard to see how such principles are beyond the ken of a lay juror.

(D.I. 430, ex. A at ¶ 43) These allegations—about assertions that Defendants allegedly made to Plaintiffs, and what impact those assertions had on Plaintiffs, all of which relate to *the actual transaction at issue in this case*—are what is going to be important to any trial here. Macey will have nothing relevant or admissible to say about how "Voss was portrayed" or whether it was "highly unlikely" that Plaintiffs would have bought Schratter had they known the "true facts" about Voss' role. (D.I. 429 at 18-19 (Defendants noting the same)) Instead, such testimony will come from fact witnesses who participated in the events giving rise to this case. *See, e.g.*, *Shire Viropharma Inc. v. CSL Behring LLC*, Civil Action No. 17-414 CONSOLIDATED, 2021 WL 1227097, at *5-6 (D. Del. Mar. 31, 2021) (noting that "[i]t is well settled that experts may not provide testimony concerning the 'state of mind' or 'culpability' of defendants, corporations, regulatory agencies, and others" and that an expert's testimony "cross[ed] the line" when he opined on the plaintiff's "subjective thought processes and motivations" as to whether it was "likely" that the plaintiff entity would have discontinued development of a drug product); *Kleban*, 277 F. Supp. 3d at 284 (concluding that Macey could not provide expert testimony that would "instruct the jury about what happened in this case between [the parties, since f]actual evidence about what happened between the parties will be presented by counsel at trial; and the jurors, as finders of fact, will draw their own conclusions").

In light of the above, the Court concludes that Macey's proffered opinions do not meet the fit requirement, in that they are either not relevant or would not otherwise assist the trier of fact.

## IV. CONCLUSION

For the reasons set out above, the Court hereby ORDERS that Defendants' Motion is GRANTED.

10

Dated: March 22, 2024

                                              */s/ Christopher J. Burke*
                                              Christopher J. Burke
                                              UNITED STATES MAGISTRATE JUDGE