## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ECB USA, INC., a Florida corporation, and ATLANTIC VENTURES CORP., a Florida Corporation,<br><br>                    Plaintiffs,<br><br><br>              v.<br><br>SAVENCIA, S.A., a/k/a SAVENCIA FROMAGE & DAIRY, a French corporation, et al.,<br><br><br>              Defendants.<br><br><br>ZAUSNER FOODS CORP., a Delaware corporation, et al.,<br>             Counterclaim Plaintiff,<br><br>              v.<br><br>ECB USA, INC., a Florida corporation, and ATLANTIC VENTURES CORP., a Florida corporation,<br>             Counterclaim-Defendants,<br><br><br>ZAUSNER FOODS CORP., a Delaware corporation, et al.,<br>             Third-Party Plaintiff,<br><br>              v.<br><br>G.I.E. C2B, a French entity, and John Doe Defendants 1-10,<br>             Third-Party Defendants. | Civil Action No. 19-cv-00731–GBW |

Thomas G. Macauley, MACAULEY LLC, Wilmington, DE; Joel S. Magolnick, John E. Kirkpatrick, MARKO & MAGOLNICK, P.A., Miami, FL

> *Attorneys for Counterclaim Defendants ECB USA, Inc. and Atlantic Ventures Corp. and Third-Party Defendant G.I.E. C2B*

David W. Marston Jr., Jody C. Barillare, Brian F. Morris, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, DE; Troy S. Brown, Su Jin Kim, Margot G. Bloom, MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, PA; Michael J. Ableson, MORGAN, LEWIS & BOCKIUS LLP, New York, NY

> *Counsel for Defendant Savencia SA and Defendant, Counterclaim-Plaintiff, and Third Party Plaintiff Zausner Foods Corp.*

**MEMORANDUM OPINION**

September 19, 2024
Wilmington, Delaware

2

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Pending before the Court is Third-Party Defendant G.I.E. C2B's ("C2B") Motion for Summary Judgment on Third-Party Plaintiff Zausner Foods Corp.'s ("Zausner") claims for equitable accounting, tortious interference, and conspiracy. D.I. 446. Zausner opposes the Motion and contends that the record evidence creates a genuine dispute of fact that bars summary judgment in favor of C2B on any of the three grounds. D.I. 468. Also pending before the Court are: (1) C2B and Plaintiffs/Counterclaim-Defendants ECB USA, Inc. ("ECB USA") and Atlantic Ventures Corp.'s ("Atlantic Ventures") (collectively with C2B, the "CC and Third-Party Defendants") Motion for Summary Judgment asserting that Zausner lacks standing to sue for any relief related to the Stock Purchase Agreement ("SPA") or the Stock Pledge Agreement (the "Stock Pledge") (D.I. 452); and (2) Defendants Savencia, S.A. and Zausner Foods Corp.'s (collectively, "Defendants") Motion for Rule 11 Sanctions against ECB USA, Inc., Atlantic Ventures, and their counsel (D.I. 529). Having reviewed the pending motions and all related briefing, the Court finds that: (1) C2B's Motion for Summary Judgment on Zausner's claims for equitable accounting, tortious interference, and conspiracy is **GRANTED**; (2) the CC and Third-Party Defendants' Motion for Summary Judgment is **DENIED**; and (3) Defendants' Motion for Rule 11 Sanctions is **DENIED** without prejudice.

## I.   SUMMARY JUDGMENT

### A. BACKGROUND[1]

C2B is a French business entity, known as a "Groupement d'Interet Economique" ("G.I.E.") entity, which is comprised of several member companies. D.I. 449, ¶ 3. Etablissement Claude Blandin, S.A.R.L. ("ECB"), the parent company of Counterclaim Defendant ECB USA, formed C2B to help its members "obtain favorable banking and borrowing terms." *Id.*, ¶¶ 4-5. According to Zausner, each "member of C2B is owned, either directly or indirectly, by ECB, which in turn is owned by Claude, Bruno, and Patrick Blandin, and is the ultimate parent company of Plaintiffs." D.I. 469, ¶ 1. Both parties agree that C2B executes "treasury agreements" with its members to allow the members to borrow money. *Id.*, ¶ 5, D.I. 469, ¶ 6.

In December 2014, ECB USA and Atlantic Ventures ("Plaintiffs") purchased Schratter Foods, Inc. ("Schratter"), a distributor of specialty cheese and other dairy products in the United States. D.I. 449, ¶¶ 17, 27. At the time, ZNHC, Inc., a wholly-owned subsidiary of Zausner, owned 75 percent of Schratter's shares, while Alain Voss, Schratter's President and Chief Executive Officer ("CEO"), owned the remaining 25%. D.I. 432, ¶¶ 16-18. On December 6, 2014, ECB USA and Voss Enterprises, Inc. ("VEI"), signed the SPA to purchase Schratter for $27 million, payable as follows: (a) $2 million at closing; (b) $15 million six months later (the "Initial Deferred Installment"); and (c) $10 million payable in four equal annual installments thereafter. D.I. 447 at 6. Under Article II.3(b) of the SPA, 90 percent of the shares of Schratter were pledged as collateral security for Plaintiffs' obligation to pay the Deferred Installment Payments. D.I. 449, ¶ 31. On December 9, 2014, ECB USA and VEI assigned their interest in the SPA to Atlantic

---

[1] The Court writes for the benefit of the parties who are already familiar with the pertinent background facts. For more background facts, see D.I. 449, D.I. 469, D.I. 470, D.I. 511.

Ventures and, shortly thereafter, on December 31, 2014, Atlantic Ventures paid ZNHC $2 million at closing.[2]  *Id.*, ¶ 33.

The parties agree that Schratter became a member of C2B soon after closing and, in January 2015, began borrowing money from C2B.  *Id.*, ¶¶ 20-21; D.I. 469, ¶ 7.  In sum, C2B loaned Schratter over € 40 million, only some of which was paid back.  D.I. 449, ¶ 23.  In late 2017, Schratter "began investigating the possibility of covering its debts" by finding a buyer for its assets.  *Id.*, ¶¶ 36-38.  Schratter's board and shareholders approved the sale of its assets to Atalanta Corp. ("Atalanta") in January 2018, and the assets were sold to Atalanta for a price of or around $12 million.  *Id.*

C2B contends, and Zausner disputes, that "[t]he funds realized from the sale of Schratter's assets had to be used to pay expenses of Schratter and creditors of Schratter," including $4,272,105.72 to Wells Fargo and $517,010.49 to FS3 Building 7 LLC.  *Id.*, ¶ 44.  According to C2B, once creditors were paid, a balance of $6,797,429.09 was transferred to the Trust Account of Marko & Magolnick, P.A. ("MMPA") on February 6, 2018.  *Id.*, ¶ 45.  C2B claims that the MMPA Trust Account funds were then distributed as follows: (1) $393,045.12 for legal fees, (2) $493,918.97 to Toscana Cheese, (3) $25,000 to Darren J. Epstein (a vendor's counsel), and (4) $5,910,465 to Schratter.  *Id.*, ¶ 46.  According to C2B, once Schratter's creditors and operating expenses were paid, "[t]he remaining funds . . . were not sufficient to pay Schratter's debts."  *Id.*, ¶ 47.  Therefore, on April 20, 2018, Schratter's board and shareholders approved and initiated the filing of a Florida state court supervised insolvency proceeding known as an Assignment for the Benefits of Creditors ("ABC").  *Id.*, ¶¶ 48-49.  At the time, Schratter owed C2B over $12 million

---

[2] Atlantic Ventures paid ZNHC $15 million on or about June 30, 2014.  D.I. 449, ¶ 29.

in loans. *Id.*, ¶ 58. C2B contends that this amount was never repaid, and C2B maintains that it did not receive any of the funds paid to Schratter from the sale of assets to Atalanta. *Id.*

Zausner, on the other hand, maintains that the sale of Schratter's assets to Atalanta was done as part of a knowing and fraudulent scheme by C2B and others to "undermine Zausner's rights under the Stock Pledge Agreement." D.I. 469, ¶ 21. Indeed, while C2B contends that "[t]he only interaction between C2B and Schratter was that of a lender and a borrower," Zausner notes that "[i]mmediately after its acquisition by Plaintiffs, [Schratter] entered into a treasury agreement with C2B, pursuant to which the parties agreed that the 'cash management of [Schratter] will be effectuated by [C2B] through its own systems and methods. . . .'" *Id.*, ¶ 7. According to Zausner, Schratter and C2B "shared a common management control," "C2B had control rights over [Schratter's] financial operation," and "[Schratter] was a voting member of C2B." D.I. 470, ¶ 49. Zausner also asserts that, following the sale of Schratter's assets and mere hours before Schratter was placed into an insolvency proceeding, C2B held an "extraordinary general meeting" to discuss the assignment of Schratter's assets, and the members of C2B voted during the meeting "that the share of [C2B] that [Schratter] currently holds would be retroceded to the company [ECB]." D.I. 469, ¶¶ 18-19. While members of C2B can sell their membership shares to third-parties for any price, Zausner contends that Schratter's shares were retroceded without Zausner's knowledge and for only €10 per share. *Id.* Taken together, Zausner alleges that the evidence reveals that C2B conspired to "cause[] [Schratter] to be stripped of one of its sole remaining assets (its share of C2B), all without prior notice to Zausner, which destroyed Zausner's security interest in 90% of the stock of [Schratter]." D.I. 468 at 2.

## B. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact is one that could lead a reasonable jury to find in favor of the nonmoving party." *Bletz v. Corrie*, 974 F.3d 306, 308 (3d Cir. 2020) (citation omitted). "The court must review the record as a whole, draw all reasonable inferences in favor of the nonmoving party, and must not 'weigh the evidence or make credibility determinations.'" *Id.* (citation omitted).

After the movant has met its burden under Rule 56(a), the burden of production shifts, and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record ...; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B). So long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

## C.  ANALYSIS

### 1.  C2B's Motion for Summary Judgment

"In a diversity case, where state law affords the underlying substantive right, federal courts are generally constrained to look to and follow the remedial treatment afforded by state courts. *See McLeod v. Stevens*, 617 F.2d 1038, 1041 (4th Cir.1980) ("The proper remedy for the harm [the plaintiff] suffered is a question of substance that is governed by state law."); 19 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4513 (2d ed.1996).  In this matter, the parties agree that Florida law governs Zausner's claims for equitable accounting, tortious interference, and conspiracy.  Accordingly, the Court will resolve C2B's Motion for Summary Judgment pursuant to Florida law.

#### a.  *Equitable Accounting*

Under Florida Law, "an accounting is best understood as a *remedy* for a cause of action, not as a cause of action in its own right." *Zaki Kulaibee Establishment v. McFliker*, 771 F.3d 1301, 1310 n. 21 (11th Cir. 2014).  To be entitled to such relief pursuant to Florida law, a party seeking an equitable accounting "'must show the existence of a fiduciary relationship or a complex transaction and must demonstrate that the remedy at law is inadequate.'" *Tatum v. SFN Grp., Inc.*, 698 F. App'x 1000, 1009 (11th Cir. 2017) (citing *Kee v. Nat'l Reserve Life Ins. Co.*, 918 F.2d 1538, 1540 (11th Cir. 1990)).  Here, Zausner contends that it is entitled to an equitable accounting because of the complicated nature of "the extensive series of poorly documented, multimillion dollar transactions at issue." D.I. 468 at 11.  For the following reasons, the Court disagrees.

According to C2B, the first related transaction, the sale of Schratter's assets for $27 million, was a straight-forward sale in which ZNHC received $17 million of the purchase price and the

8

remaining $10 million balance was adjusted downward to $6.1 million, which is the amount Zausner contends it is owed by ECB USA and Atlantic Ventures. D.I. 447 at 14-15. The other related transaction, the sale of Schratter's assets to Atalanta, according to C2B, is also not complicated and involved an asset sale for $12,176,874. *Id.* C2B maintains that the amount acquired by Schratter through this asset sale was ultimately used to pay Schratter's secured creditors, some unsecured creditors, and some operating expenses. *Id.* Because Schratter's liabilities exceeded its assets by over $21 million, C2B contends that Schratter filed and approved the ABC in the spring of 2018. C2B maintains that it did not receive any of the funds paid to Schratter from the sale of assets to Atalanta and contends that other creditors, including Wells Fargo, received most of the proceeds from the asset sale. *Id.* at 10 (noting that Wells Fargo received $4,272,105,72 of Atalanta funds). Thus, C2B argues that neither transaction is so complicated as to necessitate an equitable accounting. *Id.* at 14-15.

In response to C2B's claims that an equitable accounting is not necessary, Zausner concedes that the transactions at issue in this matter may not be complicated. D.I. 468 at 11 ("Maybe, maybe not"). Yet, Zausner provides little evidence beyond this claim to show that an equitable accounting is necessary, and its conclusory statements that "maybe" the transactions are complicated, without more, does not create a genuine issue of fact to preclude summary judgment. Similarly, Zausner's claims that the transactions are "poorly documented, multimillion dollar transactions" also does not entitle Zausner to an equitable accounting. *See, e.g.*, *Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 694 F. Supp. 2d 1275, 1280–81 (S.D. Fla. 2010) ("[T]he fact that MCS' damages may require the aggregation of thousands of receivables does not, in this case, make a calculation of damages unduly complex or unnecessarily extensive.").

Indeed, "the determination of whether a series of transactions is sufficiently complex to warrant equitable accounting is fact specific." *Traditions Senior Partners*, 2013 WL 3285419 at *5 (citing *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, 694 F.Supp.2d 1275, 1281 (S.D.Fla.2010)). And Florida courts recognize that "[a]n equitable accounting is not a substitute for discovery available and permitted under the Federal Rules of Civil Procedure." *Guarantee Ins. Co. v. Brand Mgmt. Serv., Inc.*, No. 12-61670-CIV, 2013 WL 6768641, at *11 (S.D. Fla. Dec. 20, 2013). Thus, "[w]here a party [has] the opportunity to establish their damage claim through discovery, a request for accounting is not appropriate." *Managed Care Solutions*, 694 F.Supp.2d at 1281 (citing *Centrix HR, LLC v. On–Site Staff Mgmt., Inc.*, 2008 WL 2265266, 2008 U.S. Dist. LEXIS 43629 (E.D. Pa. Jun. 3, 2008)).

Notably, here, C2B contends—and Zausner does not dispute—that "all of Schratter's financial records, Plaintiffs' bank records and C2B's bank records" were produced to Zausner during discovery. According to C2B, the productions to Zausner included Schratter's complete general ledger (hereinafter, the "Schratter GL"). D.I. 510 at 1. Zausner responds that "the [Schratter GL] shows millions of dollars being distributed to unidentified recipients in February 2018." D.I. 468 at 607; D.I. 469, ¶ 14. Yet, C2B has maintained that none of the sale proceeds were paid to C2B, and Zausner provides no evidence that C2B received any such payments. Moreover, Zausner was given access to C2B's bank statements; thus, "if a single item on the [Schratter] GL showed a transfer to C2B, Zausner would have no doubt noted it." D.I. 510 at 5. While Zausner alleges that several payments were made to unknown recipients, nothing in the record suggests that Zausner could not have obtained more information concerning the payments to the unidentified parties through discovery. And even if Zausner could show that it sought but was denied such information during discovery, this would create the grounds for a motion to

compel, not equitable accounting. *Sun Life Assurance Co. of Canada (U.S.) v. Imperial Holdings, Inc.*, No. 13-80385-CIV, 2014 WL 12452450, at *8 (S.D. Fla. June 26, 2014). In sum, Zausner has not shown that the transactions at issue are complicated transactions, as required under Florida law to justify an equitable accounting. Therefore, C2B's motion for summary judgment as to Zausner's claim for equitable accounting is **GRANTED**.[3]

### b. *Tortious Interference*

To succeed on its claim that C2B tortiously interference with a business relationship under Florida law, Zausner must show: (1) the existence of a business relationship that affords the plaintiff existing or prospective legal rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff. *Int'l Sales & Servs., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001) (citing *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994)).

With respect to the third of these four elements, "an interference is unjustified where the interfering defendant is a stranger to the business relationship." *Hamilton v. Suntrust Mortg. Inc.*, 6 F. Supp. 3d 1312, 1320 (S.D. Fla. 2014). Where the accused party is a person with "any beneficial or economic interest in, or control over" a contractual relationship, Florida law holds that the interested party "is not considered a 'stranger' to the contract and therefore has a 'privilege to interfere.'" *Palm Beach Cty. Health Care Dist. v. Prof'l Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. Dist. Ct. App. 2009). Zausner contends that "the 'privilege to interfere' is a limited doctrine that only applies where the party invoking it 'is himself a party to the contract' at issue." D.I. 468

---

[3] C2B is entitled to summary judgment for the additional reason that Zausner's tortious interference claim fails. *See Zaki*, 771 F.3d at 1310 n. 21; *see also infra* A.2.

at 18 (internal citations omitted).  Not so.  The Eleventh Circuit has clarified that a party to be "aptly described as an 'interested third party" even where the party is "neither a contracting party nor someone acting on behalf of a [contracting] party . . . ."[4]  *M & M Realty Partners at Hagen Ranch, LLC v. Mazzoni*, 982 F.3d 1333, 1339–40 (11th Cir. 2020).  The relevant inquiry for the "privilege to interfere" is whether the person has any beneficial or economic interest, since "[t]he rationale for the privilege is to allow interested third parties to interfere to "protect their own economic interests."  *Id.* (internal citations omitted).  Here, there can be no dispute that C2B, a creditor of Schratter owed over $12 million, had an economic interest in the asset sale and the proceeds from the Atalanta transaction.  C2B also held a clear economic interest in protecting its members by revoking Schratter's membership shares of C2B.  Thus, C2B was not a stranger to the business relationship between Zausner and Schratter, and any interference with that relationship by C2B would be privileged.

The privilege to interfere, however, is not absolute.  *Walter v. Jet Aviation Flight Servs., Inc.*, No. 9:16-CV-81238, 2017 WL 3237375, at *8 (S.D. Fla. July 31, 2017).  Rather, where it is found that the privilege applies, the interested third party waives the privilege if the party acts with "'a ***purely*** malicious motive' divorced from any 'legitimate competitive economic interest.'"  *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1280 (11th Cir. 2015) (emphasis added & internal citations omitted); *Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 n. 9 (11th Cir.2001) (noting that the privilege does not apply "where malice is the sole basis for the interference," and the defendant is "interfering solely out of spite, to do harm, or from some

---

[4] Zausner seemingly conflates the privilege to interfere with "the core rule that a tortious interference claim does not lie against an agent acting within the scope of his agency, which stems from the bedrock understanding that a contracting party is never liable for interfering with its own contract."  *M & M*, 982 F.3d at 1340.  But the two are distinguishable principles.  *Id.*

other bad motive"). The privilege can be lost "even where the defendant's motive is not purely malicious . . . if improper methods are used." *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004). For conduct to be improper, it must be "sufficiently egregious . . . ." *Making Ends Meet, Inc. v. Cusick*, 719 So.2d 926, 928 (Fla. 3d DCA 1998); Florida Standard Jury Instruction (Civil) MI 7.2 (noting that one who uses physical violence, misrepresentations, illegal conduct, threats of illegal conduct, or other improper conduct, "has no privilege to use those methods, and his interference using such methods is improper"). For the following reasons, Zausner has not presented evidence sufficient to prove either that C2B had purely malicious motives or that C2B undertook conduct that was egregious.

Zausner does not allege that C2B's interference was driven exclusively by ulterior motives, and Zausner provides no evidence that could support such a finding. For instance, the email chain in which "the officers of C2B and SFI agreed that they would 'try' to send money from the Atalanta transaction to C2B" only affirms that C2B was interested in protecting its financial interest. While Zausner contends that the privilege is lost because C2B acted in "bad faith," D.I. 468 at 19, Zausner has not alleged sufficient evidence to create a genuine issue of material fact as to whether C2B employed improper means to interfere with the Zausner-Schratter business relationship. As a creditor of Schratter, C2B had a legal right to seek repayment of the loaned funds from Schratter. Thus, here again, the email chain cited by Zausner does not establish illegal or improper conduct. *See* D.I. 510 at 6 ("There is nothing wrong with the desire to have C2B repaid. C2B was a creditor of Schratter and had every right to repayment of loans before any distributions to Plaintiffs that could ever result in payments from Plaintiffs under the Stock Purchase Agreement."). Moreover, while Zausner argues that C2B held a meeting to revoke Schratter's membership shares mere hours before Schratter transferred its assets to an assignee, C2B's retrocession of Schratter's membership

13

share cannot be used as evidence of C2B's "improper conduct" because C2B had the contractual authority to automatically revoke the membership shares of any member upon insolvency. *Haney v. PGA Tour, Inc.*, No. 19-CV-63108-RAR, 2021 WL 3709213, at *9 (S.D. Fla. Aug. 19, 2021) ("Under Florida law, interference is justified where a defendant acts pursuant to contractual authority."); *Textron Fin. Corp. v. RV Having Fun Yet, Inc.*, No. 09-00002, 2011 WL 13176212, at *5 (M.D. Fla. Aug. 3, 2011) (internal citations omitted) (noting that "no cause of action for intentional interference exists which is the consequence of a rightful action"). Once stripped of these two allegations, Zausner points to no other conduct demonstrating that *C2B* used improper methods to interfere with Zausner and Schratter's business relationship. Accordingly, Zausner has no cause of action for tortious interference against C2B, and C2B's motion for summary judgment as to this ground is **GRANTED**.

### c.   *Conspiracy*

Finally, C2B contends that it is entitled to summary judgment on Zausner's conspiracy claim because such a claim "must be supported by an underlying wrong." D.I. 447 at 20; *Weisman v. S. Wine & Spirits of Am., Inc.*, 297 So. 3d 646, 652 (Fla. Dist. Ct. App. 2020) (internal citations omitted) ("[A]n actionable conspiracy requires an actionable underlying tort or wrong."). Zausner responds that the underlying wrong is "the divestiture of SFI's membership interest in C2B and its transfer to non-party ECB." D.I. 468 at 20. As the Court noted *supra*, however, Zausner failed to bring an actionable claim for tortious interference. Because there is no valid claim for tortious interference, there can be no civil conspiracy claim. *See Weisman*, 297 So. 3d at 652. Thus, C2B's motion for summary judgment as to Zausner's conspiracy claim is **GRANTED**.

14

### 2. The CC and Third-Party Defendants' Motion for Summary Judgement

The CC and Third-Party Defendants move for summary judgment on grounds that Zausner lacks standing to sue for any relief related to the SPA or the Stock Pledge because it was not a party to either agreement. D.I. 543 at 1. Consistent with Judge Burke's holding in the related matter *Zausner Foods Corp. v. EBC USA, Inc., et al.*, No. 1:20-cv-01769-RGA ("Zausner Foods"), however, the Court finds that Florida law governs the analysis of the SPA's Assignment Clause. *See Zausner Foods*, D.I. 56 at 5-6. Indeed, the SPA's choice of law provision holds that "[t]his Agreement shall be governed by, construed and enforced in accordance with the internal laws of the State of Florida applicable to contracts made and to be wholly performed within such State." SPA at Art. XII.5. Thus, while the CC and Third-Party Defendants rely on Delaware caselaw to support their Motion, the standing dispute must be analyzed under Florida law. *See Zausner Foods*, D.I. 56 at 8.

Having viewed the terms of the SPA and Florida law, the Court finds that ZHNC was free to assign its right to receive payment to Zausner. The Assignment Provision of the SPA, for instance, explicitly states that "[t]h[e] Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors, heirs, legal representatives and permitted assigns." SPA at Art. XII.4. As Judge Burke found, "Section XII.4's first sentence leaves little doubt that the SPA considers a party's 'successors' to be a different category of entity than a party's 'permitted assigns.'" *See Zausner Foods*, D.I. 56 at 8. While a "assign[]" is required under the SPA to enjoy the benefits of the agreement, the SPA argues that they must be "permitted," meaning that the assignment was made with the consent of the other parties to the SPA. *Id.* With respect to a "successor," however, the SPA does not require permission or consent for the successor to enjoy the benefits of the agreement. *Id.*

15

Moreover, under Florida law, the right to receive payments under a contract is freely assignable, unless the assignment provision expressly provides otherwise. *See Rapid Settlements, Ltd. v. Dickerson*, 941 So. 2d 1275, 1277 (Fla. Dist. Ct. App. 2006) (stating that a prohibition against assignment of payments will only be allowed when the assignment clause "expressly prohibits the assignment of payments") (emphasis added).   Because the Assignment Provision does not contain language prohibiting the assignment to a successor-in-interest, the Court finds that ZHNC was entitled—pursuant to both the SPA and Florida law—to assign its right to receive payments to Zausner.   The CC and Third-Party Defendants' Motion for Summary Judgment for lack of standing is therefore **DENIED**.

## II.   RULE 11 SANCTIONS

### A.  LEGAL STANDARD

Rule 11 of the Federal Rules of Civil Procedure grants the Court authority to sanction a party or a party's counsel if a pleading, written motion or other paper, inter alia, is presented for an "improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation," if the claims, defenses, or legal contentions presented are not "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," or if the allegations lack "evidentiary support." Fed.R.Civ.P. 11(b), (c); *Loving v. Pirelli Cable Corp.*, 11 F.Supp.2d 480, 486 (D.Del.1998).   The Third Circuit has described this standard as "stringent" because sanctions: "1) are in derogation of the general American policy of encouraging resort to the courts for peaceful resolution of disputes ... 2) tend to spawn satellite litigation counter-productive to efficient disposition of cases ... and 3) increase tensions among the litigating bar and between [the] bench and [the] bar." *Doering v. Union Cnty Bd. of Chosen Freeholders*, 857 F.2d 191, 194 (3d Cir.1988) (internal quotation marks and

16

citations omitted).   Accordingly, Rule 11 "prescribe[s] sanctions, including fees, only in the exceptional circumstance ... where a claim or motion is patently unmeritorious or frivolous." *Id.* (internal quotation marks and citations omitted); *see also Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 483 (3d Cir.1987) (cautioning litigants that Rule 11 is not for routine use whenever parties disagree about the correct resolution of a matter and stating that "when issues are close, the invocation of Rule 11 borders on the abusive").

### B.  ANALYSIS

This is Defendants' second motion seeking Rule 11 sanctions.  The first motion, which was filed on October 7, 2019, asserted that ECB USA and Atlantic Ventures amended their Complaint (D.I. 1) to assert claims that were "completely time-barred" and conceal prior sworn allegations that revealed that the claims could not be pursued. *See generally* D.I. 86.  Defendants also alleged that Plaintiffs asserted conspiracy claims that were tactical and frivolous. *Id.*  In moving for Rule 11 sanctions, Defendants sought the same relief they currently seek: (1) dismissal of the suit and (2) an award of their attorneys' fees and costs incurred in connection with the Rule 11 motion. D.I. 87 at 2.  While Judge Burke recognized that some of Defendants' allegations for sanctions "may or may not ultimately have merit," Judge Burke explained that the court could not "agree with Defendants that it should adjudicate this issue now and grant their [m]otion on this ground."[5]

---

[5] Judge Burke found it "a bit troubling," for instance, that "Plaintiffs' pleadings changed" to remove prior allegations that Plaintiffs became aware of certain fraudulent conduct in January 2015. D.I. 136, at 7, n. 5.  The Court agrees with Judge Burke that there is at least some conduct that may give rise to Rule 11 sanctions.  Indeed, Defendants' renewed Motion for Sanctions cites more evidence that may prove that Plaintiffs had knowledge of the alleged misconduct in 2015. *See* D.I. 530 at 6-7.  Plaintiffs maintain that the evidence cited by Defendants does not relate to the allegations raised in the Second Amended Complaint, and Plaintiffs add that they intend to invoke "tolling and inquiry notice doctrines" to counter Defendants' arguments that certain claims fall outside of the statute of limitations period.  D.I. 545 at 4-6, 11-12.  Currently, the Court has not determined whether Plaintiffs' claims are time-barred.  Thus, it is not "patently

D.I. 136 at 7-8.  Judge Burke added that a Rule 11 motion is typically decided "at the end of the litigation," when the court has a full record of the facts underlying the claim.  *Id.* at 8 (citing *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 99 (3d Cir. 1988) (internal citations omitted)).  Thus, Judge Burke recommended that Defendants' Motion be denied without prejudice until "a later stage of the case." *Id.* at 9.

While Defendants contend that this matter is now at a stage where a Rule 11 motion is proper, the Court finds that it is still too soon to resolve such a motion.  D.I. 530 at 5-6.  Indeed, as Plaintiffs note, Defendants' Rule 11 Motion asserts many of the same grounds raised by Defendants in support of their motions for summary judgment.  D.I. 545 at 9.  On February 7, 2024, Judge Burke granted Plaintiffs' Motion to Defer Summary Judgment (D.I. 492), thus denying Defendants' summary judgment motions without prejudice and with leave to renew them at a later, more appropriate time.  D.I. 571 at 1-4.  Defendants' summary judgment motions have not been renewed; thus, the Court has yet to rule on Defendants' grounds for summary judgment.  Because a Rule 11 motion is "not a substitute for motions for summary judgment," the Court will not consider such a motion "midway through litigation" and/or before the Court can decide the merits of Plaintiffs' claim at summary judgment.  *Uniq Branch Off. Mexico, S.A. de C.V. v. Steel Media Grp., LLC*, No. 22-23876-CIV, 2024 WL 1514632, at *1 (S.D. Fla. Apr. 5, 2024); *Safe-Strap Co., Inc. v. Koala Corp.*, 270 F. Supp. 2d 407, 417-21 (S.D.N.Y. 2003).  Accordingly, Defendants' Motion for Sanctions is **DENIED** without prejudice and with leave for Defendants to refile at the end of litigation.

---

clear" that Rule 11 sanctions are appropriate.  *Doering v. Union Cnty. Bd. of Chosen Freeholders*, 857 F.2d 191, 194 (3d Cir. 1988).

III.  **CONCLUSION**

The Court will issue an Order consistent with its rulings above.