IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ECB USA, INC. and ATLANTIC VENTURES CORP., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 19-731-GBW-CJB |
| SAVENCIA, S.A. and ZAUSNER FOODS CORP., on behalf of itself and as successor in interest to ZNHC, INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM ORDER

Presently before the Court on remand is Defendants Savencia, S.A. and Zausner Foods Corp.'s ("Defendants") renewed motion seeking a determination that Plaintiffs ECB USA, Inc. ("ECB") and Atlantic Ventures Corp. ("Atlantic Ventures," and together with ECB, "Plaintiffs") have waived the attorney-client privilege as to three documents found on a computer server known as the "Miami Server" (the "renewed Motion"). (D.I. 407) Below, the Court provides factual and legal conclusions requested by the District Court regarding certain issues relevant to the renewed Motion.

**I.      BACKGROUND**

The Court writes primarily for the parties, who are well familiar with the facts. In doing so, the Court incorporates by reference its prior recitation of the relevant factual and procedural background relating to both Defendants' first motion (the "first motion") and the instant renewed Motion regarding the Miami Server/waiver issue. This recitation was set out in the Court's January 31, 2024 Memorandum Order ("January 31, 2024 MO"). (D.I. 561 at 1-3)

1

In the January 31, 2024 MO, the Court noted that in resolving the renewed Motion, it would only address Defendants' argument that Plaintiffs had *inadvertently* waived the attorney-client privilege as to certain actions that they had taken involving the Miami Server. (*Id*. at 4 n.2) The Court explained that it was doing so because while Defendants had addressed the concept of both *intentional* and *inadvertent* waiver of privilege in their first motion, in their renewed Motion, they had "address[ed] only the concept of inadvertent disclosure[.]" (*Id*.) The Court ultimately denied the Motion as to Defendants' inadvertent waiver argument. In doing so, the Court concluded that Plaintiffs had sufficiently demonstrated that they had not inadvertently waived their attorney-client privilege when helping to facilitate Defendants' review of Miami Server documents during this litigation. (*Id*. at 19)

Defendants filed Objections to the January 31, 2024 MO. (D.I. 574) In those Objections, Defendants noted that in their first motion, they had made both an intentional and inadvertent waiver argument, and they described those respective arguments this way:

> *First, there was an intentional waiver in 201[8] when Plaintiffs, as shareholders of [Schratter Foods, Inc., or "SFI"] caused SFI to assign the Miami Server to a third party, Les Osborne. See [D.I. 408 at 4.]* Second, there was, at best, an inadvertent waiver, if not a second intentional waiver, in 2022 when Plaintiffs caused Mr. Osborne to disclose the entire contents of the Miami Server to Defendants without conducting any kind of privilege review. *See id*. at 4-5.

(*Id*. at 6 (certain emphasis added, certain emphasis and italics omitted); *see also* D.I. 326 at 6-7) And Defendants asserted that (contrary to the Court's conclusion in the January 31, 2024 MO), in their briefing on the renewed Motion, they *did* re-raise the intentional waiver argument. (D.I. 574 at 1) To that end, Defendants pointed to one paragraph on page 4 of their opening letter brief regarding the renewed Motion. (*Id*. at 6 (citing D.I. 408 at 4)) That paragraph, which was titled "The Disclosure to SFI's Assignee Waived Privilege[,]" reads as follows:

2

> Plaintiffs, not SFI, decided to place SFI into insolvency proceedings and transfer the Miami Server to a third party[ i.e., Mr. Osborne, the "Assignee"]. *See* D.I. 326, 349. Indeed, the control that Plaintiffs exercised over SFI—and the complete overlap of officers and directors between Plaintiffs and SFI—is how Plaintiffs' documents came to be stored on SFI's servers in the first place. *See id*. As set forth above, one of the Subject Documents confirms that "ECB wants us [i.e., SFI] to go to an ABC as soon as possible." Exhibit 1. Thus, Defendants renew their argument that Plaintiffs' decision to cause the Miami Server to be transferred to an insolvency assignee—with full knowledge that it contained Plaintiffs' privileged communications—operated as an intentional waiver. *See* D.I. 326, 349.

(D.I. 408 at 4)

United States District Judge Gregory B. Williams reviewed Defendants' Objections to the January 31, 2024 MO. (D.I. 614) In his July 11, 2024 Memorandum Opinion (the "July 11, 2024 MO"), Judge Williams agreed with Defendants that the Court had not "address[ed] Defendants' intentional waiver theory" (i.e., the argument made in the above paragraph) in the January 31, 2024 MO. (*Id*. at 13) Judge Williams went on to state and order as follows:

> Specifically, Defendants argued that "Plaintiffs, not SFI, decided to place SFI into insolvency proceedings and transfer the Miami Server to a third party," and that "the complete overlap of officers and directors between Plaintiffs and SFI—is how Plaintiffs' documents came to be stored on SFI's servers in the first place." D.I. 408 at 4. Judge Burke—in concluding that the record does not show that Plaintiffs knew or should have known . . . . that their privileged documents resided on the Miami Server prior to providing Defendants with a copy of that server—explained "there has been no finding in this case that SFI and Plaintiffs are alter egos." D.I. 561 at 10. It appears to the Court, however, that Defendants made the argument that SFI and Plaintiffs are alter egos (including by citing to documents identified on the Miami Server, *see* D.I. 408, Ex. 1) when "renew[ing] their argument that Plaintiffs' decision to cause the Miami Server to be transferred to an insolvency assignee . . . operated as an intentional waiver." D.I. 408 at 4. Accordingly, the Court finds that Defendants' argument should have been addressed prior to issuing a finding with respect to whether Plaintiffs knew or should have known that their privileged documents resided on the Miami Server.

3

> Judge Burke's findings of fact and conclusions of law concerning whether Plaintiffs did or did not exercise control over SFI during the relevant times related to the case will assist the Court in reviewing Judge Burke's conclusion that Plaintiffs did not intentionally or inadvertently waive privilege over the contents of the Miami Server. Accordingly, the Court DEFERS ruling on Defendants' Objections to Judge Burke's Memorandum Order, dated January 31, 2024, and REMANDS this dispute to Judge Burke to (1) consider and explain whether Plaintiffs exercised sufficient control over SFI such that SFI's disclosure of the Miami Server to Mr. Osborne was an intentional waiver because those corporations were alter-egos during the relevant times related to the case, and (2) consider and explain whether those findings regarding Plaintiffs' control over SFI (or lack thereof) affect Judge Burke's factual or legal conclusions with respect to whether Plaintiffs inadvertently disclosed the contents of the Miami Server.

(*Id*. at 14-15)

## II.  DISCUSSION

Below, the Court addresses in turn the two issues remanded to it by Judge Williams.

### A.  Alter Ego Analysis and Intentional Waiver

The Court begins by taking up the first issue that Judge Williams remanded: "[W]hether Plaintiffs exercised sufficient control over SFI such that SFI's disclosure of the Miami Server to Mr. Osborne was an intentional waiver because those corporations were alter-egos during the relevant times related to the case[.]" (*Id*.) As to this issue, based on the evidence of record, the Court concludes that Defendants have *not* sufficiently demonstrated that Plaintiffs were the alter ego of SFI in the relevant time period. And therefore, the Court concludes that *SFI*'s act of disclosing the Miami Server to Mr. Osborne did not amount to an intentional waiver of privilege by *Plaintiffs*. The Court so concludes for the reasons that follow.

As an initial matter, the Court notes that in none of their briefing on this waiver issue did Defendants ever make a *clear, detailed* argument about alter ego liability. So far as the Court

can tell, the words "alter ego" are not mentioned once in Defendants' briefs regarding the first motion or the renewed Motion. (D.I. 326; D.I. 349; D.I. 408; D.I. 415) Relatedly, in all of that briefing, Defendants: (1) never identified *what legal test* it must meet to demonstrate that Plaintiffs and SFI were alter egos (and what state's law applies to that question); and (2) never attempted to marshal any relevant facts and then *compare those facts to the elements of the relevant alter ego legal framework*. In other words, it is not surprising that Defendants have failed to make a sufficient showing as to the alter ego issue—when they barely addressed that concept in the relevant briefing here.

Nevertheless, as Judge Williams noted, there are a few sentences in Defendants' opening brief on the renewed Motion where they obliquely made reference to alter ego liability and suggested that this concept could relate to the intentional waiver issue. (D.I. 408 at 4) As noted above, Judge Williams concluded that this was sufficient to "ma[ke] the argument that SFI and Plaintiffs were alter egos[.]" (D.I. 614 at 14) The Court, then, assesses Defendants' argument in that regard.

In doing so, the Court will first have to determine what law to look to.

The intentional waiver issue relates to Plaintiffs' ability to rely on the attorney-client privilege as a defense to production or use of certain documents located on the Miami Server. As the Court has noted in prior decisions: (1) attorney-client privilege issues are typically governed by state law; and (2) in this case, the parties have tended to cite and apply Florida state law with regard to such issues (likely because ECB and Atlantic Ventures are Florida corporations, because much of the relevant conduct occurred in Florida, and in light of a Florida choice-of-law provision that is part of a relevant Stock Purchase Agreement). (D.I. 551 at 3 & n.3; D.I. 561 at 4 n.4; *see also* D.I. 147 at ¶¶ 3-4); *Zausner Foods Corp. v. ECB USA, Inc.*, Civil

5

Action No. 20-1769-RGA-CJB, 2022 WL 609110, at *4 n.4 (D. Del. Jan. 31, 2022). As it has done before, here the Court will apply Florida privilege law to its assessment of the intentional waiver issue.[1]

As for the alter ego question, in a case like this one (i.e., one that does not involve federal claims), the Court would look to relevant state law. *See, e.g., Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 613 (D. Del. 2018). Although Plaintiffs are Florida corporations, SFI appears to have been a Delaware corporation in the relevant time period (though there is admittedly little in the record about that subject). *See Zausner Foods Corp. v. ECB USA, Inc.*, Civil Action No. 20-1769-GBW-CJB, D.I. 39 at ¶ 6 (D. Del. Apr. 12, 2021). If that is so, and to the extent that the issue here is about whether *SFI's* corporate veil should be pierced, perhaps Delaware alter ego law (as opposed to Florida's law) is relevant. *See Regions Bank v. NBV Loan Acquisition Member LLC*, Case Number: 21-23578-CIV-MORENO, 2022 WL 1499942, at *6 (S.D. Fla. May 12, 2022). In any event, Florida and Delaware alter ego law is similar. *Id*.; *see also Juju, Inc. v. Native Media, LLC*, Civil Action No. 19-402-CFC, 2020 WL 3208800, at *9 n.7 (D. Del. June 15, 2020), *report and recommendation adopted,* 2020 WL 4001059 (D. Del. July 15, 2020); *In re Hillsborough Holdings Corp.*, 176 B.R. 223, 231 (M.D. Fla. 1994). And so below, the Court will cite to alter ego law from both states—understanding that its analysis would be the same using either state's law.

---

[1]  That said, Defendants have at times also cited to Delaware law in addressing privilege issues as to this waiver dispute. (D.I. 326 at 6) To the extent that it could be said that Delaware law applies to such issues, (*see, e.g.*, D.I. 551 at 3), the Court has been given no indication by the parties that Delaware's law would meaningfully differ from Florida's law. And to the extent that Delaware caselaw was cited by Defendants in the relevant portion of their briefing, or to the extent that it is otherwise instructive to resolving the remaining disputed privilege issues, the Court will discuss it herein.

Pursuant to Florida law, the party asserting a privilege bears the burden of establishing not only the existence of the privilege, but also that disclosure to a third party did not waive the privilege. *RC/PB, Inc. v. Ritz-Carlton Hotel Co.*, 132 So.3d 325, 326 (Fla. Dist. Ct. App. 2014). Waiver of the attorney-client privilege is not favored; it is inappropriate where the record does not show a clear, intentional waiver. *See Petzold v. Castro*, 365 So.3d 1199, 1202 (Fla. Dist. Ct. App. 2023); *Markel Am. Ins. Co. v. Baker*, 152 So.3d 86, 92 (Fla. Dist. Ct. App. 2014); *see also* Fla. Stat. § 90.502(1)(c) (2000). "Waiver is the intentional relinquishment or abandonment of a known right or privilege, or conduct that warrants an inference of the relinquishment of a known right." *Mid-Continent Cas. Co. v. Basdeo*, 742 F. Supp. 2d 1293, 1330 (S.D. Fla. 2010) (internal quotation marks and citation omitted).

With regard to the alter ego issue, Florida courts explain that a general principle of corporate law is that a corporation is a separate legal entity, distinct from the persons comprising them or from other related corporations. *Gasparini v. Pordomingo*, 972 So.2d 1053, 1055 (Fla. Dist. Ct. App. 2008). "To 'pierce the corporate veil' three factors must be proven: (1) the shareholder [or related entity] dominated and controlled the corporation to such an extent that the corporation's independent existence[] was in fact non-existent and the shareholders [or entity were/was] in fact [an] alter ego[] of the corporation; (2) the corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant." *Id*. The party asserting that one person/entity is the alter ego of another has the burden to assert and prove that this is the case, and to do so by a preponderance of the evidence. *Id*; *In re Batcheler*, 600 B.R. 680, 689 (Bankr. S.D. Fla. 2019) (applying Florida law); *see also Johnson v. New Destiny Christian Ctr. Church, Inc.*, 303 F.

7

Supp. 3d 1282, 1286 (M.D. Fla. 2018) (citing Florida law and noting that this is, in practice, a "very heavy burden") (internal quotation marks and citation omitted).[2]

With the relevant law set out, the Court next turns to the merits. It starts by identifying some relevant facts of record:

- The Miami Server originally belonged to and was in the possession of SFI. (D.I. 341, ex. 1 at ¶¶ 10-12; *see also id.* at ¶¶ 7-9)

- SFI was at the relevant time a wholly-owned subsidiary of Atlantic Ventures. (*Id.* at ¶ 4)

- On April 25, 2018, SFI was placed in an assignment for the benefit of creditors ("ABC") proceeding pursuant to Chapter 727, Florida Statutes; an ABC proceeding is a type of alternative to formal bankruptcy proceedings. (*Id.* at ¶ 6; *see also* D.I. 223 at 77; D.I. 326, ex. 1)

- Relatedly, on that same date, in document titled "Assignment for the Benefit of Creditors[,]" SFI conveyed to the Assignee, Mr. Osborne, all of its assets (except those exempt by law from being transferred), including the Miami Server. (D.I. 341, ex. 2 at 3-5) This document states that it was signed by Arno Leoni, in his role as Chief Executive Officer ("CEO") of SFI, on SFI's behalf. (*Id.* at 5) At that point, the server became the property

---

[2] Again, Delaware law on piercing the corporate veil is similar to Florida law. In Delaware, the party seeking to demonstrate that one entity is the alter ego of another must show: (1) that there has been a lack of attention applied to corporate separateness between two entities (i.e., that the two are functionally a single economic entity); and (2) that the alleged misuse of the corporate form would work a fraud or some form of injustice or unfairness. *See Fidelity Nat. Info. Servs., Inc. v. Plano Encryption Techs., LLC*, Civil Action No. 15-777-LPS-CJB, 2016 WL 1650763, at *4 (D. Del. Apr. 25, 2016); *Mason v. Network of Wilmington, Inc.*, No. Civ.A. 19434-NC, 2005 WL 1653954, at *2-3 (Del. Ch. July 1, 2005); *see also Regions Bank*, 2022 WL 1499942, at *6. In assessing the first of these elements, Delaware courts consider various factors, including: (1) whether the corporation is adequately capitalized; (2) whether the corporation is solvent; (3) whether corporate formalities were observed (e.g., whether dividends were paid, corporate records kept, or officers and directors functioned properly); (4) whether the controlling shareholder siphoned company funds; and (5) in general, whether the corporation simply functioned as a facade for the controlling shareholder. *See Fidelity Nat. Info. Servs.*, 2016 WL 1650763, at *4; *Mason,* 2005 WL 1653954, at *2-3.

- of the Assignee, Mr. Osborne. (D.I. 341, ex. 1 at ¶¶ 7-8, 12; *id*., ex. 2 at 3-5)

- Mr. Leoni served as the CEO of SFI from early 2017 through April 25, 2018. (D.I. 341, ex. 1 at ¶ 2) During this time, he was also an officer and director of Atlantic Ventures and ECB. (*Id.* at ¶ 3)

- In the relevant time period, Claude Blandin served as President of ECB and SFI and as an owner of ECB. (D.I. 408, ex. 1 at 1)

- Plaintiffs allege that the Miami Server contains documents and communications subject to their attorney-client privilege.

As to the first element of the alter ego analysis, what facts do Defendants cite in attempting to show how Plaintiffs dominated and controlled SFI in the relevant time period (i.e., such that SFI's corporate existence was in fact non-existent)? In their briefing regarding the first motion, Defendants essentially pointed to nothing in that regard. Indeed, in that briefing, Defendants *were not actually suggesting* that SFI was the alter ego of Plaintiffs. Instead, therein Defendants essentially acknowledged that Plaintiffs and SFI were *separate entities*—even referring to SFI as a "third-party" vis-à-vis Plaintiffs. (D.I. 349 at 2; *see also id.* ("Plaintiffs argue that . . . when a debtor irrevocably transfers its assets and legal rights to an assignee . . . this includes the debtor's privilege rights . . . . But that has nothing to do with *Plaintiffs* because *Plaintiffs* were not the debtor in the ABC proceeding[.]") (emphasis in original))

That said, in the opening brief of the renewed Motion, as was noted above, it seems like Defendants slightly changed their tune. While they did not there make any explicit reference to alter ego liability, Defendants did: (1) state that "Plaintiffs, not SFI, decided to place SFI into insolvency proceedings and transfer the Miami Server to a third party[,]" (D.I. 408 at 4); (2) assert, citing to their briefing on the first motion, that there was "complete overlap of officers and directors between Plaintiffs and SFI" at the relevant time in 2018, (*id*. (citing D.I. 326; D.I.

9

349)); and (3) pointed out that in an attached April 9, 2018 e-mail from Mr. Leoni to others, Mr. Leoni wrote "ECB wants us [*i.e.*, SFI] to go to an ABC as soon as possible[,]" (*id.* (citing *id.*, ex. 1 at 1)).

These arguments are clearly insufficient to demonstrate alter ego status. For one thing, the relevant record appears far weaker than Defendants made it sound in their opening letter brief on the renewed Motion. By way of example, with regard to their assertion that there was "complete overlap of officers and directors between Plaintiffs and SFI," the Court has re-reviewed all of the briefing and exhibits relating to the first motion and the renewed Motion—and it can find no indication that there was "complete overlap" of *all* officers and directors of those entities. At most, from what the Court can tell, the record shows that as of April 2018: (1) Mr. Leoni served as CEO of SFI and as an officer and director of Plaintiffs; and (2) Claude Blandin served as President of ECB and SFI and as an owner of ECB. As to what other officers and directors Plaintiffs and SFI had at the relevant time—and what was the extent of the overlap between the respective total number of officers and directors for all parties—Defendants briefing appears to be silent. Additionally, Defendants' citation to the April 9, 2018 e-mail from Mr. Leoni does not seem to help their case. In that e-mail, Mr. Leoni states that "ECB wants *us*" (i.e., SFI) to "go to an ABC" and continuously refers to ECB as "*they*[.]" (*Id.*, ex. 1 at 1 (emphasis added)) If anything, this e-mail suggests that ECB ("they") is a separate entity from SFI ("us")—not that the two corporations are indistinguishable from a practical or legal perspective.

Moreover, the mere fact that Mr. Leoni and Mr. Blandin served as an officer and/or director of Plaintiff(s) and SFI would not demonstrate the requisite lack of corporate separateness needed to make an alter ego showing. Courts have explained, for example, that it is

10

"entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation for liability for its subsidiary's acts" since "courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary." *In re Maxus Energy Corp.*, 617 B.R. 806, 818 (Bank. D. Del. 2020) (internal quotations marks and citations omitted). And "[n]either ownership of all of the stock of a subsidiary, nor common officers and directors, or [both] combined, are sufficient . . . to justify '[p]iercing the corporate veil.'" *Unijax, Inc. v. Factory Ins. Ass'n*, 328 So.2d 448, 454 (Fla. Dist. Ct. App. 1976); *see also Wenske v. Blue Bell Creameries, Inc.*, C.A. No. 2017-0699-JRS, 2018 WL 5994971, at *6 (Del. Ch. Nov. 13, 2018) ("A parent corporation is not liable for the acts of its subsidiary merely because it owns (and votes) a majority of the subsidiary's stock or shares common shareholders, directors or officers with the subsidiary.") (internal quotation marks and citations omitted); *Weiss Cap. Mgmt., Inc. v. Crowder*, 964 So.2d. 865, 866-67 (Fla. Dist. Ct. App. 2007) (concluding that the fact that one entity was the wholly-owned subsidiary of another, and that the two entities shared an "associated person" between them, was not enough to "make the[ entities] alter egos"—and citing approvingly the proposition that "[o]ne-hundred percent ownership and identity of directors are, even together, an insufficient basis for applying an alter ego theory to pierce the corporate veil") (internal quotation marks omitted) (citing *United States v. Jon-T Chems., Inc.*, 768F.2d 686, 691 (5th Cir. 1985)).³ Here Defendants point to no other evidence of record

---

³ *Cf. Quesada v. Better Earth, Inc.,* Case No. 6:23-cv-1809-JSS-LHP, 2024 WL 3890077, at *9 (M.D. Fla. Aug. 21, 2024) (applying Florida law and noting that, at the pleading stage, an assertion that the same person was at one time an officer of both corporations at issue, and that one of the entities lacked a sufficient website, was not enough to plead alter ego status); *Alvarez Galvez v. Fanjul Corp.*, 533 F. Supp. 3d 1268, 1284 (S.D. Fla. 2021) (applying Florida law and concluding that the fact that two corporate entities had four overlapping officers and directors was not sufficient to support an alter ego theory at the pleading stage).

suggesting, for example, that SFI failed to observe corporate formalities or that in some other way Plaintiffs used it as a mere instrumentality or façade. It is *that* type of additional showing that would be needed to possibly invoke the alter ego doctrine. *See Garcia v. Gravity Interactive, Inc.*, Case No. 10-62162-Civ-COOKE/TURNOFF, 2012 WL 13005342, at *5 (S.D. Fla. Jan. 17, 2012) (concluding, in assessing Florida law regarding a personal jurisdiction inquiry, that the fact that a parent corporation consolidated its financial information with a subsidiary, and that certain officers and directors overlapped between the companies, was insufficient to allege that one was the alter ego of the other—where there were no allegations or evidence that the parent corporation paid its subsidiary's financial obligations or that the subsidiary did not have an independent financial existence with its own bank accounts, adequate capital, or the like); *Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube*, C.A. No. 2022-0378-LWW, LLC, 2023 WL 5688392, at *5-6 (Del. Ch. Sept. 5, 2023) (coming to a similar conclusion in applying Delaware law, when reviewing allegations at the pleading stage).[4]

---

[4] In the intentional waiver section of Defendants' opening brief, the main case they cited when asserting that Plaintiffs had intentionally waived privilege was *Serviz, Inc. v. ServiceMaster Co., LLC*, C.A. No. N20C-03-070 PRW CCLD, 2021 WL 5768655 (Del. Super. Ct. Dec. 6, 2021). (D.I. 326 at 7 ("*Serviz* is directly on point.")) In *Serviz*, the plaintiff was found to have intentionally waived privilege where: (1) its documents at issue had been located on a server that had been in the plaintiff's physical possession, which the plaintiff then sold to a third party; (2) thereafter, the plaintiff negotiated the further sale of that server to a different third party; and (3) the plaintiff's counsel admitted that when the plaintiff did all of this, it knew that the server likely contained the plaintiff's own privileged documents. *Serviz*, 2021 WL 5768655, at *1, *4. As the Court explained in an earlier opinion, however, *Serviz* is not on all fours with this case. That is because, *inter alia*: "(1) the documents at issue here were originally located on a server *owned by a third party (SFI), not Plaintiffs*; (2) the documents were then transferred to another third party (SFI's Assignee) via an insolvency proceeding *that SFI (not Plaintiffs) initiated*; (3) SFI's Assignee made the documents accessible to Defendants (albeit via Plaintiffs' facilitation); and (4) at no point have Plaintiffs admitted that they knew—nor is it yet clear that they should have known—that the documents at issue likely contained privileged information when they were made available to Defendants." (D.I. 369 at 2 (emphasis added)) The Court's conclusion herein (i.e., that Defendants have not sufficiently demonstrated that Plaintiffs and SFI were alter egos) only further underscores why *Serviz* does not support a grant of Defendants'

Lastly, Defendants also do not make a sufficient showing regarding elements two and three of the alter ego analysis. This is because in their briefing, Defendants never clearly address how or why they are claiming that Plaintiffs misused the corporate form in a fraudulent manner or for an improper purpose (and relatedly, how that misuse caused injury to Defendants). Defendants' failure to discuss this issue is alone a sufficient basis to conclude that no sufficient alter ego showing has been made. *Cf. Quesada v. Better Earth, Inc.,* Case No. 6:23-cv-1809-JSS-LHP, 2024 WL 3890077, at *10 (M.D. Fla. Aug. 21, 2024) (concluding at the pleading stage that the plaintiff had not sufficiently alleged alter ego status, where she insufficiently addressed how the corporate form had been used for an improper purpose, or how this misuse had caused her injury) (applying Florida law); *Fidelity Nat. Info. Servs.*, 2016 WL 1650763, at *7-8 (concluding, at the pleading stage, that the plaintiff's failure to sufficiently address how an alleged alter ego relationship promoted injustice or inequity supported grant of a motion to dismiss on personal jurisdiction grounds) (applying Delaware law).

In sum, Defendants have come nowhere close to demonstrating that Plaintiffs and SFI were alter egos in 2018 at the time when SFI assigned the Miami Server to Mr. Osborne. As a result, there can be no valid suggestion that *SFI*'s assignment of the server amounted to *Plaintiffs* having taken an action that amounts to an intentional relinquishment of their attorney-client privilege as to any documents located on the server.

---

renewed Motion on intentional waiver grounds. Unlike in *Serviz*, here *Plaintiffs* did not transfer the server at issue pursuant to an agreement that *Plaintiffs* negotiated; instead, *SFI* transferred those materials, pursuant to an agreement that *SFI* negotiated. *See Serviz*, 2021 WL 5768655, at *4 (noting, in support of its conclusion that the plaintiff ("Serviz") had intentionally waived the attorney-client privilege pursuant to Delaware law, that "*Serviz disclosed* the communications when it transferred the sever to Porch" and "*Serviz transferred* the server pursuant to an APA that *Serviz itself negotiated*") (emphasis added).

13

B. **Inadvertent Waiver**

As was noted above, in the January 31, 2024 MO, the Court did address (in some detail) Defendants' argument that Plaintiffs had *inadvertently* waived privilege when, during this litigation, they provided Defendants with access to the Miami Server's documents. In rejecting that position (and finding that no inadvertent waiver occurred), the Court discussed, *inter alia*, whether Plaintiffs had failed to take reasonable precautions to prevent inadvertent disclosure when they facilitated Defendants' review of the server documents. (D.I. 561 at 6-11) The Court found that the record did not show that Plaintiffs had failed to take reasonable precautions. This was in part because: (1) when the server documents were made available to Defendants, they were not in Plaintiffs' possession (instead, they were in the Assignee's possession); (2) Plaintiffs did not "produce" these documents to Defendants; and (3) there was insufficient evidence to show that Plaintiffs knew or should have known what the content of the server documents was at the relevant time. (*Id.*)

In making this last point about Plaintiffs' knowledge (or lack thereof), the Court explained that when the Miami Server was assigned to Mr. Osborne, it was in SFI's (not Plaintiffs') possession. (*Id.* at 9-10) And the Court noted that it could not "simply presume that just because SFI was a related entity to Plaintiffs, Plaintiffs necessarily had [] knowledge [of the server's contents, given that] [c]ourts generally respect the corporate form, *cf. Harrison*[, 320 F. Supp. 3d at 614], and [given that] there has been no finding in the case that SFI and Plaintiffs are alter egos." (*Id.* at 10) In his July 11, 2024 MO, Judge Williams highlighted this statement; he concluded that, in light of it, whether Plaintiffs and SFI are found to be alter egos could impact his decision on the inadvertent waiver issue.

14

Above, the Court has concluded that Defendants have made an insufficient showing of alter ego status. This conclusion therefore bolsters Plaintiffs' argument regarding the inadvertent waiver issue. That is because if it has not been demonstrated that Plaintiffs and SFI were alter egos in the relevant time period, then Defendants cannot credibly argue that Plaintiffs *should be charged with knowledge of what was on SFI's Miami Server at that time because Plaintiffs and SFI were the same legal entity*. In other words, since the Court's alter ego-related conclusion in this Memorandum Order hurts (not helps) Defendants' position regarding the inadvertent waiver issue, then nothing about that conclusion affects or alters the Court's decision in the January 31, 2024 MO (i.e., that Plaintiffs did *not* inadvertently waive their attorney-client privilege by assisting Defendants' review of the Miami Server documents during this litigation).

## III. CONCLUSION

For the foregoing reasons, the Court determines that: (1) Defendants made an insufficient showing that Plaintiffs and SFI were alter egos in 2018, and there is therefore no good reason to conclude that *SFI*'s disclosure of the Miami Server to Mr. Osborne amounted to *Plaintiff's* intentional waiver of *its* attorney-client privilege; and (2) the Court's alter ego finding here does not alter its conclusion in the January 31, 2024 MO (i.e., that Plaintiffs did not inadvertently waive their attorney-client privilege).[5]

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. Any such redacted version

---

[5] In light of the fact that the renewed Motion is still pending, and that trial is approaching, when the renewed Motion is ultimately resolved, the Court suggests that the parties address any lingering privilege issues relating to the Miami Server to Judge Williams in the first instance. (*See* D.I. 619)

shall be submitted no later than **January 21, 2025** for review by the Court.  It should be accompanied by a motion for redaction that shows that the presumption of public access to judicial records has been rebutted with respect to the proposed redacted material, by including a factually-detailed explanation as to how that material is the "kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (internal quotation marks and citation omitted).  The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated:  January 16, 2025

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE