IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ECB USA, INC. and ATLANTIC VENTURES CORP., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 19-731-GBW-CJB |
| SAVENCIA, S.A. and ZAUSNER FOODS CORP., on behalf of itself and as successor in interest to ZNHC, INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM ORDER

Presently pending in this action is Plaintiffs ECB USA, Inc. and Atlantic Ventures Corp.'s (collectively, "Plaintiffs") and Defendants Savencia, S.A. ("Savencia") and Zausner Foods Corp.'s ("Zausner," and collectively with Savencia, "Defendants") Joint Motion for Hearing/Oral Argument ("Joint Motion for Hearing") regarding the applicability of the crime-fraud exception to the attorney-client privilege (the "crime-fraud exception" or the "exception")). (D.I. 605)  The Joint Motion for Hearing relates, in turn, to Plaintiffs' pending motion seeking the Court's finding that the crime-fraud exception is applicable in this case ("Plaintiffs' Motion").  (*See* D.I. 258)  The Court GRANTS the Joint Motion for Hearing, as it has now held an evidentiary hearing on Plaintiff's Motion.  And having held that hearing, and having considered all of the evidence now before it, for the reasons set out below, the Court ORDERS that Plaintiffs' Motion is DENIED, as Plaintiffs have failed to make a sufficient showing that the crime-fraud exception applies here.

I.      FACTUAL BACKGROUND AND LEGAL STANDARDS

On January 4, 2024, the Court issued a 26-page Memorandum Order regarding Plaintiffs' Motion (the "January 4, 2024 MO"). (D.I. 551) In the January 4, 2024 MO, the Court set out the factual and procedural background relating to that motion, as well as the relevant legal standards that were applicable thereto. (*Id*. at 1-8) The Court hereby incorporates by reference this information into the instant Memorandum Order. It will assume the reader's familiarity with those facts and legal concepts herein.

In the January 4, 2024 MO, the Court explained that Plaintiffs were alleging that Defendants had committed certain fraudulent conduct—and that this fraudulent conduct had purportedly been furthered by the actions and/or the advice of Defendants' attorney Lewis Gitlin ("Gitlin"). (*Id*. at 9) More specifically, Plaintiffs were asserting that Mr. Gitlin and/or his advice furthered three types of allegedly fraudulent activity that was relevant to Plaintiffs' Motion: (1) misrepresentations in mid-to-late-2014 of the position of and the authority held by Alain Voss ("Mr. Voss"), the then-President and Chief Executive Officer ("CEO") of Schratter Foods, Incorporated ("SFI") (the "Voss misrepresentations issue"); (2) deliberately excluding from a "data room" certain documents that would have disclosed Mr. Voss' true position and authority, or including documents in the data room that were misleading as to Mr. Voss' true position and authority (the "data room issue"); and (3) misrepresenting SFI's financial position in certain ways (the "financial misrepresentations issue"). (*Id*.) In the January 4, 2024 MO, the Court explained that it would only address the first two of those issues, having concluded that the financial misrepresentations issue was no longer part of a viably-pleaded fraud claim in the case. (*Id*. at 9 n.14)

Thereafter, in the January 4, 2024 MO, the Court came to the following merits-based conclusions about Plaintiffs' Motion: (1) that Plaintiffs had put forward enough evidence to

2

establish a *prima facie* case that the elements of the crime-fraud exception had been met; (2) that said, if the Court were to have considered not just the evidence that Plaintiffs had made of record, but *all* of the relevant evidence before it at that time (including the evidence that *Defendants* had put forward), the Court would have concluded that Plaintiffs had not met their ultimate burden to show that the exception applies; but (3) the applicable law required that because Plaintiffs had made out a *prima face* case (with the Court having considered only Plaintiffs' evidence), then the Court was required to hold an evidentiary hearing on Plaintiffs' Motion before finally resolving the issue. (*Id*. at 8-25) The Court further noted that if, after the hearing, the "record gets no better for Plaintiffs[,]" then it would expect to deny Plaintiffs' Motion. (*Id*. at 25 n.27) Lastly, in the January 4, 2024 MO, the Court determined that it need not and would not order an *in camera* review of any impacted communications before issuing the January 4, 2024 MO. (*Id*. at 7 n.11)

Both sides objected to the January 4, 2024 MO in certain respects. (D.I. 556; D.I. 557) United States District Judge Gregory B. Williams ultimately overruled Defendants' objections and sustained-in-part and overruled-in-part Plaintiffs' objections. (D.I. 595) In overruling Defendants' objections, Judge Williams, *inter alia*, ruled that the Court did not clearly err in concluding that Plaintiffs had made out a *prima facie* case; he also found that the Court had rightly decided that it should conduct an evidentiary hearing. (*Id*. at 8-10) As for Plaintiffs' objections, Judge Williams agreed with Plaintiffs that they should be able to raise the financial misrepresentations issue at the evidentiary hearing and in their briefing thereafter if they wished—in light of his conclusion that Plaintiffs' related claim in that regard was still viably alleged in the case. (*Id.* at 12-13) But Judge Williams disagreed with Plaintiffs' assertion that the Court had erred in declining to conduct an *in camera* review; he noted that neither side had

3

actually asked for such a review yet, and he reasoned that the Court could always consider such a request (if timely made) in connection with the upcoming evidentiary hearing. (*Id*. at 13)

On July 11, 2024, the Court held a full-day evidentiary hearing ("hearing") regarding Plaintiffs' Motion. (D.I. 621 (hereafter, "Tr."))[1] Thereafter, the Court set a schedule for the filing of post-hearing briefs, in which the parties could raise any issues that they wished the Court to consider in making its final ruling. (D.I. 616) This briefing took place after Mr. Gitlin's deposition was taken. (*Id*.) Post-hearing briefing was completed on September 26, 2024. (D.I. 631)

## II.   DISCUSSION

The Court is cognizant that the parties have filed numerous rounds of briefing related to Plaintiffs' Motion, that it has already issued a lengthy opinion regarding that motion, and that trial is approaching. As a result, below the Court will: (1) assume knowledge of, and generally not repeat, the content of or the conclusions set out in its January 4, 2024 MO; and (2) briefly explain why it has now concluded that, in light of all of the evidence of record, Defendants have provided "a reasonable explanation of the conduct or communication[s]" at issue, and Plaintiffs have not demonstrated the applicability of the crime-fraud exception by a preponderance of the evidence, *see Am. Tobacco Co. v. State*, 697 So. 2d 1249, 1256 (Fla. Dist. Ct. App. 1997).

To start, the Court focuses on an aspect of the relevant legal standard that will be important here. As the Court has previously discussed, under Florida law, even assuming that there is sufficient evidence that a fraud was perpetrated or planned, the movant must also sufficiently demonstrate that attorney-client communications or attorney work product were used

---

[1] Herein, the Court will refer to certain exhibits introduced at the hearing with the designation "PX" or "DX."

in furtherance of that fraud. (D.I. 551 at 6-7 (citations omitted)) In their answering post-hearing brief, Plaintiffs acknowledge that this is the law. (D.I. 629 at 2) But Plaintiffs spend some time in that brief emphasizing that they can demonstrate the applicability of the crime-fraud exception even if Mr. Gitlin is not "implicated in [the crime or fraud,] or [does not] even have knowledge of[,] the alleged [criminal or] fraudulent scheme." (*Id*. at 2-3 (citing *In re Grand Jury*, 705 F.3d 133, 157 (3d Cir. 2012)) This appears to mark a change in emphasis for Plaintiffs regarding the instant motion.[2] Regardless, the Court simply notes that even the caselaw that Plaintiffs cite underscores that the exception is only applicable if the client "misuse[s] or intend[s] to misuse the attorney's advice in furtherance" of the fraud, *In re Grand Jury*, 705 F.3d at 157 (*cited in* D.I. 629 at 3), and if that advice is used to "advance" (or is intended to be use to advance) the fraud, *In re Grand Jury Subpoena*, 745 F.3d 681, 693 (3d Cir. 2014) (*cited in* D.I. 629 at 2). And as will be discussed below, here there is not only insufficient evidence to conclude that *Mr. Gitlin himself participated in* the alleged fraud, but there is also insufficient evidence to demonstrate that *Mr. Gitlin's advice was otherwise used* to further or advance such a fraud.

Below, then, the Court will focus on the "in furtherance of the fraud" element of the relevant crime-fraud exception test, explaining why it concludes that Plaintiffs have not shown, by a preponderance of the evidence, that Mr. Gitlin's own actions or legal advice helped further

---

[2] As Defendants suggest, the tone and tenor of Plaintiffs' arguments about Mr. Gitlin's participation in or relevance to the alleged fraud appears to have changed, as compared to the arguments Plaintiffs were making on that score prior to the hearing. (D.I. 631 at 1) Prior to the hearing, Plaintiffs advised the Court that they would prove that Defendants committed a "fraud in which [Mr.] Gitlin was *intimately involved*." (D.I. 272 at 18 (emphasis added)) Now, in their post-hearing answering brief, Plaintiffs are emphasizing that Mr. Gitlin need not even be "implicated" in the fraud for the exception to apply. (D.I. 629 at 2-3) In the Court's view, this change of emphasis amounts to an implicit acknowledgement by Plaintiffs that there is little current evidence of record of Mr. Gitlin either participating in the alleged fraud himself or providing advice used to further that alleged fraud.

5

the alleged fraud. And in so doing, the Court will again address Plaintiffs' crime-fraud exception arguments only as they relate to the Voss misrepresentations issue and the data room issue (and not as to the financial misrepresentations issue). (D.I. 551 at 9-10)[3] That is because, so far as the Court can tell, in their post-hearing answering brief, (D.I. 629)—i.e., the place where Plaintiffs were ordered to point to all of the "key evidence" that could possibly support their motion, (D.I. 616)—they make no reference to the financial misrepresentations issue, nor to any assertion that Mr. Gitlin's efforts or advice were used to further a fraud relating to financial misrepresentations. Thus, Plaintiffs are deemed to have abandoned any such argument. *See Bedoya v. Aventura Limousine & Transp. Serv., Inc.*, No. 11-24432-CIV, 2012 WL 1534488, *5, *10 (S.D. Fla. Apr. 30, 2012) (arguments not addressed in the post-hearing briefing were deemed abandoned); *Dentsply Int'l, Inc. v. Kerr Mfg. Co.*, 42 F. Supp. 2d 385, 418 n.16, 420 (D. Del. 1999) (same).

Having outlined the approach it will take here, the Court turns now to the merits. In doing so, below the Court will: (1) address, in a succinct fashion, any portion of the hearing testimony or exhibits presented after the January 24, 2024 MO that it deems relevant to these

---

[3] At times in their post-hearing answering brief, Plaintiffs reference another type of "fraud" that they assert relates to their crime-fraud exception argument: a "fraud by omission" of "withholding documents about Voss' incompetence and Defendants['] lack of confidence in his as CEO/President." (D.I. 629 at 10) The Court does not see how Plaintiffs clearly referenced this type of fraud in their original briefing on Plaintiffs' Motion. (D.I. 272; D.I. 286) And of course, post-hearing briefing is not the time for raising new issues not previously briefed.

In any event, to the extent that Plaintiffs raise this new issue as a way of discussing the import of a "Charvet Report," (D.I. 629 at 10), the Court does not see how that report impacts its conclusions herein, as there is no indication that Mr. Gitlin's advice or acts relate in some way to the report. (D.I. 631 at 3)

issues; and (2) explain why it concludes that, taking this evidence together and considering it along with the entire record, Plaintiffs' Motion should be denied:

- Prior to the hearing, one of the key pieces of evidence that Plaintiffs used to make out their *prima facie* showing was the declaration of their representative, Arno Leoni. (D.I. 551 at 14-15) In that declaration, Mr. Leoni stated that he and other of Plaintiffs' representatives had meetings with Pierre Ragnet, Mr. Voss *and Mr. Gitlin* in Viroflay, France in late November 2014 and in Paris, France in early December 2014—and that in those meetings, Mr. Ragnet, Mr. Voss *and Mr. Gitlin* "*each* told us that [Mr.] Voss [] was the president and chief executive officer of [SFI] in day-to-day and autonomous managerial control over [SFI]." (*Id*. at 14 (quoting D.I. 272, ex. 2 at ¶ 13) (internal quotation marks omitted) (emphasis in original)) In the January 4, 2024 MO, the Court noted that while aspects of this declaration were fairly self-serving and lacked detail, they at least amounted to *some* evidence that "not only did Defendants make the fraudulent misrepresentations/omissions at issue, but that *Mr. Gitlin* participated in doing so and/or furthered the fraud with his input." (*Id*. at 14-15 (emphasis added)) But at the hearing, Mr. Leoni testified live. And during that testimony, when addressing these Paris and Viroflay meetings, Mr. Leoni surprisingly said nothing specific about what, if anything, he had discussed with Mr. Gitlin about Mr. Voss' role during the meetings. (Tr. at 191-98, 201-05) The Court cannot emphasize enough how impactful Mr. Leoni's silence was on this topic. After all, he was the only witness to testify in person at the hearing—and the Court had already highlighted how potentially important his testimony about these meetings would be. Indeed, at the hearing's end, the Court was so surprised by Mr. Leoni's silence on this score that it questioned Plaintiffs' counsel about the matter. And even Plaintiffs' counsel acknowledged that he too was perplexed that Mr. Leoni had not spoken to the issue, since counsel had "sort of expected that answer to come out" and did not "know what was in Mr. Leoni's head today[.]" (*Id*. at 405) In the end, the fact that Mr. Leoni said essentially nothing during the hearing that was helpful to Plaintiffs' Motion about Mr. Gitlin's statements during these meetings leads the Court to infer that there *was* nothing helpful that Mr. Leoni *could* say.[4] (D.I. 624 at 6-8) And that reality significantly weakened

---

[4] The Court also notes that in Mr. Leoni's prior declaration, he stated that in November and December 2014, he "*met with Ragnet, Voss and Gitlin in Viroflay and Paris,*

7

> Plaintiffs' argument that Mr. Gitlin acted in a way that furthered any alleged fraud.
>
> - Mr. Gitlin testified that he has no memory of Mr. Leoni or other of Plaintiffs' representatives asking him about Mr. Voss' roles or responsibilities. (Gitlin Dep. at 329-31)
>
> - In the January 4, 2024 MO, the Court explained how certain record evidence strongly supported Defendants' assertion that Mr. Gitlin's work or advice did not further any fraud (i.e., by hiding Mr. Voss' true position and authority from Plaintiffs in 2014). One such document was a June 27, 2014 document titled "Special Action by Written Consent of the Board of Directors" (the "June 27 Special Action"), which Mr. Gitlin drafted, (Gitlin Dep. at 34), and placed in the data room. (D.I. 551 at 19-20). The Court noted that the June 27 Special Action, (DX-4 at ECBSAV0000533), appeared to *disclose* the fact that post-June 2014, J. M. Wild was SFI"s "*de facto* Interim Chief Executive Officer"—and that Mr. Voss no longer had full CEO authority. (D.I. 551 at 19-20) Now, in their post-hearing answering brief, Plaintiffs point out that various witnesses differ on whether, as of mid-2014, Mr. Wild actually was serving as SFI's *de facto* CEO (or otherwise helping to manage a significant part of SFI), with some appearing to say that he was, (Tr. at 41, 46-48, 58, 82, 124, 136, 155-56), and some appearing to say that he was not (and might only do so in the future if Mr. Voss left the company), (*id.* at 32-33, 325). But for our purposes, the Court will assume that Plaintiffs' view of the facts is correct, and that Mr. Wild really did hold the role of *de facto* CEO of SFI at this time. The Court's point is that the June 27 Special Action is a document that Mr. Gitlin drafted and placed in the data room that Plaintiffs would be able to access. And the document *flatly states* that Mr. Wild, as of late June 2014, was to serve as SFI's "de facto Interim Chief Executive Officer while maintaining the title of Executive Vice President[.]" (DX-4 at ECBSAV0000533) So

---

*France*[,]" respectively; Mr. Leoni stated that it was in these meetings where Mr. Gitlin and others told him that Mr. Voss "was the president and chief executive officer of [SFI] in day-to-day and autonomous managerial control over [SFI]." (D.I. 272, ex. 2 at ¶ 13 (emphasis added)) However, Defendants have now presented unrebutted evidence that Mr. Gitlin was not even present in Viroflay, France for the November 2014 meetings. Instead, Mr. Gitlin only participated in those meetings by phone, for part of the time. (D.I. 624 at 7 (citing D.I. 624, ex. 1 ("Gitlin Dep.") at 332-33); PX-22 at Zausner 000020213) It does appear that Mr. Gitlin was present in Paris for the December 2014 meetings. (Gitlin Dep. at 142)

if Plaintiffs are correct as to Mr. Wild's true role, then this document would not amount to evidence that Mr. Gitlin *furthered the fraud at issue.* It would amount to evidence of him *disclosing the very thing that Plaintiffs say Defendants were covering up* (i.e., that Mr. Wild was now *de facto* CEO, and Mr. Voss did not hold traditional CEO authority).[5] At the hearing, the Court took pains to try to understand Plaintiffs' argument as to why this document would not have had this effect. (Tr. at 390-98) Plaintiffs' counsel's response was not convincing, as it simply did not grapple with the words of the actual document at issue. (*Id.*)

- In the January 4, 2024 MO, the Court also cited another document that Mr. Gitlin had placed in the data room—a PowerPoint chart titled "Management Level Organization" regarding SFI (the "PowerPoint chart"). (DX-9 at 2) The Court explained how the chart appeared to disclose much of the actual job responsibilities of Mr. Voss and Mr. Wild that Plaintiffs say were also described in Mr. Voss' Employment Agreements, but had been kept hidden from them. (D.I. 551 at 19-21 & n.25) During the hearing, the Court asked Plaintiffs' counsel to explain why the Court's conclusion in this regard was off base. (Tr. at 400-03) Counsel's only response was to suggest that he read the PowerPoint chart as showing that "[e]very line [of authority] ends up at Alain Voss without exception." (Tr. at 401) But in the Court's view, this is simply not a fair characterization of what the chart itself actually depicts—in that the chart shows both Mr. Wild and Mr. Voss at the same level at its top, and depicts different employees reporting to each man. (DX-9 at 2) Plaintiffs' counsel's reading of the chart also contradicts the testimony of Mr. Wild as to what the chart depicts. (Tr. at 313) Then, in their post-

---

[5] In their post-hearing answering brief, Plaintiffs suggest that the fact that the June 27 Special Action uses the word "[i]nterim" has some consequence here. This argument (which the Court cannot recall Plaintiffs ever making before) is not persuasive. The word "[i]nterim" does not suggest, as Plaintiffs argue, that Mr. Wild would only become *de facto* CEO "in the event Voss left" SFI. (D.I. 629 at 12 (internal quotation marks omitted)) "Interim" does not connote that type of a meaning; it is a word that signals that a person's role exists, but will last only for some "temporary" period or "intervening time[.]" *Interim*, Black's Law Dictionary (9th ed. 2009). Indeed, during the hearing, the Court had asked Plaintiffs' counsel whether there would have been any difference, for our purposes, if the June 27 Special Action had used the phrase "de facto Chief Executive Officer" instead of "de facto Interim Chief Executive Officer[.]" (Tr. at 398) Plaintiffs' counsel replied "I'm not sure there is." (*Id.*) The Court agrees.

9

hearing briefing, Plaintiffs seemed to abandon that "every line of authority" argument. Instead, they had a new argument: i.e., that the chart is not helpful to Defendants' position because it does not contain all of the information about Mr. Voss' true role that was referenced in his Employment Agreements. (D.I. 629 at 13-14) But that is because the document is an organizational chart. The Court's point in the January 4, 2024 MO was simply that: (1) the PowerPoint chart, along with the June 27 Special Action are documents that Mr. Gitlin placed into the data room, and together they appear to disclose the core of the information that Plaintiffs say was kept hidden from them via the alleged fraud; and (2) the documents amount to good evidence that Mr. Gitlin did *not* take action to further the alleged fraud (and indeed, that he took actions to *disclose* the relevant information). The Court still does not see why those conclusions are off base.

- During the hearing, Mr. Leoni admitted to reviewing both the June 27 Special Action and the PowerPoint chart during the 2014 due diligence period and, in the case of the former, to discussing the document with his counsel. (Tr. at 226-27) Defendants also presented further evidence at the hearing that Plaintiffs' representative Claude Blandin had seen the PowerPoint chart during this period. (*Id.* at 299-301; D.I. 624 at 8-9)[6] This provides additional evidence that Plaintiffs were actually aware of the key information that they contend was withheld from them (thanks to documents that Mr. Gitlin placed in the data room). And so it further weakens Plaintiffs' arguments that Mr. Gitlin's actions or Mr. Gitlin's advice helped further a fraud here.

- During the hearing, Mr. Leoni testified that when he saw the PowerPoint chart, he asked "Mr. Ragnet and Gitlin about who Mr. Wild was" and that "[t]hey told me that he was some kind of a consultant just to help out . . . just in case [Mr.] Voss leaves the company" and that Mr. Wild was "not really important." (Tr. at 199-201) Plaintiffs mentioned this testimony repeatedly at the hearing and in their post-hearing answering brief. (*Id.* at 391-93, 395-97) The Court did not find this testimony to be compelling evidence of Mr. Gitlin's participation in the alleged fraud for a few reasons: (1) Mr. Leoni did not mention this fact in his pre-hearing declaration,

---

[6] The Court had previously noted in the January 4, 2024 MO that there was evidence that Claude Blandin had reviewed the PowerPoint chart prior to the relevant closing. (D.I. 551 at 21)

10

(D.I. 272-2); (2) Mr. Leoni's recitation of the conversation was vague, and included little factual detail (particularly as to Mr. Gitlin); and (3) at the hearing, Plaintiffs seemed to refer to this conversation as one where Mr. Ragnet made the alleged statements at issue (not Mr. Gitlin), (Tr. at 391-93, 395-97).

- In the January 4, 2024 MO, the Court noted that Plaintiffs had pointed to a few documents (including a list of "SFI—Officers and Directors" and a December 31, 2014 certificate of incumbency) that were placed in the data room (presumably by Mr. Gitlin or with his knowledge) and that listed Mr. Voss' title as President and CEO (and Mr. Wild's title as Executive Vice President)—without providing indication that Mr. Voss had been stripped of certain authority and that Mr. Wild was in fact *de facto* CEO at the time. (D.I. 551 at 15-16 & n.22) Plaintiffs again reference these documents in their post-hearing answering brief. (D.I. 629 at 5, 7; *id.*, ex. 9; *id.*, ex. 12) In the Court's view, however, the evidentiary force of these documents is limited. This is because, in addition to what the Court has already said about the documents, (D.I. 551 at 15-16 & n.22), it is difficult to suggest that their inclusion in the data room was part of a plan furthered by Mr. Gitlin to hide Mr. Wild's alleged increased role and title as *de facto* CEO—particularly when one considers that Mr. Gitlin also placed into the data room multiple documents that *did* speak to those issues (as set out above). Additionally, with regard to the certificate of incumbency, both its text and the evidentiary record indicates that the document was provided, at Plaintiffs' request, for a specific purpose: i.e., simply to confirm that the persons listed therein were authorized to execute the relevant Stock Purchase Agreement ("SPA") and other associated documents. (D.I. 629, ex. 12; Tr. at 211-15)

- In the January 4, 2024 MO, the Court discussed an October 31, 2014 e-mail from Mr. Gitlin to Mr. Voss. (D.I. 551 at 16-17, 21-22) The Court explained that in the e-mail, Mr. Gitlin: (1) notes that Mr. Voss had requested that the details of his two Employment Agreements not be shared with Plaintiffs; and (2) states that the existence of those agreements should be recognized in the SPA (which later occurred). (*Id.* at 16-17) And the Court articulated how this e-mail could be read as supporting either side's position. (*Id.* at 16-17, 21-22) The Court ultimately concluded that, in light of the entire record, the e-mail somewhat helped Defendants' position, in that it was yet another example of Mr. Gitlin promoting disclosure of information that could have shed light on Mr. Voss' alleged

11

      actual role and title. (*Id*. at 21-22)  Plaintiffs mention this e-mail again in their post-hearing answering brief.  (D.I. 629 at 8-9)  But they do not point to additional evidence about the e-mail that would alter the Court's view of its import.

- In the January 4, 2024 MO, the Court referenced an October 1, 2014 letter of intent (the "LOI") regarding SFI's sale; the LOI was signed by both Mr. Voss and Mr. Gitlin.  (D.I. 551 at 16 n.22; Tr. at 113-14; Gitlin Dep. at 129-31)  The LOI includes a statement that SFI was "owned by [ZNHC] but managed on a day-to-day basis by [Mr. Voss] . . . in his role as Company President/CEO[,]" (PX-37 at ECBUSA2511207); Plaintiffs say this was a false statement that assisted the fraud, (D.I. 629 at 5).[7]  Although there could be different interpretations as to what this portion of the LOI was meant to convey and/or did convey to a reader, the Court acknowledges that the document could help support Plaintiffs' position as to the "in furtherance of the fraud" issue.  But in light of the totality of *all* of the evidence, the document does not alter the Court's ultimate conclusion—i.e., that Plaintiffs have failed to demonstrate the applicability of the crime-fraud exception by a preponderance of the evidence.

In sum, even assuming *arguendo* that Plaintiffs could sufficiently demonstrate that Defendants participated in a fraud relating to the hiding of information about Mr. Voss' role and responsibilities at SFI as of mid-2014, Plaintiffs have not shown by a preponderance of the evidence that Mr. Gitlin's efforts or advice were used to further any such fraud.  To the contrary, to the extent that the evidence of record shows Mr. Gitlin giving advice or taking action relating to this issue, it tends to demonstrate that he advocated for or took actions supporting:  (1) disclosure of Mr. Wild's position as *de facto* CEO of SFI as of mid-2014; and (2) disclosure of the fact that Mr. Wild (and not Mr. Voss) was overseeing aspects of SFI that a CEO might typically oversee.  There is simply not enough evidence to suggest that in this complex corporate

---

[7]     Prior to the hearing, Plaintiffs had not produced a full copy of the LOI to the Court that included the page with this statement.  (D.I. 551 at 16 n.22)  The Court now has a full copy of the document.  (PX-37)

12

transaction, which involved sophisticated parties and sophisticated counsel, an attorney's advice was used to perpetrate the alleged fraud at issue.[8]

## III.   CONCLUSION

For the reasons set out above, the Court DENIES Plaintiffs' Motion.

Dated:  January 30, 2025

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

---

[8] The Court declines Plaintiffs' invitation, made in one paragraph at the end of its post-hearing answering brief, that the Court conduct an *in camera* review of over 200 documents. (D.I. 629 at 16-17)  In assessing a request for *in camera* review regarding a motion like this one, the decision to conduct such a review is within the Court's sound discretion. (D.I. 551 at 7 n.11)  Moreover, Plaintiffs' brief, three-sentence request provides no clear or detailed argument as to how such a review would assist the Court here. (D.I. 629 at 16-17; *see also* D.I. 551 at 7 n.11)  And the Court has already provided the parties with an incredible amount of judicial resources pertaining to this one Motion.  This has included permitting "eight briefs, one full-day hearing, and [the submission of] hundreds of exhibits[.]" (D.I. 631 at 1)  After all of that process, with Plaintiffs having failed to demonstrate by a preponderance of the evidence that Mr. Gitlin's advice furthered any fraud, the matter should now be closed. (D.I. 631 at 7-8 (citing cases)); *see also, e.g., Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1417 (11th Cir. 1994); *MapleWood Partners, L.P. v. Indian Harbor Ins. Co.*, 295 F.R.D. 550, 627-28 (S.D. Fla. 2013).