**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ECB USA, INC., and ATLANTIC VENTURES CORP. | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| SAVENCIA, S.A., and ZAUSNER FOODS CORP., on behalf of itself, and as a successor in interest to ZNHC, INC. | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | )    C.A. No.  19-00731 (GBW) |
| | ) |
| ZAUSNER FOODS CORP., on behalf of itself, and as a successor in interest to ZNHC, INC. | ) |
| | ) |
| | ) |
| Counterclaim Plaintiff. | ) |
| | ) |
| v. | ) |
| | ) |
| ECB USA, INC., and ATLANTIC VENTURES CORP. | ) |
| | ) |
| Counterclaim Defendants. | ) |
| | ) |

## MEMORANDUM OPINION

Thomas G. Macauley, MACAULEY LLP, Wilmington, DE; Joel S. Magolnick, John E. Kirkpatrick, MARKO & MAGOLNICK, Miami, FL – attorneys for Plaintiffs and Counterclaim Defendants.

David W. Marston Jr., Jody C. Barillare, Brian F. Morris, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, DE; Troy S. Brown, Su Jin Kim, MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, PA; Michael J. Ableson, MORGAN, LEWIS & BOCKIUS LLP, New York, NY – attorneys for Defendants and Counterclaim Plaintiffs.

February 6, 2025
Wilmington, Delaware



**WILLIAMS, U.S. DISTRICT JUDGE:**

Presently before the Court are Defendants' four summary judgment motions. (D.I. 641, 644, 647, 650). The Court has carefully reviewed the motions, Defendants' opening briefs, Plaintiffs' answering briefs, Defendants' reply briefs, and the corresponding exhibits thereto. For the reasons set forth below, Defendants' first Summary Judgement Motion (D.I. 641) is GRANTED-IN-PART and DENIED-IN-PART; Defendants' second Summary Judgment Motion (D.I. 644) is GRANTED-IN-PART and DENIED-IN-PART; Defendants' third Summary Judgment Motion (D.I. 647) is GRANTED-IN-PART and DENIED-IN-PART; and Defendant Zausner's fourth Summary Judgment Motion (D.I. 650) is DENIED.

## I.    BACKGROUND

This case centers on a turbulent corporate acquisition and the disorder that erupted after the transaction closed.

Plaintiffs ECB USA, Inc. ("ECB") and Atlantic Ventures Corp. ("Atlantic") (collectively, "Plaintiffs") are Florida corporations with principal places of business in Florida. (D.I. 147 ¶¶ 3, 4). Defendant Savencia, S.A. ("Savencia") is a French company that "manufactures and sells cheese and other dairy products in over 120 countries." (*Id.* ¶ 16). Defendant Zausner Food Corp. ("Zausner") (collectively with Savencia, "Defendants") is a Delaware corporation and a wholly owned subsidiary of Savencia.[1]

Over twenty years ago, Savencia purchased Schratter Foods Inc. ("Schratter") to develop its cheese and dairy distribution arm in the United States. (*Id.* ¶ 18). Alain Voss ("Voss") was the long-standing President and Chief Executive Officer ("CEO") of Schratter. (*Id.* ¶ 20). Voss,

---

[1]    Zausner is the successor in interest to ZNHC, Inc. ("ZNHC"). ZNHC was a Delaware corporation that merged into Zausner. ZNHC no longer exists as an entity. For the purposes of this Memorandum Opinion, any references to Zausner include ZNHC. (*See, for example,* D.I. 147 at ¶ 7 (adopting same convention)).

1

through his company, Voss Enterprises, Inc. ("VEI"), owned twenty-five percent of Schratter's shares. (*Id.*). The remaining seventy-five percent of Schratter's shares were held by Zausner until the end of June 2014. (*Id.* ¶ 21).

Plaintiffs allege that in the spring of 2014, Zausner, Savencia, and their agents, conspired to "take the steps necessary to strip Schratter of assets, to strip Voss of his corporate offices and authority, to make the necessary representations to sell Schratter at an inflated price, and to take such further action as was needed to harm Schratter, and any ultimate purchaser of Schratter, for the benefit of Savencia and its affiliates" ("the Savencia Conspiracy"). (*Id.* ¶ 38). Defendants allegedly recruited Voss and Bertrand Proust ("Proust"), Schratter's Chief Financial Officer ("CFO"), as key players in the Savencia Conspiracy. To incentivize Proust to join the Savencia Conspiracy, Zausner and Savencia agreed to pay Proust $50,000 after the completion of the planned, fraudulent sale of Schratter. (*Id.* ¶ 56). In exchange for Voss's assistance, Defendants allegedly entered into a series of agreements with Voss through which Voss would receive payments for his loyalty. (*Id.* ¶ 40). Plaintiffs allege that following agreements were made to incentivize Voss:

(a) The purchase of Voss's twenty-five percent interest in Schratter for $3 million [("the Share Purchase Agreement Fraud")];

(b) Payment of a bonus of up to an additional $1 million [. . .];

(c) Payment to Voss of twenty-five percent of the net proceeds from the sale of Corman;

(d) The transfer of Chocolate Stars, a valuable division of Schratter, to Voss for one dollar;

(e) The financing of Voss's purchase of Chocolate Stars' inventory with an unsecured loan in the amount of $676,852.97 [. . .]; and

(f) The continuation of Voss's salary of at least $400,000 per year at Schratter, together with fringe benefits, even though he had

been stripped of his duties and authority [("the Inside Man Fraud")].

(*Id.* ¶ 54 (a)-(f)).

The Savencia Conspiracy was put into action when Zausner and Savencia began negotiations with SARL Ets. Claude Blandin & Fils. ("ECB I") for the sale of Schratter in August 2014. Voss spearheaded negotiations on behalf of Zausner and Savencia, while ECB I primarily negotiated through its representatives, Arno Leoni ("Leoni"), Bruno Blandin ("B. Blandin"), and Claude Blandin ("C. Blandin"). (*Id.* ¶ 102). Throughout the diligence period, ECB I came to trust Voss and believed that he represented their interests. Plaintiffs aver that Zausner and Savencia "encouraged the ECB [I] representatives, and thereafter Plaintiffs, to accept Voss as a fiduciary," which they did. (*Id.* ¶ 76).

After a diligence period, through which both parties retained outside counsel and had access to a virtual data room ("the data room"), the parties drafted the Stock Purchase Agreement for Savencia ("the SPA"). The SPA specifically contemplated that the transaction was a Florida transaction, and included a provision that it was "to be interpreted and enforced in accordance with Florida law." (*Id.* ¶ 122). In the first step of the stock purchase, on December 5, 2014, ECB I formed ECB. (*Id.* ¶ 119). The next day, ECB and VEI signed the SPA for one hundred percent of Schratter's shares for $27 million. (*Id.*). Then, on December 9, 2014, ECB and VEI formed Atlantic, which was intended to serve as a holding company for Schratter. (*Id.* ¶ 120). Prior to closing, ECB and VEI assigned their rights in the SPA to Atlantic. Also on December 9, 2014, Voss was appointed as a director and the President of Atlantic. (*Id.* ¶ 123).

On December 31, 2014, the deal closed and Atlantic was left holding one hundred percent of Schratter's stock. (*Id.* ¶ 129). After closing, Voss remained in his position as President and CEO of Schratter and remained in his position as President and a director of Atlantic. Proust,

likewise, remained in his role at Schratter as CFO. Although the transaction was over, the trouble had just begun.

Plaintiffs allege that several of the representations and warranties in the SPA were false. For example, Schratter had non-conforming financial statements, artificially inflated accounting statements, a lack of internal controls and procedures, and was not being operated in compliance with applicable laws and regulations. (*See id.* ¶¶ 170-179). Further, Plaintiffs allege that in the three years following the transaction, Voss and Proust "'cooked the books' of Schratter to make it appear that Schratter's business was doing far better than it actually was.'" (*Id.* ¶ 160). And, lastly, Plaintiffs allege that Voss, acting on behalf of Schratter, intentionally entered into a disadvantageous distribution agreement with Savencia Cheese USA, LLC (the "Distribution Agreement Fraud").

Eventually in 2017, Atlantic and Schratter terminated Voss and Schratter terminated Proust. Once Voss and Proust were gone, Plaintiffs began "uncovering significant financial discrepancies and other fraudulent activities within Schratter." (*Id.* ¶ 165). As a result, Schratter became insolvent and was assigned to its creditors.

## II.   **PROCEDURAL POSTURE**

The Court will forego a lengthy recitation of the motions and decisions filed previously in this case. To the extent any prior motions or decisions are relevant to the present motions before the court, they may be referenced in Sections IV, V, VI or VII.

Relevant here, Plaintiffs filed their Second Amended Complaint (D.I. 147) on September 22, 2020. Plaintiffs assert the following causes of action: Count I: Breach of Contract (Plaintiffs against Zausner); Count II: Fraud (ECB against Zausner); Count III: Fraud (ECB against Savencia); Count IV: Fraud (Atlantic versus Zausner); Count V: Fraud (Atlantic against Savencia); Count VI: Aiding and Abetting a Breach of Fiduciary Duty (Plaintiffs against Zausner); Count

VII: Aiding and Abetting a Breach of Fiduciary Duty (Plaintiffs against Savencia); Count VIII: Conspiracy to Commit Breach of Fiduciary Duty (Plaintiffs against Zausner and Savencia); Count IX: Conspiracy to Commit Fraud and Constructive Fraud (Plaintiffs against Zausner and Savencia).[2]  (D.I. 147).  Plaintiffs seek compensatory, consequential, special, and punitive damages, plus costs, pre- and post-judgment interest, and any further relief the Court deems proper. (*Id.* ¶ 255).  The parties agree that Florida substantive law applies to all claims.  (*See* D.I. 135 at 22 (citations omitted); D.I. 156 at 14 n.5).

On November 22, 2024, Defendants filed a Motion for Summary Judgment on Plaintiffs' Fraud Claims (Counts II-V) ("the First Summary Judgment Motion") (D.I. 641); a Motion for Summary Judgement on Plaintiffs' Fraud-Adjacent Claims (Counts VI-IX) ("the Second Summary Judgment Motion") (D.I. 644); a Motion for Summary Judgment on the Statute of Limitations ("the Third Summary Judgment Motion") (D.I. 647); and Defendant Zausner filed a Motion for Summary Judgment on the Parties' Contract Claims ("the Fourth Summary Judgment Motion") (D.I. 650).  That same day, Defendants filed the respective opening briefs.  (D.I. 642, 645, 648, 651).  On December 6, 2024, Plaintiffs filed answering briefs in opposition to each of Defendants' summary judgment motions.  (D.I. 657, 660, 664, 667).  Defendants then filed their reply briefs on December 13, 2024 (D.I. 671, 673, 675, 677).

Pursuant to the Court's Summary Judgment Motion Ranking Procedures, the Court will review Defendants' motions for summary judgment in their numerical order, as designated by the movant Defendants.  Where the Court denies in full a summary judgment motion, the Court will

---

[2]    The Court will refer to Count I as "the Breach of Contract Claim."  The Court will refer to Counts II, III, IV, and V as "the Fraud Claims."  The Court will refer to Counts VI and VII as "the Aiding and Abetting Claims."  The Courts will refer to Counts VIII and IX as "the Conspiracy Claims."

not review any lower-ranked summary judgment motion. (*See* D.I. 656). Where the Court denies-in-part a summary judgment motion, the Court will review the next lower-ranked summary judgment motion.

## III.  **LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine issue of dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact is one that could lead a reasonable jury to find in favor of the nonmoving party." *Bletz v. Corrie*, 974 F.3d 306, 308 (3d Cir. 2020) (citation omitted). The moving party bears the burden "of demonstrating the absence of a genuine issue of material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986). A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must support its assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials" or "by showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted) (emphasis in original). The Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue."

*Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (internal quotation marks omitted). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). Accordingly, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment. *Id.* at 252.

## IV.    THE FIRST SUMMARY JUDGMENT MOTION

In the First Summary Judgment Motion, Defendants move the Court for summary judgment on Plaintiffs' Fraud Claims (Counts II through V). To succeed on their Fraud Claims, Plaintiffs must prove "(1) a false statement concerning a specific material fact;[3] (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in reliance on the representation." *Lopez-Infante v. Union Cent. Life Ins. Co.*, 809 So. 2d 13, 15 (Fla. Dist. Ct. App. 2002).

Defendants assert they are entitled to summary judgment for seven disparate reasons: (1) the independent tort doctrine bars part of Plaintiffs' Fraud Claims; (2) the SPA's merger clause, non-reliance clause, and other provisions preclude Plaintiffs' Fraud Claims; (3) Defendants were not under a duty to disclose; (4) the undisputed facts disprove the alleged Distribution Agreement

---

[3]    Florida courts have interpreted the materiality element to include material omissions. *Woods v. On Baldwin Pond, LLC*, Case No. 6:13-cv-726-Orl-41DAB, 2015 U.S. Dist. LEXIS 187790, at *5-6 (M.D. Fla. June 9, 2015) (collecting cases); *see also Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1182 (11th Cir. 2002) ("To prove a prima facie case for fraud, [plaintiff] had to produce evidence that . . . [defendants] made a false statement *or omission* of a material fact.") (emphasis added).

Fraud; (5) the undisputed facts disprove the alleged Inside Man Fraud; (6) the undisputed facts disprove the alleged Share Purchase Agreement Fraud; and (7) Plaintiffs cannot prove damages. (*See* D.I. 642). The Court will address each argument, in turn, below.

A.    **The independent tort doctrine bars part of Plaintiffs' Fraud Claims.**

First, Defendants assert that the independent tort doctrine, as a matter of law, bars Plaintiffs' Fraud Claims. (D.I. 642 at 12). Under Florida law, the independent tort doctrine prohibits a plaintiff from recasting their breach of contract claim as a tort claim. *See BluestarExpo, Inc. v. Enis*, 568 F. Supp. 3d 1332, 1353 (S.D. Fla. 2021). The independent tort doctrine is "a general principle of law that provides 'a plaintiff may not recover in tort for a contract dispute unless the tort is independent of any breach of contract.'" *Costa Invs., LLC v. Liberty Grande, LLC*, 353 So. 3d 627, 632 (Fla. Dist. Ct. App. 2022) (quoting U*n2jc Air 1, LLC v. Whittington*, 324 So. 3d 1, 3 (Fla. Dist. Ct. App. 2021)). "This principle is rooted in the notion that, when a contract is breached, the parameters of a plaintiff's claim are defined by contract law, rather than by tort law." *Id.* at 3 (internal quotation marks and citation omitted). The independent tort doctrine "only applies, however, to the parties to the contract" or to those in contractual privity with the parties to the contract. *Id.*

The Court agrees with Defendants and finds that several of Plaintiffs' Fraud Claims asserted against Defendant Zausner are barred by the independent tort doctrine. The independent tort doctrine, however, does not apply to Plaintiffs' Fraud Claims asserted against Defendant Savencia.

1.    **The Fraud Claims asserted against Defendant Savencia are not barred.**

Plaintiffs contend that the independent tort doctrine does not apply to the Fraud Claims asserted against Defendant Savencia because it was not a party to the SPA and the Breach of Contract Claim is not asserted against Defendant Savencia. (D.I. 657 at 10). Plaintiffs are correct.

The independent tort doctrine "requires contractual privity between the parties." *Spears v. SHK Consulting & Dev., Inc.*, 338 F. Supp. 3d 1272, 1279 (M.D. Fla. 2018). "Under Florida law, a plaintiff and defendant are in contractual privity if they are parties to the contract or if the plaintiff is a third-party beneficiary of the contract to which defendant is a party." *Cox v. Anesthesia Bus. Consultants*, Case No. 3:20-cv-5731-TKW-EMT, 2020 WL 12279046, 2020 U.S. Dist. LEXIS 259790, at *4 (N.D. Fla. Nov. 25, 2020). Savencia was neither a party to the SPA nor was it a third-party beneficiary of the SPA. To be considered a third-party beneficiary to the SPA, Savencia must demonstrate that the contract "was expressly for [its] benefit and one under which it clearly appears that [it] was a beneficiary." *Weimar v. Yacht Club Point Estates, Inc.*, 223 So. 2d 100, 103 (Fla. Dist. Ct. App. 1969). Savencia has not demonstrated that the SPA was expressly for its benefit or that it clearly was a beneficiary under the SPA. Although the Southern District of Florida determined that Savencia was bound by the SPA's forum selection clause, that finding did not discuss contractual privity. (*See* D.I. 55 at 13-14 (finding that non-signatory Savencia was bound by the forum selection clause of the SPA because the claims against Savencia were closely and predictably related to Plaintiffs' allegations against Zausner)). Furthermore, the explicit language of the SPA forecloses the argument that Savencia was a third-party beneficiary: "[t]his agreement shall not be construed so as to confer any right or benefit upon any Person other than the signatories to this Agreement and each of their respective successors and permitted assigns." (D.I. 653, Ex. 14, Art. XII.7 ("Binding Effect")). Therefore, the Court does not find that Savencia was in contractual privity with the parties to the SPA. Savencia may not utilize the independent tort doctrine to shield Plaintiffs' Fraud Claims in Counts III and V.

2.    **The Fraud Claims asserted against Defendant Zausner are barred.**

Defendants assert that the independent tort doctrine bars part of Plaintiffs' Fraud Claims against Defendant Zausner because several alleged misrepresentations are duplicative of those

9

underlying Plaintiffs' Breach of Contract Claim. (*See* D.I. 642 at 13-14). To illustrate their argument, Plaintiffs submit a chart showing each alleged false representation and its corresponding, respective provision in the SPA. (*Id.*). Plaintiffs contend that the Fraud Claims are not barred because the misrepresentations "were made before the parties entered the contract" and thus "constitute an independent tort." (D.I. 657 at 11). Plaintiffs, however, misunderstand the independent tort doctrine.

It is true that a "fraudulent inducement claim that alleges pre-contract misrepresentations does not altogether run afoul of the independent tort doctrine." *Yuken Corp. v. Gedcore LLC*, Case No. 22-20661-Civ-Altonaga/Torres, 2022 WL 3701233, 2022 U.S. Dist. LEXIS 154702, at *12 (S.D. Fla. June 21, 2022). Fraudulent inducement claims, generally, concern actions taken prior to a contract's formation and will require "proof of facts separate and distinct from the breach of contract." *Htp, Ltd. v. Lineas Aereas Costarricenses*, 685 So. 2d 1238, 1239 (Fla. 1996). Nevertheless, pleading a fraudulent inducement claim does not "absolve the pleader from satisfying the independent tort doctrine." *Inspirations Nev. LLC v. Med Pro Billing, Inc.*, Case No. 20-cv-60268-Strauss, 2021 WL 2156677, 2021 U.S. Dist. LEXIS 99476, at *16 (S.D. Fla. May 26, 2021). Fraudulent inducement does not amount to an independent tort where "the alleged fraudulent misrepresentations are inseparably embodied in the parties' subsequent agreement." *Hotels of Key Largo, Inc. v. Rhi Hotels*, 694 So. 2d 74, 77 (Fla. Dist. Ct. App. 1997). In other words, "[m]isrepresentations relating to the breaching party's performance of a contract do not give rise to any independent action in tort, where such misrepresentations are interwoven and indistinct from the heart of the contractual agreement." *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1316 (11th Cir. 2007) (quoting *Hotels of Key Largo, Inc*, 694 So. 2d at 78).

"Although [Plaintiffs] attempt to characterize [their] claim[s] as sounding in fraud, the factual allegations reveal nothing more than a purported breach of contract." *Kaye v. Ingenio, Filiale De Loto-Quebec, Inc.*, Case No. 13-61687-civ-Rosenbaum/Hunt, 2014 U.S Dist. LEXIS 73180, at *15 (S.D. Fla. May 29, 2014). The SPA represents and warrants that Schratter maintained accurate financial statements, industry-standard accounting practices, and lawful operations. (D.I. 653, Ex. 14, Art. III 7(a)(b), Art. III.8, Art. III.20). Plaintiffs' Fraud Claims are premised on alleged false representations that Schratter maintained accurate financial statements, industry-standard accounting practices, and lawful operations. (*See* D.I. 147 ¶ 181(h)-(n)). Therefore, "it cannot be said that [Defendant Zausner's] statements – truthful or not – are 'unrelated to the obligations under the contract.'" *Barrakuda Ltd. v. Zazaby Jewels, Inc.*, Case No. 19-23004-cv-Martinez-Otazo-Reyes, 2021 WL 2454467, 2021 U.S. Dist. LEXIS 92458, at *13 (S.D. Fla. May 14, 2021) (quoting *Island Travel & Tours, Ltd., Co. v. MYR Indep., Inc.*, 300 So. 3d 1236, 1240, at n.7 (Fla. Dist. Ct. App. 2020)). The Court views these repeated misrepresentations as "interwoven and indistinct from the heart of the [SPA]." *Hotels of Key Largo*, 694 So. 2d at 78. Accordingly, Plaintiffs' Fraud Claims in Counts II and IV that duplicate SPA provisions are barred by the independent tort doctrine.[4] (*See* D.I. 642 at 13-14 (Defendants correctly listing the duplicative fraud allegations)).

**B.    Plaintiffs' Fraud Claims are not precluded by other SPA provisions.**

Second, Defendants argue that "the merger clause, non-reliance clause, and other provisions of the SPA preclude Plaintiffs' fraud claims." (D.I. 642 at 15) (cleaned up). Plaintiffs

---

[4]    The Court's decision should not come as a total surprise to Plaintiffs. Nearly six years ago, the Southern District of Florida observed that "each misrepresentation upon which Plaintiffs' fraud claims rely is the obverse of a representation or warranty in the SPA." (D.I. 55 at 8). Similarly, two years ago, Judge Burke recommended a dismissal of "all the portions of the Fraud Claims that Defendants assert are expressly covered by enumerated representations and warranties contained in the SPA." (D.I. 185 at 41, n.30).

counter that "[e]xculpatory clauses do not provide a defense to fraud in the inducement under Florida law." (D.I. 657 at 12 (citing to *Oceanic Villas, Inc. v. Godson*, 148 Fla. 454, 459 (Fla. 1941) ("*Oceanic Villas*")). Plaintiffs are correct.

Under Florida law, it is well-established that "a claim of fraud in the inducement will not be defeated by contract clauses," such as merger clauses or non-reliance clauses, unless those provisions explicitly and specifically negate the right to bring a claim for fraud. *See Lower Fees, Inc. v. Bankrate, Inc.*, 74 So. 3d 517, 520 (Fla. Dist. Ct. App. 2011). This principle was established by the Florida Supreme Court in *Oceanic Villas*, wherein the court held that a non-reliance clause in a lease agreement did not bar a claim for fraudulent inducement. In doing so, the Florida Supreme Court explained:

> To hold that by the terms of the contract which is alleged to have been procured by fraud, the lessor could bind the lessee in such manner that lessee would be bound by the fraud of the lessor would be against the fundamental principles of law, equity, good morals, public policy and fair dealing. It is well settled that a party can not contract against liability for his own fraud. We do not mean by this, however, to hold that a contract may not be made incontestable by the terms thereof on the ground of fraud. We recognize the rule to be that fraud in the procurement of a contract is ground for rescission and cancellation of any contract unless for consideration or expediency the parties agree that the contract may not be cancelled or rescinded for such cause, and that by such special provisions of a contract it may be made incontestable on account of fraud, or for any other reason. The clause of the contract here relied on does not stipulate that the lease may not be rescinded for fraud, but it does stipulate 'and that no verbal agreements, stipulations, representations, exceptions or conditions whatsoever have been made or entered into in regard to the above described property which will in any way vary, contradict or impair the validity of this lease, or of any of the terms and conditions herein contained.

148 Fla. 454, 458-59 (internal citations omitted).

Since *Oceanic Villas*, Florida courts and the Eleventh Circuit have "construed [*Oceanic Villas*] as standing for the proposition that one can avoid a fraudulent inducement claim only by contract language which specifically and explicitly negates the right to bring such a claim." *Levitan v. Dancaescu*, 347 So. 3d 485, 490-91 (Fla. Dist. Ct. App. 2022) (internal quotation marks and citation omitted). Defendants fail to point to language in the SPA that explicitly prohibits the right to bring a claim for fraud or fraudulent inducement. Ostensibly, Defendants are unable to do so because no such provision exists. As a result, here, "[t]he existence of a merger or integration clause, which purports to make oral agreements not incorporated into the written contract unenforceable, does not affect oral representations which are alleged to have fraudulently induced a person to enter into the agreement." *Mejia v. Jurich*, 781 So. 2d 1175, 1178 (Fla. Dist. Ct. App. 2001); *see also Dyck v. Gavin*, Case No. 2021-CA-1478, 2021 Fla. Cir. LEXIS 10420, at *11 (Fla. Dist. Ct. App. Oct. 11, 2021) (collecting Florida cases establishing same). Therefore, the Court denies summary judgment on this ground.

**C.    <u>Plaintiffs may be able to prove a duty to disclose at trial.</u>**

In order to prove fraud in the inducement, Plaintiffs must establish that Defendants had a duty to disclose the allegedly omitted information because of a fiduciary or similar relationship. *See ATLC Inc. v. Broadband iTV Inc.*, Case No. 6:24-cv-212-ACC-EJK, 2024 U.S. Dist. LEXIS 231961, at *11-12 (M.D. Fla. Dec. 20, 2024) ) ("[A]n omission of material fact can support a claim of fraud in the inducement, but only if the defendant has a duty to disclose the information because of some fiduciary or other relationship of trust or confidence between the parties."). Defendants argue that they are entitled to summary judgment on the Fraud Claims because they did not have a duty to disclose information to Plaintiffs. (D.I. 642 at 19). Defendants, specifically, aver that no fiduciary duty or special relationship existed because "the parties objectively dealt with each other at arm's length, each represented by sophisticated counsel negotiating the SPA." (*Id.*).

Plaintiffs counter that Defendants had an affirmative duty to make full and complete disclosures because "[u]nder Florida law, 'where a party in an arm's length transaction undertakes to disclose information, all material facts must be disclosed.'" (D.I. 657 at 15 (quoting *White v. Grant Mason Holdings, Inc.*, 741 F. App'x 631, 636 (11th Cir. 2018)).  Plaintiffs are correct.

Generally, "when parties are dealing at arm's length, 'a fiduciary relationship does not exist because there is no duty imposed on either party to protect or benefit the other.'" *Identity Stronghold, LLC v. Zeidner*, Case. No. 8:16-cv-868-T-35AAS, 2019 WL 12338322, 2019 U.S. Dist. LEXIS 238328, at *30 (M.D. Fla. Sept. 11, 2019) (quoting *Taylor Woodrow Homes Fla., Inc., v. 4/46-A Corp.*, 850 So. 2d 536, 541 (Fla. Dist. Ct. App. 2003)).  Where, however, "a defendant undertakes to disclose some information in the context of an arm's length transaction, it must disclose all material facts." *ATLC Inc.*, 2024 U.S. Dist. LEXIS 231961 at *12.  Indeed, "[e]ven in contractual situations where a party to a transaction owes no duty to disclose facts within his knowledge or to answer inquires respecting such facts, the law is if he undertakes to do so he must disclose the whole truth." *Vokes v. Arthur Murray, Inc.*, 212 So. 2d 906, 909 (Fla. Dist. Ct. App. 1968).

Here, it is undisputed that Plaintiffs and Defendants engaged in a diligence process, during which Defendants disclosed some material facts relevant to the SPA.  Further, Defendants disclosed various pieces of material information through uploading documents to the data room.  Due to Defendants' partial disclosure of material facts and information, Defendants assumed the duty, under Florida law, to disclose all material facts and information.  Accordingly, the motion for summary judgment is denied on this ground.

**D.    Defendants are entitled to summary judgment on Plaintiffs' theory of Distribution Agreement Fraud.**

Fourth, Defendants argue that Plaintiffs cannot prove their theory of Distribution Agreement Fraud. (D.I. 642 at 24). The Distribution Agreement Fraud describes the alleged post-closing misrepresentations made by Voss to Plaintiffs about the June 2015 Distribution Agreement between Schratter and Savencia Cheese USA, LLC. (*See* D.I. 147 ¶ 34). Voss, allegedly, failed to inform Plaintiffs that the Distribution Agreement relinquished certain ten percent (10%), ten-year discount rights. (*Id.* ¶ 152; *see also* D.I. 657 at 9).

Defendants assert that Plaintiffs' Distribution Agreement Fraud theory fails because the Distribution Agreement was executed post-closing and thus does not involve misrepresentations made by Defendants Savencia or Zausner. (D.I. 642 at 24). The Court agrees with Defendants.

As a preliminary matter, Plaintiffs contend that the Court should not address Defendants' Distribution Agreement Fraud arguments because they relate to the Second Summary Judgment Motion, not the First Summary Judgment Motion. (D.I. 657 at 24). The Court, however, finds that the Distribution Agreement Fraud is relevant to Plaintiffs' Fraud Claims and the First Summary Judgment Motion. Illustratively, the Fraud Claims in Counts II through V repeatedly mention the "Savencia Conspiracy," which is defined to include the Distribution Agreement Fraud. (*See* D.I. 142 ¶¶ 36, 183(c)-(f), 191 (c)-(f), 199(c)-(f), 207(c)-(f)). Accordingly, the Court will address the argument concerning the Distribution Agreement Fraud because it relates to the Fraud Claims. *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense – *or the part of each claim* or defense—on which summary judgment is sought.") (emphasis added).

Returning to the merits, to succeed on a claim for fraud in the inducement, under Florida law, Plaintiffs must prove: (1) Defendants "misrepresented a material fact;" (2) Defendants "knew

or should have known that the statement was false;" (3) Defendants "intended that the representation would induce the plaintiff to enter into a contract or business relation;" and (4) Plaintiffs "were injured by acting in justifiable reliance on the representation." *Barnes v. Burger King Corp.*, 932 F. Supp. 1420, 1425 (S.D. Fla. 1996) (citing *Jankovich v. Bowen*, 844 Supp. 753, 747 (S.D. Fla. 1994)). As a matter of law, Plaintiffs are unable to prove the first element. Therefore, Defendants are entitled to summary judgment on Plaintiffs' theory of Distribution Agreement Fraud in Counts II, III, IV, and V.

The Distribution Agreement Fraud hinges on the alleged material mispresetnations made by Voss to Plaintiffs about the Distribution Agreement. At the time of the alleged conduct, in June 2015, Voss was serving as Schratter's CEO/President and no longer worked for Defendants Zausner or Savencia. Voss's statements about the Distribution Agreement, or lack thereof, cannot be attributed to Zausner or Savencia. Plaintiffs have not proffered any evidence to the Court demonstrating that Defendants Zausner or Savencia "misrepresented a material fact." *See Barnes*, 932 F. Supp. at 1425. As a result, Plaintiffs may not pursue their theory of Distribution Agreement Fraud in Counts II through V.

### E.   Defendants are entitled to summary judgment on Plaintiffs' theory of Share Purchase Agreement Fraud.

Fifth, Defendants assert that they are entitled to summary judgment on Plaintiffs' theory of Share Purchase Agreement Fraud. The Share Purchase Agreement Fraud refers to the alleged misrepresentations about Defendant Zausner's purchase of Voss's twenty-five percent interest in Schratter. (*See* D.I. 147 ¶¶ 103, 104, 180(g), 188(g), 196(g), 204(g)). More precisely, Plaintiffs aver that Defendants misrepresented that they purchased Voss's shares for $10 million, when the shares were purchased for less than $10 million. (*Id.*). Defendants, however, contend that Plaintiffs cannot establish that any such misrepresentation was made. Defendants assert that the

evidence clearly demonstrates that Plaintiffs were informed, multiple times, that Voss's shares were purchased for less than $10 million. The Court agrees with Defendants.

The record evidence unmistakably establishes that Plaintiffs were informed that Voss's shares were not purchased for $10 million. First, Voss informed Plaintiffs directly that his shares were purchased for less than $10 million. On November 23, 2014, via email, Voss told B. Blandin and C. Blandin that he "*wanted* a total sales price of *$10 million* for [his] shares, but [he] finally came to an agreement with the Groupe for *$7 million* (3 in cash plus the 4 which are now deducted from the purchase price)." (D.I. 653, Ex. 21) (emphasis added). Plaintiffs do not dispute the authenticity of this email, nor argue that it would otherwise constitute inadmissible evidence. And, problematically, this email directly contradicts Plaintiffs' claim that "Voss repeatedly misrepresented that [he] had been paid $10 million for [his] twenty-five percent of Schratter." (D.I. 147 ¶ 108). Voss explicitly told Plaintiff ECB that he did not receive $10 million for the shares, despite wanting that amount.

Second, the evidence demonstrates that Plaintiffs were informed that the shares were purchased for less than $10 million by their own counsel, Mintz Levin. In a November 14, 2014 diligence memorandum from Mintz Levin to Leoni and Voss, the following was disclosed:

> We understand that Mr. Voss held shares equal to approximately 25% of the outstanding equity of Schratter. The purchase price of the shares was **originally determined** to be $10 million. Schratter and Mr. Voss agreed **to reduce the purchase price** for the shares to **$7 million** and to transfer the "Chocolate Stars USA Division," a Schratter asset, for $1 plus the value of the division's third-party inventory held by that division on the date of the transfer.

(D.I. 653, Ex. 21 at 9) (emphasis added).

This email demonstrates that Plaintiffs were informed that Voss accepted a reduced purchase price of $7 million for the shares. Plaintiffs answer that the email is "hearsay and should

be disregarded"[5] and there is no evidence that the Share Purchase Agreement was uploaded into the data room. (D.I. 658 ¶ 25). Yet, even if the data room did not contain the agreement, it is undisputed that Plaintiffs' counsel, Mintz Levin, somehow acquired this information and provided it to Plaintiffs.

Simply put, Plaintiffs were informed, at least twice, that Defendants did *not* purchase Voss's shares for $10 million. Defendants did not "hide the ball."[6] The terms of the Share Purchase Agreement, including the non-cash receivables, were disclosed to Plaintiffs. Plaintiffs fail to present the Court with competing evidence that supports the claimed, alleged material misrepresentation. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (stating that to survive summary judgment, a plaintiff must "designate specific facts showing that there is a genuine issue for trial.") (internal citations and quotation marks omitted). Accordingly, Defendants are granted summary judgment on Plaintiffs' theory of Share Purchase Agreement Fraud and Plaintiffs may not pursue that theory at trial.

---

[5]     Plaintiffs do not explain why the statement in the email constitutes hearsay. Regardless, the Court does not think that the statement in the email, recapping diligence findings, is hearsay. The statement is offered to show that Plaintiffs had notice of the Share Purchase Agreement sale price. *See Miller v. Brunson Const. Co.*, 250 S.W.2d 958 (Mo. 1952) ("Where, regardless of the truth or the falsity of a statement, the fact that it has been made is relevant, the hearsay rule does not apply, but the statement may be shown. Evidence as to the making of such statement is not secondary but primary, for the statement itself may constitute a fact in issue or be circumstantially relevant as to the existence of such a fact.")

[6]     In their answering brief, Plaintiffs seemingly contradict the Second Amended Complaint and argue that Voss had received more than $10 million for his share via "$3 million cash, the Chocolate Stars division for a nominal $1 (when worth over $4 million), plus bonuses and a multi-million-dollar reduction in Schratter's purchase price to Voss in the LOI." (D.I. 657 at 22). In other words, Plaintiffs now claim that the "true value" of the purchase was for more than $10 million through assigning value to Voss's non-cash receivables. Regardless of whether Plaintiffs' theory is that Voss received less or more than $10 million for his shares, there were no misrepresentations or omissions about the receivables. Voss and Defendants disclosed the terms of the transaction, specifically noting that it was for less than $10 million cash.

**F.    Defendants are not entitled to summary judgment on Plaintiffs' theory of Inside Man Fraud.**

Sixth, Defendants move for summary judgment on Plaintiffs' theory of Inside Man Fraud. The Inside Man Fraud describes Plaintiffs' allegations that Defendants removed Voss as President and CEO of Schratter before closing, but told Plaintiffs that Voss remained as President and CEO and held Voss out to be "Schratter's trusted, knowledgeable, and effective chief, for the purpose of persuading the ECB Representatives to accept Voss as a fiduciary and to partner with him to purchase Schratter." (D.I. 147 ¶ 27; *see also* D.I. 642 at 20). Plaintiffs aver that J.M. Wild ("Wild") replaced Voss and was "secretly the de facto chief executive officer of Schratter from June 30, 2014 until December 31, 2014." (D.I. 147 ¶ 27).

Defendants' argument for summary judgment on the Inside Man Fraud claims is two-fold. First, Defendants contend that "any statements about Mr. Voss's title/role at [Schratter] could not have been material to Plaintiffs" because Plaintiffs were required to create a new employment agreement with Voss after the SPA was executed. (D.I. 642 at 20). Second, Defendants argue that there were no misrepresentations as to Voss's title or role because Defendants informed Plaintiffs of Voss's "diminished" role and power at Schratter. (*See id.* at 21 (stating that the disclosures regarding Voss "were objectively truthful and accurate.")). In response, Plaintiffs argue that Defendants fail to establish the lack of a genuine dispute of material fact and instead "depend on improper inferences derived from out-of-context snippets." (D.I. 657 at 17). Ultimately, the Court agrees with Plaintiffs.

**1.    Plaintiffs have demonstrated a genuine issue of material fact as to whether the alleged misrepresentation was material.**

As stated above, to prove their theory of Inside Man Fraud, Plaintiffs must show that Defendants made "a false statement of material fact." *Prieto v. Smook, Inc.*, 97 So. 3d 916, 917 (Fla. Dist. Ct. App. 2012) (internal quotations omitted). "A fact is material if, but for the

misrepresentation, the aggrieved party would not have entered into the contract.  Conversely, a representation is immaterial where it appears that the contract or transaction would have been entered into whether it had been made or not." *Buffalo Trump Tower One v. Trg Sunny Isles V, Ltd.*, Case No. 08-21857-civ-Jordan, 2009 WL 10667160, 2009 U.S. Dist. LEXIS 140685, at *14 (S.D. Fla. Mar. 19, 2009) (internal citation omitted).

Focusing on the materiality element, Defendants contend that Voss's role at Savencia was not material to the transaction or Plaintiffs' decision to retain Voss because Plaintiffs were required to re-negotiate Voss's employment after the deal had closed.   To support this contention, Defendants assert that C. Blandin admitted that Plaintiffs' failure to receive Voss's "employment letters" during diligence was "not an issue," "not a breaking point," and had "nothing to do with the deal" because post-closing, Plaintiffs were required to re-negotiate Voss's employment contract.  (D.I. 642 at 20 (referencing D.I. 653, Ex. 2 at 272:6-277:1 (deposition testimony of C. Blandin)).  Plaintiffs, however, provide additional context to C. Blandin's statements.  That is, C. Blandin was under the impression that the employment contracts were – unsurprisingly – employment contracts as opposed to documents that "memorialized the stripping of Voss's authority and autonomy, the installation of Wild and [Savencia's Secretary General] as senior management and Voss's subordination to them." (D.I. 657 at 19).  Phrased differently, Plaintiffs argue that C. Blandin was misled as to the content of the "employment letters" and even characterizing them as "employment letters" was and is "fraudulent."  (*Id.*).

In any case, and generally, the materiality of a misrepresentation or omission "is a jury question, unless the evidence excludes every reasonable inference except that there was or was not a material misrepresentation." *Perry v. State Farm Fire & Casualty Co.*, 734 F.2d 1441, 1444 (11th Cir. 1984).  In the present matter, a reasonable juror may conclude that Plaintiffs would not

have entered the transaction, hired, or trusted Voss had the information about his "diminished" role at Schratter in 2014 been truthfully and forthrightly disclosed. (D.I. 657 at 19; *see also id.* at 20 ("Plaintiffs partnered with Voss, took him as a fiduciary, made him their most senior officer, and paid Defendants millions of dollars.")). Indeed, Leoni stated that "but for" the misrepresentations about Voss, Plaintiffs would not have "purchased or otherwise capitalized the acquisition or operations of Schratter, nor would they have taken Voss as a trusted partner, or . . . 'retained' him as Schratter's president and CEO." (D.I. 663, Ex. 1 ¶ 102). Although Defendants respond that the Court should not over-emphasize "Leoni's self-serving Affidavit [ ] which itself cites nothing," the Court is unaware of what other evidence, aside from the testimony of Plaintiffs' representatives, that would speak to the perceived importance of Voss's role to Plaintiffs themselves. Moreover, "[c]ourts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving." *Price v. Time*, Inc., 416 F.3d 1327, 1345 (11th Cir. 2005); *see also Strickland v. Norfolk Southern Ry.*, 692 F.3d 1151, 1162 (11th Cir. 2012) ("Where a fact-finder is required to weigh a deponent's credibility, summary judgment is simply improper."). Therefore, the Court will not grant summary judgment on Plaintiffs' theory of Inside Man Fraud for a lack of materiality.

2.    **Plaintiffs have demonstrated a genuine issue of material fact as to whether Defendants misrepresented Voss's role.**

In addition to their materiality argument, Defendants argue that there is no genuine dispute of material fact that Defendants' misrepresented Voss's role at Schratter prior to closing. The Court disagrees.

Both parties concede that Plaintiffs received: (1) SFI's organizational chart (D.I. 653, Ex. 10) ("the Organizational Chart"); (2) SFI's Board's meeting minutes from June 27, 2014 (D.I. 653, Ex. 8) ("the Board Minutes"), which included a discussion about Wild's and Voss's respective

roles at SFI; and (3) minutes from a meeting of the acquisition group in October 2014 ("the October Meeting") (D.I. 653, Ex. 12) in which restrictions on Voss's authority were discussed. Defendants and Plaintiffs, however, disagree about the inferences that should be drawn from these documents.

Defendants first argue that the Organizational Chart evidences that their disclosures about Voss were "objectively truthful and accurate." (D.I. 642 at 21). The Organizational Chart shows that "Voss continued to hold the title of President/CEO, he continued to run sales and marketing, and [showed that] Wild handled back-office functions." (D.I. 167 at 9). In response, Plaintiffs argue that organizational chart conceals Voss's real role, insofar as it fails to list Wild as de facto interim CEO and lists Voss as the CEO and President. (D.I. 657 at 21 (referencing D.I. 653, Ex. 10 at 2, 9, 22)). The Organizational Chart, and any inferences gleaned therefrom, are neither dispositive as to whether Defendants' disclosed Voss's role nor as to whether Voss was truly President and CEO at that time. A reasonable juror may even read the Organizational Chart, which explicitly named Voss as CEO and President and failed to name Wild as de facto interim CEO, to negate the disclosure of their actual roles. Therefore, the organizational chart does not prove that Defendants were objectively truthful.

Separately, Defendants assert that the Board Minutes explicitly "include[ ] a disclosure of J Wild's status as the 'de facto interim CEO' of SFI during the second half of 2014, but that Voss maintained his title of President and CEO of SFI." (D.I. 642 at 20). Plaintiffs, in contrast, read the Board Minutes to state that "Wild would only serve as interim de facto CEO if Voss left" and, at that time, Voss had not yet departed SFI. (D.I. 657 at 21). Upon an independent reading of the Board Minutes, and making all reasonable inferences in Plaintiffs' favor, the Court does not find that the Board Minutes explicitly disclosed that Wild had become the de facto interim CEO. The Board Minutes state that Voss would receive an offer "to serve as the Company's President and

CEO [] until December 31 [of 2014]." (D.I. 653, Ex. 8). The Board Minutes also state that "it would be in the best interest of the Company for J.M. to Wild to serve as the Company's de facto Interim Chief Executive Officer while maintaining the title of Executive Vice President until such time as he is succeeded." (*Id.*). Drawing all reasonable inferences in Plaintiffs' favor, a reasonable juror could read the Board Minutes as stating that Voss was Schratter's President and CEO until December 31, 2014, and that Wild would serve as a replacement only if Voss departed. The Court, therefore, does not find the Board Minutes dispositive.

Third, and last, Defendants argue that notes from the October Meeting prove that Plaintiffs were aware of the restrictions placed on Voss's authority, including the requirement that Voss obtain Board approval for various actions. (D.I. 642 at 21). Plaintiffs counter that the scope of Voss's authority and the imposed Board approvals reflect "ordinary restrictions on a CEO [that had] nothing to do with the fact that Voss had been secretly stripped of all authority . . . because Defendants had concluded that [Voss] was incompetent." (D.I. 657 at 20). Plaintiffs also claim that Voss told Leoni that, notwithstanding the restrictions, "he had all the powers of Schratter's CEO/president." (*See* D.I. 663, Ex. 1 ¶ 15 (Declaration of Leoni) (internal quotation marks omitted)). Considering the parties' competing evidence, there remains a genuine dispute as to whether Plaintiffs had been informed about Voss's removal or diminished role through the October Meeting notes.

In sum, the discussion above clearly demonstrates that there remains a genuine dispute of material fact – namely, whether Defendants properly informed Plaintiffs of Voss's position and influence at Schratter in 2014. Neither party's interpretation of the evidence, viewed in either isolation or combination, is unreasonable or conjectural. Therefore, because the evidence "will permit different reasonable inferences" that are entirely conflicting, the issue "should be submitted

to the jury as a question of fact to be determined by it." *Levine v. Levine*, 648 So. 2d 1228, 1230 (Fla. Dist. Ct. App. 1995) (parenthetically, describing the holding of *Moore v. Morris*, 475 So. 2d 666 (Fla. 1985)); *see also Campbell v. Sands*, 404 So. 2d 402, 403 (Fla. Dist. Ct. App. 1981) (reversing a grant of summary judgment because "[t]he effect of the differences, the inferences arising therefrom and their materiality, were matters which should have been submitted to the trier of fact.").

### G.    **Plaintiffs can prove damages.**

Last, Defendants assert that "Plaintiffs cannot recover any damages on their fraud claims separate from any damages on their breach of contract claims." (D.I. 642 at 26). The Court finds that this argument repeats Defendants' independent tort doctrine argument, which the Court has decided in Defendants' favor, in part. *See supra* Section IV (A). To the extent Defendants seek to apply this argument to Plaintiffs' surviving Fraud Claims, they cannot. "Florida law provides for an election of remedies in fraudulent inducement cases: recission, whereby the party repudiates the transaction, or damages whereby the party ratifies the contract." *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 313 (Fla. 2000). Accordingly, Plaintiffs may "stand by [the] contract and sue for damages on the fraud." *Htp, Ltd.*, 685 So.2d at 1239; (*see also* D.I. 657 at 25).

### V.    **THE SECOND SUMMARY JUDGMENT MOTION**

In Defendants' Second Summary Judgment Motion (D.I. 644), Defendants move for summary judgment on Plaintiffs' Aiding and Abetting Claims (Counts VI and VII) and Plaintiffs' Conspiracy Claims (Count VIII and IX). (*See* D.I. 645). The Court analyzes Defendants' arguments for summary judgment below.

**A.    Defendants are entitled to summary judgment in part on the Aiding and Abetting Claims.**

In Count VI, Plaintiffs allege that Defendant Zausner aided and abetted a breach of fiduciary duty. (D.I. 147 ¶¶ 212-224). Similarly, in Count VII, Plaintiffs allege that Defendant Savencia aided and abetted a breach of fiduciary duty. (D.I. 147 ¶¶ 225-237). Collectively, the Aiding and Abetting Claims allege that Defendants "aided and abetted Voss in his breaches of fiduciaries duties through [Defendants'] scheme to induce Plaintiffs to take Voss as a fiduciary and through [Defendants'] payments to Voss and VEI for his role in breaching his fiduciary duties." (D.I. 147 ¶¶ 213, 226). Additionally, the Aiding and Abetting Claims allege that "while Proust was a fiduciary to Plaintiffs, [Defendants] knew of his status as a fiduciary and aided and abetted Proust in breaching his fiduciary duties. . .." (*Id.* ¶¶ 218, 232).

To prove aiding and abetting a breach of a fiduciary duty, Plaintiffs must establish: "1) a fiduciary duty on the part of a primary wrongdoer; 2) a breach of that fiduciary duty; 3) knowledge of the breach by the alleged aider and abettor; and 4) the aider and abettor's substantial assistance or encouragement of the wrongdoing." *Fonseca v. Taverna Imps., Inc.*, 212 So. 3d 431, 442 (Fla. Dist. App. Ct. 2017). Defendants argue that Plaintiffs cannot prove these elements at trial and urge the Court to grant summary judgment. More specifically, Defendants assert the following: (1) Plaintiffs cannot allege the existence of any fiduciary duty that Voss or Proust owed to Plaintiffs' pre-closing; (2) Plaintiffs cannot demonstrate that Voss or Proust breached any alleged fiduciary duties; and (3) Plaintiffs cannot establish that Defendants knew of the breach or that Defendant's aided and abetted any alleged breach. (D.I. 645 at 6-7). The Court addresses these arguments below.

**1.**    **There is a genuine dispute of material fact as to whether Voss owed Defendants a fiduciary duty prior to closing. There is not a genuine dispute of material fact as to whether Proust owed Defendants a fiduciary duty prior to closing.**

First, Defendants assert that Plaintiffs cannot establish that either Voss or Proust owed Plaintiffs a fiduciary duty before the transaction closed. (D.I. 645). Defendants reasoning is two-fold: (1) Plaintiff ECB and Plaintiff Atlantic lack standing to assert the existence of a fiduciary duty because they were not created as corporate entities until December 5 and 9, 2014, respectively; and (2) Voss and Proust could not have owed fiduciary duties to adverse parties in an arm's length transaction. (D.I. 645 at 14-15).

As to the first argument, Defendants are correct that Plaintiffs ECB and Atlantic were not owed fiduciary duties until on or after their respective dates of corporate formation. *See, for example, Lareños en Defensa del Patrimonio Historico, Inc. v. Municipality of Lares*, Civil No. 11-1880 (FAB), 2013 WL 4002008, 2013 U.S. Dist. LEXIS 111013, at *23-24 (D.P.R. July 18, 2013) (holding that plaintiff corporation lacked standing because "there [was] no disputed facts that plaintiff corporation did not exist at the time of events that serve as grounds for plaintiffs' claims"). Accordingly, ECB cannot claim it was owed a fiduciary duty prior to its date of corporate formation, December 5, 2014. (D.I. 147 ¶ 119). Likewise, Atlantic cannot claim a fiduciary relationship existed prior to its date of corporate formation, December 9, 2014. (D.I. 147 ¶ 120). Importantly, though, the transaction closed on December 31, 2014. (*Id.* ¶ 129). Therefore, Plaintiff ECB and Plaintiff Atlantic may allege breaches of fiduciary duties that occurred on or after their respective dates of corporate formation and prior to closing.

As to the second argument, Defendants contend that, as a matter of law, Voss nor Proust could have owed them fiduciary duties before closing because Voss and Proust were adverse parties in an arm's length transaction. Plaintiffs, however, respond that existence of an arm's

length transaction does not ipso facto bar the existence of a fiduciary relationship between adverse parties. Plaintiffs are correct.

Under Florida law, parties in an arm's length transaction do not owe each other fiduciary duties unless there is a "special relation[ship] of trust and confidence between the parties." *Asokan v. Am. Gen Ins. Co.*, 302 F. Supp. 3d 1303, 1317 (M.D. Fla. 2017); *see also Bldg. Educ. Corp. v. Ocean Bank*, 982 So. 2d 37, 40-41 (Fla. Dist. Ct. App. 2008). Existence of a special relationship, which creates an implied fiduciary duty, is "premised upon the specific factual situation surrounding the transaction and the relationship of the parties." *Capital Bank v. Mvb*, 644 So. 2d 515, 518 (Fla. Dist. Ct. App. 1994); *see also Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 842 So.2d 204, 207-08 (Fla. Dist. Ct. App. 2003). Here, there is a genuine dispute over the facts and circumstances of Plaintiffs' and Voss's relationship. Plaintiffs proffer evidence demonstrating that their representatives trusted and confided in Voss prior to closing. (*See* D.I. 663, Ex. 1 ¶ 93). Thus, the question of whether a pre-closing fiduciary relationship existed between Voss and Plaintiffs is a question of fact for the jury. *See Tiara Condo Ass'n v. Marsh, USA Inc.*, 991 F. Supp. 2d 1271, 1282-83 (S.D. Fla. 2014).

Additionally, Plaintiffs correctly contend that Voss owed Plaintiff Atlantic, and its shareholder, Plaintiff ECB, fiduciary duties from "the moment that he was appointed a president and director of Atlantic" on December 9, 2014. (D.I. 660 at 11; *see also* D.I. 147 ¶ 123). Under Florida law, "[c]orporate directors and officers owe a fiduciary obligation to the corporation and its shareholders and must act in good faith and in the best interest of the corporation." *Cohen v. Hattaway*, 595 So. 2d 105, 108 (Fla. Dist. Ct. App. 1992).[7] Likewise, under Delaware law,

---

[7] Historically, "Florida courts have looked to decisions from the courts in Delaware to interpret Florida law with respect to corporate doctrines." *Pain Reduction Concepts v. Frisbie*, Case No. 16-2010-CA-6759, 2011 Fla. Cir. LEXIS 422, at *6 (Fla. Dist. Ct. App.

corporate officers and directors owe fiduciary duties of care and loyalty to the corporation and its shareholders. *Malone v. Brincat*, 772 A.2d 5, 10 (Del. 1998). Therefore, as of December 9, 2014, Voss owed Plaintiff Atlantic and its shareholder, Plaintiff ECB, the fiduciary duties of care and loyalty. Consequently, Plaintiffs Atlantic and ECB have standing to assert a breach of that fiduciary duty for actions taken after that date.

The Court, however, is not convinced that Plaintiffs had a pre-closing fiduciary relationship with Proust. Plaintiffs fail to apprise the Court of evidence of a special relationship with Proust that existed prior to closing, and Plaintiffs do not inform the Court of the date that Proust was appointed as Chief Financial Officer of Atlantic. (*See, e.g.*, D.I. 673 at 5 (Defendants observing that "Plaintiffs' Opposition mentions [Proust] only once, and only to mischaracterize his testimony.")). This information likewise cannot be gleaned from the Second Amended Complaint. Absent evidence, the Court will not infer that a fiduciary relationship with Proust existed pre-closing.[8] *See Ardo v. Pagan*, 652 F. Supp. 3d 545 (E.D. Pa. 2023) (holding that a plaintiff who fails to respond to a defendant's summary judgment arguments concerning one defendant abandons their arguments and claims as to that particular defendant).

> **2.** **There is a genuine dispute of material fact as to whether Voss breached a fiduciary duty. There is no genuine dispute of material fact as to whether Proust breached a fiduciary duty.**

Second, Defendants assert that "with respect to the post-[c]losing time period," Plaintiffs have failed to allege or prove that either Voss or Proust breached any fiduciary duty owed to

---

June 24, 2011); *see also Foreclosure Freesearch, Inc. v. Sullivan*, 12 So. 2d 771, at n.2 (Fla. Dist. Ct. App. 2009) (" [Florida Courts] rely with confidence upon Delaware law to construe Florida corporate law. The Florida courts have relied upon Delaware corporate law to establish their own corporate doctrines.").

[8]   Of course, whenever Proust was appointed as CFO of Atlantic, he began to owe fiduciary duties to Atlantic and its shareholder, ECB. *See Hill v. Brady*, 737 So. 2d 1243 (Fla. Dist. Ct. App. 1999).

Plaintiffs. (D.I. 645 at 16). As corporate officers and directors, Voss and Proust owed the fiduciary duties of loyalty and care to Schratter, Atlantic, and its shareholder, ECB. *See Cohen*, 595 So. 2d at 108. The duty of loyalty requires that a fiduciary act in good faith and in the best interest of the corporation and its shareholders. *Taubenfeld v. Lasko*, 324 So. 3d 529, 538 (Fla. Dist. App. Ct. 2021) (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)). The duty of care requires that a fiduciary perform their job in an informed, reasoned, and prudent manner. *See In re Walt Disney Co Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005). If Voss breached either the duty of loyalty or the duty care, then Voss breached a fiduciary duty owed to Plaintiffs.

### a.   **Voss may have breached fiduciary duties owed to Plaintiffs before or after closing.**

Defendants contend that Plaintiffs have failed to allege or proffer evidence regarding how Voss breached a fiduciary duty. (*See* D.I. 645 at 16-18). In response, Plaintiffs contend that Voss breached his fiduciary duties by "perpetuat[ing] the lies that he had been CEO/President of Schratter pre-closing;" and by "relinquish[ing] the 10% discount in the Distribution Agreement by signing away valuable discounts, while misleading Plaintiffs about the real nature of the Distribution Agreement." (D.I. 660 at 14). To support the former assertion, Plaintiffs cite to evidence which could reasonably indicate that Voss intentionally withheld information about his termination. (*See* D.I. 662 ¶¶ 25- 29 (referencing D.I. 663, Exs. 4, 70 -74)). To support the latter assertion, Plaintiffs emphasize that Voss told Plaintiffs that the Distribution Agreement conformed with the discounts in the SPA, which it did not. (D.I. 663, Ex. 37 (email from Voss stating that the SPA complied with all of Plaintiffs' business expectations)). Additionally, Plaintiffs assert that Voss failed to seek board approval from Schratter, Atlantic, or ECB to enter into the Distribution Agreement. (D.I. 663, Ex. 1 ¶¶ 90-94 (Declaration of Leoni)). This evidence may

indicate to a reasonable juror that Voss breached his fiduciary duties of loyalty. Accordingly, summary judgment on this basis is inappropriate.

### b.    There is no genuine dispute of material fact that Proust breached any post-closing fiduciary duties owed to Plaintiffs.

Similarly, Defendants argue that Plaintiffs cannot demonstrate that Proust breached a fiduciary duty owed to Plaintiffs. The Court agrees with Defendants.

Plaintiffs allege that Proust breached fiduciary duties owed to Plaintiffs when he "cooked the books" of Schratter and when he "worked in concert with Voss to misreport Schratter's financial condition and conceal the frauds and other criminal activities." (D.I. 147 ¶¶ 160, 161). These allegations are incorporated in and repeated in the Aiding and Abetting Claims. (*Id.* ¶¶ 220, 223). Defendants, however, assert that Plaintiffs have failed to support the allegations that Proust "cooked the books" of Schratter or committed any other breach of fiduciary duty. (D.I. 645 at 16). In response, and instead of proffering evidence of the alleged breach, Plaintiffs seemingly abandon the allegations about Proust. Confusingly, and contrary to the pled Aiding and Abetting Claims, Plaintiffs contend that none of the allegations about Proust "[have] anything to do with the claims at issue in this action." (D.I. 660 at 15).

Plaintiffs have failed to enlighten the Court about how Proust "cooked the books," misrepresented finances, or engaged in any other breaches of his fiduciary duty. In contrast, Defendants have cited to the deposition testimony of Proust, who stated that he calculated accurate financial losses in accordance with GAAP; and that it was Plaintiffs, and not Defendants, who pressured Proust to "report [inflated] improved results." (D.I. 653, Ex. 37 at 106:21; *see also id.* at 150:7-152:1). Plaintiffs concede that Proust was never pressured to do anything fraudulent, but still do not provide the Court with evidence demonstrating that Proust breached a fiduciary duty. (D.I. 660 at 16). Consequently, the Court finds that Plaintiffs' allegations about Proust's breach

of fiduciary duty are too threadbare to meet the necessary factual support required at summary judgment. Conclusory allegations, in the absence of particulars, are "insufficient to defeat summary judgment." *Taylor v. Cherry Hill Bd. of Educ.*, 85 Fed. Appx. 836, 839 (3d Cir. 2004) (discussing summary judgment standard in a discrimination case). Therefore, the Court grants Defendants summary judgment on this issue.

> **3.** **There is a genuine dispute of material fact as to whether Defendants knew of and substantially assisted or encouraged Voss's alleged breach of fiduciary duty.**

Third, Defendants argue that neither Defendant Savencia nor Defendant Zausner substantially assisted or encouraged Voss to breach any fiduciary duty. (D.I. 645 at 11). Defendants assert there is "zero record evidence" of assistance or encouragement, and that "[d]iscovery has proven that no such compensation or anything of value was exchanged" to Voss. (*Id.* at 12). Due to this lack of evidence, Defendants aver that "Plaintiffs' aiding and abetting claim still constitutes nothing more than a mere recitation of the elements of the claim, and therefore must be dismissed." (*Id.*).

In response, Plaintiffs argue that Defendants "orally and in writing" perpetuated misrepresentations about Voss and "assisted and offered encouragement to Voss by promising him millions of dollars for his future involvement in Defendants' scheme to defraud a potential buyer of Schratter." (D.I. 660 at 16). To support their claims of encouragement, Plaintiffs argue that Defendants agreed to pay Voss $6.3 million, disguised as a payment for a shell entity, Corman, and $3 million for his twenty-five percent equity in Schratter (i.e., the Share Purchase Agreement discussed above). (D.I. 662 ¶¶ 8, 9 (referencing D.I. 663 Exs. 7, 19, 21)). Additionally, Plaintiffs contend that Defendants aided and abetted Voss's breach of fiduciary duty through having Zausner's Chief Legal Officer draft and deliver the Distribution Agreement to Voss. (D.I. 662 ¶ 33 (referencing D.I. 663, Ex. 25)).

Defendants do not dispute that they made payments to Voss or promised payments to Voss. Instead, Defendants contend that there is "no evidence of any agreement among Voss and Defendants that [these payments were] part of some larger plot to assist Voss in breaching any non-existent fiduciary to people (on behalf of non-existent entities) he had not even met yet." (D.I. 673 at 8) (emphasis excluded). Moreover, Defendants argue that, except for the $3 million paid to Voss under the Share Purchase Agreement, "there is no evidence of any payments by Defendant to Voss at any point before or after Closing." (*Id.*). Illustratively, Voss was never paid $6.3 million in connection with Corman. (*See* D.I. 653, Ex. 33). Problematically, however, Defendants do not dispute that several of their representatives were involved in discussing, drafting, and negotiating the Distribution Agreement. Rather than negating their participation, Defendants argue that the Voss did not breach his fiduciary duties by presenting Plaintiffs with the Distribution Agreement. (*See* D.I. 673 at 10 (arguing that Voss emailed C. Blandin and Leoni the draft Distribution Agreement)). In the same vein, Defendants do not dispute that they failed to disclose the terms of Voss's termination and Voss' Employment Letters to Plaintiffs. (*See* D.I. 663 Ex 1. ¶ 110 (Leoni declaring that Plaintiffs did not learn of the Employment Letters or their contents until they were produced in Discovery in July 2019). Alternatively, Defendants argue that their statements about Voss's previous employment were truthful.

Defendants do not convince the Court that they are entitled to summary judgment. Defendants attack the underlying assumptions and inferences that Plaintiffs seek to draw from the evidence, rather than attacking Plaintiffs inability to present evidence that raises a genuine dispute of material fact. The Court, however, is focused on whether evidence exists that creates a reasonable inference that Defendants substantially assisted or encouraged a potential breach of fiduciary duty, not whether an underlying breach conclusively occurred. *See Millstein v. Wells*

*Fargo Bank, N.A.*, Case No. 1:24-cv-22142, 2025 U.S. Dist. LEXIS 7875, at *68 (S.D. Fla. Jan. 15, 2025) (observing that aiding and abetting liability is "nearly universally found based on circumstantial evidence."). The Court finds that Plaintiffs have proffered some evidence that may suggest, to a reasonable juror, that Defendants affirmatively assisted or helped to conceal Voss's alleged misconduct, thereby enabling a breach of his fiduciary duties to occur. *Hines v. FiServ, Inc.*, Case No. 808-cv-2569-T-30AEP, 2010 WL 1249838, U.S. Dist. LEXIS 39896, at *10 (M.D. Fla. Mar. 25, 2010) (describing standard for "substantial assistance" in the aiding and abetting context). For example, a reasonable juror may find that Defendants played an active role in crafting the Distribution Agreement or purposely failed to provide Voss's employment letters – both of which, would enable an alleged breach of fiduciary duty to occur. As a result, the Court must allow the Aiding and Abetting Claims, as they pertain to Voss's alleged breach of fiduciary duty, to proceed.

**B.    Defendants are not entitled to summary judgment on the Conspiracy Claims.**

Next, Defendants move for summary judgment on Plaintiffs' "Conspiracy Claims" (Counts VII and IX). In Count VIII, Plaintiffs assert Conspiracy to Commit Breach of Fiduciary Duty against Defendants. (D.I. 147 ¶¶ 238- 245). In Count IX, Plaintiffs assert Conspiracy to Commit Fraud and Constructive Fraud against Defendants. (*Id.* ¶¶ 246-250). To succeed on their Conspiracy Claims, Plaintiffs must prove "(a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in furtherance of the conspiracy, and (d) damage to the plaintiff as a result of the acts performed pursuant to the conspiracy." *Walters v. Blakenship*, 931 So. 2d 137, 140 (Fla. Dist. Ct. App. 2006).

Defendants maintain that they are entitled to summary judgment on the Conspiracy Claims for two reasons: (1) Florida does not recognize an independent cause of action for civil conspiracy and because "Plaintiffs' fraud and breach of fiduciary duties claims fail, their conspiracy claims

also fail;" and (2) Plaintiffs fail to prove the requisite elements of civil conspiracy. (D.I. 645 at 18-20). The Court addresses both arguments in turn.

**1.      The Conspiracy Claims are premised on independent causes of action.**

First, Defendants assert that Plaintiffs' Conspiracy Claims may not proceed because they are not premised on a requisite underlying, independent tort. Defendants are correct that "an actionable conspiracy requires an underlying tort or wrong." *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. Dist. App. Ct. 1997); *see also Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1067 (11th Cir. 2007) ("Under Florida law, the gist of a civil conspiracy is not the conspiracy itself but the civil wrong which is done through the conspiracy which results in injury to the Plaintiff.") (internal quotation marks omitted). Defendants, however, premise their argument on the incorrect assumption that Plaintiffs have failed to establish the independent, underlying torts of fraud and breach of fiduciary duty. For the reasons previously stated in this Opinion, Plaintiffs' Inside Man Fraud and Aiding and Abetting of Breach of Fiduciary Duty claims are proceeding.[9] These alleged torts may serve as independent torts underlying Plaintiffs' Conspiracy Claims.

Nonetheless, Defendants also observe that Plaintiffs premise Count IX on an unpled constructive fraud claim. Plaintiffs do not independently assert a cause of action for constructive fraud. Plaintiffs, however, argue that they do not need to plead a claim for constructive fraud, and instead are only required to "identify" it. (*See* D.I. 660 at 22). To support their assertion, Plaintiffs cite to *Logan v. Morgan, Lewis & Bockius LLP*, 350 So.3d 404 (Fla. Dist. Ct. App. 2022) ("*Logan*"), wherein the Florida court determined that "in *pleading* conspiracy, the plaintiff must further identify an actionable underlying tort or wrong." *Id.* at 412 (emphasis added). *Logan*, however, is inapplicable here.

---

[9]      As explained above, these claims are proceeding only to the extent they relate to Voss's alleged actions. The Court has determined that Proust did not breach any fiduciary duty.

First, *Logan* resolved a motion to dismiss, and not a motion for summary judgment. Here, at summary judgment, the unpled constructive fraud issue has not been fully developed and thus the Court cannot determine that a genuine dispute of material fact exists regarding it. Second, the Court is concerned about the circumvention of proper procedure. Although, "Rule 15(b) allows parties to add unpled issues to a case if those issues have been tried with the express or implied consent of the parties," "one must comply with the notice demands of procedural due process before an unpled issue can be added." *Doe #6 v. Miami-Dade Cty.*, 974 F.3d 1333,1335 (11th Cir. 2020). Plaintiffs have neither moved to amend the Second Amended Complaint nor add the unpled issue of constructive fraud. Likewise, Defendants object firmly to the addition of this issue. (*See* D.I. 673 at 11-12). Therefore, Plaintiffs' conspiracy claim in Count IX may proceed on an underlying theory of fraud, which is pled, or the breach of a fiduciary duty, which is developed, but Count IX shall not proceed on an unpled, unexplained theory of constructive fraud.

### 2. There is a genuine dispute of material fact as to whether a civil conspiracy existed and was committed.

Also, Defendants assert that Plaintiffs are unable to prove the requisite elements of civil conspiracy. Under Florida law, the elements of a claim for civil conspiracy are: "(a) an agreement between two or more parties; (b) to do an unlawful act or to do a lawful act by unlawful means; (c) the doing of some overt act in pursuance of the conspiracy; and (d) damage to the plaintiff as a result of the acts done under the conspiracy." *Raimi*, 720 So. 2d at 1284. Defendants contend that Plaintiffs are unable to establish several of the aforementioned elements.[10] The Court disagrees.

### a. Plaintiffs may be able to prove that an agreement between two or more parties existed.

---

[10]    Defendants do not challenge the damages element. (*See* D.I. 645).

Defendants argue that Plaintiffs cannot prove the existence of a conspiracy before closing because there could not have been an agreement between "two or more parties." Defendants' argument is based on the intra-corporate conspiracy doctrine, which forecloses actionable conspiracy against a corporate entity and its agents because a corporation and its agents are considered to be one, singular "person" under the law. (D.I. 645 at 21). Plaintiffs respond that the intra-corporate conspiracy doctrine does not foreclose their pre-closing conspiracy claims due to the personal stake exception to the intra-corporate conspiracy doctrine. (D.I. 660 at 20). Plaintiffs are correct.

The intra-corporate conspiracy doctrine provides that "a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000). The logic behind the doctrine is that "just as it is not legally possible for an individual person to conspire with himself, it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself." *Id.* The intra-corporate conspiracy doctrine applies unless the corporation's employee or agent "has a personal stake in the activities that are separate and distinct from the corporation's interest." *Cedar Hills Properties Corp. v. Eastern Federal Corp.*, 575 So. 2d 673, 676 (Fla. Dist. Ct. App. 1991).[11] The personal stake exception may be asserted where the agent "acted 'in their personal interests, wholly and separately from the corporation.'" *Mancinelli v. Davis*, 217 So. 3d 1034, 1037 (Fla. Dist. Ct. App. 2017) (quoting *Microsoft Corp. v. Big Boy Distrib. LLC*, 589 F. Supp. 2d 1308, 1323 (S.D. Fla. 2008)).

---

[11]    Another exception to the intra-corporate conspiracy doctrine "manifests where separate legal entities are involved in the alleged conspiracy." *Rossi v. Darden*, Case No. 16-21199-Civ-Altonaga/O'Sullivan, 2016 U.S. Dist. LEXIS 195751, at *30 (S.D. Fla. July 19, 2016). Plaintiffs, however, have not argued that this other exception should apply. The Court, therefore, will not discuss its potential applicability.

Here, the personal stake exception applies. Prior to closing, Voss maintained an interest that was separate and distinct from the corporation's interest, and separate and distinct from his interest as an executive of the corporation. That is, "Voss had a personal stake in the conspiracy; to wit, he was purchasing Schratter with Plaintiffs." (D.I. 660 at 20). Indeed, Voss acquired 45% of Schratter for himself and was appointed as President of Atlantic and CEO/President of Schratter. These pre-closing interests were separate and distinct from Voss interests as Defendants' employee. In other words, Voss's ownership stake and his prospect of new "employment" at Schratter and Atlantic were not interests shared by Defendants' corporations. *See e.g., Orange Lake Country Club v. Reed Hein & Assocs.*, 367 F. Supp. 3d 1360, 1373 (determining that an attorney's collection of additional revenue and fees from an alleged conspirator may establish a personal stake). Therefore, the Court finds that the intra-corporate conspiracy doctrine does not, as a matter of law, bar Plaintiffs' pre-closing conspiracy claims.

**b.     Plaintiffs may be able to prove the commission of an unlawful act or a lawful act by unlawful means.**

Next, Defendants argue that there is no evidence of an "unlawful act" or a "lawful act by unlawful means." (D.I. 645 at 21). In particular, Defendants contend that "'a breach of contract is not a wrong or unlawful act cognizable under civil conspiracy.'" (*Id.* at 22 (quoting *Francois v. Hatami*, 565 F. Supp. 3d 1259, 1269 (S.D. Fla. 2021)). Plaintiffs answer that Defendants argument is "untenable" because Plaintiffs have alleged several torts. (D.I. 660 at 22). Plaintiffs are correct insofar as they have successfully alleged, and created a genuine dispute of material fact, as to whether Voss, or Defendants, committed several torts. Defendants, however, are correct that "breaching a contract is not, by itself, unlawful" for purposes of civil conspiracy. *Nat. Chem. L.P. v. Orenda Techs., Inc.*, No. 6:13-cv-1607, 2014 WL 3385046, 2014 U.S. Dist. LEXIS 92572, at *8 (M.D. Fla. July 8, 2014). Rather, a breach of contract is "simply a failure to perform as one

agreed to perform." *Id.*; *see also Cabrera v. Wright*, 516 So. 2d 95 (Fla. Dist. Ct. App., 1987). Several of the allegations underlying Count IX are premised on the breach of the SPA. (D.I. 147 ¶ 248(h)-(t)). To the extent, Plaintiffs seek to argue that the conspiratorial agreement was to breach the SPA, Plaintiffs may not do so. In contrast, if Plaintiffs seek to argue that the conspiratorial agreement was to commit fraud, they may do so.[12]

c.   **Plaintiffs may be able to prove an overt act in pursuance of the conspiracy.**

Third, Defendants argue that Plaintiffs have not produced evidence that Defendants committed an overt act in furtherance of the alleged conspiracy. (D.I. 645 at 23). The Court is unconvinced by this argument. As discussed previously in this Opinion, Plaintiffs clearly allege that Defendants took multiple overt acts in furtherance of the conspiracy. For example, Plaintiffs allege and have provided evidence which may indicate that Defendants "lied orally and in writing about Voss's role, offices, authority, competence, and autonomy," "prepared the Distribution Agreement and forwarded it to Voss for execution," and paid Voss in exchange for his participation. (D.I. 660 at 23; *see* D.I. 663, Ex. 7 (the Corman letter promising Voss payment for selling Corman); *see also id.* Ex. 25 (email from Defendants' subsidiary regarding the Distribution Agreement)). Thus, there remains a genuine dispute of material fact as to whether Defendants committed these overt acts and for what purpose.

## VI.   THE THIRD SUMMARY JUDGMENT MOTION

In Defendants' Third Summary Judgment Motion, Defendants move for summary judgment on all of Plaintiffs' claims on the grounds that all of Plaintiffs' claims are barred by the applicable three-year statute of limitations. (*See* D.I. 648 at 1). Plaintiffs filed the instant action

---

[12]   The Court believes that this is Plaintiffs' intention because Count IX is titled "Conspiracy to Commit Fraud and Constructive Fraud." (*See* D.I. 147 at 61). Plaintiffs have not alleged a conspiracy to commit breach of contract.

on October 23, 2018 (D.I. 1 Ex. 1), but Defendants argue that this was not timely because Plaintiffs were on inquiry notice of their claims prior to October 23, 2015. Defendants Savencia and Zausner previously raised this argument in their respective motions to dismiss (D.I. 82, D.I. 84), but the Court determined that Plaintiffs may be able to prove that the statute of limitations should be tolled under various theories of tolling. (*See* D.I. 135, D.I. 141, D.I. 185, D.I. 198). Now, however, on summary judgment, the Court determines that tolling does not apply to several of Plaintiffs' claims. The undisputed evidence demonstrates that Plaintiffs were on inquiry notice of the Breach of Contract Claim (Count I) and were on inquiry notice of the alleged Distribution Agreement Fraud months before October 23, 2015. Defendants are granted summary judgment on Count I. Defendants are also granted summary judgment in part on Plaintiffs' other claims that rely on Count I. Additionally, Defendants are granted summary judgment on Plaintiffs' claims and counts that rely on the theory of Distribution Agreement Fraud.

A.    **Delaware's statute of limitations applies to all of Plaintiffs' claims.**

The instant action is before the District Court in the District of Delaware. This Court maintains diversity jurisdiction over the parties. As a federal court sitting in diversity, the Court must apply the choice-of-law rules of the forum state, which is Delaware. *Pac. Emplrs. Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 431 (3d Cir. 2012). Delaware's choice-of-law rules provide that "a statute of limitations issue is procedural, not substantive in nature; thus, Delaware's own law generally determines whether an action is barred by the statute of limitations." (D.I. 135 at 24 (citing *Gavin v. Club Holdings, LLC*, Civil Action No. 15-175-RGA, 2016 WL 1298964, at *3 (D. Del. Mar. 31, 2016)).[13] In Delaware, a breach of contract claim, a fraud claim, a conspiracy claim, and an aiding and abetting claim, premised either on fraud or breach of

---

[13]    Previously, the Court analyzed the choice-of-law issue. (D.I. 135; D.I. 142). The Court finds no reason to depart from its former findings or conclusions.

fiduciary duty, have a three-year statute of limitations.   10 Del. C. § 8106.   Accordingly, Delaware's three-year statute of limitations applies to all of Plaintiffs' claims.   Absent a tolling exception, each of Plaintiffs' claims must have arisen on or after October 23, 2015 (three years prior to the date of filing) to comply with the statute of limitations.

### 1.   Claims asserted against Defendant Savencia must adhere to Delaware's statute of limitations.

As a preliminary matter, the Court must address whether Florida or Delaware law governs the applicable statute of limitations for Plaintiffs' claims against Defendant Savencia.   Although Plaintiffs concede that Delaware's three-year statute of limitations applies to claims against Defendant Zausner, Plaintiffs contend that Florida's choice-of-law rules and thus Florida's four-year statute of limitations apply to claims asserted against Defendant Savencia.   (D.I. 664 at 5, 7-9).   In contrast, Defendants assert that Delaware's choice-of-law rules and thus Delaware's three-year statute of limitations apply to claims asserted against Defendant Savencia.   Defendants are correct.

Previously, Magistrate Judge Burke, in a carefully crafted and thoroughly researched Report and Recommendation, determined that Delaware's choice-of-law rules applied to Savencia. (D.I. 135 at 23).   Magistrate Judge Burke explained that "[b]ecause this case was transferred to Delaware pursuant to the SPA's forum selection clause," the Supreme Court's decision in *Atlantic Marine Constr. Co., Inc. v. United States Dist. Court*, 571 U.S. 49 (2013) ("*Atlantic Marine*"), "unequivocally provides that Delaware's choice of law rules apply here." (D.I. 135 at 23-24).   In *Atlantic Marine*, the Supreme Court held:

> W]hen a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a §1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules [ . . .].   A federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits. *See*

> *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 494-496, 61 S.
> Ct. 1020, 85 L. Ed. 1477 (1941).

571 U.S. at 64-65. (internal quotation marks and citations omitted).

Plaintiffs, however, argue that *Atlantic Marine* does not apply here because the SPA's forum selection clause "does not apply to Savencia because it was not a party to the SPA and therefore did not contract in advance to litigate disputes in Delaware." (D.I. 664 at 8) (internal quotation marks omitted). Plaintiffs' attempt to avail the due process rights of their adversary, Defendant Savencia, is insincere and unconvincing to the Court. Indeed, as the Sixth Circuit has observed "[w]hen a non-signatory defendant, 'actively seeking the benefits provided by the forum selection clause,' invokes the clause against a signatory plaintiff, that defendant is acting as a presumptive alter ego or third-party beneficiary, and enforcement of the clause presents no problems concerning consent or due process." *Firexo, Inc. v. Firexo Grp. Ltd.*, 99 F.4th 304, 318 (6th Cir. 2024) (quoting John F. Coyle & Robin J. Effron, *Forum Selection Clauses, Non-Signatories, and Personal Jurisdiction*, 97 NOTRE DAME L. REV. 187, 209 (2021)). Instead, the Court views Plaintiffs' argument as a plea to relitigate the Southern District of Florida's transfer decision. (*See* D.I. 55). In any case, Plaintiffs' argument fails. As stated in *Atlantic Marine*:

> [A] plaintiff who files suit in violation of a forum-selection clause enjoys no such 'privilege' with respect to its choice of forum, and therefore it is entitled to no concomitant 'state-law advantages.' Not only would it be inequitable to allow the plaintiff to fasten its choice of substantive law to the venue transfer, but it would also encourage gamesmanship. Because §1404(a) should not create or multiply opportunities for forum shopping, we will not apply the *Van Dusen* rule when a transfer stems from enforcement of a forum-selection clause: The court in the contractually selected venue should not apply the law of the transferor venue to which the parties waived their right.

571 U.S. at 65-66 (internal citations omitted).

Plaintiffs also argue that the forum selection clause should not apply to claims against Defendant Savencia because the "claims against Savencia are independent of the claims against Zausner and could be maintained solely against Savencia." (D.I. 664 at 8). Not so. Plaintiffs' claims asserted against Defendant Savencia are almost identical from those asserted against Defendant Zausner. (*See* D.I. 147); *see also Horvath v. Banco Comercial Portugues, S.A.*, 461 F. Appx 61, 64 (2d Cir. 2012) (holding that a non-signatory could enforce a forum selection clause where the non-signatory was alleged to have "aided and abetted [the signatory's] breach of fiduciary duty by acting in concert with it to negligently misrepresent the nature and risks associated with certain securities that [the signatory] marketed and sold to [the plaintiff]"). Further, Plaintiffs are responsible for crafting their own case. Had Plaintiffs wanted to benefit from Florida's four-year statute of limitations, Plaintiffs could have commenced a separate action against non-signatory Defendant Savencia in Florida. The Court will not bifurcate the case and reverse the effect of the transfer through a motion for summary judgment simply because a case "*could* be maintained solely against Savencia." (D.I. 664 at 8) (emphasis added).

Thus, Plaintiffs' claims against Defendant Savencia and Defendant Zausner are subject to Delaware's three-year statute of limitations.

**B.    The Breach of Contract Claim is barred by Delaware's statute of limitations.**

First, Defendant Zausner asserts that it is entitled to summary judgment on Plaintiffs' Breach of Contract Claim (Count I) because every alleged breach "occurred outside the three-year limitations period and is time-barred." (D.I. 648 at 16). Plaintiffs respond that the Breach of Contract Claim is not time-barred because various doctrines toll the statute of limitations.[14]

---

[14]    More specifically, Plaintiffs argue that "the statute of limitations was tolled under Delaware's doctrines of inherent unknowability, fraudulent concealment, equitable tolling, rule of *Bovay*, and continuing tort." (D.I. 664 at 9).

(D.I. 664 at 9).  The Court, however, disagrees with Plaintiffs.  The Court finds that the application of tolling doctrines is inappropriate because undisputed facts demonstrate that Plaintiffs were on inquiry notice of the breach of contract.  Thus, Plaintiffs' Breach of Contract Claim against Defendant Zausner is time-barred.

1.    **The statute of limitations began to run on the closing date.**

Under Delaware law, a breach of contract claim is subject to a three-year statute of limitations.  10 Del. C. § 8106(a).  The three-year statute of limitations begins to run "'at the time the contract is broken, not at the time when actual damage results or is ascertained.'"  *Lehman Bros. Holdings, Inc. v. Kee*, 268 A.3d 178, 185 (Del. 2021) (quoting *Worrel v. Farmers' Bank of Delaware*, 430 A.2d 469, 470 (Del. 1981)).  Where a breach of contract is premised on a breach of pre-existing or contemporaneous representations and warranties, the breach occurs on the date of the contract's closing.  *GRT, Inc. v. Marathon GTF Tech., Ltd.*, Civ. Action No. 5571-CS, 2011 WL 2682898, 2011 Del. Ch. LEXIS 99, at *19 (Del. Ch. July 11, 2011).[15]  Therefore, a claim for a breach of contract, based on a breach of the contract's representations and warranties, is time-barred under Delaware law if it is filed more than three years after the contract's closing date.

2.    **The statute of limitations is not tolled because Plaintiffs were on inquiry notice prior to October 23, 2015.**

Plaintiffs maintain that "Delaware's statute of limitations does not apply under various tolling doctrines and the continuing tort doctrine."  (D.I. 664 at 9).  Plaintiffs are correct that "Delaware has many doctrines that can toll a statute of limitations."  *Leb. Cnty. Employees' Ret. Fund v. Collis*, 287 A.3d 1160, 1211 (Del. Ch. 2022).  For example, the common law doctrines of

---

[15]    Similarly, "[w]here a fraud claim alleges false representations and warranties in a purchase agreement, the fraud claim accrues at closing."  *Kilcullen v. Spectro Sci., Inc.*, C.A. No. 2018-0429-KSJM, 2019 WL 3074569, 2019 Del. Ch. LEXIS 259, at *16 (Del. Ch. July 15, 2019).

unknowable injury, continuing tort, fraudulent concealment, or equitable tolling can toll the statute of limitations past the three-year period. *Gregorovich v. E.I. DuPont De Nemours*, 602 F. Supp. 2d 511, 518-19 (D. Del. 2009) (citing to *In re Tyson Foods, Inc., Consol. S'holder Litig.*, 919 A.2d 563, 584 (Del. Ch. 2007) ("*In re Tysons Foods, Inc.*")).  Plaintiffs, however, are incorrect that any tolling doctrines apply to this case.

<strong>a.    <u>Tolling applies until a plaintiff is put on inquiry notice.</u></strong>

"Under Delaware law, inquiry notice universally limits tolling doctrines." *Collis*, 287 A.3d at 1212.  No tolling doctrine, of any sort, will toll the statute of limitations beyond the point where the plaintiff was put on inquiry notice of the underlying wrong. [16] *In re Tyson Foods*, 919 A.2d at 585.  "'Inquiry notice' requires only notice of 'facts sufficient to put a person of ordinary intelligence and prudence on inquiry, which, if pursued would lead to the discovery'" of the underlying wrong. *EBS Litig. LLC v. Barclays Global Investors, N.A.*, 304 F.3d 302, 306 (3d Cir. 2002) (quoting *Becker v. Hamada, Inc.*, 455 A.2d 353, 356 (Del. 1982)).  Inquiry notice does not "require a plaintiff to have actual knowledge of a wrong, but simply an objective awareness of the facts giving rise to the wrong." *Sunrise Ventures LLC v. Rehoboth Canal Ventures, LLC*, C.A. No. 4119-VCS, 2010 WL 363845, 2010 Del. Ch. LEXIS 22, at *27 (Del. Ch. Jan. 27 2010).

The Court evaluates a plaintiff's objective awareness by examining "whether there were 'red flags' that clearly and unmistakably would have led a prudent person of ordinary intelligence to inquire further and by determining if [a] plaintiff gained 'possession of facts sufficient to make him suspicious, or that ought to make him suspicious.'" *Banner v. Hockessin Chase, L.P.*, C.A. No. N21C-06-235 JRJ, 2022 WL 1537382, 2022 Del. Super. LEXIS 190, at *17 (Del. Super. Ct. May 12, 2022) (quoting *Coleman v. PricewaterhouseCoopers LLC*, 854 A.2d 838, 842 (Del.

---

[16]    Tolling also stops when a plaintiff receives actual notice. *See, for example, Garrison v. Town of Bethany Beach*, 131 F. Supp. 2d 585, 589-90 (D. Del. 2001).

2004). Additionally, and importantly, a plaintiff is considered to be "on inquiry notice when the information underlying plaintiff's claim is readily available." *In re Dean Witter P'ship Litig.*, Consolidated Civil Action No. 14816, 1998 WL 442456, 1998 Del. Ch. LEXIS 133, at *36 (Del. Ch. July 17, 1998) ("*In re Dean Witter*"). "Tolling doctrines will not aid a claimant who turned a blind eye to a known [or readily knowable] problem." *Barbosa v. Bob's Canine Acad., Inc.*, C.A. No. 7834-MZ, 2017 WL 2492042, 2017 Del. Ch. LEXIS 104, at *17 (Del. Ch. May 19, 2017).

### b. Plaintiffs were on inquiry notice of their breach of contract claim.

Defendants assert that undisputed facts, and Plaintiffs' admission, establish that Plaintiffs were on inquiry notice of the breach of the SPA as early as January 2015 or as late as June 2015. Under the later date, Plaintiffs were required to file the Breach of Contract Claim in or before June 2018. This action was not filed until October 23, 2018 – nearly four months after the statute of limitations expired.

Defendants point to several pieces of uncontested evidence that establish Plaintiffs were on inquiry notice of the SPA's breach: (1) a discovery of debt in violation of a covenant in the SPA; (2) a post-acquisition audit requiring a net equity adjustment of the purchase price; (3) receipt of the Distribution Agreement, which eliminated SPA-guaranteed discounts; and (4) an admission in an earlier pleading.[17] (*See* D.I. 648 at 23-25). Plaintiffs first contend that the aforementioned evidence is irrelevant because it does not show that Plaintiffs were on inquiry notice of fraud or

---

[17]     Defendants also argue that statements made in September and October 2014 to B. Blandin and C. Blandin by Pierre de Agostini ("Agostini") should have put Plaintiffs on inquiry notice of breach of the SPA. (*See* D.I. 648 at 10-11). The Court does not find this argument convincing, as the SPA was not executed until December 31, 2014. Moreover, Agostini's opinions and comments were negated by assurances Defendants and Voss gave to B. Blandin and C. Blandin. (*See* D.I. 665 ¶ 4 (stating that Voss had explained why Schratter had diminished cash) (citing to D.I. 663, Ex. 9)). Therefore, the Court will not discuss this argument further.

fraudulent concealment. (D.I. 664 at 19). Plaintiffs misunderstand the law. "Even where a defendant uses every fraudulent device at its disposal to mislead a victim or obfuscate the truth, no sanctuary from the statute will be offered to the dilatory plaintiff who was not or should not have been fooled." *In re Tyson Foods, Inc.*, 919 A.2d at 585. On this issue, inquiry notice is found if Plaintiffs have objective awareness of their underlying breach of contract claim, not their fraud claim. Second, Plaintiffs argue that the aforementioned evidence does not demonstrate inquiry notice because none of the evidence constitutes a "red flag." (D.I. 664 at 21). The Court, however, is unconvinced that the evidence does not, objectively, raise "red flags." As explained below, the undisputed evidence shows that Plaintiffs were on inquiry notice.

### i.    There is no genuine dispute of material fact that Plaintiffs were on inquiry notice in January 2015.

Defendants contend that Plaintiffs were on inquiry notice of their Breach of Contract Claim in January 2015; and, as a result, the statute of limitations cannot be tolled past January 2018. The Court agrees.

Immediately after closing, Plaintiffs discovered that Defendants, allegedly, breached the SPA's "covenants to liquidate certain indebtedness by the closing date of December 31, 2014." (D.I. 648 at 16 (referring to D.I. 653, Ex. 14 Art. VI.4 (covenant to liquidate indebtedness owed by the Company prior to the closing date)). Indeed, Leoni stated that "when [Plaintiffs] took over Schratter on *January 1, 2015*, [Plaintiffs] discovered that Defendants had failed to pay off over $4 million dollars of debt to cheese affiliates of seller *in violation of their obligation* to pay off inter-company indebtedness." (D.I. 663, Ex. 1 ¶113 (Declaration of Leoni) (emphasis added)). In other words, in January 2015, Plaintiffs discovered that a covenant in the SPA was breached.

The Court finds that a breach of one of the provisions in the SPA should have put the Plaintiffs on notice that other provisions in the SPA – particularly, those related to Schratter's

financials – may have been breached. *See Certainteed Corp. v. Celotex Corp.*, C.A. No. 471, 2005 Del. Ch. LEXIS 11, at *43 (Del. Ch. Jan. 24, 2005) (holding that a plaintiff was "duty-bound to investigate and to try to discover all of its claims against Defendant" when it discovered that at least one of the facilities it purchased was not in the warranted condition). The failure to pay off $4 million in indebtedness is a "red flag" that the company may have other significant, costly outstanding, liabilities. Not only would a reasonable person be suspicious of other possible misrepresentations, but also a reasonable person would have begun investigating the truth and accuracy of the other representations, warranties, and covenants in the SPA. *See Norman v. Elkin*, 338 F. Supp. 3d 361, 375 (D. Del. 2018) (holding that a corporation's public filings disclosing certain business practices "should have prompted investigation by [a shareholder plaintiff] into potential wrongdoing."); *see also In re Cellular Tel. P'ship Litig.*, Coordinated C.A. No. 6885-VCL, 2021 WL 4438046, 2021 Del. Ch. LEXIS 224, at *186 (Del. Ch. Sept. 28, 2021) (remarking that to show inquiry notice plaintiffs were required to identify evidence in the record which established that defendant made "departures" from the agreement).

While it is true that post-closing, Voss or Proust may have assuaged any of Plaintiffs' fears about Schratter's indebtedness, "a trusting Plaintiff still must be reasonably attentive to his interests." *In re Dean Witter*, 1998 Del. Ch. LEXIS 133, at *36; *see also Elkin*, 338 F. Supp. 3d at 378 ("[Plaintiff's] allegation that his fiduciary relationship with [Defendant] insulates him from having to investigate wrongdoing absent a 'smoking gun' is unavailing."). It is not reasonably attentive to ignore a $4 million dollar misrepresentation, or assume it was a "one off." Therefore, the Court determines that, as early as January 2015, Plaintiffs were on inquiry notice of facts underlying the Breach of Contract Claim. (*See* D.I. 147 ¶ 178 (alleging that "Zausner breached

Article VI.4 by failing to pay off, or contribute continuing equity to pay off, all inter-company indebtedness owed by Schratter.").

### ii.    There is no genuine dispute of material fact that Plaintiffs were on inquiry notice in April 2015.

In addition to the Court's finding of inquiry notice in January 2015, the Court finds that Plaintiffs were also put on inquiry notice in April 2015.[18]

Defendants contend that Plaintiffs received inquiry notice of an apparent breach of the SPA in April 2015 when Plaintiffs conducted a "post-acquisition audit." (*See* D.I. 648 at 14). In April 2015, Plaintiffs retained an outside advisor, Crowe Horwath, to perform a post-acquisition audit, which was required by the SPA. (*See* D.I. 653, Ex. 11 at 88:18-89:5 (Deposition of Leoni)). The audit revealed several red flags. (*See* D.I. 653, Ex. 59 at 9 (Letter to Zausner from Plaintiffs about the Closing Net Equity Statement sent on April 8, 2015)). Among several financial discrepancies, the audit uncovered that "there [were] issues related to the manner in which [Zausner] effectuated the payoff of the [$7,500,000] Citibank loan prior to the Closing Date," which "was to be paid off in full by [Zausner] prior to the Closing Date." (*Id.* at 8-9). More specifically, the audit alleged that "[Zausner] paid only $3,650,000 towards the pay-off of the Citibank loan; and [Zausner] caused [Schratter] to pay $3,850,000 from [Schratter's] own cash reserves." (*Id.* at 9). In light of this issue, in April 2015, Plaintiffs told Defendant Zausner that "[i]t is [Plaintiffs'] position that [Defendant Zausner's] actions *violated the spirit and intent of the Stock Purchase Agreement*." (*Id.* at 9) (emphasis added). As a result of the post-acquisition audit's findings, on June 16, 2015, Plaintiffs and Defendant Zausner executed an amendment to the SPA that reduced the deferred installment payments due from $10 million to $6.1 million.

---

[18]    Although the Court previously concluded that the "indebtedness breach" placed Plaintiffs on inquiry notice in January 2015, the Court's interest in thoroughness compels it to address an additional instance of inquiry notice.

Accordingly, the Court finds that the post-acquisition audit should have, at the very least, aroused suspicions that the SPA was breached or contained additional misrepresentations. "Although it is true that courts will not apply the statute of limitations in a way that forces litigants to file suits based merely on suspicions and fears, it equally is true that the statute of limitations begins to run, at the latest, when a plaintiff has such suspicions *and* sufficient facts to state a cause of action." *Ocimum Biosolutions (India) Ltd. v. AstraZeneca UK Ltd.*, C.A. No. N15C-08-168 AML CCLD, 2019 WL 6726836, 2019 Del. Super. LEXIS 640, at *26 (Del. Super. Ct. Dec. 4, 2019) (internal quotation marks and citation omitted). Moreover, once suspicion is aroused, Plaintiffs are "expected to act with alacrity to explore those suspicions as well as other possible instances of non-compliance." *Id.* at *26. Here, the record demonstrates that Plaintiffs believed that Defendant Zausner "violated the spirit and intent of the Stock Purchase Agreement" and could point to specific misrepresentations and discrepancies to support their claim in April 2015. (D.I 653, Ex. 59 at 9; *see also* D.I. 653, Ex. 14 at Arts. III.7, III.9, III.20, and VI.4 (SPA provisions concerning financial positioning of Schratter and payments of debts)).

In response, Plaintiffs argue that, even if their suspicions were aroused, an inquiry into a breach would not recover any evidence to support a claim for breach of contract because "the books and records of Schratter are void of documents, which would evidence the various frauds" and the books and records "were maintained in Defendants' servers." (D.I. 664 at 23). This assertion, however, is unsupported by evidence and defies logic. In fact, it was these very books and records that ultimately caused Plaintiffs to accuse Zausner of violating "the spirit and intent" of the SPA. The Court does not find that Plaintiffs' theory - unsubstantiated after discovery – raises a genuine dispute of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (holding that a nonmovant on summary judgment may not "rest upon mere allegations or

denials of his pleadings" and, instead, must produce "significantly probative evidence" supporting the existence of a genuine issue for trial). As such, the Court finds that Plaintiffs were on inquiry notice of the breach of the SPA in April 2015. Therefore, even if the Court did not find that the statute of limitations did not expire in January 2018, the statute of limitations for Plaintiffs Breach of Contract Claim expired in April 2018.

### iii.    There is no genuine dispute of material fact that Plaintiffs were on inquiry notice in June 2015.

The Court also finds that Plaintiffs were on inquiry notice of the SPA's breach on June 30, 2015.

The Breach of Contract Claim alleges that Defendant Zauner breached Article VI.9(d)(iii) of the SPA, which provided for certain discounts from foreign affiliate producers. (*See* D.I. 147 ¶ 178). Plaintiffs allege that this provision was breached when Voss executed the Distribution Agreement on June 30, 2015, which rescinded the SPA-guaranteed discounts.

On June 16, 2015, Voss emailed Plaintiffs and ECB's attorney a draft of the Distribution Agreement for review. (*See* D.I. 653, Ex. 28). Plaintiffs and Defendants agree that the emailed draft and the final Distribution Agreement were identical. (*See* D.I. 665 ¶ 27). None of Plaintiffs' representatives, however, observed that the Distribution Agreement "relinquished the valuable ten-year 10% discount contract rights that Plaintiffs had secured in the SPA." (D.I. 663, Ex. 1 ¶ 94). Notwithstanding receiving the Distribution Agreement that evidenced the SPA's breach, Plaintiffs argue that "Voss never informed Plaintiffs that the Distribution Agreement relinquished the valuable ten-year 10% discount contract rights that Plaintiffs had secured in the SPA." (D.I. 663, Ex. 1 ¶ 94). Plaintiffs also assert that Voss affirmatively misrepresented that the Distribution Agreement conformed with Plaintiffs' business expectations. (See D.I. 653, Ex. 28 (Voss stating, "I confirm that the terms and conditions are all conforming to the agreement [Plaintiffs] have made from a business point of view.")). Therefore, Plaintiffs urge the Court to find that Plaintiffs'

reliance on Voss's misrepresentation precludes inquiry notice because there was no reason to suspect that Voss's statement was inaccurate. The Court, however, cannot do so.

Importantly, Voss did not hide the Distribution Agreement. Rather, the Distribution Agreement was readily available to Plaintiffs and Plaintiffs failed to read it. Had Plaintiffs read the Distribution Agreement, which they were sent, they would have discovered that the discounts were relinquished and that the SPA was breached. The Court does not find it "too much to ask [Plaintiffs]" to "read past [Voss's] rosy forecasts and actually look at the cold, hard figures provided to them." *In re Dean Witter*, 1998 Del. Ch. LEXIS 133, at *36. Even a trusting plaintiff who relies on a fiduciary must be "reasonably attentive to his interests" and will found to be on "inquiry notice when the information underlying [their] claim is readily available." *Id.*; *see also Silverstein v. Fischer*, C.A. No. N13C-05-160 FWW, 2016 WL 3020858, 2016 Del Super. LEXIS 234, at *24 ("Although [Plaintiffs] assert that they reasonably relied on the competence and skill of professionals to act on their behalf, like in *Dean Witter*, the information regarding the [the breach] was readily available to [Plaintiffs].").

It is undisputed that the Distribution Agreement was readily available to Plaintiffs. Plaintiffs' June 26, 2015 Credit Agreement with Wells Fargo referenced the Distribution Agreement as a material contract, which disclosed the relinquished discount. (*See* D.I. 653, Ex. 30; D.I. 653, Ex. 31 at Sch. B § 2.10(5)). And, significantly, C. Blandin stated that Plaintiffs "probably [went] over the contract a few weeks after, or maybe a month after, with [Voss]." (D.I. 653, Ex.2 at 429:4-16; *see also id.* at 437:15-439:23).

As explained above, "the limitations period is tolled until such time that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued*, would lead to the discovery of the injury." *In re Dean Witter P'ship Litig.*, 1998 Del. Ch. LEXIS

133, at *38 (emphasis added). The Distribution Agreement was neither hidden nor concealed. Had Plaintiffs read the Distribution Agreement, they quickly and clearly would have discovered that the discounts were relinquished and the corresponding provision in the SPA was breached. Plaintiffs' failure to act diligently does not toll the statute of limitations.

**iv.  Plaintiffs previously admitted that they were on inquiry notice prior to October 23, 2015.**

In conjunction with the other evidence, the Court cannot ignore the admission made in Plaintiffs' original Complaint. (*See* D.I. 1, Ex. 1). There, Plaintiffs stated that "beginning in January 2015, Plaintiffs discovered that [Schratter] . . . failed to pay certain suppliers" and "in September 2015, it became clear to ECB USA that the financial condition of [Schratter] was far worse than ZNHC had represented." (D.I. 1, Ex. 1 ¶¶ 33, 40). These allegations were omitted from Plaintiffs' subsequent, amended complaints, including the Second Amended Complaint (D.I. 147). The Court had previously noted this omission and questioned Plaintiffs about why those allegations were any less relevant to the First Amended Complaint's breach of contract claim. (D.I. 136 at 7, n. 5). At the time, Plaintiffs' counsel "failed to make the Court feel *less* concerned about the viability of [that] instant motion." (*Id.*). The Court, however, did not hold Plaintiffs to their admission about the September or January 2015 discovery because the "Third Circuit has explained that when a plaintiff amends a complaint, and in doing so asserts facts that contradicts assertions the plaintiff made in an earlier complaint, the district court may not consider the content of the earlier complaint when ruling on a Rule 12(b)(6) motion to dismiss the amended complaint." (D.I. 135 at 7, n.4 (referencing *W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 172 (3d Cir. 2013)). At the summary judgment stage, however, "a district court may consider a statement or allegation in a superseded complaint as rebuttable evidence when determining whether summary judgment is proper." *Huntington Nat'l Bank*, 712 F.3d at 173.

52

Therefore, at this stage, the Court permissibly considers those factual allegations in Plaintiffs' superseded complaint. The Court finds these superseded allegations to be particularly relevant because the allegations endorse and validate Defendant Zausner's theory that Plaintiffs were on inquiry notice of the alleged breach as early as January 2015.

In conclusion, multiple sources of evidence unequivocally demonstrate that Plaintiffs were put on inquiry notice of their Breach of Contract Claim prior to October 23, 2015. Therefore, notwithstanding any asserted tolling theories, Plaintiffs are time-barred from bringing their Breach of Contract Claim in this Court. Summary Judgment on Count I is granted in favor of Defendants.

**C.**     **The Fraud Claims are partially barred by the statute of limitations.**

Under Delaware law, the statute of limitations for fraud is three years. "A fraud claim accrues, and the statute of limitations begins to run, 'at the moment of the wrongful act and not when the effects of the act are felt.'" *Kilcullen v. Spectro Sci., Inc.*, C.A. No. 2018-0429-KSJM, 2019 WL 3074569, 2019 Del. Ch. LEXIS 259, at *15 (Del. Ch. July 15, 2019) (quoting *Sunrise Ventures LLC*, 2010 Del. Ch. LEXIS 22, at *25). Additionally, "[w]here a fraud claim alleges false representations and warranties in a purchase agreement, the fraud claim accrues at closing." *Kilcullen*, 2019 Del. Ch. LEXIS 259 *at* *15.

**1.**     **Any fraud claims premised on breaches of the representations and warranties in the SPA are barred by the statute of limitations.**

As previously discussed in this Opinion, *see supra* Section IV(A), Plaintiffs assert two fraud claims against Defendant Savencia (Counts III and V). (*See* D.I. 147 at ¶¶ 188-195, 204-211). Several of the allegations in Counts III and V allege fraud based on misrepresentations in the SPA. For the reasons explained immediately above, the Court finds that Plaintiffs were on inquiry notice of the misrepresentations in the SPA on the same dates that Plaintiffs were on inquiry notice of the various alleged breaches. Indeed, when Plaintiff was aware that a

representation and warranty was breached in the SPA, Plaintiffs were equally aware that the representation or warranty was false when made. In other words, Plaintiffs were aware of the material misrepresentation on the same date that they were objectively aware of facts that contradicted such representation or warranty.

Additionally, in light of the Court's holding that Defendants are granted summary judgment on Plaintiffs' Breach of Contract Claim, the Court will re-address its findings concerning the independent tort doctrine. *See supra* Section IV (A)(c) (holding that several of Plaintiffs' fraud claims in Counts II and IV were barred by the independent tort doctrine). The Court's dismissal of Plaintiffs' Breach of Contract Claim does not provide Plaintiffs with a new opportunity to assert any breach of contract claims, disguised as fraud claims, in Counts II or IV. Like the fraud allegations based on misrepresentations in the SPA asserted against Defendant Savencia, the duplicative fraud allegations against Defendant Zausner may not proceed because they are time-barred. Plaintiffs were put on inquiry notice of the misrepresentations in the SPA on the same dates that they were put on inquiry notice of the SPA's breaches. As a result, the duplicative breach of contract claims, disguised as fraud claims, in Counts II and IV violate the statute of limitations.

In summary, Plaintiffs' fraud claims that are premised on misrepresentations made in the SPA are barred by the three-year statute of limitations. Accordingly, Defendants are entitled to partial summary judgment on the Fraud Claims (Counts II, III, IV, and V). Defendants are also entitled to partial summary judgment on the Aiding and Abetting Claims (Counts VI, VII) and the Conspiracy Claims (Counts VIII, IX), to the extent those claims rely on alleged misrepresentations in the SPA.

### 2. Plaintiffs' theory of Distribution Agreement Fraud is barred by the statute of limitations.

Additionally, the Court finds that there is no genuine dispute of material fact as to whether Plaintiffs were on inquiry notice of the alleged Distribution Agreement Fraud. The evidence demonstrates that Plaintiffs were on inquiry notice of the Distribution Agreement Fraud on June 30, 2015. Accordingly, the statute of limitations for this theory of fraud expired on June 30, 2018 and Plaintiffs' claims are time-barred.

Plaintiffs' theory of Distribution Agreement Fraud is premised on alleged misrepresentations made by Voss about the Distribution Agreement. Voss executed the Distribution Agreement on June 30, 2015. (*See* D.I. 147 ¶¶ 34, 35). Before that date, on that date, and in the days after, Plaintiffs were presented with the Distribution Agreement and were continually able to access its terms and conditions. Plaintiffs cannot, as a matter of law, claim they were not on inquiry notice of the Distribution Agreement Fraud, when the facts giving rise to that fraud were readily available to Plaintiffs. *See supra* Section VI (B)(2)(c).

Although Plaintiffs acknowledge that they received the Distribution Agreement in June, 2015, Plaintiffs argue that their reliance on Voss's statements about the Distribution Agreement was reasonable and thus precludes a finding of inquiry notice. (D.I. 664 at 24 (arguing that "Plaintiffs were entitled to rely on their fiduciary for an explanation."); *see also* D.I. 663, Ex. 37 (email from Voss stating that the Distribution Agreement's "terms and conditions are all conforming to the agreement [Plaintiffs'] made from a business point of view.")). Plaintiffs' argument, however, improperly conflates reasonable reliance with inquiry notice. This Court has previously explained:

> [G]enerally, inquiry notice and reasonable reliance do not intersect: Questions of reasonable reliance ask what information a "reasonable person would consider important in determining his choice of action in the transaction in question." *Lock v. Schreppler*, 426 A.2d 856,

860-63 (Del. Super. Ct. 1981) (citing Restatement (Second) Tort, § 538)). In contrast, questions of inquiry notice ask when a reasonable person should have been aware of the existence of a cause of action for the purpose of measuring the statute of limitations. *Wal-Mart Stores Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004) ("[T]he statute will begin to run only upon the discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts." (emphasis in original) (internal quotation marks omitted)). Thus, a finding of inquiry notice typically has no bearing on reasonable reliance because it concerns discovery of the fraud and not the actual transaction.

*Davis v. 24 Hour Fitness Worldwide, Inc.*, 75 F. Supp. 3d 635, 640 (D. Del. 2014).

Accordingly, when evaluating inquiry notice, the Court is focused on "when a reasonable person should have been aware of the existence of [the fraud]." *Id.* "The defense of fraudulent concealment [ ] does not function as a trump card on issues of due diligence and constructive knowledge." *Lenz v. Associated Inns & Restaurants Co.*, 833 F.Supp. 362, 373 (S.D.N.Y. 1993). Had Plaintiffs acted reasonably – personified through their officers, board members, and directors – they would have discovered that Voss made a misrepresentation of material fact or omitted information about the Distribution Agreement when the Distribution Agreement was sent to them by Voss. Corporate representatives are required to act with sense. They may not "blindly rely upon a misrepresentation, the falsity of which would be patent to [them] had [they] utilized [their] opportunity to make a cursory examination or investigation."[19] *Casso v. Pa. R.R. Co.*, 219 F.2d 303, 305 (3d Cir. 1955) (quoting Restatement (Second) Torts, § 541, cmt. a). Not only should Plaintiffs have conferred with their attorney, who also was sent the Distribution Agreement, but

---

[19]    The Court does not mean to imply that corporations should be distrustful of their fiduciaries, who are bound by the duties of loyalty and care. Rather, the Court seeks to emphasize that it is objectively unreasonable to rely on a fiduciary when information contradicting the fiduciary's statements is placed directly in front of the corporation.

also Plaintiffs should have read the Distribution Agreement themselves.[20]    The Court is not convinced that any reasonable juror would conclude differently.

Therefore, finding that Plaintiffs were on inquiry notice of the Distribution Agreement Fraud on June 30, 2015, the Court grants summary judgment on the parts of each of Plaintiffs fraud claims (Counts II, III, IV, and V), the Aiding and Abetting Claims (Counts VI, VII), and the Conspiracy Claims (Counts VIII, IX), that rely on the theory of Distribution Agreement Fraud.

### 3.    Plaintiffs' theory of Inside Man Fraud is not barred by the statute of limitations.

The Court does not find that Plaintiffs' claims premised on their Inside Man Fraud theory are barred by the three-year statute of limitations because there is a genuine dispute of material fact as to whether the doctrine of fraudulent concealment tolls the statute of limitations, and the evidence does not conclusively prove inquiry notice.

"Delaware law recognizes fraudulent concealment as a basis for equitable tolling."[21] *Miller v. Hudson (Estate of Miller)*, 528 Fed. Appx. 238, 240 (3d Cir. 2013).    "Under the fraudulent concealment doctrine of tolling, a plaintiff must show that a defendant knowingly acted to prevent plaintiff from learning facts or otherwise made misrepresentations intended to put plaintiff off the trail of inquiry." *Lincoln Nat'l Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 563 (D. Del. 2010)

---

[20]    This evidence also definitively negates a theory of fraudulent concealment.  Voss directly sent Plaintiffs and their attorney the Distribution Agreement.  Furthermore, the pertinent information about the Distribution Agreement was disclosed in a schedule to Plaintiffs' Wells Fargo Credit Agreement, which was likewise available to Plaintiffs.  (*See* D.I. 653, Ex. 30 (Wells Fargo Credit Agreement signed by Voss, B. Blandin, C. Blandin, Leoni, and Patrick Blandin on June 26, 2015), Ex. 31 at 43 (Schedule B to Wells Fargo Credit Agreement listing the Distribution Agreement as a "Material Contract")).

[21]    "The guiding principle behind the doctrine of equitable tolling is that the law should be used to achieve some approximation of justice rather than to perpetrate fraud." *Niehoff v. Maynard*, 299 F.3d 41, 52 (1st Cir. 2002) (analyzing the doctrine of equitable tolling under Delaware law).

(internal quotation marks and citation omitted). Here, Plaintiffs have alleged sufficient facts, with particularity, that Defendants repeatedly withheld and prevented Plaintiffs from discovering Voss's previous "employment status" and role at Schratter, which induced and perpetuated their trust and reliance on Voss as a fiduciary. *See Halpern v. Barran*, 313 A.2d 139, 143 (Del. Ch. 1973) (stating that fraudulent concealment must be plead with sufficient particularity). For example, Plaintiffs contend that they repeatedly requested that Defendants provide them with Voss's Employment Letters, which Defendants, allegedly, withheld. (*See* D.I. 663, Ex. 1 ¶¶ 108-110 (Leoni declaring that the misrepresentations were perpetuated post-closing); *id.* Ex. 71 at 199:1-20 (Deposition of Gitlin stating that Mintz Levin and Plaintiffs' other attorney requested the employment letters during due diligence); *see also id.* Ex. 77 at 156:9-12 (Wild stating that Zausner did not recall why it made the decision to not share the employment letters)). At the same time, however, Defendants provided assurances about Voss's same role. For example, at closing, Defendants received an "Incumbency Certificate" from Defendants certifying that "Alain Voss" was the "President and Chief Executive Officer." (D.I. 663, Ex. 13). This evidence may indicate to a reasonable juror that Defendants took an affirmative action to conceal the truth, and/or that Defendants made misrepresentations to prevent Plaintiffs from gaining knowledge of the facts. *Weyerhaeuser Co. v. Domtar Corp.*, 61 F. Supp. 3d 445 (D. Del. 2014) (explaining the standard for fraudulent concealment).

Additionally, and unlike the other claims discussed above, the Court does not find that Defendants were on inquiry notice of Plaintiffs' Inside Man Fraud claims before October 23, 2015. Plaintiffs claim that they did not have a reason to be suspicious of Voss or his pre-closing employment. (*See, for example,* D.I. 653, Ex. 1 ¶ 81 (Leoni declaring that "Plaintiffs had no reason to suspect that Voss was anything other than the long-term, trusted, competent, autonomous

CEO/President of Schratter.")). Indeed, it was not until July 31, 2019, that Plaintiffs received the Employment Letters or reports about Voss's alleged removal. (D.I. 666 ¶¶ 23, 24). Accordingly, drawing all inferences in Plaintiffs' favor, the Court is not persuaded that Plaintiffs were, or should have been, aware of the facts underlying their claim for Inside Man Fraud.

As a result, the Court finds that there is a genuine dispute of material fact as to whether Defendants' fraudulently concealed Voss's "role" or competence at Schratter pre-closing and post-closing. Therefore, Plaintiffs' theory of Inside Man Fraud, and any dependent claims, are not barred by the three-year statute of limitations.[22]

### D.    The continuous tort doctrine[23] is inapplicable.

Last, Plaintiffs assert that the "continuous tort doctrine tolled the statute of limitations until July 31, 2019." (D.I. 664 at 17). "Under [the continuous tort doctrine], where the wrongful conduct remains ongoing, inquiry notice does not matter, because the continuing nature of the conduct means that the claim has not yet accrued for purposes of the running of the statute." *Collis*, 287 A.3d at 1212-13. "The continuing [tort] doctrine applies in narrow and unusual factual situations where the alleged wrongful acts are so inexorably intertwined that there is but one continuing wrong." *AstraZeneca UK Ltd.*, 2019 Del. Super. LEXIS 640 at *34. This case does not present such a situation. First, where a plaintiff is able to allege a prima facie case for breach

---

[22]    The Court has determined that at least one of Plaintiffs' tolling theories applies to this claim. Therefore, it will not explore Plaintiffs' other tolling theories in this Memorandum Opinion.

[23]    The Court observes that this concept is not universally referred to as "the continuous tort doctrine." Some courts have referred to the concept as "the continuing tort doctrine," "the continuing/continuous breach doctrine," or "the continuing/continuous wrong doctrine." *See Effs v. Sony Pictures Home Entm't, Inc.*, 197 So. 3d 1243 (Fla. Dist. Ct. App. 2016) (using term "continuing tort doctrine"); *AM Gen. Holdings LLC v. Renco Group, Inc.*, C.A. No. 7639-VCS, 2016 Del. Ch. LEXIS 132 (Del. Ch. Aug. 22, 2016) (using term "continuing breach doctrine"); *In re AIG Fin. Prods. Corp.*, 660 B.R. 603 (Bankr. Del. 2024) (using term "continuing wrong doctrine.").

of contract, after a single incident, the continuous tort (or "breach") doctrine does not apply. *Id.* Second, Plaintiffs' theory of Distribution Agreement Fraud occurred at one point in time – at the moment Voss allegedly misrepresented or omitted the terms of the Distribution Agreement. The alleged harm caused by the loss of the discounts and Voss's fraud, could be determined on the date the Distribution Agreement was executed. *See, e.g., Kerns v. Duke*, C.A. No. 1999-S Class Action, 2004 Del. Ch. LEXIS 36, at *20 (Del. Ch. Apr. 2, 2004) (explaining that "[w]here suit can be brought immediately and complete and adequate relief is available, a cause of action cannot be tolled as a continuing violation."). Thus, the continuous tort doctrine is not applicable in the circumstances of this case and the Court's finding of inquiry notice as to Plaintiffs' Breach of Contract Claim and Plaintiffs' theory of Distribution Agreement Fraud stands.

## VII.   THE FOURTH SUMMARY JUDGMENT MOTION

Last, Defendant Zausner seeks summary judgment on Plaintiffs' Breach of Contract Claim (Count I). (D.I. 650). In its opening brief, Defendant Zausner asserts that "[t]here is no evidence from which a reasonable finder of fact could conclude Zausner committed a breach of contract." (D.I. 651 at 9). The Court, however, has determined that Defendant Zausner is entitled to summary judgment on Plaintiffs' Breach of Contract Claim because Plaintiffs failed to adhere to Delaware's three-year statute of limitations. *See supra* Section VI (B)(2). Therefore, the Fourth Summary Judgment Motion is denied as moot.

## VIII.   CONCLUSION

For the reasons explained above, the Court grants-in-part and denies-in-part Defendants' First Summary Judgment Motion (D.I. 641), grants-in-part and denies-in-part Defendants' Second Summary Judgment Motion (D.I. 644), grants-in-part and denies-in-part Defendants' Third Summary Judgment Motion (D.I. 647); and denies as moot Defendant Zausner's Fourth Summary Judgment Motion (D.I. 650).

As a result of the Court's findings, Defendants are granted summary judgment on Count I of Plaintiffs' Second Amended Complaint. Defendants also are granted summary judgment in part on Counts II, III, IV, V, VI, VII, VIII, and IX of the Second Amended Complaint to the extent those claims are premised on Count I or on Plaintiffs' theories of Share Purchase Agreement Fraud and/or Distribution Agreement Fraud. Plaintiffs' theories of Share Purchase Agreement Fraud and Distribution Agreement Fraud, any related breach of fiduciary duty stemming from those fraud theories, and those theories' role as underlying independent torts for Plaintiffs' Aiding and Abetting Claims or Conspiracy Claims shall not proceed to trial and are decided in favor of Defendants by way of summary judgment. Counts II, III, IV, V, VI, VII, VIII, and IX of the Second Amended Complaint survive to the extent they rely on Plaintiffs' theory of Inside Man Fraud. That theory of fraud, any related breach of fiduciary duty stemming from that fraud, and its role as an underlying independent tort for Plaintiffs' Aiding and Abetting Claims or Conspiracy Claims may proceed to trial.

The Court will enter an Order consistent with the findings and rulings contained in this Memorandum Opinion.